# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RYAN NOAH SHAPIRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-CV-313-BAH |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SECOND DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia. I have held this position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 274 employees who staff a total of ten (10) FBIHQ units and two field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to

requests for access to FBI records and information pursuant to the FOIA, as amended by the

OPEN Government ACT of 2007; the Privacy Act of 1974; Executive Order 13526; Presidential,

Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and

Congressional directives. The statements contained in this declaration are based upon my

personal knowledge, upon information provided to me in my official capacity, and upon

conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of

the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am

aware of the FBI's handling of the approximately 491 FOIA requests plaintiff has submitted to

the FBI from 2005 to the present, including those requests that are represented by the 81 FOIA

request numbers identified by plaintiff in his First Amended Complaint. *See* Docket ("Dkt.")

No. 13.

(4)    This is my second declaration in this case, and it supplements and incorporates by

reference the information previously provided by me in my declaration of May 15, 2012. *See*

Dkt. No. 9-1 (hereinafter "First Hardy Decl."). This declaration is submitted in support of the

FBI's motion for an *Open America* Stay, which the FBI seeks in order to allow it adequate time

to properly address and process plaintiff's numerous FOIA requests, which involve

approximately 349,000 pages responsive to the subjects of this case alone. In order to provide

the Court and plaintiff with a fulsome explanation of the bases for the requested stay that the FBI

seeks, this declaration provides an overview of the FBI's efforts to respond to FOIA requests

generally and to plaintiff's FOIA requests in particular.

## CORRESPONDENCE RELATED TO PLAINTIFF'S FOIA REQUESTS

(5)    The FBI has attached a table that lists the 81 FBI FOIA request numbers[1]

identified by plaintiff in his First Amended Complaint, and details the dates of the requests, the

FBI's acknowledgment and/or response letters, the nature of the FBI's substantive response (if

any), and the dates and outcomes of any appeals to the U.S. Department of Justice, Office of

Information Policy ("OIP"), which adjudicates administrative FOIA appeals of the FBI's

processing of FOIA/Privacy Act requests. *See* **Exhibit A**.

## HOW A FOIA REQUEST IS PROCESSED IN RIDS

(6)    In order to best place into context the time the FBI needs to complete processing

the FOIA requests at issue in this lawsuit, it is useful to have an understanding of both the

organization and magnitude of the FBI's FOIA/Privacy Act program. As discussed more fully

below, RIDS handles over 17,000 FOIA and Privacy Act requests annually, and has an average

of 117 FOIA cases in litigation nationwide on any given day. RIDS must carefully balance

multiple competing demands to ensure the best use of finite resources. A FOIA/Privacy Act

request to the FBI passes through a series of separate, discreet phases in RIDS: (1) initially

receiving and perfecting the request; (2) searching for and collecting potentially responsive

material; (3) scoping the material for responsiveness; (4) classification or declassification review

if needed; and (5) processing responsive material for release. RIDS must undertake these steps

sequentially, as access to the information must be controlled to ensure its integrity. While the

storage and movement of material at each of these steps is facilitated by the FBI's electronic

---

[1]    In my previous declaration, I noted that as of April 3, 2012, plaintiff had filed nearly 480 FOIA requests with the FBI. Since April 3, 2012, plaintiff has filed an additional 11 requests related to animal rights extremism. Thus, these 81 FOIA request numbers represent only a small portion of the plaintiff's prolific FOIA request activity with the FBI. If plaintiff's request activity to date is any guide, this Court will also face additional burdens: To the extent plaintiff initiates further litigation arising out of FOIA requests to the FBI, those requests will presumably be designated as related cases to the actions already pending before this Court.

FOIPA Data Processing System ("FDPS"), the vast bulk of the work on a FOIA/Privacy Act request, whether at the administrative stage or in litigation, still requires action by an individual analyst who must conduct a page-by-page, line-by-line, word-by-word review in order to determine whether the material ultimately can be released.

(7)     In executing its mission to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information, RIDS engages in rigorous program and policy management of research, review, analysis, processing, and classification/declassification work related to the FOIA, as amended by the Open Government Act of 2007 and the Open FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. RIDS also provides pre-publication review of material written by current and/or former FBI employees concerning FBI matters, as mandated by the FBI's employment agreement; and executes the FBI's historic declassification program. RIDS currently employs 274 personnel, most of whom are Legal Administrative Specialists ("LASs"), who are assigned among ten (10) units within RIDS in Winchester, Virginia, and two (2) operational service centers located in Savannah, Georgia and Butte, Montana, respectively, and are further subdivided into the following units: one (1) Work Process Unit ("WPU"), three (3) Classification Units ("CU"), five (5) FOIPA Disclosure Units, and one (1) Litigation Support Unit ("LSU"). A brief functional description of each of these units follows.

(a)     Work Process Unit:

(i)     The Work Process Unit ("WPU") is responsible for reviewing and sorting all correspondence/incoming requests for information from the public, Congress, Presidential Libraries, foreign governments, other federal and state agencies. and other FBI

4

entities (*e.g.*, FBI field offices and Legal Attaché offices). WPU handles various initial tasks required to "perfect" a FOIA/Privacy Act request, including sending letters to acknowledge requests, advising requesters to provide identifying data so that accurate records searches can be made and/or to submit notarized signatures/Privacy Act waivers, and notifying requesters when no responsive records are located. WPU opens new requests, assigns them a FOIA/Privacy Act ("FOIPA") request number, and enters the perfected requests into FDPS. WPU conducts searches of the general indices for identifiable records,[2] confirms responsive documents, stamps files for retention, addresses fee issues (other than fee waiver reviews), retrieves and forwards files for scanning into FDPS, responds to status inquiries, and maintains requests prior to their transfer to a FOIPA Disclosure Unit. WPU is also responsible for preparing "perfected" requests for eventual transfer to one of the FOIPA Disclosure Units. RIDS considers a request as "perfected" when it has completed all administrative tasks and has collected and scanned in all responsive documents into FDPS.

      (ii)      Once a request has been perfected, WPU sends it to the "perfected backlog" for assignment to a FOIPA Disclosure Unit for processing. The FBI uses a three-queue system as a way to fairly assign and process new requests.[3] This "multi-track" processing system sorts requests based on the amount of time and work involved in handling a particular request.[4] In order to ensure fairness to all requesters and to equitably administer the deluge of

---

[2] At times, when RIDS's standard search of the general indices does not produce anticipated results, WPU drafts an electronic communication ("EC"), directs it to those divisions most likely to maintain potentially responsive material, and asks those divisions to search for records and provide any results to WPU within a specified period of time. Searches that involve this level of coordination with other divisions are far more complex than the searches conducted on the average request and therefore often require additional time and resources.

