UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RYAN NOAH SHAPIRO, | ) | |
| | ) | |
| PLAINTIFF | ) | Civil Action No. 1:12-cv-313 (BAH) |
| vs. | ) | |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| DEFENDANT | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR *OPEN AMERICA* STAY**

## I.  INTRODUCTION

In testimony before Congress last year, Deputy Assistant Director for the FBI's Counterterrorism Division Michael A. Clancy stated, "Following the rule of law and upholding civil rights and civil liberties—these are not our burdens. These are what make all of us safer and stronger."[1]  One of the statutes that makes up the "rule of law" in this country is the Freedom of Information Act (FOIA).  This law makes us "safer and stronger" by allowing citizens to learn in a timely manner what their government is up to, even when – especially when – the information is embarrassing to the government.

Defendant raises the specter of a threat to national defense in its latest salvo against the timely production of documents under the Freedom of Information Act, seeking over seven *years* in which to comply with a statute that mandates an agency determination

---

[1] Michael A. Clancy, Statement to the Senate Judiciary Committee, Subcommittee on the Constitution, Civil Rights, and Human Rights (Sep. 19, 2012),  *available at* http://www.fbi.gov/news/testimony/the-domestic-terrorism-threat (last accessed Feb. 20, 2013.)

about releasing records within 20 *days*.  As the Supreme Court has recognized, however, "Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart."  *United States v. Robel*, 389 U.S. 258, 2264 (1967). Openness and transparency in government, an informed citizenry, the accountability of those in power to the people who elected them, and a commitment to the rule of law are among those values and ideals which set this Nation apart.  As long as FOIA is the law in this country, its terms and purpose must be enforced by this Court and not simply disregarded whenever the executive branch invokes the possibility of a threat to national security.

As described below, Defendant has failed to make the required showing to justify any further delay in the proceedings.  Accordingly, the Court should deny the *Open America* stay and order the FBI to produce all responsive records without further delay.  If the Court concludes that an *Open America* stay is warranted, it should be of dramatically shorter length than that requested by Defendant; the FBI should be ordered to produce monthly interim releases; and the stay should not apply to requests which are directed at other agencies, which have already been processed by the FBI, or for subject matters about which Defendant has already released records.

## II.      BACKGROUND

Plaintiff Ryan Shapiro is a Ph.D. candidate in the Department of Science, Technology & Society at the Massachusetts Institute of Technology.  (First Am. Compl. ¶ 2.)  Mr. Shapiro's research focuses on disputes over animals and national security from the late nineteenth century to the present, particularly with respect to the substantial role played

by federal law enforcement agencies in conflicts over animal use and protection.  (First Am. Compl. ¶ 2.)  In particular, Mr. Shapiro's research explores the nature and evolution of federal law enforcement agencies' understanding and handling of the animal rights and animal protection movements from the Cold War era to the present.  (First Am. Compl. ¶ 2.)  To this end, numerous leading animal rights activists from the 1970's through today have signed privacy waivers allowing Plaintiff to request their records through the Freedom of Information Act.  (First Am. Compl. ¶ 2.)

Mr. Shapiro's research dovetails with that of scholars and journalists analyzing today's "Green Scare."  (First Am. Compl. ¶ 3.)  As defined by award-winning journalist and author Will Potter, the Green Scare is the ongoing "disproportionate, heavy-handed government crackdown on the animal rights and environmental movements, and the reckless use of the word 'terrorism'" in the process.[2]  Supporting this understanding is the FBI's 2005 announcement to Congress that it had designated the animal rights and environmental movements as the leading domestic terror threats despite the fact that neither movement has ever physically injured a single person in the movements' decades of existence in the United States.[3]  Likewise, the FBI-supported 2006 passage of the Animal Enterprise Terrorism Act (AETA) has been widely condemned as a pernicious infringement upon protected speech and an effort to employ the rhetoric and apparatus of national security to marginalize animal protectionists as threats to American security. (First Am. Compl. ¶ 3.)

---

[2] *See* "'Eco-Terrorism' and the Green Scare," *Green is the New Red*, *available at* http://www.greenisthenewred.com/blog/green-scare (last accessed Feb. 21, 2013).

[3] *See* Henry Schuster, "Domestic Terror: Who's Most Dangerous?" CNN.com (Aug. 24, 2005), *available at* http://www.cnn.com/2005/US/08/24/schuster.column/index.html (last accessed Feb. 21, 2013.)

As part of his research into the nature and evolution of federal law enforcement agencies' understanding and handling of the animal rights and animal protection movements, Mr. Shapiro began regularly filing FOIA requests with various governmental agencies beginning in 2010.  To date, Mr. Shapiro has filed several hundred FOIA requests pertaining to animal rights / protection matters with the FBI and a smaller number of requests to other agencies.  As of September 27, 2012, Mr. Shapiro had received from the FBI dozens of releases totaling tens of thousands of pages.

Only a portion of Mr. Shapiro's many FOIA requests relating to animal rights / animal protection activists, publications, events, and organizations are part of this litigation. Those FOIA requests which are the subject of the present lawsuit were submitted by Mr. Shapiro at various times between 2010 and 2012.  (First Am. Compl. ¶¶ 62-516.)

## III.   ARGUMENT

### A.   Standard of review

A court may retain jurisdiction and allow an agency[4] additional time to complete its review of the records only if the government can show that "exceptional circumstances

---

[4] The FBI is a component of the Department of Justice, not an agency itself.  *See* 5 USC § 552(f)(1) (defining "agency" to include an "executive department"); *Judicial Watch, Inc. v. FBI*, 190 F. Supp. 2d 29, 30 n.1 (D.D.C. 2002) ("the FBI . . . is a component of DOJ and therefore not an 'agency' within the statutory definition.")  The term "agency" should be presumed to have the same meaning throughout the entire FOIA statute.  *See Powerex Corp. v. Reliant Energy Servs.*, 551 U.S. 224, 232 (2007)("identical words and phrases within the same statute should normally be given the same meaning.")  Accordingly, the defendant's motion for an *Open America* stay should be denied on the grounds that it has presented no evidence relating to the Department of Justice's, rather than the FBI's, "exceptional circumstances" or "due diligence."  Although courts considering *Open America* stays have analyzed the workload of a component rather than an agency, this appears to be the result of unexamined assumptions by the parties about the proper subject of analysis, rather than a deliberate decision by the courts.  *Monroe v. Pape*, 365 U.S. 167, 220-21 (1961)(Frankfurter, J., dissenting in part)("the relevant demands of *stare decisis* do not preclude considering, for the first time thoroughly and in the light of

4

exist." 5 U.S.C. § 552(a)(6)(C)(i).  In *Open America v Watergate Special Prosecution Force*, 547 F.2d 605, 616, 178 US App DC 308 (D.C. Cir. 1976), the D.C. Circuit interpreted the statutory phrase "exceptional circumstances exist" to mean an agency "is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it 'is exercising due diligence' in processing the requests."

   The D.C. Circuit went on to state that "[t]he good faith effort and due diligence of the agency to comply with all lawful demands under the Freedom of Information Act in as short a time as is possible by assigning all requests on a first-in, first-out basis, except those where exceptional need or urgency is shown, is compliance with the Act."  *Id.* After a Congressional committee criticized agencies' employment of this "overly broad dictum" to invoke the "exceptional circumstances-due diligence exception to obtain judicial approval for lengthy delays whenever they have a backlog," Congress adopted the Electronic Freedom of Information Amendments of 1996, Pub. Law 104-231, 110 Stat. 3048 (hereinafter "E-FOIA").  House Committee on Government Operations, Electronic Freedom of Information Act Amendments of 1996, House Report 104-795, 104th Cong. 2d. Session (hereinafter "H. Rep. 104-795").  Among the purposes of E-FOIA were to "ensure agency compliance with statutory time limits," Pub Law. 104-231 § 2(b)(3), and to this end, E-FOIA specified that "the term 'exceptional circumstances' does not include a delay that results from a predictable agency workload of requests

---

the best available evidence of congressional purpose, a statutory interpretation which started as an unexamined assumption on the basis of inapplicable citations and has the claim of a dogma solely through reiteration.")

under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests," *Id.* at § 7(c), codified at 5 U.S.C. § 552(a)(6)(C)(ii).  The House Committee explained that in adopting this language, Congress intended that "[r]outine backlogs of requests for records under the FOIA should not give agencies an automatic excuse to ignore the time limits, since this provides a disincentive for agencies to clear up those backlogs."  H. Rep. 104-795.

