# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RYAN NOAH SHAPIRO,          *

                                 *

          Plaintiff,         *

                                 *

          v.             *     Case: 1:12-cv-00313 (BAH)

                                 *

DEPARTMENT OF JUSTICE,      *

                                 *

          Defendant.     *

                                 *

*    *    *    *    *    *    *    *    *    *    *    *    *

### *AMICI CURIAE* BRIEF IN PARTIAL OPPOSITION TO DEFENDANT'S MOTION FOR *OPEN AMERICA* STAY

     The Center for Constitutional Rights, the Washington, D.C. Chapter of the National Lawyers Guild, the National Security Archive, National Security Counselors, Truthout, and Mark Zaid (collectively "Amici") respectfully submit this *Amici Curiae* Brief in Partial Opposition to Defendant's Motion for *Open America* Stay, Dkt. #19-1 (filed Aug. 3, 2012) ("FBI's Motion").

### INTERESTS OF *AMICI CURIAE*

     Amici are non-profit institutions, representatives of the news media, and individuals which frequently file and litigate Freedom of Information Act ("FOIA") requests, both on their own behalf and on behalf of clients, in order to inform and educate the public about government operations and activities. Together they collectively file thousands of FOIA requests each year, many with law enforcement, defense, and intelligence agencies. Their interest in this case is to ensure that the Federal Bureau of Investigation ("FBI") and other agencies are not permitted to indefinitely delay responses to FOIA requests through a misapplication of the "mosaic theory," by which they could both: a) penalize frequent requesters (like Plaintiff and Amici) and b) allow

third parties unaffiliated with requests to interfere with their processing of those requests by filing requests for similar records.

As frequent—and in some cases prolific—FOIA requesters and litigators which often file and/or litigate complex requests, Amici are very familiar both with the "industry standard" of interim releases—a mutually beneficial compromise between requesters and agencies which allows agencies to take longer periods of time to process complex requests while still providing timely information to requesters—and agencies' use of the mosaic theory. Both practices are sound, well-established fixtures of modern FOIA administration, which until this case have never been argued to be at odds with one another. Because of the paramount importance of *timely* release of information in FOIA jurisprudence, coupled with the simple fact that both principles can be easily reconciled without sacrificing one to the other, this Court should deny FBI's Motion to the extent that it seeks the Court's sanction of FBI's refusal to make interim releases.

## **ARGUMENT**

This Court recently observed, "FOIA was intended to promote not merely disclosure, but *timely* disclosure." *Nat'l Sec. Counselors v. CIA*, No. 11-443, 2012 U.S. Dist. LEXIS 149073, at *54 (D.D.C. Oct. 17, 2012). To that end, courts have endorsed the making of "interim," "rolling," or "piecemeal" releases for over thirty years. "[C]ourts have held that it is preferable for an agency to release documents to a requester on a rolling basis, as they are determined to be responsive to the request." *S. Yuba River Citizens League v. Nat'l Maritime Fisheries Serv.*, No. 06-2845, 2008 U.S. Dist. LEXIS 107177, at *47 (E.D. Ca. June 20, 2008), citing *Caifano v. Wampler*, 588 F. Supp. 1392, 1395 n.2 (D. Ill. 1984) ("[D]efendants should [not] wait until their review of *all* of the relevant documents is complete before they release *any* available documents

to plaintiff.  Rather, we believe that the . . . piecemeal release of document installments as they

are reviewed and cleared [is preferable].").  The reason for this preference was best explained by

the Eastern District of Pennsylvania thirty-two years ago:

> The timed, "piecemeal" and orderly release of the requested documents protects
> the government's right to review them on a line-by-line basis and to withhold
> those documents which it legally need not produce.  The timed release also gives
> plaintiff those documents which he needs in order to meet his contractual
> obligations.   Given the fact that the FOIA seeks to ensure disclosure of
> information, rather than its suppression; and that all of the Act's exemptions are to
> be narrowly construed, we simply see no reason why plaintiff should have to wait
> until defendant has completed review of all and necessarily the last requested
> document before he may obtain the first requested and reviewed document.  This
> is particularly true since defendant is presumably engaged in an on-going review
> of plaintiff's documents.   Once the first documents have been reviewed and
> "cleared", plaintiff's access thereto should not be improperly impaired.

*Hinton v. FBI*, 527 F. Supp. 223, 225 (E.D. Pa. 1981) (directing plaintiff to "prioritize" requested

documents and ordering FBI to release all "cleared" documents at ninety-day intervals in

accordance with plaintiff's priorities).  *See also Nat'l Sec. Counselors v. CIA*, No. 11-445, Min.

Order (D.D.C. July 11, 2012) (ordering agency to make interim release of records already

processed); *Gov't Accountability Proj. v. HHS*, No. 07-1702, Min. Order (D.D.C. Sept. 22, 2008)

(ordering rolling release of releasable records over one-month period); *Elec. Frontier Found. v.

