IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| RYAN NOAH SHAPIRO<br>  Plaintiff, | ) ) ) ) | |
| v. | ) ) | Case No. 1:12-cv-00313-BAH |
| UNITED STATES DEPARTMENT OF<br>JUSTICE | ) ) ) | |
|   Defendant. | ) ) ) | |

## FIFTEENTH DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1) I am the Section Chief of the Record/Information Dissemination Section

("RIDS"), Information Management Division ("IMD")[1], in Winchester, Virginia.  I have held

this position since August 1, 2002.  Prior to my joining the Federal Bureau of Investigation

("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the

Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information Act

("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to

April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked

with FOIA matters.  I am also an attorney who has been licensed to practice law in the State of

Texas since 1980.

(2) In my official capacity as Section Chief of RIDS, I supervise approximately 242

employees who staff a total of twelve (12) Federal Bureau of Investigation Headquarters

("FBIHQ") units and two (2) field operational service center units whose collective mission is to

effectively plan, develop, direct, and manage responses to requests for access to FBI records and

---

[1] In May 2008, the FBI changed the name of its Records Management Division to IMD.

information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN

FOIA Act of 2009; and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive

Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial

decisions; and other Presidential and Congressional directives.  My responsibilities also include

the review of FBI information for classification purposes as mandated by Executive Order

13526,[2] and the preparation of declarations in support of Exemption 1 claims asserted under the

FOIA.  I have been designated by the Attorney General of the United States as an original

classification authority and a declassification authority pursuant to E.O. 13526, §§1.3 and 3.1.

The statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

 (3) Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to Plaintiff's requests for information from its files pursuant to the

provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.  Specifically, I am

familiar with the FBI's handling of the FOIA and Privacy Act requests that are represented by

the 81 request numbers identified by Plaintiff in his First Amended Complaint.  *See* Docket

("Dkt.") No. 13.

 (4) This is my fifteenth declaration in this case.  It supplements and incorporates by

reference the information previously provided by me in my first declaration of May 12, 2012, *see*

Dkt. No. 9-1, my second declaration of July 31, 2012, *see* Dkt. No. 17.1, my third declaration of

May 24, 2013, *see* Dkt. No. 49-1, my fourth declaration of January 23, 2015, *see* Dkt. No. 65-1,

---

[2] 75 Fed. Reg. 707 (2010).

my fifth declaration of February 6, 2015, *see* Dkt. No. 68, my sixth declaration of May 7, 2015, *see* Dkt. No. 70, my seventh declaration of August 6, 2015, *see* Dkt. No. 71, my eighth declaration of November 15, 2015, *see* Dkt. No. 72, my ninth declaration of February 4, 2016, *see* Dkt. No. 73, my tenth declaration of May 3, 2016, *see* Dkt. No. 75, my eleventh declaration of August 2, 2016, *see* Dkt. No. 76, my twelfth declaration of November 4, 2016, *see* Dkt. No. 77, my thirteenth declaration of February 1, 2017, *see* Dkt. No. 78, and my fourteenth declaration of April 28, 2017, *see* Dkt. No. 79. Pursuant to the October 20, 2017 Joint Status Report (*see* Dkt. No. 86), the parties agreed to brief defendant's application of FOIA Exemptions based on a 500 page sampling. Plaintiff selected approximately 401 pages released in part ("RIP"). The FBI selected approximately 100 pages withheld in full ("WIF"). The FBI prepared a *Vaughn* Index to further explain the withholdings on the selected sample pages. **(*See* Exhibit A.)** Additionally, Plaintiff selected five (5) FOIA requests in which the FBI asserted Exemption 7(A) to categorically withhold records pertaining to ongoing investigations. Parties have agreed to brief the issue of whether the withholdings pursuant to Exemption 7(A) were proper at the time they were made as opposed to at the time of briefing, in accordance with *Bonner v. United States Dep't of State*, 928 F.2d 1148 (D.C. Cir. 1991). **(*See* ECF No. 86, Joint Status Report at ¶ 1.)**

(5)     The FBI submits this declaration in support of its motion for summary judgment. In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration provides the Court and Plaintiff with justification for the FBI's categorical withholding of records pursuant to FOIA Exemption (b)(7)(A), an explanation of the FBI's procedures used to search for, review, and process the records responsive to Plaintiff's FOIPA requests, and of the FBI's justification for withholding certain records in full or in part pursuant to FOIA Exemptions

3

(b)(1), (b)(3), (b)(4), (b)(5), (b)(6)/(b)(7)(C), (b)(7)(A), (b)(7)(D), and (b)(7)(E).[3]

## THE FBI's SEARCH FOR RESPONSIVE RECORDS

(6)     Paragraphs 10-22 of the Second Hardy Declaration describe the FBI's Central

Records System ("CRS"), the CRS General Indices and Indexing, Automated Case Support

("ACS"), Electronic Surveillance ("ELSUR") and the FBI's search for records responsive to

Plaintiff's requests.  The FBI respectfully refers the Court to that declaration for further

information about the FBI's search for responsive records.  *(See ECF No. 17-1, Second Hardy*

*Declaration at ¶¶ 10-22.)*

## FIVE REQUESTS CONTAINING RECORDS CATEGORICALLY DENIED
## PURSUANT TO EXEMPTION 7(A)

(7)     Pursuant to the Joint Status Report dated October 20, 2017, see Dkt. No. 86,

parties agreed to brief five requests, provided by Plaintiff, in which the FBI asserted FOIA

Exemption (b)(7)(A) to withhold all records pertaining to ongoing investigations.  Plaintiff

provided the FBI with the following five requests: Ryan Noah Shapiro (FOIPA Request Number

1167292-000), Compassion Over Killing (FOIPA Request Number 1143759-000), the Hyram

Kitchen murder (FOIPA Request Numbers 1159897-000 and 1159897-001), William Edward

Potter FOIPA Request Number 1179996-000, and Lindsay Parme (FOIPA Request Number

1156661-000).  In the following paragraphs, the FBI will provide administrative background for

each request, explanation of the review process and justification of the asserted exemptions.

## REQUEST #1: RYAN NOAH SHAPIRO

(8)     By letter dated May 26 2011, Plaintiff submitted a FOIPA request to FBIHQ

seeking "disclosure of any and all records that were prepared, received, transmitted, collected

---

[3] FOIA Exemption (b)(7)(F) was asserted on originally processed document Bates Stamped
Shapiro-5114.  After further review, the FBI determined this exemption is no longer applicable.

and/or maintained by the FBI, the National Joint Terrorism Task Force, or any Joint Terrorism Task Force relating or referring" to him. A completed Certification of Identity (DOJ-361) was attached. Plaintiff also provided 110 pages of obituaries or privacy waivers of third parties he believed may appear in responsive material, whose names would be released. (*See* **Exhibit B.)**

(9) By letter dated June 2, 2011, the FBI acknowledged receipt of Plaintiff's request and assigned it FOIPA Request Number 1167292-000. The FBI advised Plaintiff based on the information provided, a search of the CRS was conducted and no responsive main file records were identified.[4] RIDS advised that "[i]n accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) [5 U.S.C. § 552 (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists."[5] The FBI also notified Plaintiff of his right to appeal the FBI's response to the Office of Information Policy ("OIP") within sixty

---

[4] A "main" entry or main-file, pertains to records indexed to the main subject(s) of a file. The "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file.

[5] By supporting the ability of front-line screening agencies to positively identify known or suspected terrorists trying to obtain visas, enter the country, board aircraft, or engage in other activity, the consolidated Terrorist Watchlist is one of the most effective counterterrorism and law enforcement tools for the U.S. government. The Terrorist Watchlist is composed of many sub-lists pertaining to various categories of criminal matters under investigation, such as so-called no-fly list. The rationale behind the FBI's general assertion of a FOIA Exemption 7(E) Glomar with regard to these government watch lists is that to confirm any individual's watch list status reasonably could be expected to compromise investigative operations as well as endanger sources and methods. Specifically, confirming that any particular individual is, or is not listed, in the Terrorist Screening Center Database ("TSDB"), for example, could heighten an individual's suspicion, inducing him or her to more closely scrutinize activities and associations, which in turn would compromise highly sensitive methods and sources. Such official confirmation, could, for example, induce an individual to flee, to destroy or hide evidence, to alter the behavior and conduct of his or her close associates, family members and friends, or to otherwise alter their own behavior so as to avoid detection by law enforcement. Thus, the government has determined that a consistent, across-the-board Glomar response to all first-party requests made pursuant to the FOIA and Privacy Act of neither confirming nor denying any individual's status on any government watch list is the best way of ensuring that the harms enumerated above do not occur.

(60) days from the date of the response letter. **(*See* Exhibit C.)**

(10)   By letter dated June 8, 2011, Plaintiff submitted additional information to conduct a search for cross-reference records responsive to his request.[6] **(*See* Exhibit D.)**

(11)   By letter dated June 16, 2011, the FBI acknowledged receipt of Plaintiff's additional request and assigned it FOIPA Request number 1167292-001.  The FBI advised Plaintiff an additional search of the CRS would be conducted. **(*See* Exhibit E.)**

(12)   By letter dated July 20, 2012, the FBI re-reviewed and responded to Plaintiff's FOIPA request by reviewing 2,599 pages and releasing 720 pages either in full or part. Additionally, a search of the FBIHQ electronic surveillance indices ("ELSUR") was conducted and no responsive records were located.  Also, the FBI advised Plaintiff that approximately 1,816 additional pages located in investigative files are exempt from disclosure pursuant to 5 U.S.C § 552(b)(7)(A).  In addition to being withheld pursuant to FOIA Exemption (b)(7)(A), the exempt material was withheld pursuant to Privacy Act Exemption (j)(2) as well as FOIA Exemptions (b)(3), (b)(6)/(b)(7)(C), (b)(7)(D), and/or (b)(7)(E). **(*See* Exhibit F.)**

## **REQUEST #2: COMPASSION OVER KILLING**

(13)   By letter dated January 1, 2010, Plaintiff submitted a FOIA request to FBIHQ seeking "any and all information pertaining to the organization Compassion over Killing ("COK"). **(*See* Exhibit G.)**

(14)   By letter dated March 1, 2010, the FBI acknowledged receipt of Plaintiff's request and assigned it FOIPA Request Number 1143759-000.  The FBI advised Plaintiff based on the information provided, a search of the CRS was conducted and no responsive main file records

---

[6] A "reference" entry, sometimes called a cross-reference, is generally only a mere mention or reference to an individual, organization, or other subject matter contained in a document located in another main file on a different subject matter.

were identified. The FBI advised Plaintiff if he could provide additional information pertaining to his subject, the FBI would conduct an additional search. Additionally, RIDS advised that "[i]n accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) [5 U.S.C. § 552 (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists." The FBI also notified Plaintiff of his right to appeal the FBI's response to the Office of Information Policy ("OIP") within sixty (60) days from the date of the response letter. (*See* **Exhibit H.**)

(15)    By letter dated March 9, 2011, Plaintiff submitted additional information to conduct a cross reference search for records responsive to his request. (*See* **Exhibit I.**)

(16)    By letter dated March 24, 2011, the FBI acknowledged receipt of Plaintiff's additional request and assigned it FOIPA Request number 1143759-001. The FBI advised Plaintiff an additional search of the CRS would be conducted. (*See* **Exhibit J.**)

(17)    By letter dated July 20, 2012, the FBI re-reviewed and responded to Plaintiff's FOIPA request for information concerning COK. The FBI informed Plaintiff all responsive material concerning COK was reviewed in FOIPA Request Number 1167292-001. This included records categorically exempt pursuant to Exemption (b)(7)(A). *See* Exhibit F, *supra*.

## REQUEST #3: HYRAM KITCHEN MURDER

(18)    By letter dated December 29 2010, Plaintiff submitted a FOIA request to FBIHQ seeking "any and all information pertaining to the murder of Hyram Kitchen, and pertaining to the federal and local investigations of the murder of Hyram Kitchen." The request sought all main files and cross-references pertaining to the subject. (*See* **Exhibit K.**)

(19)    By letter dated January 10, 2011, the FBI acknowledged receipt of Plaintiff's request and assigned it FOIPA Request Number 1159897-000. The FBI advised Plaintiff it was

searching the indices to the CRS for information responsive to his request. *(**See** **Exhibit L.**)*

(20)    By letter dated April 18, 2011, the FBI advised Plaintiff that information responsive to his request was located in an investigative file exempt from disclosure pursuant to FOIA Exemption (b)(7)(A).  The FBI informed Plaintiff he could appeal the FBI's determination by filing an administrative appeal to OIP within sixty (60) days from the date of its letter. *(**See** **Exhibit M.**)*

(21)    By letter dated September 2, 2011, Plaintiff submitted an additional request seeking "any and all records that were prepared, received, transmitted, collected and/or maintained by the FBI, the National Joint Terrorism Task Force, or any Joint Terrorism Task Force relating or referring to the murder of Hyram Kitchen, and pertaining to the federal and local investigations of the murder of Hyram Kitchen.  This request is for all main files and cross-references" pertaining to the subject. *(**See** **Exhibit N.**)*

(22)    By letter dated December 22, 2011, the FBI advised Plaintiff his September 2, 2011 request was fully addressed in its April 18, 2011 letter. *(**See** **Exhibit O.**)*

(23)    By letter dated January 5, 2012, Plaintiff filed an administrative appeal with OIP regarding the FBI's April 18, 2011 response to FOIPA Request Number 1159897-001. *(**See** **Exhibit P.**)*

(24)    By letter dated January 20, 2012, OIP acknowledged receipt of Plaintiff's appeal and advised Plaintiff it has assigned appeal number AP-2012-01153 to this appeal. *(**See** **Exhibit Q.**)*

(25)    By letter dated May 10, 2012, OIP remanded Plaintiff's request to the FBI for a search for responsive records.  OIP advised Plaintiff if the FBI located releasable records, they would be sent to Plaintiff directly.  Additionally, Plaintiff may appeal any future adverse

determinations made by the FBI.  *(See* **Exhibit R.)**

(26)    By letter dated February 9, 2015, the FBI re-reviewed and responded to Plaintiff's FOIPA request by reviewing 56,581 pages and releasing 17,727 pages either in full or part.[7] Additionally, a search of the FBIHQ ELSUR was conducted and no responsive records were located for this subject.  The FBI advised Plaintiff records potentially responsive to his FOIA request were destroyed prior to receipt of his FOIA request.  Since the material could not be reviewed, it was not known if the records were responsive to his request.  *(See* **Exhibit S.)**

### REQUEST #4: WILLIAM EDWARD POTTER

(27)    By letter dated December 19 2011, Plaintiff submitted a FOIA request to FBIHQ seeking "any and all information relating or referring to William Edward Potter.[8]  Plaintiff previously provided a signed DOJ-361 from the subject.  *(See* **Exhibit T.)**

(28)    By letter dated January 12, 2012, the FBI acknowledged receipt of Plaintiff's request and assigned it FOIPA Request Number 1179996-000.  The FBI advised Plaintiff it was searching the indices to the CRS for information responsive to his request.  Additionally, the FBI advised Plaintiff his fee waiver was being considered and he would be advised of a decision at a later date.  *(See* **Exhibit U.)**

(29)    By letter dated February 9, 2015, the FBI reviewed and responded to Plaintiff's FOIPA request for information concerning William Edward Potter.  The FBI processed the responsive material in conjunction with responsive material of other subjects within Tier I.  *See*

---

[7] Material reviewed and released was responsive to subjects/requests Plaintiff identified in "Tier 1" on his list of priorities.  Requests also addressed within this release were: FOIPA Request Number 1143926-001, 1156549-000, 1167305-001, 1167816-000, 1166938-001, 1169365-000, 1171597-000, 1171759-000, 1172386-000, 1179996-000, 1182395-001, 1182475-000, and 1182729-000.