[3] This system went into effect on July 10, 1997, and replaced the previous two-queue system utilized by the FBI.

[4] *See* 5 U.S.C. § 552(a)(6)(D)(i) and 28 C.F.R. § 16.5(d).

FOIA/Privacy Act requests received by the FBI on an annual basis, a request is assigned to one of the three queues based on the date of receipt on a "first in, first out" basis.[5]  The placement of a request in one of the three queues depends on the total volume of material responsive to that request:  500 pages or less = "small queue;" 501 – 2,500 pages = "medium queue;" and more than 2,500 pages = "large queue." This standard operating procedure, coupled with the FBI's "first in, first out" policy, permits RIDS to address requests in the order in which they are received, while simultaneously obviating the inequities to those requesters whose interests relate only to a small number of documents.

> (b)    <u>Classification Units</u>:  The three (3) Classification Units ("CUs") are responsible for complying with the classification/declassification review of FBI records pursuant to Executive Order 13526, and for conducting mandatory declassification reviews consistent with Executive Order 13526.  The CUs review documents responsive to FOIA/Privacy Act requests, criminal and civil discovery requests, Congressional and Presidential mandates, Presidential Library requests, mandatory declassification requests, DOJ Office of the Inspector General reports, and other federal agency requests, in order to determine whether such material should remain classified or be declassified.  In addition, the CUs review and prepare classified material for review by the U.S. Department of Justice Review Committee ("DRC").[6]

> (c)    <u>FOIPA Disclosure Units</u>:  There are currently five (5) FOIPA Disclosure Units in RIDS.  Recently, three (3) of these units assumed responsibility for performing the same tasks performed by WPU in addition to the processing tasks described below.  This change has enabled RIDS to increase efficiency by reducing the time it takes to accomplish WPU functions

---

[5] *See* 28 C.F.R. § 16.5(a).

[6] The DRC is the FBI's appellate authority regarding the implementation and administration of Executive Order 13526 and related directives and guidelines concerning classified information. *See* 28 C.F.R. § 17.14.

upon receiving a request. FOIPA Disclosure Units perform the actual processing of records pursuant to the provisions of the FOIA and Privacy Act. "Processing" involves a word-by-word, page-by-page review of responsive documents to determine what, if any, information can be disclosed and what, if any, information is exempt from disclosure under the FOIA and/or Privacy Act. The FOIPA Disclosure Units redact exempt information and note the applicable exemption(s) in the margin of each page and/or prepare deleted page information sheets when pages are withheld in their entireties, all done electronically in FDPS. During the course of review, the FOIPA Disclosure Units consult with other government agencies, as necessary, for their respective determinations as to the releasability of the other agencies' information contained within FBI records, and refer non-FBI documents to the agencies from which they originated for processing and direct response to the requester. The FOIPA Disclosure Units ensure that FOIA and/or Privacy Act exemptions have been properly applied, that no non-exempt information has been withheld, that exempt information is protected, that all necessary classification reviews have been completed by transferring applicable cases to the CUs, and that other government agency information or documents have been properly handled.

(d)    Litigation Support Unit: The Litigation Support Unit ("LSU") is responsible for providing legal support and administrative assistance to the FBI's Office of the General Counsel in all FOIA lawsuits filed in federal courts nationwide. LSU is responsible for coordinating the processing of the particular FOIA/Privacy Act requests at issue in a lawsuit as they progress through the units described above; the receipt of substantive litigation-related information from involved FBI Special Agents and other professional support staff in field offices and operational Divisions at FBIHQ;[7] and the referral of documents to other DOJ

---

[7] It is often the case that the information at issue in a FOIA lawsuit is either classified or very sensitive law enforcement information. RIDS consults frequently with Special Agents and other FBI personnel in the field and in

components and/or government agencies for consultation or direct response to the requester. LSU prepares the administrative record, codes and Bates stamps documents processed by the FOIPA Disclosure Units;[8] and drafts both procedural and substantive declarations, including detailed *Vaughn* declarations that justify the FBI's reliance on particular FOIA/Privacy Act exemptions to withhold information.

(8)    In order to promote administrative efficiency in light of the tremendous number of requests the FBI receives, RIDS LASs understandably must work on more than one request at a time. Certain cases may require that the usual processing be halted midstream. This can occur for a variety of reasons, including the resolution of classification issues, the location of additional records, or consultation with other government agencies as to the nature and propriety of releasing certain information. In the interest of efficiency during this waiting period, the LAS may turn to and complete processing of other pending requests. RIDS LASs often process large-queue requests on parallel tracks with smaller requests in an attempt to ensure that one requester does not consume a disproportionate share of RIDS's resources.

(9)    Consistent with standard administrative procedure, any records referred to the FBI from other DOJ components or government agencies in response to a particular request are added to that pending FOIA/Privacy Act request. This process is an equitable way for RIDS to maintain administrative control of FOIA/Privacy Act requests. Under this system, the same LAS

---

various operational FBIHQ divisions as subject matter experts as they are best situated to provide their expertise about investigations, programs, processes, techniques, etc. This further ensures that any exemptions applied are appropriate and must be protected.

[8] A coded format is used in cases to assist the Court and parties in reviewing information that the FBI withholds from processed documents. Each redacted piece of information is accompanied by a coded designation that corresponds to a specified category of information. For example, if "(b)(7)(C)-1" appears next to redacted information, the "(b)(7)(C)" portion identifies that the FBI is relying FOIA Exemption 7(C) (unwarranted invasion of personal privacy) to withhold the information, and the "-1" portion signifies a subcategory of personal information that is being withheld, such as names and/or identifying information about third parties merely mentioned in a law enforcement file. Although adding codes is a time-consuming process, the FBI has determined that it is the most efficient and effective manner in which it may justify its withholdings to the Court and plaintiffs.

assigned to process a particular request will also handle the review of records referred by other DOJ components or government agencies. By ensuring continuity in the processing of FOIA/Privacy Act requests, this system is not only fair to all persons seeking information under the FOIA/Privacy Act, but is also administratively efficient.

## SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUESTS

### The Central Records System ("CRS")

(10)    The Central Records System ("CRS"), which is utilized by the FBI to conduct searches in response to FOIA and Privacy Act requests, enables it to maintain all information that it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in this system are maintained at FBIHQ. Records which are pertinent to specific field offices of the FBI are maintained in those field offices.[9]

(11)    Access to the CRS is afforded by the General Indices, which are arranged in alphabetical order. The General Indices consist of index cards on various subject matters that are searched either manually or through the automated indices. The entries in the General Indices fall into two categories:

(a)    A "main" entry:" A "main" entry carries the name corresponding with a subject of a file contained in the CRS.

---

[9]  In his requests, plaintiff requested "FISUR" searches. FISUR, or physical surveillance, records are maintained in the investigative files indexed in the CRS. Thus, searches of CRS encompass FISUR records. Plaintiff also requested that the FBI's searches include Joint Terrorism Task Force ("JTTF") records. Records generated by the JTTFs are indexed and maintained in the CRS, and as a result, a search of the CRS would also encompass these records.

(b)     A "reference" entry:  A "reference" entry, sometimes called a "cross-reference" is generally only a mere mention or reference to an individual, organization, etc., contained in a document located in another "main" file on a different subject matter.

(12)    Access to the CRS files at FBI field divisions is also afforded by the General Indices (automated and manual), which are likewise arranged in alphabetical order, and consist of an index on various subjects, including the names of individuals and organizations.  Searches made in the General Indices to locate records concerning a particular subject are made by searching the index for the subject requested.  FBI field offices have automated indexing functions.

(13)    On or about October 16, 1995, the Automated Case Support ("ACS") system was implemented for all field offices, Legal Attachés ("Legats"), and FBIHQ.  More than 105 million records were converted from automated systems previously utilized by the FBI.  ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

(a)     Investigative Case Management ("ICM"):  ICM provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads.  The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a case.  The offices that receive leads are referred to as Lead Offices ("LOs"), formerly known as Auxiliary Offices.  When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is utilized by all FBI field offices, Legats, and FBIHQ, that are conducting or assisting in the investigation.  An example of a UCFN is "90-AT-93882."  In this example, "90" indicates the classification for the specific type of investigation - *i.e.*, "Irregularities in Federal

10

Penal Institutions;";"AT" indicates the Office of Origin of the investigation - *i.e.*, the Atlanta Field Office; and "93882" is the unique case file number for the particular investigation.

(b)    Electronic Case File ("ECF"):  ECF serves as the central electronic repository for the FBI's official text-based documents.  ECF supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized ECF system.  All original serials are maintained in the OO case file.

(c)    Universal Index ("UNI"):  UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases.  Only the OO is required to index: however, the LOs may index additional information as needed. UNI, a 93.3 million record index, functions to index names to cases, and to search names and cases for use in FBI investigations.  Names of individuals or organizations are recorded with identifying applicable information, such as sex, race, event date, date or place of birth, locality, Social Security number, or address.

(14)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent ("SA") assigned to work on the case, the supervisor in the field office conducting the investigation, the supervisory SA at FBIHQ and other FBI support employees working on that case.  The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval.  Without a "key" or index to this mass of data, information essential to ongoing investigations could not be readily retrieved.  The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes.  Therefore.

the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual.

### The Electronic Surveillance ("ELSUR") Indices

(15)     The Electronic Surveillance ("ELSUR") Indices, a separate system of records from the CRS, are used to maintain information on subjects whose electronic and/or voice communications have been intercepted as a result of warrantless and/or consensual electronic surveillance, or court-ordered electronic surveillance conducted by the FBI. The ELSUR Indices date back to January 1, 1960, and were automated in 1991. Since 1991, FBIHQ and all FBI field offices have electronically generated, maintained, modified, and accessed all ELSUR records.

(16)     Prior to automation, the ELSUR Indices consisted of index cards identifying individuals who had been subject of microphone or telephone surveillance by the FBI since 1960.[10] The FBI converted its manual index card system to an automated system on or about October 9, 1991. In addition to individuals who were the targets of surveillance, other participants in monitored conversations and the owners, lessees, or licensors of the premises where the FBI conducted the electronic surveillance are also indexed. Moreover, the ELSUR Indices also include the dates an individual was monitored; a confidential identification symbol number to identify the individual being monitored; and the location of the FBI field office that conducted the surveillance. The ELSUR Indices are published as a separate records system in the Federal Register because not all names of individuals contained in the ELSUR Indices can be retrieved through the General Indices of the CRS. *See* 52 Fed. Reg. 8482 (1992).

---

[10] In his FOIA requests, plaintiff requested "MISUR" searches. MISUR, or microphone surveillance, records are part of the ELSUR Indices. Thus, a search of the ELSUR Indices would encompass MISUR records.

(17)    FBI field offices that have conducted electronic surveillance at any time since 1960 also maintain ELSUR Indices.  Since January 1, 1960, field offices have been including their ELSUR Indices and reporting to FBIHQ for inclusion in its ELSUR Index, the names of all individuals whose voices have been monitored through an FBI microphone installation or telephone surveillance.  The names of monitored individuals are retrieved through the FBIHQ or local field office ELSUR Indices.

(18)    Until 1969, FBI field offices were also required to forward to FBIHQ the names of all individuals mentioned during monitored conversations, for inclusion in the FBIHQ ELSUR Index.  Although FBIHQ discontinued this requirement in 1969, some field offices continued to include the names of individuals mentioned in monitored conversations in their field office ELSUR Indices.  However, the names of such individuals cannot be retrieved through the FBIHQ ELSUR Index.

## Searches for Records Responsive to Plaintiff's Requests

(19)    In his First Amended Complaint, plaintiff identified 81 FOIPA request numbers, which involve requests for information about 64 individuals, organizations, incidents, or publications related to animal rights extremism.  As of this date, RIDS has completed the searches for records potentially responsive to all of these requests.  These searches have included querying CRS using the name of the individual or organization identified by plaintiff in his request, and/or by using key words derived from plaintiff's requests where the request was not about a specific individual or organization.  ACS searches of the CRS consist of a phonetic breakdown of search terms, which facilitates location of records using the phonetic sounds of the terms, and for names, would return results for the initials of the first and middle names.  RIDS would also use additional identifying information, including but not limited to dates of birth,

places of birth, and/or social security numbers, in order to ensure search results pertained to the correct individual at issue in plaintiff's requests.