Thus, "[u]nder D.C. Circuit law, a stay pursuant to this subsection and the *Open America* doctrine may be granted '(1) when an agency is burdened with an unanticipated number of FOIA requests; *and* (2) when agency resources are inadequate to process the requests within the time limits set forth in the statute; *and* (3) when the agency shows that it is exercising due diligence in processing the requests; *and* (4) the agency shows reasonable progress in reducing its backlog of requests.'"  *Elec. Privacy Info. Ctr. v. United States DOJ*, 2005 U.S. Dist. LEXIS 18876, at *10-*11 (D.D.C. Aug. 31, 2005)(emphasis in original)(*quoting Williams v. FBI*, 2000 U.S. Dist. LEXIS 17493, at *4 (D.D.C. Nov. 30, 2000)).

In adopting the E-FOIA amendments, Congress did not define what it meant by a "predictable agency workload of requests under this section," but the phrase "requests under this section" should be interpreted to mean requests under FOIA, 5 U.S.C. § 552. *See Aspin v. Department of Defense*, 491 F.2d 24, n.2, 160 U.S. App. D.C. 231 (D.C. Cir. 1973)(noting that FOIA is a section of the Administrative Procedures Act).  Thus, an agency's non-FOIA obligations, no matter how pressing, should not be considered in assessing the agency's entitlement to a stay.

B.  **The FBI is not entitled to a stay under _Open America_.**

    i.  *The FBI has not been burdened with an unanticipated number of FOIA requests.*

    The FBI has not demonstrated exceptional circumstances because the number of FOIA requests it has received has not been unanticipated.  Despite its claim of a "sharp increase in [the] volume" of requests, (Def. Mem. of Points & Authorities in Support of Def. Mot. for *Open America* Stay, at 11 [ECF dkt: 17])(hereinafter "Def. Mot. for *Open America* Stay"), the FBI experienced only a minor uptick in FOIA requests in FY2012 after four fiscal years of consistent decline, as Figure 1 illustrates.



**Figure 1, Number of FOIA Requests Received by FBI for FY2008-2011[5]**

---

[5] The data for all of the graphs in this Opposition were obtained from the Department of Justice Annual FOIA Reports, available at http://www.justice.gov/oip/reports.html.

While the FBI did experience a 15% increase in intake of FOIA requests, such year-to-year fluctuations are hardly unpredictable. For example, from FY1998 to FY1999, the FBI experienced a 32% increase in intake of FOIA and Privacy Act requests, and from FY2005 to FY2006 the increase was 41%.[6] In terms of absolute volume, the FBI received significantly more FOIA requests in FY2008, FY2009, and FY2010 than it did in FY2012. Further, the average (mean) number of FOIA requests in recent years (FY2008-FY2011) is almost 2,000 more than were received in FY2012. Going back further, the FBI's workload has been consistently, not unpredictably, high. *Fiduccia v. United States DOJ*, 185 F.3d 1035, 1042 (9th Cir. 2009)(reversing grant of *Open America* stay and noting that "the FBI was able in the early 1980's to keep up with a caseload only 22% less than the current one.") For example, in 1989, the FBI received 18,368 FOIA and Privacy Act requests and in 1978, it received 19,059. Lesar Decl., attached as Ex. A to Plaintiff's Response in Opposition to Stay Proceedings [dkt: 5] in *Computer Professionals for Social Responsibility v. FBI*, 92-2117-HHG (D.D.C. 1992). Thus, set against the FBI's historical experience, both recent and longer-term, the current level of requests is not unpredictable.

Defendant also contends that the "complexity of the requests has increased significantly over the past year. Second Hardy Decl., ¶ 28." (Mot. for *Open America* Stay, at 15.) This contention is without any factual support. Paragraph 28 of the Second Hardy Declaration says nothing about the increase in complexity of requests over the past year. But even if Mr. Hardy had said as much, this Court has concluded that similarly broad and conclusory statements do not constitute sufficient evidence from which to

---

[6] Data is not available from these years for FOIA requests alone.

"draw any concrete and meaningful conclusions as to the composition of the [agency's] workload today in comparison to years past, at least in terms of complexity." *Buc v. FDA*, 762 F. Supp. 2d 62, 68 (D.D.C. 2011)(agency declaration "aver[red] in blanket and rather unilluminating terms that the 'level of effort required to respond to each individual request has increased on average[.]'")  The FBI has therefore failed to evidence "that incoming requests have, on average, become significantly and unexpectedly more complex as of late." *Id.*

Defendant's own statistics demonstrate that, on the contrary, the average FBI FOIA request has become *less* complex as of late.  The percentage of pending FOIA requests considered by the FBI as complex decreased from 37% in FY2009 to 25% in FY2010, and in FY2012 was at 24%, the lowest it has been in recent years.[7]

Defendant also contends that the size of the average FBI FOIA request in 2009 weighs in favor of granting a stay.  "In 2009, as a result of new Department of Justice guidelines, the average size of an FBI FOIA request jumped from 500 to 1,000 pages, in effect doubling the work required to complete a request."  Second Hardy Decl. ¶ 27.  This statement, however, does not support Defendant's request for an *Open America* stay for several reasons.  First, the change in Department of Justice guidelines was not an unpredictable event, as it was certainly predictable that searching more locations[8] would

---

[7] Prior to FY2008, the Department of Justice's annual FOIA reports listed only combined statistics for FOIA and Privacy Act requests, making direct comparisons with recent years impossible.

[8] The change in the DOJ guidelines resulted in the abandonment of the "field office rule," thus requiring the FBI to search and process all responsive records no matter where they are located.  (Ex. 1 at ¶ 24.)  The FBI's decision to better comply with FOIA, while commendable, should not weigh in favor of granting Defendant's request for an *Open America* stay.  Agencies should not be permitted to unilaterally create the "extraordinary

yield more potentially responsive documents.  Second, the change in the size of an average FBI FOIA request from four years ago to three years ago is not probative of the size of an average FBI FOIA request today.  In fact, the average size of a FOIA request in the FBI's backlog is presently approximately 592 pages[9], over 40% smaller than the average size of a FOIA request in 2009.  Finally, even if the size of the average FBI FOIA request had been consistently around 1,000 pages[10] since 2009, this would evidence only that a new status quo was established in 2009 when the new policy went into effect, and the agency's workload has been predictable since then.

Aside from the volume and complexity of requests it has received this year, Defendant also contends that a number of other factors support a finding that "exceptional circumstances" exist.  These factors include: (1) "Plaintiff's prolific FOIA activity"; (2) the "size and complexity of the requests implicated in this action"; (3) the potential for disclosure to harm the FBI's statutory obligations; (4) a large backlog; (5) litigation deadlines in unrelated cases; and (6) delays associated with the upgrading of the FDPS.

Except for litigation deadlines, none of these six factors were cited by Congress in describing the types of evidence which may contribute to a showing of exceptional circumstances.  *See* H. Rep. 104-795 ("Agencies may also make a showing of exceptional

---

circumstances" that justify an *Open America* stay unless doing so would assist in reducing an agency's backlog.

[9] The average size of a backlogged FOIA request was calculated by dividing the total number of potentially responsive backlogged pages (2.2 million) by the total number of backlogged requests (3,718).  These numbers were provided in the second Hardy Declaration, Paragraph 28.

[10] A declaration by Mr. Hardy in an unrelated case in November 2009 states that as a result of the 2009 policy change, "the size of each request increased by 30%," not, as he now claims, by 100%.  (Ex. 1 at ¶ 24.)

circumstances based on the amount of material classified, based on the size and complexity of other requests processed by the agency, based on the resources being devoted to the declassification of classified material of public interest, or based on the number of requests for records by courts or administrative tribunals.")  Nevertheless, Plaintiff will examine each factor and explain why it does not support Defendant's request for an *Open America* stay.


### 1.  Mr. Shapiro's status as a prolific requester

Defendant cites no cases, and undersigned counsel is not aware of any, which hold that the number of FOIA requests made by a particular plaintiff that are not the subject of litigation should be considered in evaluating an agency's entitlement to an *Open America* stay for the plaintiff's requests that are the subject of litigation.  Taking into account the history of a particular requester's previous FOIA requests in evaluating an agency's entitlement to an *Open America* stay would run counter to FOIA jurisprudence which does not consider the identity of a requester except in a few narrow exceptions.  *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)("disclosure does not depend on the identity of the requester"); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 837 n.12 (D.C. Cir. 2001)("the identity of the FOIA requester is immaterial"); *Swan v. SEC*, 96 F.3d 498, 499, 321 U.S. App D.C. 8 (D.C. Cir. 1996)("FOIA does not make distinctions based on who is requesting the information"); *Feinman v. FBI*, 680 F. Supp. 2d 169, 175 (D.D.C. 2010)(noting as "exceptions to th[e] rule" that the "identity of a FOIA requester is typically irrelevant to the request," situations involving fee waivers and "first party" requesters); *McLaughlin v. United*

*States DOJ*, 2009 U.S. Dist. LEXIS 102364, at *6 (D.D.C. Nov. 4, 2009) (explaining that as a "general rule" the identity of a FOIA requester is irrelevant to the FOIA analysis).