DOJ*, 517 F. Supp. 2d 111, 121 (D.D.C. 2007) (ordering FBI to make interim releases at four-

week intervals); *Carter v. Dep't of Commerce, Patent & Trademark Office*, No. 85-0975, slip op.

(D.D.C. June 4, 1985) (ordering interim releases of several categories of records); *Hamlin v.

Kelley*, 433 F. Supp. 180, 183 (N.D. Ill. 1977) (ordering agency to release records at thirty-day

intervals).

Despite the overwhelming general preference for interim releases, FBI now argues that it

should not have to make them when multiple requests are filed for related materials.  Should the

Court endorse such a position, a significantly large number of agencies which currently have the

ability to invoke the mosaic theory to withhold otherwise non-exempt information would be able to stall their processing of large numbers of FOIA requests because the information being requested was "interrelated."  All of a sudden a FOIA request could be effectively frozen until an agency completed its processing of *other requests*, even those submitted by *other requesters*, which happened to be for similar information.  Besides the fact that such an overextension of the mosaic theory would allow many agencies to virtually ignore their responsibility to process requests in a timely fashion, this approach is not even necessary to protect the information FBI is trying to withhold.

## I.    MOSAIC THEORY AND RELATED REQUESTS: A BACKDROP

Before it is possible to discuss the effect that a ruling in FBI's favor would have on the FOIA community, it is first necessary to set the stage with regard to the nature of the mosaic theory and the commonality of potentially "interrelated" requests.

### A.    Mosaic Theory

Both FBI and Plaintiff treat the mosaic theory as an abstract in relatively summary fashion, although Plaintiff does address some of the weaknesses of the theory.  (*See* Mem. P. & A. Supp. Def.'s Mot. Open Am. Stay, Dkt. #19-1, at 14 (filed Aug. 3, 2012) [hereinafter FBI's Mem.]; Pl.'s Mem. P. & A. Opp'n Def.'s Mot. *Open Am.* Stay, Dkt. #35, at 30-32 (filed Feb. 21, 2013) [hereinafter Pl.'s Opp'n].)  However, while Amici do not here dispute the usefulness of the mosaic theory in the context to which it belongs, it is necessary to clarify some of the nuances in order to better reveal the practical ramifications of FBI's proposed solution.

First, it is important to note that the mosaic theory has only been endorsed by courts in FOIA cases as a reason to withhold information[1] in the national security context, and previous attempts to expand its use have been rejected.  To date, courts have only accepted mosaic theory arguments for Exemptions (b)(1), 5 U.S.C. § 552(b)(1) (properly classified information); (b)(3), *id.* § 552(b)(3) (information required to be withheld by statute); and (b)(7)(A), *id.* § 552(b)(7)(A) (information which could reasonably interfere with law enforcement proceedings).  Moreover, only mosaic theory arguments involving (b)(3) statutes and (b)(7)(A) law enforcement proceedings relating to national security have been endorsed.

At this point it is necessary to distinguish between two distinct but seemingly related types of mosaic theory arguments.  Both types rely on the same philosophical underpinning, but they are legally distinct because of their application, and the use of the word "mosaic" in some of the case law for both of them has led both FBI and Plaintiff to inadvertently conflate them.  The first type of mosaic theory argument—the one *not* being addressed herein, and referred to for convenience as "Type I"—is the common sense argument seen in cases where the requester has specialized extrinsic contextual knowledge that would allow him to deduce exempt information. A common example of this type of argument is the hypothetical case where the requester, a plaintiff in a lawsuit, was one of only two people in a meeting on 14 March 2013, and the agency later cites Exemption (b)(6), *id.* § 552(b)(6) (personal privacy), to redact a line from an email which reads, "I met with the plaintiff on 14 March 2013."  Because the requester knows who was in the meeting, that otherwise releasable sentence is legitimately withheld because it would

---

[1] Courts have accepted the concept of a "law enforcement mosaic" as a reason for considering a record "compiled for law enforcement purposes"—the threshold test for Exemption (b)(7)—but only for that limited purpose.  *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 159 (1989); *Gould Inc.* v. *General Services Administration,* 688 F. Supp. 689, 698 (D.D.C. 1988).

identify the sender of the email as easily as his name or email address.  *See*, *e.g.*, *Nat'l Whistleblower Ctr. v. HHS*, 849 F. Supp. 2d 13, 29-31 (D.D.C. 2012) (allowing agency to withhold witness interview reports in full because requesters, due to their inside knowledge of agency and investigation, would be able to determine who the witnesses were from their testimony), citing *Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976), and *Alirez v. NLRB*, 676 F.2d 423 (10th Cir. 1982).