[8] Plaintiff's request also requested subjects Danae Kelley and James Richard Scarce III (also known as ("AKA") Rik Scarce)

Exhibit S, *supra*.

## REQUEST #5: LINDSAY PARME

(30)   By letter dated October 24, 2010, Plaintiff submitted a FOIA request to FBIHQ

seeking "any and all information pertaining to the individual Lindsay Parme (1982-)." Plaintiff

provided a signed DOJ-361 from the subject. **(*See* Exhibit V.)**

(31)   By letter dated November 12, 2010, the FBI acknowledged receipt of Plaintiff's

request and assigned it FOIPA Request Number 1156661-000. The FBI advised Plaintiff it was

searching the indices to the CRS for information responsive to his request. **(*See* Exhibit W.)**

(32)   By letter dated February 24, 2011, the FBI denied Plaintiff's request for a fee

waiver. The FBI informed Plaintiff fee waivers are determined on a case by case basis, pursuant

to 5 U.S.C. § (a)(4)(A)(iii) and 28 C.F.R. § 16.10(k)(i)-(ii), and Plaintiff failed to articulate two

of the four statutory requirements.[9] Additionally, the FBI informed Plaintiff he could appeal the

FBI's response to OIP within sixty (60) days of the FBI's letter. **(*See* Exhibit X.)**

(33)   By letter dated February 26, 2011, the FBI advised Plaintiff approximately 11,485

pages of potentially responsive records were located through the FBI's search and advised

pursuant to Department of Justice ("DOJ") regulations, the anticipated fees could exceed $25.00.

Plaintiff was also informed releases are made via Compact Disc ("CD") unless otherwise

requested; each CD contains up to approximately 500 reviewed pages; the first 100 pages or the

cost equivalent ($10.00) is free of charge; and if all potentially responsive pages were processed

for release he would owe approximately $345.00 in duplication fees (23 CDs at $15.00 per CD)

or approximately $1,148.50 in duplication fees if the release was requested in paper. The FBI

---

[9] Plaintiff failed to articulate the second requirement stating whether the disclosure is "likely to contribute" to an understanding of government operations or activities and the fourth requirement stating whether the disclosure is likely to contribute "significantly" to public understanding of government operations and activities. See 28 C.F.R. § 16.11(k)(2).

reminded Plaintiff the anticipated fees associated with his request were only an estimate, as some information may be withheld in full pursuant to FOIA Exemptions, or may not be responsive to Plaintiff's FOIA request. Thus, the actual charges could be less than the estimate provided. Plaintiff was instructed to notify RIDS in writing within thirty (30) days from the date of its letter of his commitment to pay the estimated fees or the request would be closed. Lastly, the FBI advised Plaintiff if he wished to reduce the scope of the FOIA request, costs associated with the request would be less and also result in a faster response. (*See* **Exhibit Y.**)

(34)   By letter dated March 16, 2011, Plaintiff responded to the FBI's February 26, 2011 cost duplication letter informing the FBI he was willing to pay all required search and duplication fees; and for all releases to be provided on CD. Plaintiff also advised he would be filing an administrative appeal with OIP pertaining to the FBI's denial of his fee waiver request. (*See* **Exhibit Z.**)

(35)   By letter dated April 2, 2011, Plaintiff filed an administrative appeal with OIP contesting the FBI's denial of his request for a waiver of fees associated with FOIPA Request Number 1156661-000. (*See* **Exhibit AA.**)

(36)   By letter dated April 19, 2011, OIP acknowledged receipt of Plaintiff's appeal and assigned it appeal number AP-2011-01644. (*See* **Exhibit BB.**)

(37)   By letter dated July 21, 2011, OIP advised Plaintiff the FBI agreed to grant his fee waiver for requests pertaining to the animal rights movement. Since the FBI was no longer assessing fees, Plaintiff's appeal was moot and was closed administratively. (*See* **Exhibit CC.**)

(38)   By letter dated August 4, 2016, the FBI reviewed and responded to Plaintiff's FOIPA request by reviewing 12,862 pages and releasing 5,391 pages either in full or part.[10]

---

[10] Material reviewed and released was responsive to subjects/requests Plaintiff identified in "Tier

11

Also, the FBI advised Plaintiff that approximately 4,694 additional pages located in pending investigative files were exempt from disclosure pursuant to 5 U.S.C § 552(b)(7)(A). **(See Exhibit DD.)**

(39)    By letter dated November 4, 2016, the FBI reviewed and responded to Plaintiff's FOIPA request by reviewing and withholding in their entirety 13 CDs and Digital Video Discs ("DVDs").[11] **(See Exhibit EE.)**

## JUSTIFICATION OF CATEGORICAL DENIAL OF RECORDS PURSUANT TO EXEMPTION 7(A)

(40)    In 2010, the Domestic Terrorism Unit ("DT") of the Counterterrorism Division ("CTD") learned RMD received numerous FOIA requests for a myriad of animal rights extremism cases. Further coordination efforts revealed Plaintiff had submitted approximately 68 FOIA requests in 2010 – all related to animal rights extremism. DT began coordinating with RMD and took the lead in reviewing proposed releases through the FOIA. This allowed appropriate operational units across the FBI to review FOIA documents associated with Plaintiff's requests prior to release. DT's global supervision ensured operational techniques, confidential human sources ("CHSs"), and ongoing investigations were protected throughout all investigations implicated by Plaintiff's requests. At the time, this practice was not RMD's standard protocol. RIDS personnel typically only contacted individual case agents in FBI Field Offices handling specific investigations or one individual subject matter expert ("SME") to

---

4" on his list of priorities. Requests also addressed within this release were: FOIPA Request Numbers 1168089-000, 1168139-000, 1169540-000, 1169594-000, 1169688-000, 1169943-000, 1170104-000, 1170437-000, 1170784-000, 1170870-000, 1171456-000, and 1173506-000.

[11] Material reviewed and released is responsive to subjects/requests Plaintiff identified in "Tier 4" on his list of priorities. Requests also addressed within this release are: FOIPA Request Numbers 1168089-000, 1168139-000, 1169540-000, 1169594-000, 1169688-000, 1169943-000, 1170104-000, 1170437-000, 1170784-000, 1170870-000, 1171456-000, and 1173506-000.

review proposed releases.  DT oversight ensured release of responsive material from one investigation did not harm other possibly intertwined investigations.

(41)     The practice of the "tiered" system through which Plaintiff prioritized his requests and subjects allowed RIDS to search for and review potentially responsive documents in a more streamlined and economical way.  Utilizing this tiered system, DT reviewed the responsive material twice.  The first review determined whether FOIA Exemption (b)(7)(A) was applicable, allowing RIDS to carve out and categorically withhold files that could reasonably be expected to interfere with pending enforcement proceedings.  This review ensured that the FBI could contain the mosaic effect concerns posed by frequent rolling releases as material exempt in full under Exemption 7(A).  This step was necessary given the intersecting equities among the various investigations and investigative files responsive to Plaintiff's 81 FOIA/Privacy Act requests.  The second review involved an in-depth review of the processed material to protect specific CHSs, sensitive techniques, and/or personal information.

(42)     All files determined to be pending at the time of Plaintiff's request, including those files responsive to the five requests selected by Plaintiff for this sample, were vetted through DT for confirmation of their pending status.  DT determined all of the material was connected with pending enforcement procedures and exempt from disclosure pursuant to FOIA Exemption (b)(7)(A).  Plaintiff was either notified of the Bates numbers of the pending files or provided an approximate page count of pending files denied in their entirety.

(43)     In an effort to preserve all underlying exemptions applicable to the material categorically denied pursuant to Exemption 7A, the FBI re-reviewed the material within Plaintiff's five selected requests.  During this review, the FBI located six documents withheld pursuant to FOIA Exemption (b)(7)(A) and other underlying exemptions that had been processed

and released in full or part in other non-pending file numbers within the same request.[12]  The FBI

processed and will be releasing to Plaintiff either in full or part these six documents.  This

material has been added to the FBI's *Vaughn* Index and justification for the applicable

exemptions provided *infra*.  In addition, during the FBI's re-review of the RIP sample

documents, it was determined that information previously withheld pursuant to FOIA Exemption

(b)(7)(A) on Bates page Shapiro-262374 could be released, and will also RIP to Plaintiff.

## JUSTIFICATION FOR NONDISCLOSURE OF RECORDS PERTAINING TO PLAINTIFF UNDER THE PRIVACY ACT

(44)    When individuals request records about themselves from the FBI, RIDS first

considers the request under the Privacy Act, which generally provides individuals a right of

access to records about them maintained in government files, unless the records are part of a

system of records exempted from individual access.  *See* 5 U.S.C. § 552a(d).  Exemption (j)(2)

exempts from mandatory disclosure systems of records "maintained by an agency or component

thereof which performs as its principal function any activity pertaining to the enforcement of

criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend

criminals…." 5 U.S.C. § 552a(j)(2).

(45)    Under the Privacy Act, agencies may promulgate rules to exempt systems of

records from various provisions of the Act, to include individual requests for access or

amendment.  *See* 5 U.S.C. § 552a(d), (j), and (k).  Accordingly, DOJ promulgated regulations

exempting certain systems of records from individual access, inter alia, under the Privacy Act, 5

U.S.C. § 552a(d).  As relevant here, the FBI is a criminal and regulatory enforcement agency

within DOJ responsible for enforcing federal laws, and DOJ has exempted FBI law enforcement

---

[12] The processed material previously withheld pursuant to Exemption 7A is duplicate to the
following files/serials previously processed and released to Plaintiff:  90-NK-C87712 Serial 399
and 266I-NF-33925 Serials 35-37 and 40.

investigative records maintained in the CRS[13] from the Privacy Act's access provision pursuant to (j)(2). In other words, pursuant to 28 C.F.R. § 16.96(a)(1), the Plaintiff has no individual right of access to investigative records about himself under the Privacy Act. Therefore, Plaintiff's request was processed under the provisions of the FOIA.

(46)    In response to Plaintiff's FOIPA request, the FBI located responsive records relating to investigative matters that were compiled per the FBI's primary law enforcement mission to investigate violations of federal laws. The law enforcement records at issue were retrieved by RIDS through a search of the CRS, a system of records specifically exempt from the access provisions of the Privacy Act as noted above per 5 U.S.C. § 552a(j)(2), as implemented by 28 C.F.R. §16.96(a)(1). Furthermore, records responsive to the Plaintiff's request are law enforcement records as they were specifically compiled in the course of the FBI's investigation of potential terrorist acts related to animal rights and ecological extremism. Consequently, because the records were generated in furtherance of an FBI criminal investigation and are maintained in the CRS, an FBI system of records exempted from individual access under the Privacy Act, the FBI processed the records under the FOIA to achieve maximum disclosure. As a result, the records identified as exempt under Privacy Act Exemption (j)(2) were processed and released to Plaintiff subject only to the FOIA Exemptions noted. None of the information exempt from disclosure under the Privacy Act has been withheld from Plaintiff unless it was exempt pursuant to a FOIA Exemption.

## JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

(47)    All responsive documents subject to FOIA were reviewed under the access provisions of the FOIA to achieve maximum disclosure. Every effort was made to provide

---

[13] Privacy Act Systems of Records FBI-002, 63 FR 8659, 8671 (2/20/1998) (last publication of complete notice.)

Plaintiff with all material in the public domain and with all reasonably segregable, non-exempt

information in the responsive records. Of the entirety of processing, the FBI was able to

segregate 38,788 pages[14] and 28 compact discs ("CDs") and/or digital video discs ("DVDs")[15]

from the responsive records. Although it is not the normal practice of the FBI, Plaintiff was

advised in each of the FBI's "tier" release letters of the approximate number of pages withheld

pursuant to Exemption 7A, which totaled approximately 460,054 pages. These records were

categorically denied pursuant to FOIA Exemption 7(A), because they related to pending

investigations. In light of the D.C. Circuit's ruling in <u>Maydak v. U.S. Department of Justice</u>,

218 F.3d 760 (D.C. Cir. 2000), the FBI seeks to reserve the right to assert all other applicable

Exemptions to withhold information from the records categorically denied pursuant to

Exemption 7(A).[16] Further description of the information withheld, beyond what is provided in

---

[14] By letter dated July 20, 2012, the FBI advised Plaintiff it had reviewed 2,599 pages and released 720 pages. By letter dated February 9, 2015, the FBI advised Plaintiff it had reviewed 56,851 pages and released 17,727 pages as part of "Tier 1 (paper)." By letter dated August 7, 2015, the FBI advised Plaintiff it had reviewed 41,028 pages and released 1,851 pages as part of "Tier 2 (paper)." By letter dated February 4, 2016, the FBI advised Plaintiff it had reviewed 39,125 pages and released 12,186 pages as part of "Tier 3 (paper)." By letter dated August 4, 2016, the FBI advised Plaintiff it had reviewed 12,862 pages and released 5,391 pages as part of "Tier 4 (paper)." By letter dated February 3, 2017, the FBI advised Plaintiff it had reviewed 1,758 pages and released 912 pages as part of "Tier 5 (paper)." (***See* Exhibit FF.)**

[15] By letter dated May 8, 2015, the FBI advised Plaintiff it had reviewed 29 CDs/DVDs and released 23 CDs/DVDs as part of "Tier 1 (media)." By letter dated November 6, 2015, the FBI advised Plaintiff it had reviewed 14 CDs/DVDs and released one (1) CD/DVD as part of "Tier 2 (media)." By letter dated May 4, 2016, the FBI advised Plaintiff it had reviewed 64 CDs/DVDs and released three (3) CDs/DVDs as part of "Tier 3 (media)." By letter dated November 4, 2016, the FBI advised Plaintiff it had reviewed 13 CDs/DVDs and all CDs/DVDs were being withheld in their entirety as part of "Tier 4 (media)." By letter dated May 3, 2017, the FBI advised Plaintiff it had reviewed 37 CDs/DVDs and released 1CD/DVD as part of "Tier 5 (media)." (***See* Exhibit GG.)**

[16] Plaintiff was advised in each of its "tier" release letters of the other applicable exemptions to the records categorically denied pursuant to Exemption 7(A) – FOIA Exemptions (b)(3), (b)(6)/(b)(7)(C), (b)(7)(D) and (b)(7)(E).

this declaration could identify the actual exempt information that the FBI has protected.  As part of the sample provided by Plaintiff, the FBI will brief the five (5) requests on the merits of the application of Exemption 7(A) at the time of the request.

## EXEMPTION 7 THRESHOLD

(48)     The FBI withheld records responsive to Plaintiff's five selected requests: Ryan Noah Shapiro, Compassion Over Killing, Hyram Kitchen murders, William Edward Potter and Lindsay Parme in full pursuant to FOIA Exemption (b)(7)(A) to avoid harm to pending law enforcement proceedings.  See 5 U.S.C. § 552(b)(7)(A).