(20)    The CRS searches encompassed main files and reference entries.  Moreover, to the extent that any responsive FISUR, or JTTF records exist and were properly indexed, they would be maintained in main files or reference entries and would have been retrieved through the CRS searches RIDS conducted.

(21)    Plaintiff also requested that the FBI search for ELSUR and MISUR records.  Both types of records would be encompassed within a search of the FBI's ELSUR Indices.  RIDS has also completed searches of those indices for the subjects plaintiff identified in his requests.

(22)    As of this date, RIDS estimates that approximately 349,000 pages of records are potentially responsive to the FOIA requests identified in plaintiff's First Amended Complaint. These records have not yet been reviewed by RIDS.[11]  RIDS is still in the process of retrieving files and cross-references from field offices which make up the estimated 349,000-page collection of potentially responsive information.  RIDS cannot definitively ascertain the volume of a file or size of a cross-reference until it physically receives the file or document. Consequently, because responsive information is still being physically gathered and reviewed, the above number is our current best estimate about the volume of potentially responsive information in this case.  The actual volume may increase or decrease as RIDS continues to obtain and review additional material and determines whether it is either responsive, not responsive, or duplicative of other material.  The FBI has calculated the amount of time necessary for processing responsive records in this case based on these factors and its current

---

[11]  The records located in during RIDS's searches include multiple CDs.  RIDS is unable to make a more accurate determination as to the volume of information on those CDs until it undertakes a more exacting review of each of the CDs.

page estimate. As we continue to obtain files and cross-references containing potentially responsive information, we will further hone our estimates of volume and processing times. As the FBI further refines the universe of responsive material and concomitantly revises its processing schedule, we propose to provide periodic status updates at 60-day intervals to the Court and plaintiff, and will include updates of our estimated volume and processing time as part of these status updates.

### July 20, 2012 Response to Plaintiff

(23)    The FBI has processed information responsive to plaintiff's requests for information about himself and about Compassion Over Killing ("COK"),[12] and has released all non-exempt responsive information to plaintiff, in compliance with the Court's July 11, 2012, Minute Order.

(24)    For the July 20, 2012 release, RIDS reviewed approximately 2599 pages of information, and released 720 pages in whole or in part. The FBI asserted Privacy Act Exemption (j)(2), 5 U.S.C. § 552a(j)(2), and FOIA Exemptions 3, 6, 7(A), 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552(b)(3), (6), (7)(C), (7)(D), and (7)(E), to protect exempt information.

(25)    I previously described the inter-related nature of these records in the First Hardy Decl. *See* Dkt. No. 9-1, ¶ 12. It appears that the Court acknowledged the inter-relatedness of these requests to the others at issue in plaintiff's lawsuits in its Memorandum Opinion and Order directing plaintiff to consolidate all four of his lawsuits into a single action. *See* Dkt. No. 11, p. 3. Despite the FBI's concerns about being able to fully assess the implications of disclosure of these records in relation to the processing of related information responsive to other requests, it

---

[12]    The FOIPA request numbers that plaintiff identified in his First Amended Complaint as concerning himself and COK are 1121258, 1167292, 1167292-001, 1143759, 1143759-001, 1160815, and 1161231. RIDS has processed and released non-exempt records responsive to FOIPA request number 1167292-001 and 1143759-001 as part of its July 20, 2012 response.

has complied with the Court's July 11, 2012 Minute Order. Nevertheless, the FBI does not

concede that these records are not inter-related to the other animal rights extremism-related

records at issue in the other FOIA requests in this case nor does it concede that making

piecemeal releases does not otherwise risk releasing material that should otherwise have been

withheld pursuant to appropriately applicable FOIA exemptions.

## FACTORS AFFECTING THE PROCESSING OF PLAINTIFF'S REQUESTS

(26)    Historically, the FBI repeatedly has sought additional funding for the creation of

new FOIA positions. For example, Congress appropriated funds in the 1997 fiscal budget

providing for 129 additional employees, and in the 1998 fiscal budget, providing for 239

additional employees. In 2003, the FBI moved from paper processing to data processing. Many

of these additional employees transitioned to document scanning to support the FBI's new

automated FOIA process.   Despite these staffing constraints, RIDS made significant strides in

reducing its backlog of FOIA and Privacy Act requests. For perspective, at the end of FY 1998,

there were 10,816 pending requests in various stages of processing. By the end of FY 2005, the

number of pending requests had been reduced to 1,786. In order to achieve this reduction in its

backlog level, RIDS implemented various steps designed to streamline its work. These steps

include the utilization of direct on-line computer searches to locate responsive records, use of

form letters, formation of specific teams to address backlog issues, processes to handle

consultations and referrals to other Government agencies, and the creation of the Litigation

Support Unit to handle all FOIA/Privacy Act litigation in RIDS. RIDS also implemented the use

of its FOIPA Document Processing System ("FDPS") to electronically process requests. All of

the units responsible for responding to FOIA and Privacy Act requests, as well as the Office of

the General Counsel's FOIA Litigation Unit, DOJ's Office of Information Policy, and certain

other employees in the FBI have access to FDPS, which also reduces the amount of time spent

physically transferring documents throughout the processing of a request, and is another time-

saving step implemented by the FBI. In addition to these efforts, RIDS's ability to reduce the

backlog was aided by a steady decline in the number of FOIA and Privacy Act requests received

by the FBI from FY 2001 through FY 2005. (Intake fell as low as an average of 906 requests per

month in FY 2004 and an average of 911 requests per month in FY 2005.)

(27)    In 2009, as a result of new Department of Justice guidelines, the average size of

an FBI FOIA request jumped from 500 to 1,000 pages, in effect doubling the work required to

complete a request. The FBI responded by funding 35 contract employees to assist the FOIA

program.