Defendant intimates that the "prolific" nature of Mr. Shapiro's requests justifies penalizing him with a seven-year stay of proceedings because he has increased the FBI's workload.  (Mot. for *Open America* Stay, at 11)("The Government has demonstrated that exceptional circumstances exist to warrant a stay because . . . Plaintiff's prolific FOIA activity has significantly contributed to the volume, backlog, and delays in processing"; "[T]he [FBI's] sharp increase in volume [of FOIA requests] . . . is partially attributable to the Plaintiff[.]")  Even if the underlying factual premise of Defendant's argument were true, and it is not,[11] nothing in FOIA authorizes a court to grant an agency a lengthy delay based on how prolific a requester is.  *See* 5 USCS § 552(a)(3) (requiring agency to make records "promptly available to *any person*").  If Congress had intended to change the time period required to respond to a request from a frequent FOIA requester, it certainly could have amended the law to create such a provision.  *See e.g.*, 5 Ill. Comp. Stat. § 140/3.2 (2011)(extending time for Illinois agencies to respond to FOIA requests from "recurrent requesters").

Defendant does not allege that Mr. Shapiro has ever failed to pay a required fee, that he has failed to follow applicable agency procedures, or that his FOIA requests are being made for an improper purpose.  Instead, Defendant's request for a stay appears to be in

_____

[11] Mr. Shapiro's FOIA activity has not contributed "significantly" to the FBI's volume, backlog and delays in processing, nor has the FBI experienced a "sharp increase in volume" of requests.  Most of Mr. Shapiro's requests were made in FY 2011, a year in which the FBI experienced a sharp decline in FOIA requests.  *See* Figure 1, supra. According to the FBI's own estimate, Mr. Shapiro's requests amounted to no more than 3% of the FBI's total annual FOIA intake in FY 2011.  First Hardy Decl. ¶ 7 [ECF: dkt 9-1.]

response to Mr. Shapiro's identity as the requester.[12]  For example, the FBI has responded to a request by Professor Potter for records about himself, but is seeking a stay in this case to postpone for seven years its response to a similar request made by Mr. Shapiro about Professor Potter.  (Potter Decl. ¶ 13.)

2.  The size and complexity of Mr. Shapiro's requests

Mr. Hardy estimates that "there are 349,000 pages of *potentially* responsive information remaining to be reviewed for responsiveness, and if responsive, processed." Second Hardy Decl. ¶ 33 (emphasis added).  While this is certainly a significant number of pages, it is not uncommon for the FBI to determine after review that a large number of potentially responsive pages are not responsive after all and therefore need not be processed.  (*See* First Am. Compl. ¶ 377)(noting that after review for responsiveness, only 1,000-1,500 pages of the 11,485 potentially responsive pages were in fact responsive).  Further, Defendant provides no actual evidence that the requests are particularly complex, instead repeating over and over that the requests are "inter-related," as if saying it made it so.  Defendant has not provided any facts from which the Court

---

[12] If the redacted portion of the Clancy declaration asserts that disclosure of documents about "animal rights extremism" specifically to Mr. Shapiro would undermine counterterrorism efforts, the Court should reject such an assertion. *See Military Audit Project v. Casey*, 656 F.2d 724, 730 n.11, 211 U.S. App. D.C. 135 (D.C. Cir. 1981)(explaining, during the Cold War, "Under the Freedom of Information Act, the identity of the requester is immaterial; for example, there is no statutory bar to the military attaché of the Soviet embassy filing FOIA requests for information from the CIA and the FBI on the same basis as a United States citizen.") Because a "a disclosure made to any FOIA requester is effectively a disclosure to the world at large," *Students Against Genocide*, 257 F.3d at 836, the FBI's disclosure of documents pertaining to "animal rights to extremism" to individuals other than Mr. Shapiro undermines any argument that releasing documents to Mr. Shapiro poses a special danger to national security.

could determine the complexity of the requests, such as the number of pages of records

which are classified or the number of other agencies which might need to be consulted.


    3.   <u>The potential harm to FBI's statutory obligations</u>

    Defendant contends that "exceptional circumstances exist where disclosure could harm

the FBI's statutory obligations." (Def. Mot. for *Open America* Stay at 11.) While it is no

doubt true that erroneous disclosure of some of the records requested by Plaintiff could

be harmful to the FBI's statutory obligations, "Congress has already weighed the value of

prompt disclosure against the risk of mistake by an agency and determined that twenty

days is a reasonable time period, absent exceptional circumstances, for an agency to

properly process standard FOIA requests." *Elec. Privacy Info. Ctr. v. DOJ*, 416 F. Supp.

2d 30, 42 (D.D.C. 2006). Defendant "has not yet made any specific showing that it will

not be able to process the documents within" a period less than seven years, and its

"vague suggestion that inadvertent release of exempted documents *might* occur" is

"insufficient to outweigh the very tangible benefits that FOIA seeks to further—

government openness and accountability." *Id.*

    Further, Defendant argues only that inadvertent disclosure *could* harm the FBI's

interests. (Def. Mot. for *Open America* Stay at 11.) The same could be said, however,

about any FOIA request. Yet "courts often find that one to two months is sufficient time

for an agency to process broad FOIA requests that may involve classified or exempt

material." *Elec. Privacy Info. Ctr.*, 416 F. Supp. 2d at 40. Even where the "government

raises important issues of national security in regard to the documents" sought by a

plaintiff, agencies may not move at a "glacial pace" with "an indifference to the

commands of FOIA." *ACLU v. DOD*, 339 F. Supp. 2d 501, 504 (S.D.N.Y. 2004).  While courts must "strik[e] a proper balance between plaintiffs' right to receive information on government activity in a timely manner and the government's contention that national security concerns prevent timely disclosure or identification," when "[n]early one year has passed since the documents were first requested[, . . .] permit[ting] further delays in disclosure or providing justification for not disclosing would subvert the intent of FOIA." *Id.* at 504-05.  If a delay beyond a period of nearly one year since the request for documents would "subvert" the intent of FOIA, the intent of FOIA would be thoroughly decimated if this Court accepts government's proposal for a delay until approximately eight years since the documents were requested.

### 4.  The FBI's backlog

To fully appreciate the error in Defendant's analysis of the significance of the FBI's backlog, it is necessary to understand the rationale behind *Open America.*  The D.C. Circuit's decision in *Open America* was a rejection of the "theory that after a request is made, appealed, and denied, then on the face of the statute the applicant can go to court and secure, without further allegation or proof, an order placing him at the head of the line at the administrative agency."  547 F.2d at 614-15.  The *Open America* court did not want to force the FBI to "tak[e] personnel away from other *prior* requests which the FBI is now engaged in processing" because the result would be that "similar, *prior*, non-urgent requests will be displaced" and "even those requests with an urgent need will be unable *to get to the head of the line*[.]" 547 F.2d at 614-15 (emphasis added).  This Court has routinely described the purpose of an *Open America* stay as making a plaintiff wait in

line behind *prior* requesters. *See e.g., Ohaegbu v. FBI*, 936 F. Supp. 7, 9 (D.D.C. 1996)(granting *Open America* stay because "plaintiff must wait his turn"); *Judicial Watch of Fla. v. United States Justice Dep't*, 1998 U.S. Dist. LEXIS 23441 at *17 (D.D.C. Aug. 25, 1998)(granting *Open America* stay because "expedited treatment of the plaintiff's requests will delay the processing of many other requests made prior to the plaintiff's filing"); *Nation Magazine v. Department of State*, 805 F. Supp. 68, 72 (1992)(explaining the holding of *Open America* as allowing an agency to "process pending requests on a first-in first-out basis, even if such an approach results in delays longer than the period provided by statute").