This type of argument requires a fact-specific analysis of the knowledge of the *requester*, unlike the arguments one normally involved in invocations of the "mosaic theory."  "[W]hile the redaction of an individual's name may be sufficient to protect his identity and privacy from the public, it may not be sufficient so protect him in the smaller community of his school or work." *Nat'l Whistleblower Ctr.*, 849 F. Supp. 2d at 30.  Although this sentiment could be conceivably read to mean that if *a person* existed who could identify the source, the agency could withhold all the information *from anyone* which might possibly identify him *to that person*, to Amici's knowledge no court has ever endorsed such an expansive reading of this approach.  Instead, every case to discuss this matter involved a fact pattern where the *requester* was such a person. *See*, *e.g.*, *Rose*, 425 U.S. at 358 n.1 (requester was graduate of U.S. Air Force Academy and records were about disciplined Air Force Academy cadets); *Alirez*, 676 F.2d at 428 (requester had specific knowledge of incidents to which contested documents pertained); *Nat'l Whistleblower Ctr.*, 849 F. Supp. 2d at 30 (requesters were employees or former employees involved in OIG investigation to which records pertained); *Harvey's Wagon Wheel, Inc. v. NLRB*, 91 L.R.R.M. 2410, 2415 (N.D. Cal. 1976) (employer-requester would be able to identify employee-affiants from context of affidavits), *remanded in part on other grounds*, 550 F.2d 1139 (9th Cir. 1976).  The case *Lewis-Bey v. DOJ*, 595 F. Supp. 2d 120 (D.D.C. 2009), cited by FBI

6

and distinguished by Plaintiff, belongs to this category and is not applicable to the instant case. *See id*. at 127 (discussing "the unique set of circumstances" regarding plaintiff's singular knowledge of the criminal investigation of his criminal organization).[2]

The second type of argument—referred to herein as "Type II"—is the species commonly understood as the "mosaic theory," in which information is withheld because *anyone* with sufficient skill could piece together otherwise exempt information.  Because this argument *is* sufficiently broader than Type I, it has only prevailed in cases where the government agency is entitled to a high degree of deference.  Specifically, it has been endorsed when: (a) an intelligence agency[3] is invoking Exemption (b)(1) and is entitled to "substantial weight";[4] (b) an intelligence agency is invoking Exemption (b)(3) and a national security-related statute—such as the National Security Act of 1947 or the Central Intelligence Agency Act of 1949—and is entitled to "substantial weight";[5] and (c) a law enforcement agency is invoking Exemption

---

[2] *Lewis-Bey* actually applied the Type I mosaic theory to Exemptions (b)(2) and (b)(7)(D), but the underlying reason was the same.  His unique knowledge would allow him to use the information to circumvent the law—the standard for the now-rejected "High 2" exemption—or identify a confidential source (Exemption (b)(7)(D)).

[3] This term applies to the national security-related components of law enforcement agencies as well.

[4] Declarations of an intelligence agency asserting that information is sensitive to national security are entitled to "substantial weight" unless controverted by evidence of bad faith due to these agencies' specialized knowledge of that field.  *Hayden v. NSA/CSS*, 608 F.2d 1381, 1387 (1979), *cert. denied*, 446 U.S. 937 (1980).

[5] The "substantial weight" standard set forth in *Hayden* applies to any declaration by an intelligence agency in which the point of the declaration is to describe the relationship between the withheld information and national security, which includes the security-related (b)(3) withholding statutes.

(b)(7)(A) to withhold information that could reasonably be expected to interfere with law enforcement proceedings pertaining to national security and is entitled to "substantial weight."[6]

Given FBI's focus on possible "ongoing investigations" (2d Hardy Decl., Dkt. #17-1, ¶¶ 34-35 (filed Aug. 1, 2012)), Amici assume that FBI is primarily implying that it may unintentionally reveal information exempt under Exemption (b)(7)(A) if it makes interim releases, and so the remainder of this brief will only address those concerns.[7]  It is important to reiterate here that courts only give "substantial weight" to agency invocations of Exemption (b)(7)(A) when the "ongoing investigations" pertain to national security matters, and this deference relies on the same reasoning as *Hayden*.  *See Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d at 928, 932 (explaining that courts "must defer" to executive on national security matters; therefore, "we owe the same deference under Exemption 7(A)" when national security is at issue); *Am.-Arab Anti-Discrimination Comm. v. DHS*, 516 F. Supp. 2d 83, 89 (D.D.C. 2007) (finding information about individuals arrested on national security criteria withholdable under Exemption (b)(7)(A) and explaining that "*Center for National Security Studies* may have ratcheted up the degree of deference that must be accorded the executive, but it was clear long before that decision that the courts are not simply to use their own best judgment in a national security context"); *L.A. Times Commc'ns v. Dep't of the Army*, 442 F. Supp. 2d 880, 899 (C.D. Cal. 2006) (stating that "Court defers to [Army officer's] predictive judgments" about

---

[6] As noted in Note 1 above, the "mosaic" argument used in Exemption (b)(7)(A) cases *not* related to national security only pertains to whether or not records were "compiled for law enforcement purposes."  For that reason, those cases will not be discussed herein, since Amici concede for the purposes of this brief that all responsive records were compiled for law enforcement purposes.