(49)     The first step in applying any of Exemption (b)(7)'s subparts is to demonstrate the records or information at issue were compiled for law enforcement purposes.  5 U.S.C. § 552(b)(7).  Law enforcement agencies such as the FBI must demonstrate the records at issue are related to the enforcement of federal laws and the enforcement activity is within the law enforcement responsibility of the agency.

(50)     Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM"), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government, with authority and responsibility to: investigate all violations of federal law not exclusively assigned to another agency; conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and further the foreign intelligence objectives of the United States.

(51)     The investigative files at issues were compiled during the FBI's criminal investigation into Plaintiff and other third parties' crimes involving potential terrorism activities related to animal rights and ecological extremism.  Thus, these records were compiled for a law

17

enforcement purpose and squarely fall within the law enforcement duties of the FBI; therefore, the information readily meets the threshold requirement of Exemption (b)(7).

### *Exemption 7(A) – Pending Enforcement Proceedings*

(52)   5 U.S.C. § 552 (b)(7)(A) exempts from disclosure:

> Records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … could reasonably be expected to interfere with enforcement proceedings.

(53)   Application of this exemption requires: the existence of law enforcement records; a pending or prospective law enforcement proceeding; and a determination that release of the information could reasonably be expected to interfere with the enforcement proceeding.  The FBI asserted FOIA exemption (b)(7)(A) to categorically deny information from records pertaining to investigations on-going at the time of the FBI's initial review.  The FBI determined that some records pertaining to and/or referencing Plaintiff and other subjects were exempt from disclosure pursuant to FOIA Exemption (b)(7)(A).  The FBI has concluded that all such law enforcement records related to pending FBI investigations.  The FBI has determined disclosure of the records, in the midst of the ongoing investigations was reasonably expected to interfere with these investigations.  Paragraphs 54-66, *infra*, describe in further detail the applicability of FOIA exemption (b)(7)(A) to the categorically denied records.

### Types of Document Categorically Denied Pursuant to FOIA Exemption (b)(7)(A)

(54)   Providing a document-by-document description or listing of the records responsive to Plaintiff's request falling in the categorically denied records would have undermined the very interests that the FBI sought to protect under Exemption (b)(7)(A), in addition to the other exemptions identified below.  In order to protect these interests, the FBI has described the types of responsive records from the pending investigative files, which are being

18

withheld in full pursuant to FOIA Exemption (b)(7)(A).  The pending investigative files contain the following types of documents:

(a) <u>FD-1057[17] - Electronic Communication ("EC")</u>:  FD-1057s and ECs replaced the traditional FBI correspondence (i.e., Memoranda and Letters) as the primary vehicle of correspondence within the FBI.  The purpose of an EC is to communicate within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network.  These forms are often utilized to record and disseminate intelligence/investigative information and for general investigation administration purposes.

(b) <u>Interview Forms (FD-302)</u>:  FD-302s are internal FBI forms in which evidence is often documented, usually as a result of FBI interviews.  Such evidence and/or interview information may later be used as testimony or evidence in court proceedings/trials.  Additionally, these evidence/interview forms are often incorporated in other FBI documents that may be used to disseminate intelligence/investigative information and can be utilized to set leads in furtherance of the FBI's investigative efforts.

(c) <u>Letterhead/Memorandum:</u>  This document provides investigative updates to management and other agencies and typically accompanies an EC.

(d) <u>FD-36, Airtels/Teletypes:</u>  FD-36s are utilized to report investigative details from the Field Office to FBI Headquarters.

---

[17] The designation "FD-" is attached to forms created and utilized internally by the FBI.

(e) <u>Fingerprint Cards:</u> This document is an identification record retained by the FBI in connection with arrests, federal employment, naturalization or military service.

(f) <u>State and Local Law Enforcement Documents:</u> This category consists of documents provided to the FBI by state and local law enforcement agencies. These documents can be used as evidence in court proceedings, are often incorporated in other FBI documents that may be used to disseminate intelligence/investigative information, and can be utilized to set leads in furtherance of the FBI's investigative efforts.

(g) <u>Other Investigative Documents Utilized for Investigative Purposes:</u> This category consists of various types of documents reflecting information and evidence gathered during an FBI investigation, the sources from/by which such information and evidence was gathered, methods used to obtain the information and evidence, and methods used to analyze the information and evidence. To describe these investigative documents in this category any more specifically would reveal the scope of the FBI's investigations, as well as the sources and methods being utilized by the FBI.

(h) <u>Non-Public Court Documents:</u> These are documents that have been filed with a court or otherwise made part of the non-public court record.

(i) <u>FD-340, 1A Envelopes:</u> These envelopes are used to organize and store documents that need to be stored separately from the FBI file to which they are attached, due to their size. They usually contain handwritten notes of interviews, photographs, and other various evidentiary documents.

(j) <u>Handwritten Interview Notes:</u> These are the original handwritten notes of FBI personnel who conducted interviews in the course of FBI investigations. These notes

20

are almost always transposed into FD-302s and are utilized by the FBI in the same manner.

(k) <u>Photographs:</u> These are photographs used to identify subjects of investigations and maintained within the FBI's investigative files.

(l) <u>Intelligence Write-ups:</u> This category consists of intelligence documents written to document/disseminate relevant intelligence information.

(m) <u>FD-448: FBI Facsimile Cover Sheet:</u> This form is used to identify information sent via facsimile to individuals within or outside the FBI.

(n) <u>FD-515, 542, Accomplishment Report:</u> These types of documents are used by FBI SAs to report investigative accomplishments.  They are submitted at various stages of an investigation to report statistically important events such as an arrest, conviction, sentencing, asset seizure, drug seizure, and/or disruption/dismantlement of a criminal enterprise.

(o) <u>News Articles:</u> These documents consist of information that was located and printed from public websites.

(p) <u>FD-525: Request for Photo Processing:</u> This form requests development, scanning and/or printing of any film or digital media by the Photographic Processing sub-unit of the Forensic Imaging Unit.

(q) <u>FD-7, Complaint Form:</u> FD-7s are utilized to submit complainant information collected during a phone call received after normal business hours during evening or overnight shifts.

(r) Emails: These documents consist of internal electronic email communications between employees in other government agencies, divisions, squads, and/or units discussing the direction or focus of an investigation.

(s) Documents Implementing Sensitive Investigative Techniques: These documents were utilized to implement a specific, sensitive, investigative technique. Describing these documents further would reveal this technique or sensitive data concerning this technique.

## Reasonable Expectation of Interference

(55)    In 2010, RIDS coordinated research and response to Plaintiff's then 68 requests with DT units with CTD. RIDS continued this practice for the additional 13 requests submitted by Plaintiff following 2010 and that are at issue in this case. DT advised, at the time, the records at issue were part of active investigations into multiple defendants/subjects. Consequently, RIDS exempted the information pursuant to FOIA exemption (b)(7)(A) to prevent interference with the FBI's pending investigation, as well as current and potential prosecutions. Therefore, releasing any records, outside what had already been provided in response to Plaintiff's request, would have jeopardized the investigations by undermining any remaining investigatory efforts and/or any on-going prosecutorial efforts. The FBI relied on FOIA Exemption (b)(7)(A) to not only prevent interference with the investigations, but to avoid disruption of any potential prosecutorial procedures that could arise as a result of these investigations, sentencing, and/or any subsequent appeals. Specifically, the potential harm from the release of this information in the midst of the pending investigations was as follows:

(a) It would have allowed for identification of individuals, sources of information, witnesses, potential witnesses who possess information relative to the investigation, FBI/ other law enforcement personnel, i.e., local, state, and federal, and individuals

22

otherwise associated with the investigation who could then be targeted for potential
intimidation and/or physical harm;

(b) individuals and other third parties could have improperly utilized the information to
counteract evidence developed by investigators, alter or destroy potential evidence
and/or create false evidence; and

(c) individuals and other third parties could have used the information to uncover the
government's legal strategy.

Moreover, once this information was released to the Plaintiff and in the public domain, its use

and dissemination would have been unrestricted. DT investigations are often interconnected and

involve a multitude of related subjects. Thus, harm in release existed even if the investigations

into Plaintiff and other third parties were currently not active. DT determined the release of any

of the records at issue could have potentially led to disclosure of information related to other

subjects still under investigation. Unfettered dissemination following release of this information

through the FOIA could have alerted these subjects to FBI investigative intentions/strategies.

Even providing a document-by-document *Vaughn* Index or description of the documents within

the pending investigatory files would undermine the very interests the FBI seeks to protect under

Exemption (b)(7)(A) as it would have resulted in the disclosure of key information about the

scope and nature of the FBI's (at the time) pending investigative efforts.

## Functional Categories of Information

(56)    The FBI has reviewed and categorized the types of exempt records into two

categories - Evidentiary/Investigative Materials and Administrative Materials. The categories

will be discussed in more detail below.

(57)    A record can fall into one or more functional categories as described in the below

paragraphs. For example, a record, such as an FBI Investigative Report, may serve several

purposes and may contain multiple categories of information, such as witness statements,

23

administrative directions, and/or evidentiary materials. Therefore, the information in each record could be included in both categories.

***Category 1: Evidentiary/Investigative Materials***

(58)     This category includes copies of records or evidence, analyses of evidence, and derivative communications discussing or incorporating evidence. A derivative communication describes, verbatim or in summary, the contents of the original record, how it was obtained, and how it relates to the investigation. Other derivative communications report this information to other FBI field offices, other law enforcement agencies, or other Federal agencies, either to advise them about the progress of the investigation, or to elicit their assistance in handling investigative leads. The following subparagraphs describe the types of evidentiary materials in the responsive records and the anticipated harm that could have reasonably resulted from the release of the materials.

(59)     <u>Exchange of Information between the FBI and Local/State/Federal Law Enforcement Agencies</u>:   Release of information exchanged between the FBI and its law enforcement partners (whether local, state, or federal) would disclose evidence, investigative information, and criminal intelligence developed by various agencies that have cooperated with—and provided information and records to—the FBI. This information was gathered, to help identify subjects, suspects, and/or other individuals of potential investigative interest; to identify and assist in locating witnesses and/or confidential sources; and to further the progress of this investigation. Release of information would have identified the FBI's investigative interest in particular individuals; revealed the scope and focus of the investigation; identified and tipped off individuals who were of interest to law enforcement; and provided suspects or targets the opportunity to destroy evidence and/or alter their behavior to avoid detection.

(60)   <u>Information Concerning Physical or Documentary Evidence</u>:   Disclosure of information concerning physical or documentary evidence gathered during the pendency of this investigation, or information discussing, describing, or analyzing the physical or documentary evidence, would have undermined efforts made in this investigation and  disrupted potential prosecutions.  The premature release of such information would have revealed the scope and focus of this investigation as well as the identities of subjects who were of investigative interest. Once subjects become aware of the FBI's interest in their activities, they could have taken actions to conceal their activities, evade detection, and/or suppress or fabricate evidence.  Also, the disclosure of physical or documentary evidence and/or information concerning this evidence could have led to the identification of confidential sources.  This would have directly and adversely impacted the investigations described within the records and any prospective resulting prosecutions.  Lastly, revealing such information could have resulted in the possible intimidation of or harm to witnesses and sources who assisted the FBI.

(61)   <u>Confidential Source/Witness Statements</u>: Confidential source and/or witness statements are one of the principal tools used in proving the facts which form the basis for a prosecution.  These statements contain information obtained from confidential informants and/or witnesses who had knowledge of the criminal activities that resulted in the investigation.  If the FBI released this information, the witnesses and/or confidential sources that have chosen to cooperate with law enforcement could be subjected to retaliation, intimidation, or physical or mental harm.  This could have had greatly damaged the FBI investigations as potential witnesses and/or confidential sources would have feared exposure and reprisals from the subjects of this investigation.  Implicit in conducting interviews in an investigation of this nature is the notion that an individual's identity and the information provided by them will be afforded

confidentiality.  The FBI goes to great lengths to protect and maintain an individual's

confidentiality since it is an integral part of a successful investigation and prosecution.  The

release of witness statements and/or confidential source statements would have disrupted and

harmed the FBI's investigative and/or prosecutorial actions.

***Category 2:  Administrative Materials***

(62)    Materials falling within this category include items such as case captions, serial

numbers, identities of FBI field offices, dates of investigations, and detailed instructions

designed to ensure that investigative procedures were conducted within the appropriate FBI and

DOJ guidelines.  The following subparagraphs describe the types of administrative materials

contained in the files and the anticipated harms that could reasonably have resulted from the

disclosure of such materials in the midst of an ongoing investigation, and prior to any

prospective prosecutions.  In many instances, administrative information is contained at the

beginning or end of correspondence or documents that fall within other categories of documents;

therefore, to release details on this category of information would also reveal the investigative

interests of the FBI and could have enabled suspects to discern a "road map" of the investigation.

(63)    Reporting Communications:  These communications permit an agency to monitor

the progress of an investigation and to facilitate its conduct.  These communications have the

potential to reveal or confirm the cooperation of other local or state government agencies in this

investigation.  These communications are replete with detailed information about the FBI's

investigative activities as well as detailed information about potential witnesses/confidential

sources for interview.  Additionally, they contain background information about third-party

individuals, the origins of pertinent information connecting them to the investigation, and their

connections to subjects and their relationship with the pending investigation.  The release of this

information would have revealed the nature and scope of the ongoing investigation by revealing: the investigative steps taken to obtain witness and source interviews; techniques and investigative methods used to compile and/or solicit information from various sources; and any potential or perceived challenges in the investigations.

(64)   Miscellaneous Administrative Documents:  These materials include items such as transmittal forms and standardized forms used for a variety of purposes.  These types of materials were used throughout this investigation for many routine purposes; however, the manner in which they were used and organized in the files also reveals information of investigative value.  The premature disclosure of this information could have undermined the pending investigation as well as pending and prospective prosecutions.

(65)   Administrative Instructions:  This type of information, whether it originates in communications from the FBI or other government or law enforcement agencies, would disclose specific investigative procedures employed in this investigation.  Release of this information would have permitted subjects or individuals of investigative interest to anticipate law enforcement actions and to alter, destroy, or fabricate evidence.

(66)   Specific examples of these instructions include the setting out of investigative guidelines and requests for specific investigative inquiries and affirmative tasking to various FBI field offices or to other government or law enforcement agencies.  These instructions are commonly referred to as "investigative leads" and are set forth in documents throughout the course of these investigations.  Revelation of the specific details could have rendered them useless to the FBI and allowed criminals to anticipate the FBI's plans and avoid certain actions and/or activities.

## JUSTIFICATION FOR WITHHOLDING CERTAIN INFORMATION PURSUANT TO OTHER APPLICABLE FOIA EXEMPTIONS

(67)    All documents responsive to Plaintiff's requests were processed to achieve

maximum disclosure consistent with the access provisions of the FOIA.  Every effort was made

to provide Plaintiff with all material in the public domain and with all reasonably segregable,

non-exempt information in the responsive records.  No reasonably segregable, non-exempt

portions have been withheld from Plaintiff.  Further descriptions of the information withheld,

beyond what is provided in this declaration, could identify the actual exempt information that the

FBI has protected.