(28)    Despite the increase in the size of each FOIA request, at the end of FY 2011 the

number of pending FOIA requests was only 1,179. While the size of a FOIA request has

increased, the number of requests received by FBI has also significantly risen. For example, the

FBI received an average of 911 requests in FY 2005. In FY 2011, the FBI received a total of

17,755 FOIA and Privacy Act requests, or an average of 1,480 requests per month. And with

two months left in FY 2012, we have already exceeded our FY 2011 intake by 14%. For FY

2012 thus far (October 2011 through today), the FBI has received 17,927 FOIA and Privacy Act

requests, or an average of 1,793 requests per month. As of today, there are 3,718 pending

requests. There are approximately 2.6 million pages of information currently assigned to the five

FOIPA Disclosure Units for review. Among the requests currently pending processing by the

FOIPA Disclosure Units are 81 large-queue requests, each of which involve in excess of 8,000

pages of potentially responsive records. This is in addition to the 3,718 backlogged requests

totaling an estimated 2.2 million pages of potentially responsive records that are pending assignment to a FOIPA Disclosure Unit for processing.

(29)    RIDS is continually considering and implementing procedures and processes to more efficiently address workload issues. One example of a shift in procedure designed to achieve additional efficiency is described in ¶ 7(c) *supra*. – *i.e.*, three FOIPA Disclosure Units have assumed "cradle to grave" responsibility for responding to FOIA and Privacy Act requests received by RIDS, to include completing initial tasks necessary to perfect requests, searching for responsive records, reviewing records, redacting exempt information and applying exemptions (other than Exemption 1/classification review), and preparing letters and records for release to requesters. This "one stop shopping" approach will allow RIDS to move FOIA and Privacy Act requests more efficiently through the various stages of processing.

(30)    Also as part of its on-going effort to continually improve its efficiency and effectiveness, RIDS is upgrading to its FOIPA Document Processing System ("FDPS"); the upgrade will add some important features that will maximize processing and improve efficiency. However, RIDS's ability to review and process material responsive to the requests in plaintiff's lawsuit, as well as other pending requests, will be impacted by this upgrade to FDPS. The upgrade is currently scheduled to take place from mid-August to mid-September 2012. The upgrade will involve installation of the next generation version of the FDPS software program. At this time, we anticipate the installation process will take approximately 30 days to complete fully, and will require a complete shutdown of the system for at least five full days, although we will have a more accurate estimate once the upgrade process begins. During this time, all FOIA work in RIDS will, of necessity, completely cease. It is also quite possible that at other times

during this continuous 30-day period, FDPS access will be considerably degraded or virtually impossible, so productivity will be affected significantly.[13]

(31)    In addition to the workload demands on its finite resources described above, the FBI's ability to complete the processing of material responsive to plaintiff's numerous requests is directly affected by competing litigation resource requirements. The aggregate volume of work in RIDS directly impacts the availability and allocation of resources to requests in litigation. With finite resources and an extremely high FOIA workload, RIDS constantly strives to adhere to and comply with the FOIA's statutory and regulatory requirements for responsiveness and processing times, to the maximum extent possible. This requires a careful balancing of resources and priorities among both litigation and administrative requests as the same RIDS personnel who are working to comply with numerous litigation deadlines, such as those discussed below, simultaneously handle a constantly high volume of administrative requests and appeals. As of today, the FBI is involved as a defendant in 122 pending FOIA lawsuits nationwide. A number of these cases – including plaintiff's case – involve large volumes of records, and will continue to require that RIDS devote significant resources in order to comply with federal district court Orders or agreed-upon court-entered deadlines. Examples of some of these cases include, but are not limited to:

(a)    *Lardner v. FBI, et al.*, Civ. A. No. 03-CV-0874 (D.D.C.) – 60,000 pages must be re-processed by June 2013, per agreement of the parties;[14]

---

[13] The rate at which LASs process records in the upgraded FDPS may initially be impacted as well, as they become familiar with new features of the system.

[14] The records in this case, which are quite old, are being re-processed by order of the Court and as a result, we are able to process more pages per month than we would be able to if we were to be processing these records for the first time.

    (b)    *Webster et al. v. DOJ, et al.*, Civ. A. No. 02-CV-0603 (D.D.C.) –

approximately 3,000 pages per month must be processed until August 8, 2012, per Court Order

and agreement of the parties;

    (c)    *Kisseloff v. FBI, et al.*, Civ. A. No. 09-CV-391 (D.D.C.) – at least 2,000

pages per month must be re-processed until all pages (which exceed 300,000 pages) are

completed, per court-approved agreement of the parties;[15]

    (d)    *International Counsel Bureau, et al. v. CIA, et al.*, Civ. A. No. 09-CV-

2269 (D.D.C.) – 430 pages must be processed by July 31, 2012, per agreement of the parties;

    (e)    *Garrett M. Graff v. FBI, et al.*, Civ. A. No. 09-CV-2047 (D.D.C.) – 6,000

pages must be processed by May 2013, per Court Order; and

    (f)    *Corey Davis v. DHS, et al.*, Civ. A. No. 11-CV-203 (E.D.N.Y.) – the FBI

has agreed to process 500 pages per month until the remaining 12,500 pages and 16 DVDs are

completed.

(32)    Finally, RIDS personnel also work closely with staff from OIP to review and

assist with OIP's adjudication of administrative FOIA appeals. As of today, the FBI has 334

pending administrative appeals. Addressing these appeals results in additional demands – and

direct competition with – the same RIDS resources being expended on review and processing of

pending requests.

(33)    In addition to the backlog issues and multiple resource demands faced by RIDS as

described above, the processing of the 81 particular requests identified in plaintiff's First

Amended Complaint present unique, and resource-intensive challenges. The first factor that

---

[15] The records in this case, which are quite old, are being re-processed by order of the Court and as a result, we are able to process more pages per month than we would be able to if we were to be processing these records for the first time.

presents processing challenges is the sheer volume of requests, subject matters, and potentially responsive records involved. The 81 FOIA requests identified in plaintiff's First Amended Complaint concern 64 inter-related individuals, organizations, incidents, and/or publications related to animal rights extremism. The amount of time to search for and obtain potentially responsive records has been significant, and indeed, RIDS actively continues working to obtain the remaining records responsive to plaintiff's requests.[16] Moreover, as indicated in paragraph 23 *supra*, RIDS estimates that there are 349,000 pages of potentially responsive information remaining to be reviewed for responsiveness, and if responsive, processed.