   Defendant has not alleged that there are any requesters ahead of Mr. Shapiro in line to have their requests processed. Indeed, most of Mr. Shapiro's FOIA requests which are the subject of this litigation were submitted over a year ago. (First Am. Compl. ¶¶ 88-511.) By way of comparison, in FY2012 the median processing time by the FBI for a perfected "simple" request was 8 days and for a perfected "complex" request was 141 days. (Ex. 5 at VII.A.) Rather than requesting time for Mr. Shapiro's requests to rise to the top of the stack, "the FBI is seeking a stay of these proceedings until September 30, 2019, in order to allow RIDS the time necessary to process and release all non-exempt records responsive to plaintiff's requests[.]" Second Hardy Decl. ¶ 37. If the Court grants the relief sought by Defendant, a stay until September 30, 2019 without interim releases, most of Mr. Shapiro's requests which are the subject of this litigation, whether simple or complex, will have been pending for nearly 3,000 days before they are released. Such a delay would represent over three times the length of the FBI's longest pending complex request in FY2012 (which was 775 days) and over five times the length

of the FBI's longest pending simple request in FY 2012 (which was 592 days).  (Ex. 5 at

VII.A.)  Granting Defendant's motion would therefore frustrate, rather than serve, the

purpose of an *Open America* stay.  Further, a consideration of the size of the FBI's

backlog is logically irrelevant to Defendant's request for an *Open America* stay where

there is no allegation that it is not Mr. Shapiro's turn to have his requests processed.[13]


5.  Litigation deadlines in unrelated cases

Defendant cites its obligations in unrelated litigation as a justification for seeking an

*Open America* stay in this case.  Of the six examples of litigation deadlines listed in the

second Hardy declaration, however, two of the deadlines have already passed and

therefore should not be considered in evaluating Defendant's entitlement to a stay.  *See*

*Elec. Frontier Found. v. DOJ*, 517 F. Supp. 2d 111, 118 (D.D.C. 2007)(noting that the

"specific litigation deadlines to which DOJ points have already passed" and therefore do

not constitute exceptional circumstances).  Another two of the deadlines expire in mid-

2013, and therefore do not justify a seven-year stay.  The remaining two litigation

deadlines listed in the Second Hardy Declaration require processing of 500 pages per

month and re-processing of 2,000 pages per month.  Given that there are 2.6 million

pages of documents assigned for processing, the burden of processing or re-processing

the documents involved in those two cases is quite minimal.  Defendant has failed to

show what effect these deadlines will have on its ability to process Mr. Shapiro's

requests.  Further, the initial FOIA requests involved in one of these two cases dates from

---

[13] While the size of the FBI's present backlog is not relevant to the issue of whether the
number of requests received by the FBI was unforeseeable, the FBI's progress (or lack
thereof) in reducing its backlog is relevant to the due diligence inquiry, as explained,
*infra*.

May 6, 2004, (Settlement Agreement and Dismissal at 1, 1:09-cv-391-BAH [ECF dkt: 21]) and were therefore not unpredictable.

Further, Defendant has failed to show that its litigation deadlines impose a workload that could not have been predicted.  Defendant offers no facts to show that any resources diverted to meet litigation deadlines are more significant than in previous years.  *See Gov't Accountability Project v. U.S. Dep't of HHS*, 568 F. Supp. 2d 55, 61 (D.D.C. 2008)("Significantly, because Defendants do not provide the Court with any sense of whether DIDP faced or handled similar litigation requests in previous years, the Court cannot determine whether the 2007 litigation requests were unusual"); *Buc*, 762 F.Supp.2d at 69 ("the FDA neglects to compare the DIDP's present [litigation and subpoena] workload with past levels in such a way that would permit the Court to draw any broader conclusions about the DIDP's workload as it has developed over time.") Although the FBI is a defendant in 122 pending FOIA lawsuits, this is a nearly 20% decrease from August 30, 2004, when it was a defendant in approximately 150 federal lawsuits involving 650 FOIA requests.  *Elec. Privacy Info. Ctr. v. United States DOJ*, 2005 U.S. Dist. LEXIS 18876, at *15 (D.D.C. Aug. 31, 2005).   The FBI has recently had significant resources freed up since the entry of final judgment and dismissal in *Rosenfeld v. U.S. Department of Justice*, Civ. A. Nos. 90-3576-MHP, 85-1709-MHP, and 85-2247-MHP (N.D. Cal.) [3:90-cv-3576-EMC ECF dkt: 155], which Mr. Hardy described as "the FBI largest FOIA litigation in its history" which had required a "substantial commitment of resources," (Ex. 2 at ¶ 17).

6.  <u>Delay due to upgrade of FDPS</u>

The brief downtime caused by the upgrade to the FDPS is not the type of exceptional circumstances that would warrant an *Open America* stay at all, much less a stay for seven years.  Routine upgrades to or maintenance of computer systems involving short periods of unavailability are not uncommon these days and are not so unpredictable or disruptive as to constitute exceptional circumstances.  Even if it would have weighed in favor of a stay at some point in the past, the upgrade has presumably already been completed by now and would only have merited at most, one or two weeks of delay.

  ii. *The FBI's resources are adequate to handle its FOIA workload, including Mr. Shapiro's FOIA requests*

The size and scope of Mr. Shapiro's FOIA requests are not unprecedented in FBI's history and the FBI has previously been able to marshal the resources to respond to even larger and more complex requests.  For example, between 1981 and 1987, investigative journalist Seth Rosenfeld submitted FOIA requests to the FBI relating to several hundred subject matters.  (Ex. 3 at ¶ 4.)  One request by Mr. Rosenfeld encompassed more than 225 subjects related to the Free Speech Movement, University of California officials, and related files detailing FBI investigation of political activities at the University of California, Berkeley.  (*Id*.)  Another request sought records related to the FBI's counterintelligence program, COINTELPRO.  (*Id*.)  The FBI initially identified more than 350,000 pages potentially responsive to these two requests alone.  (*Id*.)  In response to another FOIA request submitted by Mr. Rosenfeld regarding 125 subjects, the FBI identified 216,000 pages of potentially responsive records. (*Id*.)

The FBI mobilized its resources and personnel to respond to Mr. Rosenfeld's FOIA requests, allocating over $1 million in funds and at one point dedicating 126 FOIPA personnel to work full-time on the requests.  (*Id.* at ¶ 6.)  In this case, Defendant does not contend that the FBI is *unable* to commit a similar number of personnel and funds to responding to Mr. Shapiro's FOIA requests.  It appears simply that the FBI is willing to commit so few resources to processing Mr. Shapiro's requests that it would take seven years to complete.  As explained below, the FBI has access to vast resources that would permit it to adequately and timely respond to FOIA requests, including Mr. Shapiro's, in a timely manner, if only it would choose to do so.

In FY2012, when the FBI had a budget of approximately $8.2 billion and a workforce consisting of 34,019 positions, it spent $29.8 million on FOIA processing and employed 291 full-time FOIA staff. (Ex. 4 at 1; Ex. 5 at IX).  In other words, the FBI devoted a mere 0.36% of its total budget and 0.86% of its overall staff to processing FOIA requests.  By contrast, in FY2012 the U.S. Citizenship and Immigration Service, which had only a $3.08 billion budget and 10,700 full-time employees, was able to maintain a staff of 213 full-time FOIA employees (amounting to 1.99% of its total workforce) and expend $16 million in processing costs (amount to 0.53% of its total budget).  (Ex. 6 at 15; Ex. 7 at 155, 159.)

       iii.    *The FBI has not been exercising due diligence in general or in regard to Mr. Shapiro's requests.*

The FBI's recent history with FOIA has demonstrated a consistent pattern of doing less with more.  As shown in Figure 2, for each year from FY2008 to FY2011, the FBI

had been processing fewer FOIA requests despite having more full-time FOIA analysts on staff each year.



**Figure 2, Number of FOIA Requests Processed by FBI Compared to Number of FBI Full-Time FOIA Staff (FY2008-FY2012)**

In his declaration in this case, Mr. Hardy describes some of the steps that have been taken to streamline the FBI's processing of FOIA requests in recent years, (Second Hardy Decl. ¶ 26) and he previously predicted that the Sentinel project, when complete, would further reduce processing time (Ex. 2 ¶ 9). Sentinel became available to all users on July 1, 2012 and FBI employees routinely use it to perform their work, but the FBI did not migrate all case data from the Automated Case System (ACS)[14] to Sentinel, as previously planned. (Ex. 8 at 6.) Thus, the anticipated reduction in processing time has not come to fruition, with the median time for a pending perfected simple request nearly doubling

---

[14] A description of ACS is provided in the Second Hardy Decl. ¶¶ 13, 19.

from FY2011 to FY2012.  (*Compare* Ex. 9 at VII.D (33 days) *with* Ex. 5 at VII.D (61 days)).

By way of comparison, in FY2012, USCIS processed 145,278 FOIA requests, more than 10 times as many as were processed by the FBI.  (Ex. 6 at V; Ex. 5 at V.A.)  In addition to facing a higher volume of incoming requests than the FBI, FOIA requests pending at the USCIS were more often complex than those at the FBI (94% vs. 24%). (Ex. 6 at VII.D; Ex. 5 at VII.D.)  Even with the higher volume and complexity of requests, USCIS was able to process complex requests far more quickly than the FBI. The average number of days a complex request was pending at FBI was 190.12, but only 40 for USCIS. (Ex. 6 at VII.D; Ex. 5 at VII.D.)