[7] Similarly, because FBI has not alleged that Plaintiff has any particular inside knowledge of the subjects of these records, the term "mosaic theory" used herein excludes Type I, which requires

Exemption (b)(7)(A) harm in insurgency setting); *Edmonds v. FBI*, 272 F. Supp. 2d 35, 55

(D.D.C. 2003) (stating that deference "must be extended to Exemption 7(A) in cases like this

one, where national security issues are at risk," citing *Ctr. for Nat'l Sec. Studies*, 331 F. 3d at

927-28).

Therefore, because the Type II mosaic theory argument has only been endorsed in

national security cases, and those national security cases required the court to give "substantial

weight" to agency affidavits regarding the exemptions implicated by the mosaic theory, it is safe

to say that no court which was *not* required to give "substantial weight" to agency affidavits has

endorsed a Type II mosaic theory argument.  In fact, one court outright rejected such an

argument in the context of Exemption (b)(7)(E) (information pertaining to not-widely-known

law enforcement techniques, the exposure of which would allow criminals to circumvent them).

*See Gerstein v. DOJ*, No 03-4893, 2005 U.S. Dist. LEXIS 41276, at *42-43 (N.D. Cal. Sept. 30,

2005) (finding agency's citation to *Center for National Security Studies* inapplicable where

agency argued that knowing which U.S. Attorneys issued delayed-notice USA PATRIOT Act

warrants would allow criminals to circumvent the law by revealing which jurisdictions were

"soft on crime").  While that court admittedly made no mention of deference in the context of

this argument, it is difficult to imagine that such a result would have been possible if it was

required to give deference to the agency's affidavits.

The reason for the above extended dissertation on the limitations of the mosaic theory

will be made apparent in Section II(A) below, but, put simply, allowing the government to delay

the release of *any* information because some of it *might* be exempt under the mosaic theory

requires a presumption that the agency's mosaic theory argument will be found *valid* at the end

---

a specific finding that the *requester* in particular possesses such information, not that some

9

of the day, which is an unsupportably speculative presumption given the narrow set of circumstances to which that theory has been found to apply.

### B.     "Interrelated" Requests and the Requester Community

In contrast to the above legal analysis, this Section is based solely on fact and logic.  By their nature, most frequent requesters file requests for information which fall within their realm of expertise.  Jason Leopold, Lead Investigative Reporter for Truthout, is a specialist in, among other things, detainees and terrorism investigations.  (*See* Leopold Decl., Dkt. #35-1, ¶ 5 (filed Feb. 21, 2013).)   As part of his investigative reporting, as a representative of Truthout he files numerous FOIA requests—both specifically and generally—for records about detainees and terrorism investigations.  (*Id.*)  A large number of those records would likely be considered "interrelated," because he only requests records that relate to his specialty.

National Security Counselors ("NSC") has a particular interest in a few areas of national security law and information and privacy law, and its requests reflect that specialization.  (*See* McClanahan Decl. ¶ 4, attached as Ex. 1.) It prefers to submit multiple "project" requests to agencies, each one limited to a specific subset of the records it is seeking.  (*See id.* ¶ 5.)  It does this for several reasons: 1) the agency can process the separate requests simultaneously, allowing for faster processing and release (*id.* ¶ 6); 2) different records may exist in different parts of the agency (*id.* ¶ 7); and 3) some agencies consider requests for "all records about" a subject to be unduly burdensome, but will process multiple requests for "smaller bites" (*id.* ¶ 8).  The National Security Archive ("the Archive") utilizes a similar approach, often with several researchers making clearly related requests for records about a fairly narrow topic, such as its "Guatemala Documentation Project," a nineteen-year-old undertaking designed to obtain, evaluate, and

---

unspecified third party might piece the puzzle together.

publish government records about human rights abuses in Guatemala.  (*See* Jones Decl. ¶¶ 4-5,

attached as Ex. 2.)  *See also* The Guatemala Documentation Project, *at*

http://www.gwu.edu/~nsarchiv/guatemala/ (last accessed Mar. 11, 2013).  Nate Jones, the

Archive's FOIA Coordinator, estimates that up to 90% of all its requests last year would be

reasonably described as "interrelated."  (Jones Decl. ¶ 7.)

        Katelyn Sack, an NSC client, is a Ph.D. candidate at the University of Virginia doing a

dissertation on polygraph bias.  (McClanahan Decl. ¶ 11.)  As such, she has filed numerous

FOIA requests with various intelligence agencies for records about polygraph bias, including

Equal Employment Opportunity records, analytical records, and security records.  (*Id.*)  All of

her FOIA requests pertain to this narrow subject, and many agencies have identified records

which were responsive to more than one of her requests.  (*Id.*)  Much like Plaintiff, who only

requests records about animal rights extremism, Ms. Sack only requests records about polygraph

bias, because that is her academic specialty.