(68)    The FBI has carefully examined all records responsive to Plaintiff's five (5)

selected requests for information on himself and others where information was withheld pursuant

to Exemption (b)(7)(A).  Within the five (5) requests containing originally pending material, the

FBI determined all Evidentiary/Investigative and Administrative  documents in these requests

were exempt from disclosure pursuant to FOIA Exemption (b)(7)(A) at the time of the FBI's

initial review of this material.  In light of the D.C. Circuit's ruling in Maydak v. U.S. Department

of Justice, 218 F.3d 760 (D.C. Cir. 2000), the FBI is asserting FOIA Exemptions 3, 6, 7(C),

7(D), and 7(E) of the FOIA as additional grounds for withholding records and information from

these records.  The decision in Maydak requires the simultaneous assertion of all applicable

exemptions, in addition to Exemption (b)(7)(A).

(69)    In the following paragraphs, the FBI will describe its reasoning for withholding

information within the sample documents RIP and WIF and reasoning for asserting underlying

Exemptions within the records categorically denied pursuant to Exemption (b)(7)(A).  For ease

of the Court and Plaintiff, the FBI will refer to the five (5) requests where records were

categorically denied pursuant to Exemption (b)(7)(A) as Part I.  The sample documents RIP,

WIF, and the re-processed 7A documents will be referred to as Part II.   The challenged documents within Part II were identified by their assigned Bates numbers and can be provided to the Court upon request.

### Explanation of the Coded Format Used to Describe and Justify Withholdings

(70)     The Bates-numbered documents contain, on their faces, coded categories of exemptions that detail the nature of the information withheld pursuant to the provisions of the FOIA.   The coded categories are provided to aid the Court's and Plaintiff's review of the FBI's explanations of the FOIA exemptions it has asserted to withhold the material.   Each instance of information withheld on the Bates-numbered documents is accompanied by a coded designation that corresponds to the categories listed below.   For example, if "(b)(7)(E)-1" appears on a document, the "(b)(7)(E)" designation refers to FOIA Exemption 7(E) protecting against records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement would disclose techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.   The numerical designation of "1" following the "(b)(7)(E)" narrows the main category into a more specific subcategory identified in the table below, such as "Sensitive File Numbers or Sub-File Names."

(71)     The FBI has prepared and included a *Vaughn* Index describing each of the selected sample pages in Part II, their applicable Bates page numbers, all coded Exemptions applied on each page, and designations whether the pages were RIP, WIF per Exemption or WIF because the pages were duplicate of another page.   The coded, Bates-numbered pages together with this declaration and the *Vaughn* Index demonstrate that all challenged material withheld by the FBI in Part II is exempt from disclosure pursuant to the cited FOIA exemptions, or is so

intertwined with protected material that segregation is not reasonably possible without revealing the underlying protected material.

(72)   Listed below are the categories used to explain the FOIA exemptions asserted to withhold the protected material at issue:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Exemption (b)(1)** | **CLASSIFIED INFORMATION** |
| *Cited at times with other exemptions (e.g., (b)(3), 6/7(C), 7(D), 7(E))* | |
| (b)(1)-1 | Information Properly Classified By an FBI Official Pursuant to E.O. 13526 |
| **Exemption (b)(3)** | **INFORMATION PROTECTED BY STATUTE** |
| *Cited at times in conjunction with other exemptions (e.g., (b)(1), 6/7(C))* | |
| (b)(3)-1 | Title III |
| (b)(3)-2 | Grand Jury Information – Fed. R. Crim. Pro. 6(e) |
| (b)(3)-3 | NSA of 1947 [50 U.S.C. Section 3024(i)(1)] |
| (b)(3)-4 | Pen Registers |
| (b)(3)-5 | Juvenile Justice & Delinquency Act [18 U.S.C. Section 5038] |
| **Exemption (b)(4)** | **TRADE SECRETS AND COMMERCIAL OR FINANCIAL INFORMATION** |
| **Exemption (b)(5)** | **PRIVILEGED INFORMATION** |
| *Cited at times in conjunction with other exemptions (e.g., 6/7(C))* | |
| (b)(5)-1 | Deliberative Process Privilege |
| **Exemption (b)(6) and Exemption (b)(7)(C)** | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and/or Identifying Information of FBI Special Agents and Support Personnel |
| (b)(6)-2 and (b)(7)(C)-2 | Names and/or Identifying Data of Third Parties of Investigative Interest |
| (b)(6)-3 and (b)(7)(C)-3 | Names and/or Identifying Information of Non-FBI Federal Government Personnel |

| | |
|---|---|
| (b)(6)-4 and (b)(7)(C)-4 | Names and/or Identifying Information of Local Law Enforcement Personnel |
| (b)(6)-5 and (b)(7)(C)-5 | Names and/or Identifying Information of Third Parties Merely Mentioned |
| (b)(6)-6 and (b)(7)(C)-6 | Names and/or Identifying Data Regarding Third Party Victims |
| (b)(6)-7 and (b)(7)(C)-7 | Names and/or Identifying Information of Third Parties Who Provided Information to the FBI<br>*[cited at times in conjunction with 7(D)]* |
| (b)(6)-8 and (b)(7)(C)-8 | Names and/or Identifying Data of 3rd Parties with Criminal Records/Rap Sheets |
| **Exemption (b)(7)(A)** | **PENDING LAW ENFORCEMENT PROCEEDINGS** |
| (b)(7)(A)-1 | Information, Which, if Disclosed, Could Reasonably be Expected to Interfere with Pending Law Enforcement Proceedings |
| **Exemption (b)(7)(D)** | **CONFIDENTIAL SOURCE INFORMATION** |
| *Cited at times in conjunction with other exemptions (e.g., 6/7(C))* | |
| (b)(7)(D)-1 | Names, Identifying Data and/or Information Provided by Sources Under Implied Assurances of Confidentiality |
| (b)(7)(D)-2 | Names, Identifying Data and/or Information Provided by Individuals Under an Express Assurance of Confidentiality |
| (b)(7)(D)-3 | Confidential Source File Numbers |
| (b)(7)(D)-4 | Foreign Government Agency Information Under Express Confidentiality |
| (b)(7)(D)-5 | Confidential Source Symbol Numbers |
| **Exemption (b)(7)(E)** | **LAW ENFORCEMENT INVESTIGATIVE TECHNIQUES AND PROCEDURES** |
| *Cited at times in conjunction with other exemptions* | |
| (b)(7)(E)-1 | Sensitive File Number and Sub-file Name |
| (b)(7)(E)-2 | Monetary Payments for Investigative Techniques |
| (b)(7)(E)-3 | Identity and/or Location of FBI or Joint Units, Squads, Divisions |
| (b)(7)(E)-4 | Dates/Types of Investigations |
| (b)(7)(E)-5 | Collection/analysis of Information |
| (b)(7)(E)-6 | Database Identifiers/Printouts |
| (b)(7)(E)-7 | Undercover Operation |
| (b)(7)(E)-8 | Information Regarding Targets, Dates, and Scope of Surveillance (e.g., location, types of devices, installation info) |
| (b)(7)(E)-9 | Statistical Info Contained in Effectiveness Rating FD-515 |

31

| (b)(7)(E)-10 | Investigative Focus of Specific Investigation |
| (b)(7)(E)-11 | Specific Law Enforcement Technique Utilized to Conduct National Security Investigations |
| (b)(7)(E)-12 | Targets of Pen Registers/Trap and Trace Devices |
| (b)(7)(E)-13 | ViCAP Material |

### *Exemption (b)(1) – Classified Information*

(73)    5 U.S.C. § 552(b)(1).  Exemption (b)(1) protects from disclosure records that are:

    (a)  specifically authorized under criteria established by Executive Order to be kept secret in the interest of national defense or foreign policy; and

    (b)  are in fact properly classified pursuant to such Executive Order.

(74)    Before I can consider an Exemption (b)(1) claim for withholding agency records, I must determine whether the information in those records is information that satisfies the requirement of the E.O. 13526, the executive order that governs the classification and protection of information that affects the national security, and whether the information complies with the various substantive and procedural criteria of the order.  E.O. 13526, signed by President Barack Obama on December 29, 2009, is the executive order that currently applies to the protection of national security information.  I am bound by the requirements of E.O. 13526 when making classification determinations.

(75)    For information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in E.O. 13526 § 1.1(a):

    (1)  an original classification authority is classifying the information;

    (2)  the information is owned by, produced by or for, or is under the control of the United States Government;

    (3)  the information falls within one or more categories of information listed in § 1.4 of this order; and

    (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(76)    As I will explain in further detail below, in my role as an original classification authority, I have determined that the information withheld pursuant to Exemption (b)(1) is under the control of the United States Government, is classified and requires a classification marking at the "Secret" level since the authorized disclosure of the information reasonably could be expected to cause serious damage to national security. See E.O. 13526 § 1.2(a)(2). In addition to these substantive requirements, certain procedural and administrative requirements of E.O. 13526 must be followed before information can be considered properly classified, such as proper identification and marking of documents. In particular, I made certain that all procedural requirements of E.O. 13526 were followed:

    (1) Each document was marked as required and stamped with the proper classification designation;

    (2) Each document was marked to indicate clearly which portions are classified, and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b);

    (3) The prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were adhered to;

    (4) The declassification policies set forth in E.O. 13526 § 3.1 and 3.3 were followed; and

    (5) Any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

## FINDINGS OF DECLARANT REGARDING EXEMPTION (b)(1)

(77)    With the above requirement in mind, I personally and independently examined the FBI information withheld pursuant to Exemption 1.  As a result of this examination, I determined that this classified information is owned by, was produced by or for, and/or is under the control of the U.S. Government.  I further determined the classified information continues to warrant classification at the "Secret" level pursuant to E.O. 13526 § 1.49(c), intelligence activities (including covert action), intelligence sources or methods, or cryptology.  The information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense and foreign relations of the United States.  This information was not examined in isolation.  Instead, the information was evaluated with careful consideration given to the impact disclosure of this information will have on other sensitive information contained elsewhere in the United States' intelligence files, including the secrecy of that other information.  Equal consideration was given to the impact that the other information, either in the public domain or likely known or suspected by present or potential adversaries of the United States, would have upon the information I examined, and upon attempts by hostile entity to analyze such information.

(78)    In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and its withholding outweighed the benefit of disclosure, I exercised my prerogative as an original classification authority and designated that information as classified in the interest of national security at the "Secret" level, and invoked FOIA Exemption (b)(1) to prevent disclosure.  Likewise, the justifications for the withheld classified information has been prepared with the intent that they be read with consideration given to the context in which the classified information is found, but

also other information already in the public domain, as well as information likely known or

suspected by hostile intelligence entities.  It is my judgment that any greater specificity in the

descriptions and justifications set forth herein with respect to the intelligence activities (including

covert action), sources or methods could reasonably be expected to jeopardize the national

security of the United States.  As a result, the information appearing in the challenged document

has been appropriately classified pursuant to E.O. 13526 and withheld pursuant to FOIA

Exemption (b)(1).  Additionally, the FBI is also asserting FOIA Exemption (b)(3) [50 U.S.C. §

3024(i)(1) (National Security Act of 1947)] in conjunction with (b)(1).  Additional information

supporting the assertion of FOIA Exemptions (b)(1) and (b)(3) will be provided to the Court in

camera, ex parte upon request as the withheld information cannot be further discussed on the

public record, beyond what I describe herein, without revealing classified information.

**Exemption (b)(1) – E.O. 13526 § 1.4(c)**
**INTELLIGENCE ACTIVITIES, SOURCES AND METHODS**

(79)     E.O. 13526 § 1.4(c) exempts intelligence activities (including covert action),

intelligence sources or methods, or cryptology from disclosure.  An intelligence activity or

method includes any intelligence action or technique utilized by the FBI against a targeted

individual or organization that has been determined to be of a national security interest.  An

intelligence method is used to indicate any procedure (human or non-human) utilized to obtain

information concerning such individual or organization.  An intelligence activity or method as

two characteristics.  First, the intelligence activity or method – and information generated by it –

is needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions.  Second,

confidentiality must be maintained with respect to the activity or method if the viability,

productivity and usefulness of its information is to be preserved.

(80)     Within Part II the FBI withheld information protected by Exemption 1 because it

35

describes and pertains to intelligence activities, sources, and methods utilized by the FBI in gathering intelligence information. Thus, the information falls squarely within the meaning of §1.4(c). The FBI protected information under FOIA Exemption (b)(1) and § 1.4(c) because the information is classified and the release of such information would reveal intelligence activities and methods used by the FBI against targets of domestic counterterrorism investigations; or disclose the intelligence gathering capabilities of the activities or methods directed at targets.

(81)     It is my determination the release of this information could permit hostile persons, entities, and/or foreign governments to appraise the scope, focus, location, target and capabilities of the FBI's intelligence-gathering methods and activities, and allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless in providing intelligence information. This revelation of intelligence activities and methods would severely disrupt the FBI's intelligence-gathering capabilities and could cause serious damage to our national security. This information is properly classified at the "Secret" level pursuant to E.O. 13526, § 1.4(c). Thus, the information is exempt from disclosure pursuant to Exemption 1.

### Exemption (b)(3)—Information Protected by Statute

(82)     Exemption 3 protects information that is:

> specifically exempted from disclosure by statute requiring ... provides that such statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009,[18] specifically cites to this paragraph.

---

[18] The OPEN FOIA Act of 2009 was enacted October 28, 2009. See Pub.L. 111-83, 123 Stat. 2142, 2184.

**(b)(3)-1**          **Information Specifically Exempted by 18 U.S.C. §§ 2510-2520**
                  **(Title III of the Omnibus Crime Control and Safe Streets Act of 1968)**

(83)     Within Part II The FBI asserted Exemption (b)(3) to protect information

specifically exempted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of

1968, 18 U.S.C. §§ 2510-2520 ("Title III"), concerning the Court-ordered lawful interception

and recording of telephone communications and vocal communications recorded by electronic

microphone surveillance by a federal law enforcement agency in criminal investigations.  As

relevant to 5 U.S.C. § 552(b)(3)(B), the Omnibus Crime Control and Safe Streets Act of 1968 is

a statute enacted before the date of enactment of the OPEN FOIA Act of 2009.

(84)     The Title III statute specifically exempts from disclosure certain criteria of

information concerning Court-ordered interceptions and recordings by federal law enforcement

agencies, including the identities of targeted individuals, targeted locations of microphones, the

identities of participants in intercepted and/or recorded conversations, and the content of these

intercepted and recorded conversations.  Essentially, Title III ("T III") protects from release who,

what, when, where, and how of the intercept.  Specifically, T III identifies intercepted

communications of the subject of its disclosure limitations,[19] and apart from those instances

where judges may release intercepted material to parties overheard,[20] Section 2517 limits

disclosure of intercepted communications to only three circumstances.[21]  In this case, the FBI is

---

[19] See 18 U.S.C. § 2517, ("Authorization for disclosure and use of intercepted wire, oral, or electronic communications").

[20] See 18 U.S.C. § 2518 (8)(d), (10)(a).