(34)    Another factor complicating the FBI's response to plaintiff's requests is the inter-relatedness of the material involved in the requested files. For illustration purposes, assume the file concerning the Animal Defense League ("ADL"), one of the organizations about which plaintiff has requested records, contains a document about an animal rights incident that is the subject of an on-going investigation (which may or may not be the topic of a request at issue in this lawsuit) and also references one of the individuals about whom plaintiff requested information. In order to properly process this single document, RIDS must analyze the implications of its release in the broader context of the other records in the files on (a) ADL, (b) the individual, and (c) the on-going investigation. Based on input from the subject matter experts in the FBI's operational divisions, RIDS will continue to be faced with an increasingly complicated set of factors which will require assessments about the impact of release in reference to multiple individuals, multiple organizations, and/or multiple on-going investigations (which may or may not be the subjects of the requests at issue in this lawsuit).

---

[16] RIDS has collected and processed records responsive to two of the 64 topics about which plaintiff requested records – *i.e.*, himself and COK – and released non-exempt information to plaintiff on July 20, 2012.

## PROPOSED PROCESSING SCHEDULE

(35)    Due to the inter-related nature of the records in this case, RIDS must consider

carefully the mosaic effect of release of individual pieces of information in order to assess

whether disclosure would damage the FBI's overall Domestic Terrorism enforcement efforts.

While a single piece of information may, on its own, appear innocuous, as part of a whole, its

disclosure could be highly damaging to the FBI's Domestic Terrorism enforcement efforts. This

is especially the case due to the unique nature of such investigations, which can involve multiple,

inter-related investigations stemming from a single incident. The FBI can only make reasoned

decisions about the effect of disclosure of any particular information by analyzing it in context

with other inter-related information and determine whether, if pieced together, the information

would reveal how the FBI's Domestic Terrorism program operates, and the sources, techniques,

and methods it utilizes.[17]    These concerns are heightened here due to the sheer volume of

information that must be collected and reviewed. For example, the true impact of the disclosure

of a piece of information reviewed on Day 1 may not be fully appreciated until RIDS considers it

in the context of the disclosure of other related information, which RIDS may not review until

Day 50 or Day 100, etc, as well as the context of other information already in the public domain.

(36)    In accordance with this Court's Minute Order dated July 11, 2012, I am aware

that plaintiff has provided the FBI "a list of priorities describing the order in which he believes

his remaining FOIA requests should be processed." For the reasons noted previously, it is not

possible for the FBI to assess fully the potential impact of any disclosures – even in plaintiff's

desired priority order – until it has considered those future disclosures in the context of other

---

[17]   The FBI is constrained in the amount of detail it can disclose publicly without undermining the very
interests that the FBI is trying to protect here. Consequently, the FBI is moving simultaneously for leave to file an
additional *in camera, ex parte* declaration that will provide a more detailed rationale for the Court's consideration.

anticipated/potential disclosures as well as information that is already in the public domain. For these reasons, and as explained more fully in the Declaration of Deputy Assistant Director for Counterterrorism Michael A. Clancy, the sequential processing and release of information as contemplated by this Court's July 11, 2012 Order, if executed, has a significant likelihood of threatening and undermining the FBI's ongoing law enforcement operations related to domestic terrorism.

(37)    Due to the volume of work generally faced by RIDS with respect to administrative matters and other litigation cases, in conjunction with the complexities associated with the processing of the requests at issue in this case, the FBI is seeking a stay of these proceedings until September 30, 2019, in order to allow RIDS the time necessary to process and release all non-exempt records responsive to plaintiff's requests after having examined each of them against the backdrop of the mosaic concerns we have articulated above. Although the FBI typically proposes processing schedules in FOIA cases that call for the rolling production of non-exempt, responsive records at regular intervals (*e.g.*, monthly), we do not believe that this is a feasible approach in this case given the above-described concerns about the volume of inter-related information and the mosaic effect of disclosure of pieces of information. Consequently, the FBI requests a stay until September 30, 2019, at the end of which, it will disclose all non-exempt information to plaintiff. The FBI further proposes to provide the Court and plaintiff status reports every 60 days that report the volume of information processed since the previous status report, and update and revise our estimates about volume of responsive information to be processed and amount of time to complete processing.

(38)    RIDS proposes to process responsive records as follows, taking into account the

Priorities List provided by plaintiff:

- Tier 1 (currently estimated to consist of approximately 21,000 pages): processing to be completed in 5 months, then;

- Tier 2 (currently estimated to consist of approximately 78,000 pages): 19 more months, then;

- Tier 3 (currently estimated to consist of approximately 130,000 pages): 32 more months, then;

- Tier 4 (currently estimated to consist of approximately 71,000 pages): 18 more months, then;

- Tier 5 (currently estimated to consist of at approximately 49,000 pages): 12 more months.

## CONCLUSION

(39)    The FBI takes very seriously its responsibilities with regard to the administration

of the FOIA/Privacy Act program. All reasonable efforts are being made to timely process

requests that are either at the administrative stage or those that are in litigation, including

plaintiff's requests. The FBI's proposal, as described above, has carefully balanced the volume

and inter-relatedness of the responsive records, plaintiff's interests, the very significant

operational sensitivities and concerns associated with the FBI's domestic operations program,

while also recognizing and preserving the rights of other litigants and requesters in access to the

information they seek. As detailed above, the unique complexities of this case, coupled with the

extremely high volume of other administrative and litigation-related FOIA work being handled

by RIDS and the serial nature of FOIA processing, pose an exceptional demand on RIDS's finite

resources, which the FBI has attempted to address through the above-articulated proposed

processing method and schedule.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibit A attached hereto is a true and correct copy.

Executed this _31st_ day of July, 2012.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