Despite long queues for requesters, Defendant was unable to give a single example to a Congressional committee of disciplinary actions or remedial measures being taken with respect to those responsible for administering the FOIA.  Committee Hearing, House Government Reform Committee, Government Management, Finance and Accountability Subcommittee, Hearing on Freedom of Information Act, May 11, 2005.

Defendant also argues that "cradle to grave responsibility" is an example of how the FBI is "continually considering and implementing procedures and processes to more efficiently address workload issues," (Second Hardy Decl. ¶ 29) a factor which should weigh in favor of a finding of due diligence.  However, Defendant provides no evidence that "cradle to grave responsibility" is, was, or will result in faster or better processing of FOIA requests.  Further, while Defendant claims that "cradle to grave responsibility" is an example of how the FBI has been "continually considering and implementing procedures and processes," it fails to note that "cradle to grave responsibility" is not a

new process, but one which Mr. Hardy has promoted since at least as early as 2004 as part of the "FOIA Re-engineering Project" (Ex. 10 at 21).  Defendant can hardly demonstrate "due diligence" by simply stating that it is continuing to adhere to a nearly decade-old process with no evidence of whether that process is effective.  It is at least plausible that "cradle to grave responsibility," while "designed to achieve additional efficiency," (Second Hardy Decl. ¶ 29) is actually less efficient than having each analyst perform a different task in the same way that assigning a single factory worker to build an entire automobile is less efficient than an assembly line.  At the very least, it appears that requiring a majority of the FOIPA Disclosure Units to assume responsibility for performing a substantial amount of non-FOIPA-related work[15] would lead to a reduction in the number of FOIPA requests processed.

Prior to 2001, the FBI had roughly 600 employees doing FOIA work.  After 9/11, as Subcommittee Chairman Rep. Platts noted, there was a "tremendous redirection" of resources and the number of employees at FBI doing FOIA work was reduced by one-third.  Committee Hearing, House Government Reform Committee, Government Management, Finance and Accountability Subcommittee, Hearing on Freedom of Information Act, May 11, 2005.  As Mr. Hardy has noted, there was a "reduction of RIDS personnel to support the war on terrorism following September 11, 2001[.]" (Ex. 1 ¶ 22.)  The redirection of resources occurred in response to the executive branch's refusal to support the FBI's request for increased funding for counterterrorism operations and

---

[15] According to Mr. Hardy, 3 of the 5 FOIPA Disclosure Units now perform "the same tasks performed by WPU" in addition to their traditional tasks.  Second Hardy Decl. ¶ 7(c).  The WPU's tasks include "sorting all correspondence/incoming requests for information from the public, Congress, Presidential Libraries, foreign governments, other federal and state agencies, and other FBI entities (e.g., FBI Field Offices and Legal Attaché offices)."  Second Hardy Decl. ¶ 7 (a)(i).

personnel in the immediate aftermath of September 11, 2001.  (Ex. 11.)  However justified and well-meaning this redirection may have been, it represents a conscious policy choice by the FBI which does not bespeak diligence in attempting to comply with the time limits set forth in FOIA.  In reversing the grant of an *Open America* stay, the Ninth Circuit explained, "It may be that agency heads, such as the Attorney General in this case, can be forced by the Freedom of Information Act to divert staff from programs they think more valuable to Freedom of Information Act compliance. It may be that people with ulterior motives can use Freedom of Information Act requests to interfere with the proper functioning of federal agencies. Arguably taxpayers are providing an excess of free research and copying services to authors and investigators. But these policy concerns are legislative, not judicial, and we intimate no views on them. Congress wrote a tough statute on agency delay in FOIA compliance, and recently made it tougher." *Fiduccia*, 185 F.3d at 1041.

Defendant also avers, "Historically, the FBI repeatedly has sought additional funding for the creation of new FOIA positions."  Second Hardy Decl. ¶ 26.  This statement is misleading at best, and Defendant provides no evidence to support it.  There is no line item representing funding for FOIA personnel or activities in the budget proposals sent by the executive branch to Congress.  (Ex. 12, Dept. of Justice FOIA Update, Vol. XI, No. 1 (1990)).  Instead, the FBI is free to distribute and redistribute resources to processing FOIA requests as it deems appropriate.  What the FBI has done instead of asking Congress for additional funding has been to ask for additional funding through "requests within the executive branch, by the Office of Management and Budget and by

the Department of Justice, before the requests even got to Congress." *Fiduccia*, 185 F.3d at 1042.

In its most recent Authorization and Budget Request to Congress (FY2013), the FBI makes no mention of the need for additional funding or staff for responding to FOIA requests.  (Ex. 13.)  None of the new funding requested for programs or positions would be applied to responding to FOIA requests.  (*Id.*)  Further, the FBI does not even mention the reduction of the agency's FOIA backlog as a "strategic goal" or "strategic objective." (*Id.*)

As Defendant acknowledges, in addition to the need to show due diligence generally, the agency is required to show due diligence in responding to a plaintiff's requests specifically.  (Def. Mot. for *Open America* Stay at 18.)  The D.C. Circuit has explained that the FOIA's legislative history requires an agency to have exercised "due diligence" from the outset in order to qualify for the kind of relief Defendant seeks here.  *Oglesby v. Dep't of the Army*, 920 F.2d 57, 62 n.3, 287 U.S. App. D.C. 126 (D.C. Cir. 1990) ("The court [has] authority to allow the agency additional time to examine requested records in exceptional circumstances where the agency was exercising due diligence in responding to the request *and had been since the request was received*") (*quoting* H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 11 (1974)) (emphasis added).  Defendant has failed to show that the FBI has acted diligently since it received Mr. Shapiro's requests.

Of the requests at issue in this litigation, the vast majority were submitted by Mr. Shapiro in 2011 but have not been responded to yet by the FBI.  (*See generally*, First Am. Compl.)The oldest of Mr. Shapiro's requests at issue in this litigation that the FBI has not responded to was submitted on October 24, 2010 (Lindsay Parme #1156661-000) and the

newest was submitted February 10, 2012 (U.S. Surgical Corp. #1182729-000).  (*See* First

Am. Compl. ¶¶ 128-29, 370.)  Thus, all of Mr. Shapiro's requests at issue in this

litigation to which the FBI has not responded have been pending for at least a year, most

have been pending for between one and two years, and a few have been pending for over

two years.  Yet as of the submission of Defendant's Motion for *Open America* Stay and

Second Hardy Declaration on July 31, 2012, the FBI had not even obtained all of the

records potentially responsive to Mr. Shapiro's requests, let alone completed a review of

them for responsiveness. (Second Hardy Decl. ¶ 33.)

   Defendant has not produced even the most basic information from which the Court

could determine whether or not the FBI has acted with diligence in responding to Mr.

Shapiro's requests.  For example, the FBI has failed to provide evidence of when the FBI

"perfected" each of Mr. Shapiro's requests; when and how long it took to search for and

collect potentially responsive records; when and how long it has taken to scope the

material for responsiveness; whether classification or declassification is needed and/or

has been performed; when the requests were assigned to a FOIPA disclosure unit; into

which of the three queues (small, medium, or large) each of Mr. Shapiro's requests were

placed;[16] how many other requesters were ahead of Mr. Shapiro in the queue; and when

and how long it has taken to process the information.

   Defendant's actions in this litigation also undermine any claim of diligence.  On

October 18, 2011, Plaintiff filed the Complaint in case 11-cv-1835 which eventually

---

[16] Although it appears that the FBI has now placed all of Mr. Shapiro's requests at issue
in this litigation into the long-queue, (Def. Mot. for *Open America* Stay at 18), it is not
clear where they were initially placed or why those requests that are the subject of this
litigation, *and only those requests*, are being treated as a single aggregated request for
processing purposes.

came to be consolidated with the present action.  After Plaintiff filed and served the

Complaint in case 11-1835, Defendant failed to timely respond to the Complaint and a

default was entered.  [11-1835, ECF: dkt. 7.]  This Court granted Defendant's motion to

vacate the default and granted Defendant's request for an additional thirty days to

respond to the Complaint.  Defendant then made a second request for an extension of

time [11-1835, ECF: dkt. 19] and was granted another thirty days to respond to the

Complaint.  After this Court issued a scheduling order giving Defendant approximately

two weeks to produce the requested records, Defendant requested [11-1835, ECF: dkt.

24] and was granted an additional period of nearly three months to produce the records.

Less than three hours before the deadline for production of documents, Defendant filed a

motion indicating that it would not produce the documents on the date required by the

scheduling order and would not commit to producing the documents on any date certain.