        This simple fact is true for most of the more frequent requesters, generally members of

the news media, academics, and non-profit organizations.  In fact, as a general rule of thumb, it

is safe to say that "the more prolific the requester, the more interrelated the requests."  Media

outlets like Truthout request records about subjects their reporters cover.[8]  Academics like Ms.

Sack and Plaintiff request records about their chosen specialties.  Non-profit organizations like

NSC and the Archive request records about the subjects in which they specialize.  Because these

individuals and organizations are generally the most frequent requesters, by definition they are

responsible for a large percentage of *requests*.  If an agency is allowed to delay release of

information because of "interrelated" requests and the *chance* that something protected might be

11

released, and a large percentage of all requests are interrelated, such a practice would have widespread impact on the FOIA requester community writ large, in addition to unfairly depriving only frequent requesters of their right to *timely* information.

## II.   FBI'S PRACTICE WOULD ALLOW AGENCIES TO PENALIZE FREQUENT REQUESTERS AND INDEFINITELY DELAY REQUESTS WITHOUT GOOD CAUSE

This Part analyzes the practical ramifications of the practice proposed by FBI in three parts.  Section A discusses the potential for agency use of potential mosaic theory arguments which would not actually be supported in a withholding context.  Section B discusses the disproportionate impact this practice would have on frequent requesters.  Section C discusses the unbounded scope of a practice which would allow a third party to delay—intentionally or unintentionally—the processing of a request simply by filing a "related" request.  Each Section will be accompanied by a case study drawn from the experience of Amici.

### A.   Unjustified Delay

The problem is simple.  Agencies can only withhold information under the Type II mosaic theory in a very few select circumstances, each of which is exceedingly fact-driven by the specific nature of the information being withheld.  But FBI has not—and *cannot*—provide the information in question to the Court to justify an application of the mosaic theory because *it has not reviewed it yet*.  This raises the specter of an agency being allowed to delay release of records for *years* for reasons that might not be accepted as justification for withholding.

Even in cases where national security was implicated by an Exemption (b)(7)(A) invocation, as Amici assume is likely the case here, agencies have still been required to demonstrate with particularity that release of the information could be reasonably expected to

---

[8] Moreover, subjects which are of interest to one media outlet are almost always of interest, and

*interfere* with ongoing investigations.  *See Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926-32 (while stating that "[w]e have consistently reiterated the principle of deference to the executive in the FOIA context when national security concerns are implicated," nonetheless still reviewing standards agencies must meet and stressing that "we do not abdicate the role of the judiciary"); *Am.-Arab Anti-Discrimination Comm.*, 516 F. Supp. 2d at 89-90 (noting that "courts have consistently deferred to executive affidavits predicting harm to the national security," but nonetheless reviewing agency submissions to determine if agency "satisfies" test of reasonableness and provides "sufficient detail"); *Kidder v. FBI*, 517 F. Supp. 2d 17, 27-28 (D.D.C. 2007) (mentioning deference given to law enforcement agencies, but stressing that agency must show, even in case involving terrorism and intelligence gathering, how release of records could interfere with proceedings); *Owens v. DOJ*, No. 04-1701, 2007 U.S. Dist. LEXIS 21721, at *24-25 (D.D.C. Mar. 9, 2007) (noting "sensitive investigations" involving terrorist bombings in Tanzania and Kenya, yet requiring agency to provide sufficient detail to allow court to trace link between document and purported interference with "potential criminal proceedings"); *Haddam v. FBI*, No. 01-434, slip op. at 23-27 (D.D.C. Sept. 8, 2004) (stating that courts generally do not question FBI's assessments, but finding that FBI has not shown how release could jeopardize ongoing investigation or national security).

So what happens if FBI—or any other agency—makes a mosaic theory argument to delay release of information for seven years, then, in seven years, invokes the mosaic theory to withhold the information, and the court *rejects* it?  What relief can be given to the requester who waited for seven years to receive information which, had the withholding argument been presented to the court at first, would have been released *then*?  This is not to imply that FBI is

---

the subject of requests filed by, others.  That is the definition of "newsworthy."

acting in bad faith here; every agency which has been reversed by a court was still presumably acting in good faith at the time it made the argument.  Agencies are often *wrong*; that is why Congress gave courts *de novo* review over FOIA cases.

The presumption of FOIA is release, not withholding, and to justify withholding an agency must *prove* that the information fits within one of nine "narrowly construed" exemptions. *FBI* v. *Abramson*, 456 U.S. 615, 630 (1982).  Equally well-established is the rule that "Congress recognized that delay in complying with FOIA requests is tantamount to denial."  *Elec. Privacy Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30, 40-41 (D.D.C. 2006).  Combining these two axioms, it becomes clear that an agency which wishes to delay the release of information must 1) prove with specificity 2) that particular information 3) is exempt.  Such proof is by definition impossible when the agency has not reviewed the information, and a court cannot determine if it fits within "narrowly construed" exemptions.  Given that a perfectly acceptable alternative exists, as discussed in Part III, the Court should decline the government's invitation to give agencies a chance to effectively deny information to requesters without judicial review until some point in the distant future.