[21] See 18 U.S.C.§ 2517(1)-(3) (2011) (limiting disclosure to (1) exchanges between law enforcement officers as necessary for the performance of official duties, (2) use by law enforcement officers for the performance of official duties, and (3) persons testifying under oath).

asserting FOIA Exemption (b)(3) to protect the target of the T III wiretap and the T III

communication analysis.  None of the three circumstances described in Section 2517 apply to the

withheld T III information.  Accordingly, the FBI is properly asserting FOIA Exemption (b)(3)

to protect this type of information.[22]

**(b)(3)-2**            **Information Specifically Exempted by Federal Rule of Criminal Procedures 6(e) (Federal Grand Jury Information)**

(85)    Within Part II the FBI protected Federal Grand Jury information pursuant to

Federal Rule of Criminal Procedure 6(e).  As relevant to 5 U.S.C. § 552(b)(3)(B), Rule 6(e) is a

statute[23] enacted before the date of the enactment of the OPEN FOIA Act of 2009.  It is well-

established that Rule (6)(e) embodies a broad, sweeping policy of preserving the secrecy of

grand jury material regardless of the substance in which the material is contained.  In the

investigative records at issue, only that information which explicitly discloses matters occurring

before a Federal Grand Jury has been withheld pursuant to Exemption (b)(3).  Specifically, the

information withheld consists of the names and/or identifying information of third parties who

were either subpoenaed to provide testimony or actually providing testimony to the Federal

Grand Jury; the company names and/or employees served with Federal Grand Jury subpoenas;

information identifying specific records subpoenaed by the Federal Grand Jury; and other

information concerning the internal workings of the Federal Grand Jury.  The disclosure of this

---

[22] During the FBI's re-review of the sample documents, it was determined that FOIA Exemption (b)(3)-1 is no longer applicable on the following Bates stamped page: Shapiro-179308.  The FBI applied FOIA Exemption (b)(7)(E)-8 to withhold this information.

[23] As prescribed by 18 U.S.C. § 3771, proposed rules become effective ninety days after the Chief Justice reports them to Congress.  By order of April 26, 1976, the Supreme Court adopted amendments to the Federal Rules of Criminal Procedure which include Rule 6(e) and reported the amendments to Congress.  Congress voted to delay the effective date of several of the proposed rules, to include Rule 6(e), "until August 1, 1977, or until and to the extent approved by Act of Congress, which is earlier." Pub. L. No. 94-349 § 1, 90 Stat. 822 (1976).

material would clearly violate the secrecy of the Grand Jury proceedings, revealing the inner

workings that led to the Grand Jury indictment of the subject, as well as other possible violations

being investigated. Consequently, the FBI properly asserted FOIA Exemption (b)(3), in

conjunction with FOIA Exemptions (b)(6), (b)(7)(C), and (b)(7)(E), to protect Rule 6(e) Grand

Jury information in the subject's law enforcement records.[24]

### (b)(3)-3          Information Specifically Exempted by 50 U.S.C. § 3024(i)(1) (National Security Act of 1947)

(86)    Within Part I and Part II the FBI withheld information pursuant to Section

102A(i)(1) of the National Security Act of 1947 ("NSA"), as amended by the Intelligence

Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. § 3024(i)(1), which

provides the Director of National Intelligence ("DNI") "shall protect from unauthorized

disclosure intelligence sources and method."[25]  As relevant to U.S.C. § 552(b)(3)(B), the

National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act

of 2009.  On its face, this federal statute leaves no discretion to agencies about withholding from

the public information about intelligence sources and methods.  Thus, the protection afforded to

intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute.  See *CIA v Sims*, 471

U.S. 159 (1985).  In order to fulfill its obligation of protecting intelligence sources and methods,

the DNI is authorized to establish and implement guidelines for the Intelligence Community

("IC") for the classification of information under applicable laws, Executive Orders, or other

---

[24] During the FBI's re-review of the sample documents, it was determined that Exemption (b)(3)-2 is applicable to information also withheld pursuant to FOIA Exemptions (b)(6) and (b)(7)(C)-3, 7 and (b)(7)(D)-2, 5 on the following Bates stamped pages: Shapiro-5142, 34976, 34985, 35266, 35389, and 35421.

[25] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1).  As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is now codified at 50 U.S.C. § 3024(i)(1).

Presidential Directives, and for access to and dissemination of intelligence.   50 U.S.C. §

3024(i)(2)(A), (B).

(87)   The FBI is one of 17 member agencies comprising the IC, and as such must

protect intelligence sources and methods.   As described above, Congress enacted the NSA, as

amended by the IRTPA, to protect the IC's sources and methods of gathering intelligence.

Disclosure of such information presents the potential for individuals to develop and implement

countermeasures, which would result in the loss of significant intelligence/information relied

upon by national policymakers and the IC.   Given that Congress specifically prohibited the

disclosure of information pertaining to "intelligence sources and methods" used by the IC as a

whole, I have determined that the FBI's intelligence sources and methods would be revealed if

any of the withheld information is disclosed to Plaintiff.   Furthermore, as evident by the

markings on one selected sample page, the information withheld pursuant to FOIA Exemption

(b)(3)/ 50 U.S.C. § 3024(i)(1) was originally classified at the Secret level.   The information

pertains to intelligence activities source and methods and has been the subject of declassification

in accordance with existent regulations.   Nonetheless, because it pertains to information

prohibited from disclosure as prescribed by the National Security Act under 50 U.S.C. §

3024(i)(1), the information was properly withheld pursuant to FOIA Exemption (b)(3).

Additionally, in another selected sample page, the FBI properly withheld information prohibited

from disclosure pursuant FOIA Exemption (b)(3), in conjunction with FOIA Exemptions (b)(1),

as both Exemptions apply to this information (*see* Bates page Shapiro-262152).[26]

---

[26] During the FBI's re-review of the sample documents, it was determined that FOIA Exemption
(b)(7)(A)-1 is no longer applicable on the following Bates stamped page(s): Shapiro-85303.   The
FBI applied FOIA Exemptions (b)(3)-3 and (b)(7)(E)-5 to withhold this information.
Additionally, the FBI applied FOIA Exemption (b)(3)-3 as underlying exemptions to Exemption
7A on the following Bates stamped page(s): Shapiro-1613-1639 and 2121-2177.

**(b)(3)-4**          **Information Specifically Exempted by 18 U.S.C. § 3123 (Pen Register Act)**

(88)      Within Part I and Part II, the FBI asserted Exemption (b)(3) to protect pen register information, which is specifically exempt pursuant to 18 U.S.C. § 3123(d), the Pen Register Act. The Pen Register Act protects from disclosure information pertaining to certain court "order(s) authorizing or approving the installation and use of pen registers or a trap and trace device;" and information pertaining to "the existence of the pen register or trap and trace device or the existence of the investigation." A pen register is a device that records phone numbers dialed to or from a target telephone. The statute mandates that a court order be obtained prior to installing or using a pen register, unless the user of the telephone consents to the device. Orders for pen registers are sealed unless otherwise ordered by the Court. FOIA Exemption (b)(3) protects the court order in its entirety; the identity of the individual on whom it is placed; the location of the device; information obtained from the device; and any other specifics regarding the pen register/trap and trace device. As relevant here, in the documents at issue, the FBI withheld information that if disclosed, would reveal the existence or use of a pen register or trap and trace device, or reveal the existence of an investigation involving a pen register or trap and trace device, that information is protected from disclosure by FOIA Exemption (b)(3). As relevant to 5 U.S.C. § 552(b)(3)(B), the Pen Register Act is a statute[27] enacted before the date of enactment

---

[27] The Electronic Communications Privacy Act (ECPA) was passed in 1986 (Pub. L. No. 99-508, 100 Stat. 1848). There were three main provisions or Titles to the ECPA. Title III created the Pen Register Act, which included restrictions on private and law enforcement uses of pen registers. The United States statutes governing pen registers are codified under 18 U.S.C., Chapter 206. Section 216 of the 2001 USA PATRIOT Act expanded the definition of a pen register to include devices or programs that provide an analogous function with internet communications. 26 The OPEN FOIA Act of 2009 was enacted October 28, 2009, Pub. L. No. 111-83, 123 Stat. 2142, 2184; 5 U.S.C. § 552(b)(3)(B).

of the OPEN FOIA Act of 2009.  Pursuant to 18 U.S.C. § 3123(d), the FBI has properly asserted

FOIA Exemption (b)(3) to withhold this information from disclosure, in conjunction with

underlying FOIA Exemption (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E).

**(b)(3)-5**          **Juvenile Justice and Delinquency Act [18 U.S.C. § 5038]**

(89)    Within Part I, the FBI asserted Exemption (b)(3) to protect information

concerning juvenile criminal records, which is specifically exempt pursuant to 18 U.S.C. § 5038,

the Juvenile Justice and Delinquency Act.  This act protects from disclosure the juvenile's name,

date of adjudication, court, offenses, and sentence, along with any notations that the matters were

juvenile adjudications.  For purposes of this Act, a "juvenile" is a person who has not attained

his/her eighteenth birthday, or for the purposes of proceedings and disposition for an alleged act

of juvenile delinquency, a person who has not attained his twenty-first birthday.  For purposes of

this Act, "juvenile delinquency" is a violation of a law of the United States committed by a

person prior to his eighteenth birthday which would have been a crime if committed by an adult.

As relevant to 5 U.S.C. § 552(b)(3)(B), the Juvenile Justice and Delinquency Act is a statute[28]

enacted before the date of enactment of the OPEN FOIA Act of 2009.  This statute clearly

requires this type of juvenile related material not be publically disclosed.  The Statute states

during the course of any juvenile delinquency proceedings, all information and records relating

to the proceeding, which are obtained and/or prepared as the official duty of an employee of the

---

[28] The Juvenile Justice and Delinquency Act was passed in 1974 (Pub. L. No. 93-415, Title V, § 508, Sept. 7, 1974, 88 Stat. 1137; amended Pub. L. 95-115, § 8(B), Oct. 3, 1977, 91 Stat. 1060; Pub. L. 98-473, Title II, § 1202, Oct. 12, 1984, 98 Stat. 2150; Pub. L. 103-322, Title XIV, § 140005, Sept. 13, 1994, 108 Stat. 2032; Pub. L. 104-294, Title VI, § 601(F)(16), (o), Oct. 11, 1996, 110 Stat. 3500, 3502). There are twelve main provisions this Act.  The United States statutes governing juvenile delinquency are codified under 18 U.S.C., Chapter 403.

court or an employee of any other government agency, shall not be disclosed directly or indirectly to anyone other than the judge, counsel for the juvenile, and the Government, or others entitled to receive juvenile records pursuant to this Act. Furthermore, throughout and upon completion of the juvenile delinquency proceedings, the records shall be safeguarded from disclosure to unauthorized persons. As relevant here, in the documents at issue, the FBI withheld information pertaining to the arrest and adjudication of a juvenile's criminal acts. Pursuant to 18 U.S.C. § 5038, the FBI has properly asserted FOIA Exemption (b)(3) to withhold this information from disclosure, in conjunction with underlying FOIA Exemption (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E).

**(b)(4)-1**          **Trade Secrets and Commercial or Financial Information**

(90)     Within Part II, the FBI asserted Exemption (b)(4) to protect "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). This exemption is intended to protect the interest of both the government and submitters of information (e.g., private companies). Its very existence encourages submitters to voluntarily furnish useful commercial or financial information to the government and provides the government with an assurance that required submissions will be reliable. The exemption also affords protection to those submitters who are required to furnish commercial or financial information to the government for competitive bidding of contracts by safeguarding them from the competitive disadvantages that could result from disclosure.

(91)     For purposes of Exemption (b)(4), commercial information furnished to the government is confidential if disclosure is likely to: 1) impair the government's ability to obtain necessary information in the future; or 2) cause substantial harm to the competitive position of the person/company from whom the information was obtained. In this case, the FBI withheld

43

pursuant to FOIA Exemption (b)(4) the following: selected pages from a book titled *"A Poor Man's James Bond"* copyrighted in 1972 by Kurt Saxon.

(92)    FOIA Exemption (b)(4) was asserted because the material is copyrighted.  The copyright information for the company clearly appears in these records.  Furthermore, the withheld copyrighted information has commercial value.   Five volumes of this book are still for sale today and a second book of the same title was published in 1988 and updated in 1991.  The FBI conducted research to locate the 1972 printing of the book in the public domain at no cost. The 1988 printing is available for free in the public domain, but it is only similar in content to the 1972 version.  The 1972 copyrighted version of the material is only available at a cost.  The pages from the 1972 printing of the book withheld pursuant to Exemption 4 are not located in the free, public 1988 printing of the second, more up-to-date book.

(93)    Release through the FOIA of this copyrighted information could cause substantial harm to the company's competitive position.  First, disclosing this information could have an immediate negative impact on the holder's commercial interests, considering Plaintiff would benefit from free information for which this company normally charges fees.  Second, disclosure undermines the commercial nature and inherent value of this copyrighted work as copyright holders have an exclusive right to disseminate work by sale, lease, or rental.  See 17 U.S.C. § 106.  Once information is released through the FOIA, the government has no control over further dissemination.  Thus, release of this copyrighted material through the FOIA could potentially result in the wide release of proprietary information to the public, at no cost, denying the company revenue and its proprietary rights to its dissemination.  Accordingly, the FBI properly asserted FOIA Exemption (b)(4) to protect this type of information.

### *Exemption (b)(5) – Privileged Information*

(94)     Exemption (b)(5) exempts "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

(95)     Exemption 5 has been construed to exempt those documents or information normally privileged in the civil discovery context, including the deliberative process privilege. The deliberative process privilege protects the internal deliberations of the government by insulating recommendations, analyses, opinions, and other non-factual information comprising the decision-making process.

(96)     In order to apply Exemption (b)(5), agencies must first satisfy the threshold requirement – i.e., show that the information protected was "inter-agency or intra-agency." As it pertains to the documents withheld pursuant to FOIA Exemption (b)(5) in this case, the inter-agency and/or intra-agency character of the documents is readily apparent on their face or by the context of internal FBI discussions or communications between the FBI and other federal agencies. Agencies must next show the withheld information was created in reasonable anticipation of litigation. Finally agencies must satisfy of the particular elements of particular privileges, in this case, the deliberative process privilege.

**(b)(5)-1**               **Deliberative Process Privilege**

(97)     The deliberative process privilege protects the internal deliberations of the government by insulating recommendations, analyses, opinions, and other non-factual information comprising the decision-making process. In turn, Exemption 5 allows for the withholding of such privileged material—i.e., material that contains or was prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policies,

45

proposals, conclusions, or recommendations. The privilege also protects records and information that if disclosed, would reveal the agency's collection of multitudinous facts, and the sorting, evaluation, and analysis of those facts in order to make recommendations or reach a final agency decision. The agency's treatment of such information is, itself, a deliberation and is a deliberative process properly protected by the privilege.

(98)    Exemption (b)(5) is predicated on the recognition release of privileged information would inhibit the government's development of policy and stifle its decision-making process. Furthermore, exempting such information from disclosure also protects against public confusion resulting from preliminary disclosure of opinions and information that do not, in fact, reflect the final views or policies of the FBI. The FBI invoked Exemption (b)(5) and the deliberative process privilege because FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew that their opinions of the moment might be made a matter of public record at some future date; and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decision-makers of fully-explored options developed from robust debate.

(99)    As discussed *supra*, in order to apply FOIA exemption (b)(5), agencies must first satisfy the threshold requirement, showing the information protect was either "inter-agency" or "intra-agency" and created in reasonable anticipation of litigation. Once these thresholds are satisfied, agencies must then satisfy the elements of the pertinent privilege. With respect to the deliberative process privilege, agencies must show the withheld information is both pre-decisional – i.e., antecedent to the adoption of agency policy; and agency must also pinpoint agency decision or policy to which a document contributed ... or ... identify a decision making process to which a document contributed – and deliberative – i.e., a direct part of the deliberative

46

process in that it makes recommendations or express opinions on legal or policy matters, reflects

the give and take of the consultative process, and bears on the formulation or exercise of agency

policy-oriented judgment.  Furthermore, an agency must identify the role of a contested

document in a specific deliberative process.