25

# Second Declaration of

# David M. Hardy

# "Exhibit A"

| # | FOIPA # | Subject Matter | Date of Request | Date FBI Acknowledged Request | Date of FBI Response | FBI's Response | Date of Appeal to OIP | OIP's Decision |
|---|---|---|---|---|---|---|---|---|
| 1 | 1121258 | Self (Ryan Noah Shapiro) | 10/6/2008 | 10/17/2008 | 10/30/2008 | No records | | |
| 2 | 1167292 | Self (Ryan Noah Shapiro) | 5/26/2011 | | 6/2/2011 | No records | | |
| 3 | 1167292-001 | Self (Ryan Noah Shapiro) | 6/8/2011 | 6/16/11 | | | | |
| 4 | 1143759 | Compassion Over Killing (COK) | 1/31/2010 | 1/31/2010 | 3/1/2010 | No records | | |
| 5 | 1143759-001 | Compassion Over Killing (COK) | 3/9/2011 | 3/24/11 | | | | |
| 6 | 1160815 | Compassion Over Killing (COK) | 1/18/2011 | | 2/4/2011 | No records | | |
| 7 | 1161231 | Compassion Over Killing (COK) | 1/18/2011 | | 2/9/2011 | No records | | |
| 8 | 1171759 | Foundation for Biomedical Research (FBR) | 7/26/2011 | 8/22/2011 | | | | |
| 9 | 1171768 | National Association for Biomedical Research (NABR) | 7/26/2011 | 8/22/2011 | | | | |
| 10 | 1172386 | Americans for Medical Progress (AMP) | 7/26/2011 | 9/6/2011 | | | | |
| 11 | 1171492 | American Medical Association (AMA) | 8/5/2011 | 8/18/2011 | | | | |
| 12 | 1172382 | Center for Consumer Freedom (CCF) | 7/26/2011 | 9/6/2011 | | | | |
| 13 | 1173044 | National Animal Interest Alliance (NAIA) | 7/26/2011 | 9/13/2011 | | | | |
| 14 | 1173385 | Fur Information Council of America (FICA) | 7/26/2011 | 9/22/2011 | | | | |
| 15 | 1171597 | Perceptions International (PI) | 7/26/2011 | 8/25/2011 | | | | |
| 16 | 1182729 | United States Surgical Corporation (USSC) | 2/10/2012 | 2/20/2012 | | | | |
| 17 | 1170449 | Joseph Buddenberg | 7/12/2011 | 8/1/2011 | | | | |
| 18 | 1143926 | Friends of Animals (FOA) | 1/31/2010 | | 3/4/2010 | No records | | |
| 19 | 1143926-001 | Friends of Animals (FOA) | 8/10/2011 | 10/6/2011 | | | | |
| 20 | 1160275 | Friends of Animals (FOA) | 12/24/2010 | 1/19/2011 | | | | |
| 21 | 1171428 | Julie Elizabeth Lewin | 7/20/2011 | 8/15/2011 | | | | |
| 22 | 1173573 | Mercy for Animals (MFA) | 8/10/2011 | 9/27/2011 | | | | |
| 23 | 1167308 | Nathan Donald Runkle | 5/27/2011 | | 6/10/2011 | No records | | |
| 24 | 1167308-001 | Nathan Donald Runkle | 8/10/2011 | 12/23/2011 | | | | |

| | FOIPA # | Subject Matter | Date of Request | Date FBI Acknowledged Request | Date of FBI Response | FBI's Response | Date of Appeal to OIP | OIP's Decision |
|---|---|---|---|---|---|---|---|---|
| 25 | 1179204 | Rodney Adam Coronado | 12/5/2011 | 12/14/2011 | | | | |
| 26 | 1173506 | Steven Paul Best | 8/19/2011 | 9/26/2011 | | | | |
| 27 | 1173555 | Utah Animal Rights Coalition/ United Animal Rights Coalition (UARC) | 9/8/2011 | 9/23/2011 | | | | |
| 28 | 1171892 | Sean Diener | 7/26/2011 | 8/23/2011 | | | | |
| 29 | 1146934 | Lauren Beth Gazzola | 4/10/2010 | 4/20/2010 | 2/28/2011 | 125 pages released in whole or in part | | |
| 30 | 1177804 | Lauren Beth Gazzola | 11/15/2011 | 11/25/2011 | | | | |
| 31 | 1170437 | Michael A. Budkie | 7/12/2011 | 8/1/2011 | | | | |
| 32 | 1179685 | Peter Daniel Young | —[1] | 12/23/2011 | | | | |
| 33 | 1170784 | Rick A. Bogle | 7/12/2011 | 8/5/2011 | | | | |
| 34 | 1170104 | Stephen Omar Hindi | 7/12/2011 | 8/1/2011 | | | | |
| 35 | 1171456 | Allison Helene Lance Watson | 8/5/2011 | 8/16/2011 | | | | |
| 36 | 1144639-001 | Fund for Animals (FFA) | 8/10/2011 | 9/27/2011 | | | | |
| 37 | 1168139 | Dallas Rachael Rising | 5/31/2011 | 6/20/2011 | | | | |
| 38 | 1169590 | Iver R. Johnson III | 6/29/2011 | 7/14/2011 12/23/2011[2] | | | | |
| 39 | 1169688 | Kevin Rich Olliff | 6/28/2011 | 7/28/2011 | | | | |
| 40 | 1173497 | Animal Liberation Front Conference | 8/15/2011 | 9/29/2011 | | | | |
| 41 | 1144151 | American Anti-Vivisection Society | 1/31/2010 | 3/10/2010 | 4/22/2010 | No records | | |
| 42 | 1144151-001 | American Anti-Vivisection Society | 8/10/2011 | 12/21/2011 | | | | |
| 43 | 1143766 | New England Anti-Vivisection | 1/31/2010 | 3/1/2010 | 3/1/2010 | No records | | |

[1] The FBI does not have a copy of the original request from plaintiff for records about Mr. Young. In subsequent correspondence from plaintiff to the FBI, he stated he received a delivery confirmation for this request on June 28, 2011.

[2] According to plaintiff, he did not receive an acknowledgment letter for this request but was advised by RIDS on December 23, 2011, that the request had been received and assigned FOIPA File No. 1169590. The FBI's FOIA Document Processing System ("FDPS") contains an acknowledgment letter for this request, dated July 14, 2011.