Instead, Defendant requested an additional ten days to either produce the documents or

file a motion for a stay. [11-1835, ECF: dkt. 25.]  Plaintiff's four FOIA cases were then

consolidated at which point the Court ordered the parties to meet and confer.  Defendant,

rather than agreeing to meet and confer, moved for an extension of time to file the Meet

and Confer Statement.  This Court denied Defendant's request for an extension and

ordered production by July 20, 2012 of certain documents which Defendant had

previously agreed to produce by May 15, 2012.  Plaintiff was ordered to submit a list of

priorities and Defendant was ordered to propose a schedule for disclosure 20 days

thereafter.  Plaintiff complied with the order, but Defendant filed the presently-pending

motion for an *Open America* stay.

As is clear from the procedural history of this case, Defendant has been dilatory every step of the way in an attempt to forestall production of even non-exempt records to which Mr. Shapiro is entitled.  Defendant's response to the Complaint in this case was originally due on March 29, 2012 [ECF dkt: 5], but Defendant did not move for a stay until over four months later, on August 1, 2012 [ECF dkt: 17].  *See Gov't Accountability Project v. U.S. Dep't of HHS*, 568 F. Supp. 2d 55, 64 (D.D.C. 2008)(three-and-a-half month delay between deadline for responding to Complaint and filing of *Open America* stay "cannot be described as a model of due diligence.")

The only attempt by Defendant to show that the FBI acted with diligence with regard to Mr. Shapiro's requests is to point out that it "released approximately 2,599 pages of documents responsive to Plaintiff's requests for information about himself and COK." (Def. Mot. for *Open America* Stay at 18.)  This statement is, first of all, untrue.  As Mr. Hardy states in his declaration, "RIDS *reviewed* approximately 2599 pages of information, and *released* 720 pages in whole or in part." Second Hardy Declaration ¶ 24 (emphasis added).  But regardless of the number of pages released, it is disingenuous for Defendant to take credit for being diligent when Defendant did not produce non-exempt documents relating to Mr. Shapiro and COK *until this Court refused Defendant's request for further delay*.  It appears that but for the Court's order, the FBI would not have released even this limited number of documents.  Second Hardy Declaration ¶ 24 (noting that FBI obeyed  this Court's order to produce documents "[d]espite the FBI's concerns about being able to fully assess the implications of disclosure of these records in relation to the processing of related information responsive to other requests[.]")

*iii.*     *The FBI has not shown progress in reducing its backlog*

The FBI has not made progress in reducing its backlog of FOIA requests, and in fact the backlog increased dramatically in FY 2012.



**Figure 3, FBI FOIA Backlog for FY2008-FY2012**

During the period from FY2009-FY2011 when the FBI's backlog did decrease, the reduction in the number of pending requests was not attributable to any affirmative efforts made by the FBI, but was simply the result of fewer requests being made.  Indeed, the FBI's productivity in processing FOIA requests actually *decreased* during these years, but the backlog declined anyway because the decrease in productivity was offset by the decline in the number of FOIA requests.



**Figure 4, FOIA Requests Received and Processed by FBI for FY2008-FY2012**

> iv.  *Defendant's "mosaic theory" is inapplicable to the Open America context and, if applied in such circumstances, would have a devastating impact on the administration of FOIA.*

Defendant argues that because of the "interrelated nature of the records in this case," the agency must consider each piece of information, no matter how innocuous, "as part of a whole" before the FBI can determine whether release "would reveal how the FBI's domestic terrorism program operates, and the sources, techniques, and methods it utilizes." (Def. Mot. for *Open America* Stay at 13-14.)  Defendant claims that the FBI must consider every piece of information requested by Mr. Shapiro in relation to every other piece of information requested by Mr. Shapiro, in addition to all information in the public domain, before it can assess the "true impact of the disclosure."

Defendant asks the Court to find that extraordinary circumstances exist because Mr. Shapiro's requests implicate this so-called "mosaic theory."  Although courts have occasionally relied on mosaic theory in cases involving national security, adopting

Defendant's argument in the context of this case would be both radical and unprecedented, and would severely undermine the functioning of FOIA.

In two of the cases cited by Defendant to support its mosaic theory, the court found that a particular piece of information was properly withheld under one or more FOIA exemptions because, when combined with other information, it would threaten the government's interest protected by that exemption. *See Ctr. for Nat'l Sec. Studies v. United States DOJ*, 331 F.3d 918, 929, 356 U.S. App. D.C. 333, 344 (D.C. Cir. 2003)(withholding under Exemption 7(A) justified because releasing the names of every individual detained after 9/11, when combined with terrorist organizations' knowledge of their membership, would deter or hinder cooperation by detainees); *Edmonds v. United States DOJ*, 405 F. Supp. 2d 23, 24, 33 (D.D.C. 2005)(withholding under Exemption 1 justified because releasing memoranda and transcripts of interviews, when combined with plaintiff counsel's notes of the meeting, would reveal information gathering methods and activities within the FBI's translation services); *Lewis-Bey v. United States DOJ*, 595 F. Supp. 2d 120, 137 (D.D.C. 2009)(withholding under exemptions 2 and 7(D) justified because releasing confidential source codes, dates, and other identifying information, when combined with plaintiff's knowledge of the informant's identities, would place informants in danger).  The situation in the present case is different.  Defendant does not invoke any of FOIA's exemptions and does not identify a particular piece of information that is innocuous by itself but damaging to governmental interests when combined with other information.  Instead, Defendant seeks a seven year stay because of the mere possibility that some hypothetical piece of information requested by Mr. Shapiro could be combined with some other hypothetical piece of information also requested by Mr.

Shapiro or in the public domain, in order to damage the government's ability to combat terrorism in some way that they cannot even mention on the public record. As this Court has recognized, "Even using the Government's theoretical model of a mosaic, it must be acknowledged that the mosaic theory is only as persuasive as the tiles which compose it and the glue which binds them together – just as a brick wall is only as strong as the individual bricks which support it and the cement that keeps the bricks in place. Therefore, if the individual pieces of a mosaic are inherently flawed or do not fit together, then the mosaic will eventually split apart, just as the brick wall will eventually collapse." *Al-Adahi v. Obama*, 698 F. Supp. 2d 48, 55 (D.D.C. 2010). Where, as here, the government provides neither the "tiles" nor the "glue," its mosaic splits apart. It is not surprising then, that no court appears to have ever relied on the "mosaic theory" in determining whether extraordinary circumstances exist for the purpose of an *Open America* stay.

In addition to the absence of any legal authority to support Defendant's position, the Court should reject Defendant's position because of the havoc it would wreak on the administration of FOIA. Defendant would have this Court believe that there is something special about Mr. Shapiro's FOIA requests in this case, as compared to all of the other FOIA requests it receives, such that the FBI's processing of the requests requires application of the "mosaic theory" and thus constitutes "extraordinary circumstances." The reality is, however, that every case is a mosaic case, and the processing of Mr. Shapiro's requests is not fundamentally different than the processing of other requests. No information is dangerous in itself, as even the launch codes for the nation's nuclear arsenal requires access to and knowledge of how to use the system. On the other hand,

any information, no matter how innocuous it may seem, could conceivably provide the last piece of the jigsaw puzzle that a terrorist group needs to complete an attack. Thus, whenever the FBI processes *any* FOIA request, it is (presumably) considering whether the information could be combined with other information in the public domain to threaten national security. Because there is no intrinsic difference between an ordinary FOIA request and a "mosaic" request, Defendant cannot simply invoke the "interrelatedness" of Mr. Shapiro's requests to classify them as mosaic and therefore have the Court deem their processing to constitute extraordinary circumstances.

The implications of accepting Defendant's argument raise serious questions. Why should Defendant only be entitled to a seven year stay when information might become available in eight years which would turn otherwise innocuous information disclosed to Mr. Shapiro into a dangerous piece of the mosaic? If Defendant is entitled to a stay because of the "interrelatedness" of Mr. Shapiro's requests involved in this litigation, why should the stay not extend to *all* of Mr. Shapiro's "interrelated" requests, whether or not they are part of this litigation? For that matter, why not extend the stay until *every* present requester's animal rights-related FOIA request has been processed? What principle would prevent Defendant from being entitled to a stay until every possible *future* request for animal rights-related information has been processed? The same rationale would permit any agency to obtain a stay of any length as to any FOIA request simply by asserting that some hypothetical future requester could obtain an otherwise innocuous piece of information that maybe – *just maybe* – could be combined with "future disclosures in the context of other anticipated/potential disclosures" to "threaten[]

and undermin[e] the FBI's ongoing law enforcement operations related to domestic

terrorism."  Second Hard Decl. ¶ 36.