As a case study, one need look no further than *Gerstein*, cited in Section I(A) above.  In that case, the government (presumably acting in good faith) argued that it could not release otherwise non-exempt information about search warrants because criminals, analyzing the information as a mosaic, would be able to pinpoint and exploit weaknesses.  The court rejected that argument.[9]  *Gerstein*, 2005 U.S. Dist. LEXIS at *42-43 (N.D. Cal. Sept. 30, 2005).  In that case the agency was able to review the six-page list in question relatively quickly before deciding to make its mosaic theory argument.  The court rejected the argument approximately a

year after it was made.  Now, instead of a six-page list that could be reviewed, withheld as a mosaic, and ordered released by a judge within a little over a year, consider if the record in question had been a 350,000-page database listing and *none* of it had been released until a court ordered it more than *seven* years later.  Similarly, the agency could very well decide in seven years that *none* of the information is properly withheld under the mosaic theory.  Either way, the end result is the same; the requester is denied access to records to which he was legally entitled, *without judicial review*, for seven years.  Expand this fact pattern to all agencies which deal with national security matters and could therefore *potentially* make a mosaic theory argument, and a significant segment of the requester community is denied judicial review of their requests for months or years.

> **B.**    **Potential for Discrimination against Frequent Requesters**

The second problem with FBI's proposal is the way in which it would allow agencies, either intentionally or unintentionally, to discriminate against frequent requesters and force them to choose between prompt access to records and making multiple requests for different but related types of records.  If a FOIA requester is required to wait until each request is processed and adjudicated before he makes a new request, or else risk having the first request delayed until the agency completes the second, that is a choice that the agency is not allowed to force him to make, for two reasons.  First, the well-established "first-in, first-out" rule of FOIA processing, cited prominently by FBI (FBI's Mem. at 18), would create an absurd result in which a request filed in January 2013, which reached the top of the queue in December 2013, would have to wait until the agency had completed processing a request filed in January 2014, which might not

---

[9] The Court also rejected the idea that what the government described as "weaknesses" were in fact weaknesses, but that determination is irrelevant to this discussion.

reach the top of the queue until December 2014, even if absent that second request the first request would have been completed in February 2014.

Given the tremendous FOIA backlogs facing intelligence agencies and the glacial pace with which they process requests, the ramifications of this cannot be overstated.  The oldest uncompleted FOIA request filed by the Archive is over twenty years old, filed with the National Archives and Records Administration.  (Jones Decl. ¶ 8.)  NSC is currently involved in a FOIA lawsuit relating in part to a request filed in 1997 and completed in 2011, filed with the Defense Intelligence Agency.  (McClanahan Decl. ¶ 12.)  When agencies measure processing times in years or decades, the Court cannot give them another reason to further delay the release of records.

Second, the problem is exacerbated if agencies are allowed to treat requests for large amounts of information as "unduly burdensome," as CIA does.  (McClanahan Decl. ¶ 8.)  In such a case, an agency would effectively be allowed to "throttle" the intake of requests by forcing requesters to file artificially narrow requests and then forcing them to wait until one request was completed before filing another.  This practice would disproportionately affect those requesters who are thoroughly researching a topic, which generally describes the most frequent requesters, as discussed in Section I(B) above.  Since 1994 the Archive has filed 1,838 requests relating to human rights abuses in Guatemala (a fairly narrow topic) as part of the Guatemala Documentation Project, many of them artificially narrow because an agency rejected broader versions.  (Jones Decl. ¶¶ 5-6.)  One can only imagine how long this project would last if one artificially narrow request had to be completed before the next could be filed.

C.        **Potential for Interference from Third Parties**

Of all the problems with FBI's proposal, the third is the most troubling.  Even if an

agency was allowed to "throttle" requests and force frequent requesters to choose between

prompt processing and filing multiple requests, that is still a choice within the requester's

control.  However, that is not the only possible application of this approach, a problem Plaintiff

identified in his Opposition.  (Pl.'s Opp'n at 33 ("[W]hy not extend the stay until *every* present

requester's animal rights-related FOIA request has been processed?").)  While Plaintiff couches

his argument in abstract philosophical terms, FOIA case law actually supports such an extension

of FBI's proposed practice, were the Court to authorize it.