(100)   Within Part II, the FBI applied Exemption (b)(5) to protect deliberative, intra-

agency information responsive to Plaintiff's requests and located within closed investigative

records of Plaintiff's subjects.  The FBI has applied Exemption (b)(5) to information prepared in

the context of agency employees' deliberations.  Specifically, the information withheld consists

of preliminary opinions, evaluations, and comments of Sacramento Field Office ("SCFO"),

Portland Field Office ("PDFO") and Counterterrorism Division ("CTD") Special Agents

pertaining to the criminal proceedings against investigative subjects.  The investigative

documents include intermediary discussions leading to final decisions.  They consist of

Memorandums and Electronic Communications ("ECs") between SAs and the FBIHQ executive

management.  These inter-agency communications contain information that is clearly pre-

decisional because the discussions resulting from these efforts consist of FBI staff providing

advice, asking questions within the agency, and/or deliberating to determine a final decision

and/or course of action.  The withheld information precedes the final decisions.  Furthermore,

this information was clearly created in reasonable anticipation of litigations – it was created in

furtherance of prosecutions of investigative subjects for suspected criminal activities.

(101)   Disclosure of the protected information would lay bare the FBI's deliberative

process as it would reveal internal discussions and information FBI personnel thought were

pertinent to their analysis, and their compilation and sorting of facts, all of which were used in

reaching final decisions regarding the investigative material collected and analyzed during the

criminal proceedings of the subject. These deliberations were recent[29] and of relative import –

they were related to the FBI's core law enforcement mission. The harm associated with such a

release would be a chilling effect on agency personnel's willingness to fully and frankly

deliberate during decision-making/policy creation. Essentially, agency personnel would be much

less likely to share their unrefined ideas while trying to make the best agency decisions or adopt

the best agency policies. In order to make the best decisions/policies, a whole host of ideas must

be explored. Some raw ideas, in retrospect, may seem ill-conceived or even foolish, but the

consideration of such ideas is absolutely necessary to refine and implement the best

decisions/policies. If agency personnel believed their raw ideas would be subject to public

scrutiny, they would be much more guarded in fully participating in the deliberation process.

Thus, considering release of this information could greatly degrade the quality of internal agency

deliberations, the FBI properly asserted Exemption (b)(5) in conjunction with the deliberative

process privilege to withhold this information.

### *Exemptions 6 and 7(C) –Unwarranted Invasion of Personal Privacy[30]*

(102)   5 U.S.C. § 552 (b)(6) exempts from disclosure:

> Personnel and medical files and similar files when the disclosure of such information
> would constitute a clearly unwarranted invasion of personal privacy.

---

[29] The FOIA Improvement Act of 2016 limits the application of Exemption 5 pursuant to the
Deliberative Process Privilege to records created within the last 25 years. This information is
much less than 25 years old.

[30] The practice of the FBI is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C).
Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted
invasion of personal privacy" standard and the test for Exemption (b)(7)(C) uses the lower
standard of "could reasonably be expected to constitute an unwarranted invasion of personal
privacy," the analysis and balancing required by both exemptions is sufficiently similar to
warrant a consolidated discussion. The privacy interests are balanced against the public's
interest in disclosure under the analysis of both exemptions.

(103)   5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

> Records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … could reasonably be expected to constitute an unwarranted invasion of personal privacy.

(104)   In withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure.  For purposes of this analysis, a public interest exists when information would shed light on the FBI's performance of its mission to protect and defend the United States against terrorists and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.  In each instance where information was withheld pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI determined that the individuals' privacy interests outweighed the public interest, if any, in the information.

**(b)(6) and (b)(7)(C)-1**          **Names and/or Identifying Information of FBI Special Agents and Support Personnel**

(105)   Within Part I and Part II, the FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names of FBI Special Agents ("SAs") who are responsible for conducting, supervising, and/or maintaining the investigative activities in the investigative records at issue. These responsibilities include conducting interviews and compiling information, as well as reporting on the status of investigations.  Assignments of SAs to any particular investigation are not by choice.  Publicity (adverse or otherwise) regarding any particular investigation to which they are or have been assigned may seriously prejudice their effectiveness in conducting other investigations.  The privacy consideration is also to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or not they are currently employed by the FBI.  FBI SAs conduct official inquiries into various

49

criminal and national security violation cases.  They come into contact with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives.  It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years.  These individuals may seek revenge on the agents and other federal employees involved in a particular investigation.  The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent.  The FBI could identify no discernible public interest in the disclosure of this information because disclosure of the names and identifying information of FBI SAs would not shed light on the operations and activities of the FBI.

(106)    The names of FBI support employees were also protected.  Support personnel are assigned to handle tasks related to the official investigations reflected in the documents responsive to Plaintiff's FOIA requests.  They were, and possibly are, in positions of access to information regarding official law enforcement investigations, and therefore could become targets of harassing inquiries for unauthorized access to investigations if their identities were released.  Thus, these individuals maintain substantial privacy interests in not having their identities disclosed.  In contrast, the FBI concluded that no public interest would be served by disclosing the identities of these FBI support employees to the general public because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities.  Accordingly, after balancing these employees' substantial privacy interests against the non-existent public interest, the FBI properly protected the names and identifying information of SAs and support personnel pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

50

**(b)(6) and (b)(7)(C)-2**      **Names and/or Identifying Data of Third Parties of**
                               **Investigative Interest**

(107)   Within Part I and Part II, the FBI asserted Exemptions (b)(6) and (b)(7)(C) to

protect the names and/or identifying data of third parties who were of investigative interest to the

FBI.  Identifying information includes, but is not limited to, names, dates of birth, social security

numbers, addresses, telephone numbers, and/or other personal information.  Being identified as a

subject of a criminal investigation carries a strong negative connotation and a stigma.  Release of

the identities of these individuals to the public could subject them to harassment or

embarrassment, as well as undue public attention.  Accordingly, the FBI determined these

individuals maintain substantial privacy interests in not having their identities disclosed.  In

contrast, disclosing personal information about these individuals would not significantly increase

the public's understanding of the FBI's performance of its mission and so the FBI concluded that

there was no public interest here sufficient to override these individuals' substantial privacy

interests.  For these reasons, the FBI properly asserted FOIA Exemptions (b)(6) and (b)(7)(C) to

protect this type of information.[31]

**(b)(6) and (b)(7)(C)-3**      **Names and/or Identifying Information of Non-FBI Federal**
                               **Government Employees**

(108)   Within Part I and Part II, the FBI asserted Exemptions (b)(6) and (b)(7)(C) to

protect the names and identifying information of non-FBI federal government employees within

the records at issue.

---

[31] During the FBI's re-review of the sample documents, it was determined that information
previously withheld pursuant to FOIA Exemptions (b)(6) and (b)(7)(C)-2 could be released and
this exemption is no longer applicable on the following Bates stamped pages: Shapiro-70028,
93319, 202061, and 232977.  Additionally, the FBI applied FOIA Exemptions (b)(6) and
(b)(7)(C)-2 as underlying exemptions to Exemption 7A on the following Bates stamped page:
Shapiro-49978.

(109)    The relevant inquiry here is whether public access to this information would violate a viable privacy interest of the subject of such information. Disclosure of this identifying information could subject the employees to unauthorized inquiries and harassment which would constitute a clearly unwarranted invasion of personal privacy. The rationale for protecting non-FBI federal government employees is the same as that for FBI agents and employees.

(110)    After identifying the substantial privacy interests of the non-FBI federal government employees, the FBI balanced those interests against the public interest in disclosure. The FBI could identify no discernible public interest in the disclosure of this information because the disclosure of the non-FBI federal employees' names and/or identifying information will not shed light on the operations and activities of the FBI. Accordingly, the FBI determined that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of personal privacy and asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect this type of information.

**(b)(6) and (b)(7)(C)-4**        **Names and/or Identifying Information of State and Local Law Enforcement**

(111)    Within Part I and Part II, the FBI asserted Exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names and identifying information of state and local law enforcement employees. These employees were acting in his or her official capacity and aided the FBI in the law enforcement investigative activities reflected in the records responsive to Plaintiff's requests. The rationale for protecting the identities of FBI employees discussed in ¶¶104-105, *supra*, applies equally to the names of state and local law enforcement employees. Release of the identities of these law enforcement employees could subject him or her as individuals to unnecessary and unwelcome harassment that would invade his or her privacy, and could cause him or her to be targeted for compromise. In contrast, disclosure of this information would serve

no public interest because it would not shed light on the operations and activities of the FBI. Accordingly, the FBI properly asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect this type of information.[32]

**(b)(6) and (b)(7)(C)-5**     **Names and/or Identifying Information of Third Parties Merely Mentioned**

(112)    Within Part I and Part II, the FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names and identifying information of third parties who were merely mentioned in the criminal investigative files responsive to Plaintiff's requests.  The FBI has information about these third parties in its files because these individuals came in contact with the subject(s) of FBI investigation(s).  These individuals were not of investigative interest to the FBI.  These third parties maintain substantial and legitimate privacy interests in not having this information disclosed and thus, being connected with a criminal investigation.  Disclosure of these third parties' names and/or identifying information in connection with an FBI investigation of criminal activities carries an extremely negative connotation.  Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.  The FBI then considered whether there was any public interest that would override these privacy interests, and concluded disclosing information about individuals who were merely mentioned in an FBI investigative file would not significantly increase the public's understanding of the operations and activities of the FBI.  Thus, the FBI properly asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect this type of information.[33]

---

[32] Additionally, the FBI applied FOIA Exemptions (b)(6) and (b)(7)(C)-4 as underlying exemptions to Exemption 7A on the following Bates stamped page: Shapiro-49978.

[33] During the FBI's re-review of the sample documents, it was determined that information previously withheld pursuant to FOIA Exemptions (b)(6) and (b)(7)(C)-5 could be released and this exemption is no longer applicable on the following Bates stamped pages: Shapiro-1126-

**(b)(6) and (b)(7)(C)-6**          **Name and/or Identifying Data Regarding a Third Party Victim**

(113)   Within Part I and Part II, the FBI asserted Exemptions (b)(6) and (b)(7)(C) to

protect the names, addresses, and other identifying information of the victims to Animal Rights

and Ecological Extremism and maintain a strong privacy interest in not having their names and

personal identifying information released in this context.  These individuals are victims of the

threats and extremist actions.  To release these victim's identities in the investigation could cause

embarrassment, as well as unsolicited and unnecessary inquiries in regards to their association

with these incidents.  There is no legitimate public interest to be served by releasing the identities

of these victims because release would not shed light on the operations and activities of the FBI.

Disclosure would constitute a clearly unwarranted invasion of these individuals' personal

privacy.  Therefore, the FBI properly asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect

this type of information.[34]

**(b)(6) and (b)(7)(C)-7**          **Names and/or Identifying Information of Third Parties Who**
                                    **Provided Information to the FBI**

(114)   Within Part I and Part II, the FBI asserted Exemptions (b)(6) and (b)(7)(C), at

times in conjunction with (b)(7)(D), to protect the names and identifying information of

individuals who were interviewed and/or provided information to the FBI during the course of its

investigation of Plaintiff and other subjects.  The FBI has found information provided by

individuals during an interview is one of the most productive investigative tools used by law

enforcement agencies.  The largest roadblock to successfully obtaining the desired information

---

1127.

[34] During the FBI's re-review of the sample documents, it was determined that information
previously withheld pursuant to FOIA Exemption (b)(6) and (b)(7)(C)-6 could be released  and
this exemption is no longer applicable on the following Bates stamped pages: Shapiro-18788,
19259, 19260, 19263-19265, 19317, 52100, 52101, 52107, 52129, 52130, 52767, 52808, 54279,
and 54304.

through an interview is fear by the interviewee his or her identity will be exposed and consequently, he or she could be harassed, intimidated, or threatened with legal or economic reprisal, possible physical harm, or even death.  In order to surmount these obstacles, persons interviewed by the FBI must be assured their names and personally-identifying information will be held in the strictest confidence.  Continued access by the FBI to persons willing to honestly relate pertinent facts bearing upon a particular investigation far outweighs any benefit the public might derive from disclosure of the names of those who cooperated with the FBI.  Thus, the FBI has determined these individuals' privacy interests greatly outweighs public interest in disclosure of their identities.  In contrast, the FBI could identify no public interest in the disclosure of this information because disclosure of these third parties' names and identifying information would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI.  Accordingly, the FBI properly asserted FOIA Exemptions (b)(6) and (b)(7)(C), at times in conjunction with FOIA Exemption (b)(7)(D), to protect this type of information.

**(b)(6) and (b)(7)(C)-8**  **Names and/or Identifying Data of Third Parties with Criminal Records/Rap Sheets**

(115)   Within Part II, the FBI asserted Exemptions (b)(6) and (b)(7)(C) to protect the names and identifying information of third party individuals who have a criminal record with the FBI and/or other law enforcement agencies.  Identifying information withheld concerning these third parties includes addresses, aliases, dates of birth, social security numbers, FBI numbers, and other personal information.  Being linked with any law enforcement investigation carries a strong negative connotation and a stigma.  Releasing these individuals' identities in the context of criminal records, such as criminal rap sheets which recount individuals' criminal activities, could subject them to harassment or embarrassment, as well as undue public attention.

Accordingly, the FBI determined these individuals maintain a substantial privacy interest in not having their identities disclosed in this context. In making a determination whether to release the names and personal information concerning third parties within these criminal records, the public's interest in disclosure was balanced against the individual's right to privacy. It was determined this information would not enlighten the public on how the FBI conducts its internal operations and investigations. Accordingly, the FBI concluded the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. The FBI properly asserted FOIA Exemptions (b)(6) and (b)(7)(C) to protect this information.

### *Exemption (b)(7)(D)—Confidential Source Information*

(116)   Exemption 7(D) protects "records or information compiled for law enforcement purposes" when disclosure:

> could reasonably be expected to disclose the identity of a confidential source, including a State, local or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D)

(117)   Numerous confidential sources report to the FBI on a regular basis; they provide information under express assurances of confidentiality and are "informants" within the common meaning of the term. Others are interviewed and/or provide information under implied assurances of confidentiality (i.e., under circumstances from which assurances of confidentiality may be inferred). In either situation, these sources are considered to be confidential because they furnish information only with the understanding their identities and the information they provided will not be divulged outside the FBI. Information provided by these sources is singular

in nature, and if released, could reveal the informants' identities. The FBI has learned through experience sources assisting, cooperating with, and providing information to the FBI must be free to do so without fear of reprisal. Only when protected from reprisal will they furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear that their cooperation with the FBI will later be made public. Sources providing information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence.

(118)   The release of a source's identity would forever eliminate that source as a future means of obtaining information. When the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources providing information to the FBI. Such a result would greatly impair one of the FBI's most important means of collecting information and thereby severely hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal laws.