| | FOIPA # | Subject Matter | Date of Request | Date FBI Acknowledged Request | Date of FBI Response | FBI's Response | Date of Appeal to OIP | OIP's Decision |
|---|---|---|---|---|---|---|---|---|
| | | Society (NEAVS) | | | | | | |
| 44 | 1143766-001 | New England Anti-Vivisection Society (NEAVS) | 8/10/2011 | 9/21/2011 | | | | |
| 45 | 1020553 | National Anti-Vivisection Society (NAVS) | 5/2/2005 | 5/13/2005 | 5/23/2005 | No records | | |
| 46 | 1020553-001 | National Anti-Vivisection Society (NAVS) | 8/10/2011 | 9/23/2011 | | | | |
| 47 | 1179601 | Kelly Ann Higgins | -³ | 12/21/2011 | | Records referred to ATF for processing. | | |
| -⁴ | 1143549 | Animal Liberation Front (ALF) | 1/29/2010 | 2/18/2010 | | | | |
| 48 | 1156519 | Last Chance for Animals (LCA) | 10/22/2010 | | 11/3/2010 | No records | | |
| 49 | 1156519-001 | Last Chance for Animals (LCA) | 7/26/2011 | 9/28/2011 | | | | |
| 50 | 1167816 | Chris DeRose | 6/7/2011 | 6/10/2011 | | | | |
| 51 | 1167824 | Jack D. Carone | 6/7/2011 | 6/15/2011 | | | | |
| 52 | 1167840 | Linda T. Tannenbaum | 6/7/2011 | 6/13/2011 | | | | |
| 53 | 1168703 | Crescent Vellucci | 6/7/2011 | 6/30/2011 | | | | |
| 54 | 1167949 | Jonathan Christopher Mark Paul | 6/7/2011 | 6/14/2011 | | | | |
| 55 | 1168146 | Leslie Stewart | 6/7/2011 | 6/17/2011 | | | | |
| 56 | 1167894 | Sheila Laracy | 6/7/2011 | 6/14/2011 | | | | |
| 57 | 1168089 | Henry Hutto | 6/8/2011 | 6/16/2011 | | | | |
| 58 | 1169540 | Aaron Glenn Leider | 6/29/2011 | 7/13/2011 | | | | |
| 59 | 1168026 | Animal Liberation Front Supporters | 6/8/2011 | | 6/16/2011 | No records | | |

³ The FBI does not have a copy of the original request from plaintiff for records about Ms. Higgins. In subsequent correspondence from plaintiff to the FBI, he stated he mailed the request on July 26, 2011.

⁴ The count corresponding to this request in plaintiff's First Amended Complaint concerns the ATF's processing of documents referred to that agency by the FBI. Although the request underlying that referral was submitted to the FBI, the only actions being challenged are ATF's withholding decisions. FBI's processing decisions have not been challenged.

3

| | FOIPA # | Subject Matter | Date of Request | Date FBI Acknowledged Request | Date of FBI Response | FBI's Response | Date of Appeal to OIP | OIP's Decision |
|---|---|---|---|---|---|---|---|---|
| 60 | 1168026-001 | Animal Liberation Front Supporters Group (ALFSG) | 8/10/2011 | 9/26/2011 | | | | |
| 61 | 1157033 | Animal Defense League (ADL) | 11/4/2010 | 11/15/2010 | | | | |
| 62 | 1156759 | No Compromise | 11/4/2010 | 1/8/2010 | | | | |
| 63 | 1156661 | Lindsay Parme | 10/24/2010 | 11/12/2010 | | | | |
| 64 | 1169365 | Kimberly Ann Berardi | 6/21/2011 | 7/26/2011 | | | | |
| 65 | 1167538 | Freeman Wicklund | 5/31/2011 | 6/13/2011 | | | | |
| 66 | 1169433 | Patrick Kwan | 6/29/2011 | 7/12/2011 | | | | |
| 67 | 1169964 | Joseph W. Bateman | 6/28/2011 | 7/26/2011 | | | | |
| 68 | 1169999 | David Patrick Hayden | 6/28/2011 | 7/22/2011 | | | | |
| 69 | 1156549 | Miyun Park | 10/22/2010 2/11/2011[5] | 2/12/2011 2/18/2011 2/28/2011 3/1/2011[6] | | | | |
| 70 | 1170870 | Gina Lynn | 7/7/2011 | 8/9/2011 | | | | |
| 71 | 1167305 | Sarah Jane Blum | 5/27/2011 | | 6/8/2011 | No records | | |
| 72 | 1167305-001 | Sarah Jane Blum | 8/10/2011 | 9/27/2011 | | | | |
| 73 | 1182395 | *Green is the New Red* | 2/10/2012 | 2/15/2012 | 2/27/2012 | No records | 3/2/2012 | 7/13/2012 (closed due to litigation) |
| 74 | 1179996 | Will Potter | 12/19/2011 | 1/12/2012 | | | | |
| 75 | 1178088 | Screaming Wolf | 11/22/2011 | 2/6/2011 | 12/13/2011 | Glomar | 2/8/2012 | |
| 76 | 1134526 | *A Declaration of War: Killing People to Save Animals and the* | 7/8/2009 | | 7/23/2009 | No records | | |

[5] Plaintiff sent identical requests for information about Ms. Park to FBIHQ (10/22/2010) and to the Washington, Norfolk, New York, and Baltimore Field Offices on February 11, 2011. They were all included in FOIPA File No. 1156549.

[6] The FBI sent a status letter to plaintiff about this request on February 12, 2011. It sent acknowledgment letters to him on February 18, 2011 (regarding the Baltimore Field Office request); February 28, 2011 (regarding the New York Field Office and Norfolk Field Office requests); and March 1, 2011 (regarding the Washington Field Office request).

| | FOIPA # | Subject Matter | Date of Request | Date FBI Acknowledged Request | Date of FBI Response | FBI's Response | Date of Appeal to OIP | OIP's Decision |
|---|---|---|---|---|---|---|---|---|
| 77 | 1179180 | *Environment* <br> *A Declaration of War: Killing People to Save Animals and the Environment* | 11/22/2011 | | 12/14/2011 | No Records | 1/9/2012 | 3/27/2012 (affirmed) |
| 78 | 1159897 | Hyram Kitchen Murder | 12/29/2010[7] | /10/2011 /22/2011 | 4/18/2011 | 7(A) | | |
| 79 | 1159897-001 | Hyram Kitchen Murder | 9/2/2011 | | 12/22/2011 | Previously responded to request on 4/18/2011 | 1/5/2012 | 5/10/12 (remanded for search) |
| 80 | 1166938 | National Crime Information Center (NCIC) records about possibility of violence against unknown veterinary school deans by unknown animal rights activists | 5/18/2011 | 5/26/2011 | 9/19/2011 | 7(A) | 9/28/2011 | 10/27/2011 (affirmed) |
| 81 | 1171502 | Camille Marino | 7/22/2011 | | 12/6/2011 | No records | 1/9/2012 | 3/27/2012 (affirmed) |

[7] Plaintiff sent identical requests to FBIHQ, FBI's Knoxville Field Office, and FBI's Memphis Field Office on December 29, 2010. All were included in FOIPA File No. 1166938.

# Exhibit B

(Submitted to the Court *ex parte* for *in camera* review)