Granting Defendant's request for an *Open America* stay would also threaten the

vitality of FOIA by creating a chilling effect on requesters.  As investigative journalist

Jason Leopold points out, "If the FBI were successful in obtaining a seven-year stay

simply by mentioning 'national security' it would make FOIA a useless tool and would

discourage me and other journalists from filing FOIA requests.  It would be impossible

for me to continue my work doing investigative reporting relating to issues of national

security if I was required to wait years before obtaining records relating to my

investigative work. If the Court grants the FBI's request for a stay in this case, it would

truly have a chilling effect on me and investigative journalism in general."  Leopold Decl.

at ¶ 6.  Investigative journalists like Mr. Leopold have come to "rely heavily on the

Freedom of Information Act to back up the revelations and assertions" in their reports

and have found FOIA to be an essential tool "to inform the public about ongoing

government activity primarily in areas pertaining to counterterrorism, national security,

domestic surveillance and civil liberties."  Leopold Decl. at ¶ 6.  Any chilling effect on

Mr. Leopold or other journalists would be a tragedy.  Mr. Leopold, through a FOIA

request which unquestionably raised issues relating to national security, was able "to pry

loose a previously classified Department of Defense Inspector General's report on the use

of mind-altering substances at Guantanamo Bay."   Leopold Decl. at ¶ 6.  Such

discoveries, and the consequent public attention to government misfeasance, are precisely

the reason that the FOIA exists.  If Congress had intended for "mosaic theory" to be

relied on by agencies as constituting exceptional circumstances, surely there would be

support in the text of the FOIA or in the legislative history for its amendments which would contain some reference to such a potentially sweeping carve-out to the statutory time limits.  In fact, there is none.

   v.      *The factual premise of the FBI's "mosaic theory" argument is flawed*

   In the public version of his declaration, Michael Clancy states, "the importance of coordinating responses to Mr. Shapiro's numerous FOIA/Privacy Act requests rather than making piecemeal releases over the course of several years is a key factor driving the the [sic] FBI's public request for a stay until September 30, 2019 to allow it to complete processing of the entire collection of documents."  Clancy Decl. ¶ 35.  Defendant relies on the Clancy declaration to support its mosaic theory and to argue that the "FBI can only make reasoned decisions about the effect of disclosure of any particular information by analyzing it in context with other inter-related information and determine [sic] whether, if pieced together, the information would reveal how the FBI's Domestic Terrorism program operates, and the sources, techniques, and methods it utilizes."  (Def. Mot. for *Open America* Stay at 14.)  Whatever the merits of this argument might be in the abstract, the FBI's pleas here ring hollow in light of the agency's pattern of processing and releasing records in response to similar FOIA requests submitted by Mr. Shapiro and others.

   The FBI has responded to Mr. Shapiro's FOIA requests which are the subject of this litigation in a very different fashion from those which are not part of this litigation.  But there is no legitimate reason for this disparate treatment, as the two groups of requests (i.e., litigated and non-litigated) do not differ in any fundamentally different way.

Instead, the FBI simply seems to be seeking a "litigation penalty" against Mr. Shapiro for seeking redress from this Court for violations of his statutory right to the timely release of records.

To date, the FBI has made at least 43 releases of documents to Mr. Shapiro relating to his project on the FBI and animal rights/animal protection matters.  (Second Shapiro Decl. ¶ 2.) In the course of these releases, the FBI has reviewed and released to Mr. Shapiro roughly 37, 879 pages of responsive records, and has reviewed and withheld another roughly 25,278 responsive pages.  (*Id.* ¶ 2.)  The majority of these releases directly pertain to the Animal Liberation Front (ALF), the underground animal rights organization the FBI has consistently maintained is the leading criminal and terrorist threat posed by the animal rights movement.  (*Id.* ¶ 3.)  Twenty-five of the 43 releases to date directly pertain to the ALF.  (*Id.* ¶ 3.) Of the released 37,879 pages, 29,514 pages directly pertain to the ALF, while 24,028 of the 25,278 pages withheld directly pertain to the ALF.  (*Id.* ¶ 3.)

The FBI does not, nor could it, assert that the records processed in connection with Mr. Shapiro's requests relating to the ALF are any less inter-related, sensitive, complex, or part of a "mosaic" than the records that relate to the litigation at issue in this case.  Yet even after Defendant moved for a stay of proceedings in this case, the FBI has continued to review and release to Mr. Shapiro thousands of pages of responsive records.  Since moving for an Open America stay on August 1, 2012, the FBI has made five releases to Mr. Shapiro comprising 15,583 pages of released responsive records and 12,656 pages of withheld responsive records.  (*Id.* ¶ 4.)  Four of these five releases directly pertain to the ALF and the fifth pertains to an animal rights activist suspected of involvement in the

ALF.  (*Id.* ¶ 4.) Significantly, *just one* of these releases contained records explicitly pertaining to at least *two dozen of the subjects of the present litigation*.  (*Id.* ¶ 5.)

Including releases made before and since Defendant moved for an *Open America* stay, the FBI has released to Mr. Shapiro records directly pertaining to at least *59 of the 68 FBI-related subjects of the present litigation*.  (*Id.* ¶ 7.)This includes records pertaining to 32 of the 42 individuals, 2 of the 3 publications, 11 of the 11 animal rights/protection organizations, 9 of the 9 organizations opposing animal rights/protection organizations, and 3 of the 3 animal rights/protection-related events that are subjects of the present litigation.  (*Id.* ¶ 7.)

Additionally, in a letter sent to Mr. Shapiro after Defendant's filing of the motion for an *Open America* stay, Section Chief Hardy responded to an inquiry from Mr. Shapiro concerning 15 of his animal rights FOIA requests, informing him that 12 of those requests were being processed and were estimated to be completed by January 2013.  (*Id.* ¶ 9.)  In the same letter, Section Chief Hardy also informed Mr. Shapiro that processing of the remaining three of his specified requests had now already been completed.  (*Id.* ¶ 9.)  Two of these requests (one for an organization opposing the animal rights movement and another for FBI investigation of alleged vandalism committed by animal rights activists) were denied on the basis that the FBI was unable to locate responsive records, and the third request (for records pertaining to Jonathan Camp, Director of Outreach for the vegan advocacy organization Vegan Outreach) was denied on the basis of FOIA exemption 7(A) (pertaining to ongoing law enforcement investigations). (*Id.* ¶ 9.)

The FBI has also processed records in response to FOIA requests similar to ones at issue in this litigation, but submitted by other requesters.  For example, the FBI has

recently processed two requests for records relating to and submitted by Professor William Potter while asserting that a similar request about Professor Potter submitted by Mr. Shapiro could not be processed.

Thus, the FBI appears perfectly capable of reviewing requested records pertaining to animal rights/protection matters and releasing or withholding those records as they are reviewed.

     *vi.*    *The Court should not accord a presumption of good faith to the Second Hardy declaration because it contains numerous false statements.*

Due to informational asymmetry between the parties and the Court's denial of leave to take discovery, Mr. Shapiro is limited in his ability to challenge the factual allegations of the Second Hardy declaration.  Nevertheless, many of the statements in the Second Hardy Declaration are contradicted by statements in trustworthy extrinsic documents (including other declarations by Mr. Hardy).  These contradictions should lead the court to question the reliability of the entire declaration under the principle of *falsus in uno, falsus in omnibus.  See Parker v. United States*, 801 F.2d 1382, 1385, 255 U.S. App. D.C. 343 (D.C. Cir. 1986)(factfinder has discretion to disregard entirety of testimony if any portion is willfully false with respect to a material fact).  For example:

- In ¶ 27, Mr. Hardy states, "In 2009, as a result of new Department of Justice guidelines, the average size of an FBI FOIA request jumped from 500 to 1,000 pages," but the actual increase in size was only 30%.

- In ¶ 28, Mr. Hardy states, "with two months left in FY 2012, we have already exceeded our FY 2011 intake by 14%" although Defendant has now acknowledged that the actual number is less than 1%.

- Also in ¶ 28, Mr. Hardy states that there are "3,718 pending requests" and "3,718 backlogged requests . . . that are pending assignment to a FOIPA Disclosure Unit for processing."  Unless every single pending request is backlogged and pending assignment (meaning that no pending requests are currently being processed), these statements cannot both be true.

C.  <u>If the Court grants an Open America stay, it should allow much less than seven years for the FBI to complete its initial production of records.</u>

During the debate on the E-FOIA amendments, Congresswoman Maloney stated that the legislation "would tackle the mother of all complaints lodged against the Freedom of Information Act: that is, the often ludicrous amount of time it take [sic] some agencies to respond, if they respond at all, to freedom of information requests.  By the time freedom of information requests are fulfilled, the information is often useless to the requester, if the requester has not died of old age. If you request a document from the FBI, you may be forced to wait for more than 4 years before you receive it, if not longer . . . . Information delayed is certainly information denied."  142 Cong. Rec. H 10447, 10451 (Sep. 17, 1996).  Echoing these concerns, the Ninth Circuit explained, "Congress gave agencies 20 *days*, not years, to decide whether to comply with requests and notify the requesters . . . . Telling the requester 'You'll get the documents 15, or eight, years from now' amounts as a practical matter in most cases to saying 'regardless of whether you are

entitled to the documents, we will not give them to you.'" *Fiduccia*, 185 F.3d at 1041 (emphasis in original).