One of the best-known maxims in FOIA is colloquially stated as "release to one is release

to all."[10]  In other words, once information is released to one person pursuant to a FOIA request,

it is deemed releasable to the general public.  *Nat'l Archives & Records Admin. v. Favish*, 541

U.S. 157, 174 (2004) ("[O]nce there is disclosure, the information belongs to the general

public.").[11]  This rule is a basic building block of the Type II mosaic theory, which is arguably

one of the reasons that only those agencies entitled to "substantial weight" have been able to

successfully invoke it.  Every other court to deal with the tension between the Type II mosaic

theory and FOIA's presumption of disclosure has either rejected the mosaic theory, as *Gerstein*

---

[10] This phrase never actually appears in any judicial opinion, however.  Amici do not know its origin.

[11] The one exception to this rule is that agencies cannot invoke privacy-related exemptions to withhold from a requester information pertaining only to himself.  *See DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 771 (1989), citing *DOJ v. Julian*, 486 U.S. 1, 13-14 (1988).

did, or created an imperfect compromise in which only the *requester's* ability to piece together

the mosaic matters, i.e., the Type I mosaic theory.[12]

Regarding FBI's proposal in the light of this maxim, it becomes apparent that requests for

interrelated records filed by multiple requesters would also be caught in this net if an agency

were to take its mosaic theory seriously.  The practical result would be the following case study:

1.  The Archive files a FOIA request with CIA in January 2013 for records created prior to 2000 about Guatemalan human rights abuses ("the first Archive request").

2.  In December 2013, while CIA is processing the first Archive request, Human Rights Watch files a FOIA request with CIA for records created since 1998 about Guatemalan human rights abuses ("the HRW request").

3.  CIA determines that the two requests are "interrelated" and that someone might be able to piece together classified information about CIA's relationship with Guatemala from the responsive records.

4.  In June 2014 CIA completes its processing of the first Archive request.  However, it does not release any records because it has not completed processing the HRW request.

5.  In October 2014, while CIA is processing the HRW request, Truthout files a FOIA request with CIA for all records about CIA involvement in Guatemala ("the Truthout request").

6.  CIA determines that the Truthout request is related to the first Archive request and the HRW request and that someone might be able to piece together classified

---

[12] The Type I mosaic theory cannot really be reconciled with "release to one is release to all," but it is far better than the alternative solution of withholding anything that *one hypothetical*

information about CIA's relationship with Guatemala from the responsive records.

7.     In April 2015 CIA completes its processing of the HRW request.  However, it does not release any records in response to either the first Archive request or the HRW request because it has not completed processing the Truthout request.

8.     In July 2015 the Archive writes a report about Guatemalan human rights abuses, in which it states that it is still awaiting a response from CIA to its 2013 request. José Mauricio Rodríguez Sánchez, former head of Guatemalan Army intelligence under criminal trial, reads it and decides to do whatever he can to forestall the release of records until after his trial is over.

9.     In August 2015, while CIA is processing the Truthout request, Sánchez' attorney files a FOIA request with CIA for all records about Sánchez, knowing that it will cause further delay ("the Sánchez request").

10.    CIA determines that the Sánchez request is related to the Truthout request, the first Archive request, and the HRW request and that someone might be able to piece together classified information about CIA's relationship with Guatemala from the responsive records.

11.    In March 2016, while CIA is processing the Truthout request and the Sánchez request, the Archive, facing a print deadline, riskily files a FOIA request with CIA for all records about Efraín Ríos Montt, Guatemala's former military dictator ("the second Archive request").

---

*person somewhere in the world* could fit into a mosaic, which is why Amici consider it an "imperfect compromise."

12.  CIA determines that the second Archive request is related to the Sánchez request, the Truthout request, the first Archive request, and the HRW request and that someone might be able to piece together classified information about CIA's relationship with Guatemala from the responsive records.

13.  In April 2016 CIA completes its processing of the Truthout request and the Sánchez request.  However, it does not release any records in response to either the first Archive request, the HRW request, the Truthout request, or the Sánchez request because it has not completed processing the second Archive request.

14.  In July 2017 CIA finishes completes its processing of the second Archive request and releases records in response to all five requests.  The Archive receives records that CIA cleared for release in June 2014 over three years later.

15.  In August 2017 the Archive files a FOIA request with CIA for all records about the trial of Sánchez and Montt.  The cycle begins again.

*This* is the practical consequence of FBI's proposal.  Third parties can unintentionally delay requesters' receipt of releasable records—an unacceptable reality in a world where numerous media outlets regularly file overlapping, but not identical, requests on "newsworthy" subjects.  Worse, a third party with dilatory motive and Westlaw can indefinitely delay the release of records by filing overlapping, but not identical, requests himself.