### (b)(7)(D)-1        Names, Identifying Data and/or Information Provided by Individuals Under Implied Assurances of Confidentiality

(119)   Within Part II, the FBI asserted Exemption (b)(7)(D) to protect information provided to the FBI by third parties under implied assurances of confidentiality. The FBI frequently works with third parties during criminal investigations to obtain information and data. In this case, individuals closely tied to the investigation provided information to the FBI identifying additional third parties of investigative interest. The individuals did not specifically request confidentiality, but considering the violent nature of the subject's crimes, the FBI determined these individuals provided information to the FBI with probable fear their cooperation with law enforcement could lead to violent reprisal. Thus, the FBI determined these individuals would not have provided this information without implied assurances of

confidentiality.  Publicity, adverse or otherwise, concerning information these third parties provided to the FBI could dissuade them from cooperating with the FBI in the future. Additionally, public release of this information would degrade these and other sources' trust in the FBI and would seriously impair the FBI's ability to obtain similar assistance from sources in future FBI investigations.

(120)   It is reasonable for the FBI to infer individuals so closely tied to the violent events under investigation would not share information without an expectation of confidentiality, precisely in order to avoid the harm described above.  The FBI solicits and receives assistance regularly from a variety of individuals providing information in connection with a wide variety of criminal and national security investigations.  Inherent in this cooperative effort is the mutual understanding certain information provided by a variety of individuals will be held in confidence by the FBI, and not released pursuant to FOIA and Privacy Act requests and other means.  If the FBI disclosed certain information shared by these third parties, cooperation between the FBI and these third parties would be greatly diminished, causing significant detriment to effective law enforcement.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(D), at times in conjunction with FOIA Exemptions (b)(6) and (b)(7)(C), to protect this type of information.[35]

**(b)(7)(D)-2**          **Names, Identifying Information About, and/or Information Provided by Sources Under Express Assurances of Confidentiality**

(121)   Within Part I and Part II, the FBI asserted Exemption (b)(7)(D), in conjunction with Exemptions (b)(6) and (b)(7)(C), to protect from disclosure the names, identifying information about, and information provided by third parties to the FBI and/or law enforcement

---

[35] During the FBI's re-review of the sample documents, it was determined that information previously withheld pursuant to FOIA Exemptions (b)(7)(D)-1 could be released and this exemption is no longer applicable on the following Bates stamped page: Shapiro-93317.

during the course of the investigations at issue here under express grants of confidentiality. In this case, these individuals, who provided specific and detailed information that is singular in nature, specifically requested that their identities not be revealed due to fear of reprisal. The FBI and/or law enforcement officials expressly promised these third parties that their identities and the information they provided would not be disclosed.

(122)   Providing express assurances of confidentiality is essential to the FBI's ability to obtain relevant and accurate information from Confidential Human Sources ("CHSs"). Without these assurances by the FBI, those with access to information critical to FBI investigations may be reluctant to provide information or may modify their statements in order to lessen the severity of any backlashes; therefore, the FBI must provide credible assurances of confidentiality to these individuals in order to obtain factual, relevant, and timely information. Release of these sources' identities and/or any singular information they provided may lead to the revelation of their identities and would also display unwillingness by the FBI to honor its assurances of confidentiality to current and future CHSs. Therefore, releasing this information would have a lasting negative impact on the FBI's information program -- it would greatly hinder the FBI's ability to recruit and maintain CHSs willing to provide accurate and relevant information pertaining to criminal activities.

(123)   In sum, release of the identifying information and/or the information provided by FBI CHSs who were given express assurances of confidentiality would endanger these CHSs and cause great detriment to the FBI's ability to recruit and maintain reliable CHSs; thus, this information is exempt from disclosure pursuant to Exemption (b)(7)(D).

**(b)(7)(D)-3**          **Confidential File Numbers**

(124)   Within Part I and Part II, the FBI asserted Exemption (b)(7)(D) to protect the

confidential source file numbers of permanent confidential sources of the FBI.  Confidential

source file numbers are administrative tools that facilitate the retrieval of information supplied

by a source.  Similar in usage to the confidential source symbol number, this confidential source

file number is also assigned in sequential order to confidential informants who report

information to the FBI on a regular basis pursuant to an express assurance of confidentiality.

The confidential source file is unique to the particular confidential informant and is used only in

documentation relating to that particular informant.

(125)    Disclosure of confidential source file numbers at various times and in various

documents could ultimately identify these sources because it would reveal the connections of

confidential informants to the information provided by them.  Repeated release of confidential

source file numbers along with the information provided by these confidential informants would

narrow the possibilities of the informants' true identities.  This is especially true because each

confidential source file number is assigned to only one confidential informant.

(126)    The disclosure of the identity of these confidential sources would have a chilling

effect on the activities and cooperation of other confidential informants.  It is only with the

understanding of complete confidentiality the aid of such informant can be enlisted, and only

through this assurance of confidentiality these informants can be persuaded to continue their

assistance in providing information to the FBI in the future.  Accordingly, the disclosure of these

confidential source file numbers could reasonably be expected to identify the permanent

confidential sources of the FBI.  Accordingly, the FBI properly asserted FOIA Exemption

(b)(7)(D) to this information.

**(b)(7)(D)-4**          **Foreign Government Agency Information Under Express Confidentiality**

(127)   Within Part I and Part II, the FBI asserted Exemption (b)(7)(D), at times with Exemptions (b)(5), (b)(6), (b)(7)(C) and (b)(7)(E), to protect the identity of and the information provided by foreign law enforcement authorities to the FBI under "express" assurances of confidentiality. The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged.  The agreements specify the extent of confidentiality requested by the respective foreign authorities.  While one foreign law enforcement agency might request confidentiality for its identity and not necessarily the information provided, another agency might request confidentiality for both its identity and the information provided, and yet another agency may request that its information be protected while it does not object to the disclosure of its relationship with the FBI.  Within the records at issue, the  FBI asserted FOIA Exemption (b)(7)(D) to withhold the identity of foreign law enforcement agencies, their personnel, and their information they provide because these law enforcement agencies requested their identity, information, and relationship to be protected under an express assurance of confidentiality.

(128)   When foreign agencies request confidentiality, the FBI must display willingness to keep its relationship with the foreign governments completely confidential in order to continue to obtain valuable assistance from these foreign government agencies.  Identifying these sources could subject them to unofficial inquiries and/or public scrutiny concerning their contacts with the FBI.  The FBI's ability to obtain information quickly and discreetly in future law enforcement investigations form these agencies would be negatively affected.  Thus, the FBI properly withheld this information pursuant to FOIA Exemption (b)(7)(D).

**(b)(7)(D)-5**          **Confidential Source Symbol Numbers**

(129)   Within Part I and Part II, the FBI asserted Exemption (b)(7)(D) to protect from disclosure the permanent source symbol numbers of confidential sources of the FBI.  The FBI assigns specific permanent source symbol numbers in sequential order to confidential informants who report information to the FBI on a regular basis pursuant to an express assurance of confidentiality.  In this case, the FBI did not refer to the confidential sources by their true names. Instead, the sources were referred to only by their individually assigned permanent source symbol numbers.  The FBI obtained information from these confidential sources regarding activities of investigative interest in the investigative files responsive to Plaintiff's FOIA requests.

(130)   If the FBI disclosed the confidential source symbol numbers of these informants, their identities could be ascertained by persons knowledgeable of the FBI investigations at issue in this case.  Furthermore, if the FBI disclosed their identities, the informants, as well as their families, could be subjected to embarrassment, humiliation, and/or physical or mental harm. Disclosure of source symbol numbers at various times and in various documents could identify confidential FBI sources because such disclosure would reveal the connections of the confidential informants to the subject matter of these and other documents.  Repeated release of confidential source symbol numbers along with the information provided by the confidential sources would narrow the possibilities of their true identities.  This is especially true inasmuch as each confidential source symbol number is assigned to only one confidential informant.

(131)   Moreover, the disclosure of confidential informants' identities would have a chilling effect on the activities and cooperation of other FBI confidential informants.  The FBI has found that it is only with the understanding of complete confidentiality that the aid of such

informants can be enlisted, and only through this confidence that informants can be persuaded to

continue providing valuable assistance in the future.  Accordingly, the FBI properly asserted

FOIA Exemption (b)(7)(D) to protect this type of information.

### *Exemption (b)(7)(E) – Investigative Techniques and Procedures[36]*

(132)    5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> Law enforcement records which would disclose techniques and procedures
> for law enforcement investigations or prosecutions, or would disclose
> guidelines for law enforcement investigations or prosecutions if such
> disclosure could reasonably be expected to risk circumvention of the law.

(133)   The FBI asserted Exemption (b)(7)(E) to protect information from these records,

the release of which would disclose techniques and/or procedures for law enforcement

investigations or prosecutions, or would disclose guidelines for law enforcement investigations

or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

This exemption affords categorical protection to techniques and procedures used in law

enforcement investigations; it protects techniques and procedures that are not well-known to the

public as well as non-public details about the use of well-known techniques and procedures.

(134)   Within the responsive documents, the FBI asserted FOIA Exemption (b)(7)(E) to

non-public investigative techniques and procedures utilized by the FBI to pursue its law

enforcement and intelligence gathering missions, and also to non-public details about techniques

and procedures that are otherwise known to the public.  Specifically, the FBI asserted FOIA

Exemption (b)(7)(E) to protect the application of certain sensitive investigation techniques

within the responsive records.

---

[36] The FBI asserted Exemption 3 as an underlying exemption for portions of information within
the pending investigative files responsive to the five requests selected by Plaintiff and
categorically denied pursuant to Exemption 7(A).

**(b)(7)(E)-1**            **Sensitive File Number or Subfile Names**

(135)   Within Part I and Part II, the FBI asserted Exemption (b)(7)(E) to protect sensitive case file numbers.  The FBI determined this Exemption is appropriate for protecting these file numbers as the release of file numbering convention identifies the investigative interest or priority given to such matters.  Applying a mosaic analysis, suspects could use these numbers (indicative of investigative priority), in conjunction with other information known about other individuals and/or techniques, to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities, etc.  Exacerbating this harm, releasing these file numbers provides criminals with a tracking mechanism by which they can place particular files/investigations within the context of larger FBI investigative efforts.  Continued release of sensitive investigative file numbers would provide criminal with an idea of how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative strategies.  This would provide criminals with a means of judging where the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when/how they obtained the knowledge, and if there are knowledge-gaps in the FBI's gathered intelligence.  Given this data, determined criminals could obtain an exceptional understanding as to how they might structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

**(b)(7)(E)-2**            **Monetary Payments for Investigative Techniques**

(136)   Within Part II, the FBI asserted Exemption (b)(7)(E) to protect monetary amounts requested by FBI personnel and/or paid by the FBI in order to implement particular investigative techniques.  The FBI has limited resources that it must allocate strategically in order to

effectively pursue its law enforcement and intelligence gathering missions. Revealing the amount of money the FBI has paid or plans to pay in order to implement certain investigative techniques would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts. Revealing this level of focus would reveal how the FBI plans to allocate its limited resources and essentially paint a picture as to where the FBI's strengths and weaknesses lie within the spectrum of illegal activities it is mandated to investigate. Releasing this information would give criminals the opportunity to structure their activities in a manner which avoids the FBI's strengths and exploits its weaknesses, enabling them to circumvent the law. Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

## (b)(7)(E)-3    Locations and Identity of FBI and/or Joint Units, Squads, and/or Divisions

(137)    Within Part I and Part II, the FBI asserted Exemption (b)(7)(E) to protect methods and techniques involving the location and identity of FBI units and/or joint units, squads and/or divisions that were involved in the investigations at issue in this case. The office location and units are usually found in the administrative headings of internal FBI documents. These headings identify the locations of the office and unit that originated or received the documents. Disclosure of the location of the units conducting the investigation would reveal the targets, the physical areas of interest in the investigation, and when taken together with the other locations if identified, could establish a pattern or "mosaic" that identification of a single location would not. If the locations are clustered in a particular area, it would allow hostile analysts to determine where geographically the FBI is focusing its investigative resources, and allow them to relocate their criminal activities elsewhere. This would disrupt the FBI's investigative process and

deprive the FBI of valuable information. The withholding of units, squads and/or divisions involved is justifiable as well under a similar rationale. As these specialized units focus on very specific crimes and/or intelligence gathering activities, once identified within the context of the records at issue, the units' area of expertise is revealed, and an individual would then be aware of exactly what the FBI's interest is. For example, knowing that a unit, squad and/or division whose focus is on financial crimes is involved in the investigation is quite different information than knowing that the unit, squad and/or division involved has a focus on crimes of violence. This knowledge could allow a subject to employ countermeasures targeted toward concealing particular types of behavior and/or to avoid altogether activities in a particular location. The revelation of the involvement of one or more units of differing focus in an investigation is critical information that can allow for adjustments of behaviors and activities by criminals, to avoid detection and/or disruption by the FBI. Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

**(b)(7)(E)-4**          **Dates and/or Types of Investigations**

(138)   Within Part I and Part II, the FBI asserted Exemption (b)(7)(E) to protect information pertaining to the types and dates of investigations referenced in the records at issue. Specifically, the information withheld is referenced in connection with an actual investigation and reveals whether it is a "preliminary" or "full" investigation and the date it was initiated. Disclosure of this information would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary investigation, and the particular dates that the investigation covered, allowing savvy criminals to judge when and how the FBI will react when it detects certain criminal/possibly criminal activities. This would allow these criminals to predict FBI investigative reactions, adjust their behavior accordingly, and avoid detection and/or

disruption by FBI investigative activities.  Moreover, the knowledge specific activity in general

warrants investigation could likewise cause individuals to adjust their conduct to avoid triggering

FBI interest.  Disclosure of this information could reasonably be expected to impede the FBI's

effectiveness and potentially aid in circumvention of the law.  Accordingly, the FBI properly

asserted FOIA Exemption (b)(7)(E) to protect this type of information.[37]

**(b)(7)(E)-5**               **Collection/Analysis of Information**

(139)   Within Part I and Part II, the FBI asserted Exemption 7(E) to protect methods the

FBI uses to collect and analyze the information it obtains for investigative purposes.  The release

of this information would disclose the identity of methods used in the collection and analysis of

information, including how and from where the FBI collects information and the methodologies

employed to analyze it, once it is collected.  Such disclosures would enable subjects of FBI

investigations to circumvent similar currently used techniques.  The relative utility of these

techniques could be diminished if the actual techniques were released in this matter.  This in turn

would facilitate the accumulation of information by investigative subjects regarding the

circumstances under which the specific techniques were used or requested and the usefulness of

the information obtained.  Release of this type of information would enable criminal to educate

themselves about the techniques employed for the collection and analysis of information and the

types of information of greatest value to FBI investigations.  This would allow these individuals

to take countermeasures to circumvent the effectiveness of these techniques, deprive the FBI of

key investigative intelligence, and to continue to violate the law and engage in criminal

---

[37] During the FBI's re-review of the sample documents, it was determined that information
previously withheld pursuant to FOIA Exemption (b)(7)(E)-4 could be released and this
exemption is no longer applicable on the following Bates stamped page: Shapiro-93319.

activities.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.[38]

**(b)(7)(E)-6**          **Database Information and/or Printouts**

(140)   Within Part I and Part II, the FBI asserted Exemption (b)(7)(E) to protect database search results located through non-public databases used for official law enforcement purposes by the FBI and/or other law enforcement personnel.  These non-public databases serve as repositories for counterterrorism and investigative data.  They are essentially "one-stop" shops that allow law enforcement to query information and develop investigative leads from a variety of source data using state-of-the-art analytical tools.  FBI personnel as well as task force members from local, state and other federal agencies have access to these databases.  Disclosure of the printouts or information compiled from these search results would provide criminals with an understanding as to what information is being gathered, analyzed, and utilized by the FBI in the investigation at issue and similar investigations.  Release of this information could enable criminals to employ countermeasures to avoid providing the FBI with key investigative data and/or allow them to predict how the FBI utilizes certain data to further its investigations.  In addition, revealing the data stored within the databases could jeopardize the FBI's investigative mission by revealing exactly where the FBI is housing specific investigative data.  This would make these databases attractive targets for compromise.  Criminals who could gain access to FBI systems would know where to go  corrupt or delete this type of data to deprive the FBI of its use and/or discover when and what the FBI has discovered about their criminal activities.  Release of this type of information in the form of printouts or information compiled from these search

---

[38] During the FBI's re-review of the sample documents, it was determined that Exemption (b)(7)(E)-5 is applicable to information also withheld pursuant to FOIA Exemption (b)(6) and (b)(7)(C)-2 on the following Bates stamped pages: Shapiro-10097-10098.

results would provide criminals with an understanding as to what information is being gathered, the type of information the FBI gathers, the analysis of the information and the methodology of the FBI in utilizing these databases.  Because disclosure would impede the FBI's effectiveness and potentially aid in circumvention of the techniques, if disclosed, the FBI properly asserted FOIA Exemption (b)(7)(E), cited at times in conjunction with FOIA Exemptions (b)(6), (b)(7)(C) and (b)(7)(D), to protect this type of information.