Defendant's proposed schedule anticipates the FBI processing an average of 4,059 pages per month.  At this rate, processing would not be complete until September 2019, approximately eight years after most of Plaintiff's initial requests and just shy of nine years after his earliest request.  That is too long.  As a practical matter, much of the information would be useless by then and the public discourse on many important and controversial issues will have suffered.  *See Nat'l Sec. Counselors v. CIA*, 1:11-cv-443 (BAH), 2012 U.S. Dist. LEXIS 149073 at *54 (D.D.C. Oct. 17, 2012)("FOIA was intended to promote not merely disclosure, but *timely* disclosure.")

As explained in the declarations of the writers and journalists who have submitted declarations, a seven-year delay is intolerable. For example, the records sought by Mr. Shapiro are relevant to the debate surrounding the proposals right now in many states to adopt controversial legislation which would prohibit animal rights activists from gaining and publicizing information that is essential for public dialogue.  Lovitz Decl. ¶ 13; Potter Decl. ¶ 10.  As Professor Potter explains, "The records requested by Mr. Shapiro would provide an invaluable contribution to the public debate over this type of legislation if released in a timely fashion, but not in 7 years." Potter Decl. ¶ 10.  Further, Defendant's proposed seven-year delay would inhibit the public and other scholars from understanding the impact of government investigation of activists upon the animal rights movement, and as such would forestall debate over whether scarce resources are being inappropriately spent by the FBI on preparing for terrorism attacks by animal rights activists.   Lovitz Decl. ¶ 13; Potter Decl. ¶ 12.  **Defendant itself has also recognized**

**the public interest served by Mr. Shapiro's FOIA requests**, with the FBI granting him an apparently unprecedented blanket fee waiver for all of his FOIA requests which relate to animal rights / protection.  Second Shapiro Decl. ¶ 11.

    While Mr. Shapiro is strongly opposed to the granting of an *Open America* stay, should the Court conclude that such a stay is warranted, he respectfully requests that the FBI be ordered to process the requested records at the rate of 50,000 pages per month. Although such a production schedule would require somewhat quicker production than this Court ordered in 1978 for a similarly-sized FOIA request about the investigation and execution of Julius and Ethel Rosenberg, several factors warrant more rapid production. *Meeropol v. Meese*, 790 F.2d 942, 947, 252 U.S. App. D.C. 381 (D.C. Cir. 1986)(noting the district court's "1978 Order requir[ing] the FBI to search, [sic] process documents at the rate of 40,000 pages per month and to release all 'non-exempt, non-duplicative records.'")  First, the FBI has already completed its search for documents responsive to Plaintiff's requests and therefore, unlike *Meeropol*, the FBI need only process, not search for, responsive documents.  Second Hardy Decl. ¶ 19 ("As of this date, RIDS has completed the searches for records potentially responsive to all of these requests.") Second, advances in technology have significantly increased the rate at which FOIA employees can process documents.  Second Hardy Decl. ¶ 26 (describing use of technology to increase efficiency of processing FOIPA requests).  Third, in 1978 the FBI had only 247 FOIPA employees, whereas now it has 291 full-time FOIPA employees. Lesar Decl., attached as Ex. A to Plaintiff's Response in Opposition to Stay Proceedings [dkt: 5] in *Computer Professionals for Social Responsibility v. FBI*, 92-2117-HHG (D.D.C. 1992).

Defendant provides no explanation for how it arrived at its proposed processing schedule, and it appears that the FBI arbitrarily picked a number of pages per month[17] that would be analyzed such that the total processing time would add up to seven years. No statistics are provided as to how many pages an analyst can process in a month or how many analysts the FBI intends to assign to processing Mr. Shapiro's FOIA requests. It is unclear whether the FBI contends that under its "mosaic theory" a single FOIA analyst must process all 349,000 potentially responsive pages in order to ensure that every piece of seemingly innocuous information is considered against the backdrop of every other piece of seemingly innocuous information. If it is not the FBI's contention that a single analyst must process all of the records, then it is difficult to understand why Mr. Shapiro's requests would need to be processed consecutively, as the FBI's production schedule contemplates, rather than concurrently. In other words, there does not appear to be any reason why some analysts could not begin processing Tier 2 before their colleagues have completed Tier 1.

A single analyst should be able to process at least 1,000 pages per month. *See Summers v. United States Dep't of Justice*, 925 F.2d 450, 453 n.3, 288 U.S. App. D.C. 219 (D.C. Cir. 1991)("According to the government's undisputed assertions, a document examiner began to process Summers' FOIA request on May 7, 1990 and, as of November 9, 1990, the FBI had provided to Summers a total of 6,625 pages in four interim

---

[17] Mr. Hardy's claim that the FBI will be "faced with an *increasingly* complicated set of factors" (emphasis added) as it processes Mr. Shapiro's requests is difficult to reconcile with Defendant's proposed processing schedule involving a *constant* rate of processing. *Compare* Second Hardy Decl. ¶ 34 *with* ¶ 38.

releases.")  Thus, if 50 analysts[18] are assigned to process Mr. Shapiro's requests, the FBI

should have no problem reaching a processing rate of 50,000 pages per month.


   D.  If the Court grants an *Open America* stay, it should require the FBI to release
       records on a rolling basis.


   While acknowledging that "the FBI typically proposes processing schedules in FOIA

cases that call for the rolling production of non-exempt, responsive records at regular

intervals (e.g., monthly)," Mr. Hardy asserts that this approach is not "feasible" in this

case given "concerns about the volume of inter-related information and the mosaic effect

of disclosure of pieces of information."  Second Hardy Decl. ¶ 37.  Mr. Hardy's assertion

that interim releases are not "feasible" is belied by statements he made in a presentation

regarding the FBI Records/Information Dissemination Section's (RIDS) "Re-Engineering

Project."  During the presentation, Mr. Hardy emphasizes that RIDS personnel "*must*

make interim releases on medium and large queue cases" (emphasis added).

http://www.governmentattic.org/3docs/FBIpoliciesCD-ROM.pdf.

   Defendant does not cite any cases, and undersigned counsel could find none, in which

a court has refused to order interim releases.  On the other hand, this Court ordered

interim releases over the government's objection in *Gov't Accountability Project v. U.S.

Dep't of HHS*, 568 F. Supp. 2d 55, 64 (D.D.C. 2008)(ordering agency "to process

Plaintiff's FOIA request and release the documents on a rolling basis.")

---

[18] This request is far more modest than the 126 FOIPA analysts who were assigned to
process Mr. Rosenfeld's recently completed litigation.  (Ex. 3 at ¶ 4.)

Further, the FBI has been making interim releases to Mr. Shapiro's FOIA requests related to animal rights / animal protection which are not the subject of this litigation. It is therefore clearly "feasible" for the FBI to do so for the litigated requests as well.

E.   If the Court grants an *Open America* stay, it should exclude from the stay those requests not directed to the FBI and those to which the agency has already responded.

If the Court grants an *Open America* stay, Mr. Shapiro respectfully requests that certain of his FOIA requests be excluded from the scope of the stay and that the Court set a briefing schedule for summary judgment as to those claims. Defendant has made no attempt to demonstrate that the ATF or the DOJ as a whole meet the standard for an *Open America* stay. Therefore, the FOIA requests submitted by Mr. Shapiro which relate to documents in the possession of the ATF should be excluded from any stay. (First Am. Compl. ¶¶ 554-55.) Second, because Defendant's motion is premised on the need for additional time to locate and process records, the parties should be able to proceed to brief those claims which relate to FOIA requests that have already been processed. This would include Mr. Shapiro's requests about himself and the organization COK, as well as his requests regarding the ALF, the U.S. Surgical Bombing, *Green in the New Red*, Screaming Wolf, *A Declaration of War*, the murder of Hyram Kitchen,[19] the February 21, 1990 NCIC alert, and Camille Marino (First Am. Compl. ¶¶ 554, 555, 582, 584-88.)

---

[19] After the filing of this lawsuit, Mr. Shapiro's administrative appeal regarding his FOIA request for records relating to the murder of Hyram Kicthen was remanded and is currently being processed.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Shapiro respectfully requests that Defendant's Motion for an *Open America* stay be denied, or in the alternative that a more limited stay be entered.


Respectfully Submitted,


__/s/ Jeffrey Light_____

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE


I hereby certify this 21st day of February, 2013 that a copy of the foregoing **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR *OPEN AMERICA* STAY** has been served via ECF on all counsel of record.


_/s/ Jeffrey Light_____

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

*Counsel for Plaintiff*