While the second item seems far-fetched, it is derived from an argument *the government made* in a similar context.  In the case *Feinman v. FBI*, FBI explicitly endorsed Judge Huvelle's previous determination that allowing requesters to assign their interests in FOIA requests would "multiply opportunities for . . . mischief."  Defs.' Opp'n Mot. Cert. Interlocutory Appeal, Dkt. #16, at 7 (filed June 16, 2011), *Feinman v. FBI*, No. 09-2047 (D.D.C.), attached as Ex. 3.  The

referenced determination put forward by Judge Huvelle was, in full, "[A]n individual -- or even a non-existent entity, could seek to thwart an adversary's search for information by claiming falsely to have been assigned a previous requester's FOIA rights."  *Feinman v. FBI*, 680 F. Supp. 2d 169, 175-76 (D.D.C. 2010) (citation omitted).  Furthermore, CIA made the same argument a year later in *National Security Counselors v. CIA*, citing again to Judge Huvelle's opinion. Mem. Supp. Def.'s Mot. Dismiss Counts 1 & 2 of Pl.'s Compl., Dkt. #7-1, at 6 (filed May 20, 2011), *Nat'l Sec. Counselors v. CIA*, No. 11-443 (D.D.C.), attached as Ex. 4.

This Court held in *NSC v. CIA*, "[T]he Court believes that the potential for an increase in 'opportunities for mistake and mischief' resulting from the recognition of assignment rights is minimal.  The *Feinman* court may have been correct in noting that, if FOIA administrators were to take an individual's claim to an assignment of rights 'at face value,' any stranger could step in to exclude an original requester from the FOIA process against her will.  Even so, nothing would require an agency to take such claims 'at face value.'"  2012 U.S. Dist. LEXIS 149073, at *52-53 (D.D.C. Oct. 17, 2012).  While scrupulous attention to potential assignments by FOIA administrators might reveal false assignments, there is no such mechanism by which agencies could determine which requests were filed for legitimate purposes and which were filed for dilatory purposes.

In truth, Amici believe that *Feinman* probably overstated the chance of such third-party tampering, but for the purposes of the instant case the more important question is whether or not *the government* thinks that such tampering is possible.  As evidenced by FBI's arguments in *Feinman* and CIA's arguments in *NSC v. CIA*, the government appears to believe that malicious third-party interference with FOIA requests is a clear and present danger.  Accordingly, while Amici are not so convinced, the Court should consider the proposition that third parties might

file frivolous FOIA requests related to requests about them to cause agencies to delay the release of responsive records under FBI's proposed practice as though it had the full weight of the government's FOIA experts behind it.  Any attempt by the government to dispute this argument cannot be easily reconciled with its previous arguments in *Feinman* and *NSC v. CIA*.

Accordingly, because endorsement of FBI's proposal would set the stage for scenarios in which agencies delayed releasing records which were not exempt under the mosaic theory, would have an unacceptable impact on frequent requesters, and would allow a third party to delay—intentionally or unintentionally—the processing of a FOIA request, the Court should order FBI to make interim releases of "cleared" records for the duration of any stay.

III.     **STANDARD APPLICATION OF THE MOSAIC THEORY WILL ACHIEVE FBI'S DESIRED RESULT WITHOUT DELAYING THE RELEASE OF RECORDS**

FBI's proposal has many problems, but all of them can be avoided with relative ease while still protecting exempt information by applying the Type II mosaic theory as it has always been applied, *looking backwards*.  Both Plaintiff and Amici have made prominent note of the unavoidable fact that there is absolutely nothing to stop a requester from filing a related request *after* the agency has released records, and that the government does not propose that it be allowed to delay the release of records until *all possible future related requests* have been filed (a circumstance which would likely require the abolition of either FOIA or the agency).  It is a practical reality that all requests must have an endpoint, and that at some point the agency must stop doing a mosaic analysis and release the records.  What happens next is natural: If an agency *then* receives a request for related records which, when combined with records already released, will paint a mosaic revealing protected information, *it withholds the parts of them that would serve as puzzle pieces*.  This is how agencies process FOIA requests using the mosaic theory.

22

The application to the instant case is easy and relatively painless.  FBI should make interim releases for the next seven years.  Before it makes each interim release, it will check to see if any information *in that release* can be combined with *previously released information* to reveal protected information.  It may then redact, citing the mosaic theory, any information from the pending release that could be so combined with previously released information.  There is no need for it to look *forward* to see what *might be* released, it need only look *backward* to see what *was* released.  If its concerns about the mosaic theory have merit, over time it will redact more and more information from each successive interim release, *but it will still make interim releases*.  It is an imperfect compromise in which the Court still cannot review the Type II mosaic theory argument until 2019, but, on the other hand, Plaintiff also receives thousands of pages of information while he waits for FBI to finish the job.  Mostly, however, it does not constitute a judicial endorsement of a practice of such far-reaching impact as the one proposed by FBI.  Much like the Type I mosaic theory, this is an imperfect compromise which is nonetheless orders of magnitude better than the alternative, and Amici urge the Court to adopt it.

Date:   March 14, 2013

<div style="margin-left:40%">

Respectfully submitted,

 /s/ Kelly B.  McClanahan
Kelly B.  McClanahan, Esq.
D.C.  Bar #984704
National Security Counselors
1200 South Courthouse Road
Suite 124
Arlington, VA  22204
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Amici*

</div>