### (b)(7)(E)-7          Undercover Operations

(141)    Within Part I and Part II, the FBI asserted Exemption (b)(7)(E) to protect non-public details about an undercover operation conducted by the FBI and described in the records responsive to Plaintiffs' requests.  The FBI relies on undercover operations as a useful investigative technique to conduct investigations.  Although it is publically known the FBI conducts undercover operations, the specific details of particular operations are not known.  Secrecy and discretion are essential when conducting effective undercover operations; therefore, publicizing details concerning unknown FBI undercover investigative techniques and the FBI's operational security methods during these undercover operations is counterintuitive.  If the FBI were to disclose these non-public details about how it conducts undercover operations and release details of the specific techniques used during this undercover operation, it could have devastating operational consequences and would jeopardize future use of undercover operations by the FBI in similar cases or under similar circumstances; thus, disclosure of these details would risk circumvention of the law.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

**(b)(7)(E)-8**         **Information Regarding Targets, Dates, and Scope of Surveillance**

(142)   Within Part I and Part II, the FBI asserted Exemption (b)(7)(E) to protect information concerning the targets, locations, monitoring, and types of devices utilized in surveillance operations conducted by the FBI described within the records at issue.  The FBI utilized these surveillance operations to obtain investigative intelligence relevant to the investigation of Plaintiff and others.  The law enforcement techniques used to conduct these surveillance operations are the same techniques utilized by the FBI in current criminal and national security investigations.  Certainly, it is publicly known that the FBI and other law enforcement agencies engage in different types of surveillance in investigations.  However, disclosure of non-public details about when, how ,under what circumstances, and on whom the FBI conducts surveillance would allow current and future subjects of FBI investigations and other potential criminals to develop and utilize countermeasures to defeat or avoid different types of surveillance operations, thus rendering the techniques useless to the FBI and other law enforcement agencies.  Accordingly, the disclosure of this information could reasonably be expected to reveal non-public details about law enforcement techniques still being used by the FBI, and risk circumvention of the law.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.[39]

---

[39] During the FBI's re-review of the sample documents, it was determined that Exemption (b)(7)(E)-8 is applicable to information previously withheld pursuant to FOIA Exemption (b)(3)-1 on the following Bates stamped pages: Shapiro-179308.  During the FBI's re-review of the sample documents, it was determined that FOIA Exemption (b)(7)(E)-8 is no longer applicable on the following Bates stamped page: Shapiro-5113.  The information is still withheld pursuant to FOIA Exemptions (b)(6) and (b)(7)(C)-1.

**(b)(7)(E)-9**          **Statistical Information Contained in Effectiveness Rating FD-515**

(143)   Within Part I and Part II, the FBI asserted Exemption (b)(7)(E) to protect

investigative techniques and procedures used by the FBI in conducting investigations into

domestic terrorism and actions of Plaintiff and third parties, including information that would

reveal what types of techniques and procedures are routinely used in such investigations, and

non-public details about when, how, and under what circumstances they are used.  Specifically,

the FBI asserted Exemption (b)(7)(E) to protect from disclosure statistical information contained

in effectiveness rating forms used by the FBI (FBI Form FD-515 and its attachments).  FD-515's

are forms used by FBI SAs to report investigative accomplishments.  Form FD-515 is submitted

at various stages of an investigation to report statistically important events such as an arrest,

conviction, sentencing, asset seizure, drug seizure, and/or disruption/dismantlement of a criminal

enterprise or the recovery of stolen property.  At the upper right hand side of this form is a block

captioned "Investigative Assistance and Techniques Used."  This block lists 27 publicly known

investigative techniques and/or assistance, some of which were used by the investigative

personnel during the investigation concerning Plaintiff and/or third parties.  Opposite each

investigative technique and assistance is a rating column which records a numeric rating of 1 to 4

to rate each technique/assistance used by investigative personnel during the course of the

investigation.  The numerical rating evaluates the effectiveness of each technique/assistance used

in bringing the investigation to a successful conclusion.  The entire rating columns were withheld

to protect from release the various techniques and assistance used in the investigations of

Plaintiff and others in the records.  If the rating columns were released along with the ratings of

each technique and assistance used, Plaintiff and others involved in criminal violations such as

domestic terrorism could change their activities and modus operandi in order to circumvent and

avoid detection and/or surveillance in the future.  Therefore, protection of these rating columns is essential to prevent future circumvention of the law by criminals.  The FBI will use the same or similar techniques and/or assistance to bring similar future investigations to successful conclusion.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

### (b)(7)(E)-10        **Investigative Focus of Specific Investigations**

(144)    Within Part I and Part II, the FBI asserted Exemption (b)(7)(E) to protect the investigative focus of specific FBI investigations.  Revealing the broader investigative focus as they relate to interconnected investigations would reveal the scope of the FBI's programs and the strategies it plans to pursue in preventing and disrupting criminal activity.  Release of this type of information would allow criminals to gauge the FBI's strengths and weakness within certain areas of the criminal arena and structure their activities in a manner that avoids detection and disruption by the FBI.  For example, if criminals knew that certain individuals were being investigated based on their association with on particular individual, they would be able to discern that their association with this particular individual may cause them to be subjects of an FBI investigation.  They may then decide to cut ties with this individual and find different ways to pursue criminal activities thus avoid the FBI's investigative reach.  Releasing the focus of specific FBI investigations would enable criminals to predict the FBI's investigative strategies, structure their activities in a manner that thwarts the FBI's investigative efforts, and continue to circumvent the law.  Accordingly, the FBI properly asserted FOIA Exemption (b)(7)(E) to protect this type of information.

72

**(b)(7)(E)-11**          **Specific Law Enforcement Technique Utilized to Conduct National Security Investigations**

(145)   Within Part II, the FBI asserted Exemption (b)(7)(E) to protect sensitive law enforcement techniques employed in a national security investigation.  The FBI cannot name this technique, even generically, without revealing information that is, itself, exempt.  This sensitive technique was used by the FBI to obtain valuable intelligence information.  While the technique may be known by the pubic in a general sense, its use in the specific context of this case is not a publically-known fact.  In other words, details about and analysis of this sensitive law enforcement technique, to include the specifics of how, when and in what setting it is employed, are not generally known to the public.  Such details include implementation procedures; the targets of the technique; and the nature of the information gleaned by its use in the context of the investigation.  Revealing the technique and these details would effectively reveal the specifics of how and in what settings the technique is employed.  As a result, criminal and national security targets would be better able to avoid detection by developing countermeasures to circumvent the ability of the law enforcement officials to use the technique, thus rendering it useless to the FBI and other law enforcement agencies.  Revealing details about this sensitive law enforcement technique would compromise a crucial means of collecting intelligence information and severely hamper the FBI's law enforcement efforts to detect and apprehend individuals who seek to violate United States criminal and national security laws. Accordingly, the FBI protected this information pursuant to Exemption (b)(7)(E), cited in conjunction with Exemption 3.[40]

_____

[40] During the FBI's re-review of the sample documents, it was determined that Exemption (b)(7)(E)-11 is applicable to information also withheld pursuant to FOIA Exemptions (b)(1)-1 and (b)(3)-3 on Bates page Shapiro-262152.

73

**(b)(7)(E)-12**      **Targets of Pen Registers/Trap & Trace Devices**

(146)   Within Part I, the FBI asserted Exemption (b)(7)(E) to protect the targets of FBI

pen registers/trap and trace devices.  Releasing these targets within the context of these

documents would reveal when and why the FBI decides to utilize a pen register/trap and trace

device.  Revealing these non-public details about the FBI's use of these devices would provide

criminals with an understanding of when they should expect the FBI to deploy this investigative

technique and make it easier for them to develop countermeasures to avoid disruption and

detection by the FBI.  In this manner, release of this information may deprive the FBI the utility

of this essential investigative technique and enable criminals to circumvent the law.  Therefore,

the FBI protected this information pursuant to Exemption (b)(7)(E), cited in conjunction with

Exemption 3.

**(b)(7)(E)-13**      **ViCAP Material**

(147)   Within Part I, the FBI asserted Exemption (b)(7)(E) to protect analytical

procedures utilized within criminal investigations.  The FBI's Critical Incident Response Group

("CIRG"), National Center for the Analysis of Violent Crime ("NCAVC"), Behavioral Analysis

Unit's Violent Criminal Apprehension Program ("ViCAP") is a law enforcement-oriented

behavioral science and data-processing center designed to provide assistance to local, state,

Federal and foreign law enforcement agencies investigating unusual, bizarre, and/or repetitive

violent crimes.  ViCAP is a state-of-the-art behavior-based crime analysis tool containing

detailed administrative, investigative and behavior-oriented data.  Data types may include modus

operandi, crime scene information, and type of trauma inflicted on the victim.  ViCAP collects,

collates, and analyzes crimes of violence, specifically murder.  In the records at issue the FBI is

protecting ViCAP information associated with the subject of Plaintiff's request.  The FBI

74

consistently protects ViCAP information to preserve the integrity and effectiveness of this

important law enforcement technique.  Release of ViCAP related information could equip

offenders with information that would allow them to avoid detection and/or take evasive action.

Consequently, because ViCAP is utilized for law enforcement investigations, ViCAP's

procedures are not well-known to the public, release of ViCAP information would negatively

impact its effectiveness, and could reasonably be expected to risk circumvention of the law.

Thus, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).

## OTHER GOVERNMENT AGENCY ("OGA") REFERRALS

(148)   During the course of processing the material responsive to Plaintiff's 81 requests,

the FBI referred material to OGAs for consultation.  Responses to any OGA consultations were

handled appropriately during processing.  Neither Plaintiff nor the FBI selected material in the

sample containing OGA information.  Therefore, the FBI is not addressing OGA information or

the handling of referrals at this time.

## SEGREGABILITY

(149)   As discussed previously, the FBI reviewed approximately 153,960 pages of

records and approximately 157 CDs/DVDs responsive to Plaintiff's 81 requests.  The FBI was

able to segregate for release approximately 38,788 pages and 28 CDs/DVDs.  In an effort to

narrow the remaining issues in this case, Plaintiff selected 401 pages[41] released in part ("RIP")

and the FBI selected 100 pages withheld in full ("WIF").  Following a closer inspection of the

sample selected material, the FBI determined some FOIA exemptions are no longer valid or have

changed, and additional information could be segregated for release.  As a result of this review,

---

[41] Plaintiff selected 400 pages, however, one page was marked as a duplicate.  The FBI located
the originally processed page and produced both pages for review.

the FBI was able to release three (3) pages from the RIP sample in their entirety and one (1) page from the WIF sample in its entirety.[42] Additionally, Plaintiff selected five (5) requests in which the FBI asserted Exemption 7(A) to categorically withhold records pertaining to ongoing investigations. At the time the FBI completed its review of these records, release of any of these records, would have risked disruption of ongoing enforcement proceedings. However, in an effort to preserve all underlying exemptions applicable to the material categorically denied pursuant to Exemption 7A, the FBI re-reviewed the pending material within Plaintiff's five selected requests. During this review, the FBI located six documents withheld pursuant to FOIA Exemption (b)(7)(A) and other underlying exemptions that had been processed and released in full or part in other non-pending file numbers within the same request. As a result of this review, the FBI reviewed an additional 208 pages and released 21 pages in their entirety and 187 pages in part.[43] By letter dated October 19, 2018, the FBI advised Plaintiff it had reviewed 709 pages and released 610 pages of re-processed material from the RIP/WIF sample as well as the 7A requests. (*See* **Exhibit HH.**)

## CONCLUSION

(150)   The FBI performed adequate and reasonable searches for responsive records subject to the FOIA, processed all such records, and released all reasonably segregable non-exempt information from documents responsive to Plaintiff's FOIPA requests. The FBI denied

---

[42] The FBI was able to release additional information on the following Bates stamped pages: Shapiro-163, 1126-1127, 1369, 10093, 19243-19244, 19259-19260, 19263-19265, 19317, 19625, 20802, 29237-29238, 29241-29242, 29245, 29247, 34663, 36785, 50489, 50492, 51933, 51937, 52074, 52100-52101, 52107, 52129-52130, 52767, 52808, 52827, 52860, 53750-53751, 54279, 54304, 55995, 69603, 70028, 70103, 70944, 93317, 93319, 178716, 202061, 232977, 260987, and 262374.

[43] The FBI was able to release additional information on the following Bates stamped pages: Shapiro-724, 1003, 1365, 1378, 1379, 1394, 1408, 1424, 1427, 1429-1431, 1435, 1436, 1441, 1447, 1448, 1449, 1451, 1452, 1457, 1599, 1602, 1603, 1647, 1648, 1653, 1656, 1670, 1671, 1676, 1681, 1684, 1693, 1696, 1699, 1700, 1703, and 1724.

access to records pertaining to Plaintiff pursuant to Privacy Act exemption (j)(2).  The FBI

reviewed approximately 153,960 pages and 157 CDs/DVDS and released approximately 38,788

pages and 28 CDs/DVDs in full or in part from the responsive records.  The FBI determined

some responsive records were part of on-going investigations at the time of the FBI's initial

reviews and were exempt from disclosure pursuant to FOIA Exemption (b)(7)(A).  Within the

documents released in part and the documents categorically denied pursuant to Exemption 7(A),

the FBI asserted Exemptions 1, 3, 4, 5, 6, 7(C), 7(D), and 7(E) to protect information,  the

disclosure of which would reveal classified information; would reveal statutorily protected

information; would reveal trade secrets; would reveal privileged information; would cause a

clearly unwarranted invasion of personal privacy, or could reasonably be expected to constitute

an unwarranted invasion of personal privacy; could disclose the identities of confidential sources

and/or the information they provided; and/or would disclose techniques and procedures for law

enforcement investigations.  The FBI provided Plaintiff with all material in the public domain

and no reasonably segregable, non-exempt portions were withheld from Plaintiff.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A through HH attached hereto are true and correct copies.

Executed this _____ day of October, 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia