# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RYAN NOAH SHAPIRO,

        Plaintiff,

    v.

DEPARTMENT OF JUSTICE,

        Defendant.

Civil Action No. 12-cv-313 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Plaintiff, "a longtime animal rights activist" and "Ph.D. candidate"[1] whose research "focuses on disputes over animals and national security from the late nineteenth century to the present," First Amended Compl. ("FAC") ¶ 2, ECF No. 13, challenges the Federal Bureau of Investigation's ("FBI") and the Bureau of Alcohol, Tobacco, Firearms, and Explosives' ("ATF") responses to 83 requests for records he made under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 *et seq.*, and the Privacy Act ("PA"), *id.* § 552a.  Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 1, ECF No. 97-1; FAC ¶ 518.  Over the lengthy course of this litigation, the Department of Justice ("DOJ"), of which both the FBI and ATF are components, has released thousands of pages of records responsive to those requests.  DOJ now believes its obligations under both the FOIA and PA are met and seeks summary judgment.  Def.'s Mot. Summ. J., ECF No. 97.  Plaintiff has requested time to conduct discovery to defend against DOJ's motion, Pl.'s Request for Discovery Pursuant to Rule 56(d) ("Pl.'s 56(d) Mot."), ECF No. 102, while

---

[1]     It appears that plaintiff may have, during the pendency of this action, successfully attained his Ph.D. as some of his papers now refer to him as "Dr. Shapiro."  *See, e.g.,* Pl.'s Reply Supp. Cross-Mot. Summ. J. at 1, ECF No. 125.

simultaneously filing his own motion for summary judgment, Pl.'s Cross-Mot. Summ. J. ("Pl.'s

Summ. J. Mot."), ECF No. 105.  For the reasons set forth below, plaintiff's motions for

discovery and summary judgment are denied, and DOJ's motion for summary judgment is

granted in part and denied in part.

## I.      BACKGROUND

As this Court has previously pointed out, "[t]he plaintiff . . . is among the most prolific

requesters of materials from [DOJ]."  *Shapiro v. United States Dep't of Justice*, Civ. Action No.

12-313 (BAH), 2014 WL 12912625, *1 (D.D.C. Dec. 8, 2014).  As relevant to the instant

litigation, plaintiff seeks information about what he calls the "Green Scare," which he describes

as "the ongoing disproportionate, heavy-handed government crackdown on the animal rights and

environmental movements."  FAC ¶ 3 (citation and internal quotation marks omitted).

Beginning in 2005, as part of his doctoral research, plaintiff began submitting numerous FOIA

requests to the FBI and ATF.  *Id.* ¶ 261.  Over the next seven years, plaintiff submitted close to

500 such requests seeking records concerning individuals, organizations, books and other

publications, and events related to animal rights activism.  *See* 2d Decl. of David M. Hardy ("2d

Hardy Decl.") at 3 n.1, ECF No. 17-1.

At issue in this litigation are a fraction of those requests regarding 69 separate topics

covered in 83 requests that plaintiff submitted to the FBI and ATF between 2005 and 2012.[2]

These requests sought records from these two DOJ components regarding 42 named individuals,

---

[2]      A complete chronological listing of plaintiff's requests is provided in the appendix attached to this
Memorandum Opinion.

including the plaintiff himself,[3] 21 organizations,[4] and 6 events or publications purportedly concerning animal rights.[5]

---

[3]     As described in the FAC, the individuals are: (1) plaintiff, FAC ¶¶ 62–72; (2) Joseph Buddenberg, a "leading animal rights activist," *id.* ¶¶ 16, 133–37; (3) Julie Elizabeth Lewin, "a longtime leading animal rights activist," *id.* ¶¶ 18, 149–53; (4) Nathan Donald Runkle, "a longtime leading animal rights activist" and founder of the animal rights organization known as "Mercy for Animals," *id.* ¶¶ 20, 159–65; (5) Rodney Adam Coronado, "a longtime leading animal rights activist," *id.* ¶¶ 21, 166–70; (6) Steven Paul Best, "co-founder of the North American Animal Liberation Press Office," *id.* ¶¶ 22, 171–75; (7) Sean Diener, co-founder of the "Utah Animal Rights Coalition" and the "United Animal Rights Coalition," *id.* ¶¶ 24, 181–85; (8) Lauren Beth Gazzola, "a longtime leading animal rights activist," *id.* ¶¶ 25, 186–93; (9) Michael A. Budkie, founder of "Stop Animal Exploitation Now," *id.* ¶¶ 26, 194–98; (10) Peter Daniel Young, "a longtime leading animal rights activist," *id.* ¶¶ 27, 199–203; (11) Rick A. Bogle, "a longtime leading animal rights activist," *id.* ¶¶ 28, 204–08; (12) Stephen Omar Hindi, "a longtime leading animal rights activist," *id.* ¶¶ 29, 209–13; (13) Alliston Helene Lance Watson, "a longtime leading animal rights activist," *id.* ¶¶ 30, 214–18; (14) Dallas Rachael Rising, a "longtime leading animal rights activist," *id.* ¶¶ 32, 224–29; (15) Iver R. Johnson III, "a longtime leading animal rights activist," *id.* ¶¶ 33, 230–34; (16) Kevin Rich Olliff, *id.* ¶¶ 34, 235–39; (17) Kelly Ann Higgins, "a longtime animal rights activist," *id.* ¶¶ 39, 269–73; (18) Chris DeRose, "a leading activist[]," *id.* ¶¶ 45, 293–98; (19) Jack D. Carone, "a leading activist[]," *id.* ¶¶ 45, 299–304; (20) Linda T. Tannenbaum, "a leading activist[]," *id.* ¶¶ 45, 305–10; (21) Crescent Vellucci, "a leading activist[]," *id.* ¶¶ 45, 311–16; (22) Jonathan Christopher Mark Paul, *id.* ¶¶ 45, 317–22; (23) Leslie Stewart, "a leading activist[]," *id.* ¶¶ 45, 323–28; (24) Sheila Laracy, "a leading activist[]," *id.* ¶¶ 45, 329–34; (25) Henry Hutto, "a leading activist[]," *id.* ¶¶ 45, 335–40; (26) Aaron Glenn Leider, "a leading activist[]," *id.* ¶¶ 45, 341–45; (27) Lindsay Parme, "a leading activist[]," *id.* ¶¶ 49, 370–82; (28) Kimberly Ann Berardi, "a leading activist[]," *id.* ¶¶ 49, 383–88; (29) Freeman Wicklund, "a leading activist[]," *id.* ¶¶ 49, 389–94; (30) Patrick Kwan, "a leading activist[]," *id.* ¶¶ 49, 395–99; (31) Peter George Schnell, "a leading activist[]," *id.* ¶¶ 49, 400–04; (32) Adam Weissman, "a leading activist[]," *id.* ¶¶ 49, 405–09; (33) Andrea Joan Lindsay, "a leading activist[]," *id.* ¶¶ 49, 410–14; (34) Josh Trenter, a "leading activist[]," *id.* ¶¶ 49, 415–19; (35) Joseph W. Bateman, a "leading activist[]," *id.* ¶¶ 49, 420–24; (36) David Patrick Hayden, "a leading activist[]," *id.* ¶¶ 49, 425–29; (37) Miyun Park, a "leading activist[]," *id.* ¶¶ 49, 430–52; (38) Gina Lynn, a "leading activist[]," *id.* ¶¶ 49, 453–58; (39) Sarah Jane Blum, a "leading activist[]," *id.* ¶¶ 49, 459–65; (40) William Edward Potter, author of *Green Is the New Red*, *id.* ¶¶ 50–51, 474–478; (41) Camille Marino, "one of the most controversial animal rights activists in the United States today," *id.* ¶¶ 61, 511–16; and (42) Screaming Wolf "the pseudonymous name adopted by the unknown author" of a 1991 publication titled "A Declaration of War: Killing People to Save Animals and the Environment," ("A Declaration of War"), *id.* ¶¶ 52, 479–86.

[4]     As described in the FAC, the organizations are: (1) Compassion Over Killing ("COK"), "a leading animal rights organization," FAC ¶¶ 10, 73–87; (2) The Foundation for Biomedical Research ("FBR"), which plaintiff calls a "leading professional opponent[] of the animal rights movement," *id.* ¶¶ 11, 88–92; (3) The National Association for Biomedical Research ("NABR"), also called a "leading professional opponent[] of the animal rights movement" by plaintiff, *id.* ¶¶ 11, 93–97; (4) Americans for Medical Progress ("AMP"), also called a "leading professional opponent[] of the animal rights movement" by plaintiff, *id.* ¶¶ 11, 98–102; (5) The Centers for Consumer Freedom ("CCF"), another "opponent[] of the animal rights movement," *id.* ¶¶ 12, 108–12; (6) The National Animal Interest Alliance ("NAIA"), yet another "opponent[] of the animal rights movement," *id.* ¶¶ 12, 113–17; (7) The Fur Information Council of America ("FICA"), "a leading professional advocate of the fur trade," *id.* ¶¶ 13, 118–22; (8) Perceptions International ("PI"), "a corporate intelligence and security firm," *id.* ¶¶ 14, 123–27; (9) The United States Surgical Corporation ("USSC"), "a manufacturer of surgical staplers" and "a longtime target of animal rights protests," *id.* ¶¶ 15, 128–32; (10) Friends of Animals ("FOA"), "a longtime leading animal rights organization," *id.* ¶¶ 17, 138–48; (11) Mercy for Animals ("MFA"), "a leading animal rights organization," *id.* ¶¶ 19, 154–58; (12) Utah Animal Rights Coalition ("UARC") and United Animal Rights Coalition ("UARC"), "leading Utah-based animal rights organizations," *id.* ¶¶ 23, 176–80; (13) The Fund for Animals ("FFA"), "a leading animal rights organization," *id.* ¶¶ 31, 219–23; (14) The American Anti-Vivisection Society ("AAVS"), "the oldest organization opposing animal experimentation in the United States," *id.* ¶¶ 36, 245–53; (15) The New England Anti-Vivisection Society ("NEAVS"), "one of the oldest organizations opposing animal experimentation in the United States," *id.* ¶¶ 37, 254–60; (16) The National Anti-Vivisection Society ("NAVS"), another of "the oldest organizations

DOJ 's response to this deluge of requests, however, was not as quick as plaintiff hoped, and on October 18, 2011, he initiated this lawsuit, alleging the agency's failure to produce records in response to his requests regarding himself and COK violated FOIA.  Complaint, *Shapiro v. United States Dep't of Justice*, Civ. Case No. 11-1835 (BAH) (D.D.C. Oct. 18, 2011). On February 21, 2012, the parties agreed that DOJ would disclose records responsive to those requests by May 15, 2012, with a schedule for any necessary dispositive motions.  Min. Order (Feb. 21, 2012), *Shapiro v. United States Dep't of Justice*, Civ. Case No. 11-1835 (BAH) (D.D.C. Feb. 21, 2012).

Six days later, however, plaintiff filed three additional lawsuits alleging that DOJ's failure to produce records in response to a number of his other requests also constituted violations of FOIA.[6]  This Court directed the parties to show cause why all four cases should not be consolidated.  Min. Order (Mar. 1, 2012).  Plaintiff agreed to consolidation of only three of

---

opposing animal experimentation in the United States," *id.* ¶¶ 38, 261–68; (17) The Animal Liberation Front, "an underground direct action animal rights organization," *id.* ¶¶ 40, 274–79; (18) The Animal Liberation Front Supporters Group, *id.* ¶¶ 46, 346–53; (19) Animal Defense League ("ADL"), "a militant, grassroots animal rights organization," *id.* ¶¶ 47–49, 354–60; (20) No Compromise, "a leading militant, grassroots animal rights magazine," *id.* ¶¶ 48, 361–69; and (21) Last Chance for Animals ("LCA"), "a seminal American animal rights organization," *id.* ¶¶ 44–46, 286–92.

[5]    As described in the FAC, the seven events or publications purportedly concerning animal rights are: (1) The Animal Liberation Front Conference, a 1994 FBI conference, FAC ¶¶ 35, 240–44; (2) the publication *A Declaration of War*, *id.* ¶¶ 52–56, 487–93; (3) the 1990 murder of Hyram Kitchen, the former Dean of the College of Veterinary Medicine at the University of Tennessee, *id.* ¶¶ 57–60, 494–510; (4) a 1990 "alert issued by the FBI's National Crime Information Center (NCIC) regarding the possibility of violence against unknown veterinary school deans by unknown animal rights activists," *id.* ¶ 505; (5) Green Is the New Red, a book and blog authored by Will potter focusing on "eco-terrorism, the animal rights and environmental movements, and civil liberties in the post-9/11 era," *id.* ¶¶ 50–51, 466–73 (internal quotation marks omitted); and (6) the 1988 attempted bombing of the USSC, *id.* ¶¶ 41–43, 280–85.

[6]    The first case concerned plaintiff's requests regarding ADL, No Compromise, Lindsay Parme, Kimberly Ann Berardi, Freeman Wicklund, Patrick Kwan, Peter George Schnell, Adam Weissman, Andrea Joan Lindsay, Josh Trenter, Joseph W. Bateman, David Patrick Hayden, Miyun Park, Gina Lynn, and Sarah Jane Blum.  Compl. at 1–24, ECF No. 1.  The second suit concerned plaintiff's requests for records regarding LCA, Chris DeRose, Jack D. Carone, Linda T. Tannenbaum, Crescent Vellucci, Jonathan Christopher Mark Paul, Leslie Stewart, Sheila Laracy, Henry Hutto, Aaron Glenn Leider, and the ALFSG. Complaint at 1–15, *Shapiro v. United States Dep't of Justice*, Civ. No. 12-315-BAH (D.D.C. Feb. 27, 2020).  The final suit covered plaintiff's requests for records regarding ALF and the USSC attempted bombing.  Complaint at 1–8, *Shapiro v. United States Dep't of Justice*, Civ. No. 12-318-BAH (D.D.C. Feb. 27, 2020).

the four cases, as the parties had already made some progress in the earliest filed case, *see* Pl.'s 1st Mot. for Leave to File FAC at 1, ECF No. 6, while DOJ wanted all four cases consolidated, *see* Def.'s Opp'n to Pl.'s Mot. for Leave to File FAC at 1, ECF No. 9.  The Court ordered all four cases to be consolidated, Mem. Op. & Order (Jun. 12, 2020) at 3, ECF No. 11, and subsequently granted plaintiff leave to file a first amended complaint, which was filed on June 19, 2012, setting forth all of the claims asserted in the four separate actions "together with several additional claims against the same defendant."  Pl.'s 2d Mot. for Leave to File FAC at 1, ECF No. 12.

The parties then set out to determine how DOJ would respond to this omnibus action. DOJ was ordered to produce records responsive to plaintiff's COK request by July 20, 2012, and plaintiff was directed to submit a "priority list" of his requests in order for the FBI and ATF to determine a schedule for subsequent disclosures.  Min. Order (Jul. 11, 2012).  After plaintiff submitted his priority list, DOJ moved to stay the case until September 30, 2019.  Def.'s Mot. for Open America Stay ("Def.'s Stay Mot.") at 1, ECF No. 17.  Litigation over the stay motion then took center stage until, on December 8, 2014, DOJ's motion was granted, in part, with litigation stayed until September 30, 2017, owing to the "unusually voluminous, complicated, and interconnected" nature of plaintiff's requests.  Mem. Opinion and Order (Dec. 8, 2014) ("Stay Order") at 2, ECF No. 61.

To address plaintiff's record requests, DOJ divided plaintiff's priority list into five tiers, 2d Hardy Decl. ¶ 38, and over the following three years, set about searching for, reviewing, processing, and releasing records responsive to plaintiff's requests.  For "Tier 1" requests, DOJ reviewed 56,581 responsive pages and released 17,727 pages in part or in full, 5th Decl. of David M. Hardy ¶ 5, ECF No. 67-1, and also reviewed 29 pieces of non-documentary media (*i.e.*, CDs

and DVDs) and released 23, 6th Decl. of David M. Hardy ¶ 5, ECF No. 70-1.  For "Tier 2"

requests, out of 41,028 pages reviewed, 1,851 pages were released, 7th Decl. of David M. Hardy

¶ 5, ECF 71-1, and out of 14 CDs/DVDs reviewed, 1 was released, 8th Decl. of David M. Hardy

¶ 5, ECF 72-1.  For "Tier 3" requests, out of 39,125 pages reviewed, 12,186 pages were released,

9th Decl. of David M. Hardy ¶ 5, ECF No. 73-1, and out of 64 CDs/DVDs reviewed, 3 were

released, 10th Decl. of David M. Hardy ¶ 5,[7] ECF No. 74-1.  For "Tier 4" requests, out of 12,862

pages reviewed, 5,391 pages were released, 11th Decl. of David M. Hardy ¶ 5, ECF No. 76-1,

and all 13 CDs/DVDs responsive to those requests were withheld, 12th Decl. of David M. Hardy

¶ 5, ECF No. 77-1.  Finally, for "Tier 5" requests, out of 1,774 pages reviewed, 904 pages were

released, 13th Decl. of David M. Hardy ¶ 5, ECF No. 78-1, and out of 37 CDs/DVDs, 1 was

released, 14th Decl. of David M. Hardy ¶ 5, ECF No. 79-1.  In preparing these "tiered" releases,

the FBI also reviewed and withheld "approximately 460,054 pages" related to then-pending

investigations.  15th Declaration of David M. Hardy ("15th Hardy Decl.") ¶ 47, ECF No. 97-3.

In all, then, the FBI reviewed over 614,000 pages of records and nearly 160 CDs/DVDs

responsive to plaintiff's requests and released approximately 38,788 pages and 28 CDs/DVDs to

plaintiff.

   Some of the requests plaintiff sent to the FBI turned up records that belonged to the ATF.

Decl. of Peter J. Chisholm ("Chisholm Decl.") ¶ 3, ECF No. 97-11.  When that would happen,

the FBI would refer the documents to the ATF for determination of whether any of the

documents could be released.  The ATF thus processed 509 pages of records pursuant to the

FBI's referrals or requests for consultation, 17 of which were withheld in full and the remainder

of which were released in full or in part.  *See generally*, Chisholm Decl.; Chisholm Decl., Ex. A

---

[7]      This document was mistitled the "Eighth Declaration of David M. Hardy."  It was, in fact, the 10th
declaration filed by the FBI's declarant.

("ATF *Vaughn* Index"), ECF No. 97-12.  Plaintiff also sent a single FOIA request directly to the ATF.  Chisholm Decl. ¶ 10.  That request led to the partial disclosure to the plaintiff of a single 4-page document.  *Id*. ¶ 25; ATF *Vaughn* Index at 23.

After DOJ completed its disclosures, the parties agreed on a "sample" briefing method. Joint Status Report ("JSR") (Oct. 20, 2017), ECF No. 86.  Under this sampling method, explained below in greater detail, the parties selected a small sample of the records responsive to plaintiff's requests to use in testing the propriety of FBI's withholdings.  *Id.*  The parties adopted a more traditional briefing method to test the validity of the ATF's withholdings.  DOJ relies on FOIA Exemptions 1, 3, 4, 5, 6, 7(A), 7(C), 7(D), and 7(E) to justify its withholdings as set out in the FBI's and ATF's *Vaughn* Indexes, *see* 15th Hardy Decl., Ex. A ("FBI *Vaughn* Index"), ECF No. 97-4; ATF *Vaughn* Index, and further explained in two declarations from David M. Hardy, Section Chief of the FBI's Record/Information Dissemination Section ("RIDS"), *see* 15th Hardy Decl.; 16th Decl. of David M. Hardy ("16th Hardy Decl."), ECF No. 113-1, and the declaration of Peter J. Chisholm, Chief of the Disclosure Division at the ATF, *see* Chisholm Decl.  Plaintiff objects to the invocation of each FOIA exemption.  *See generally* Pl.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 105-1.

Based on the sample of processed records and the accompanying government filings, the parties have cross-moved for summary judgment.  Def.'s Summ. J. Mot., ECF No. 97; Pl.'s Summ. J. Mot.  Plaintiff also contends that he cannot adequately defend against DOJ's summary judgment motion with respect to the adequacy of the FBI's search for responsive records and has thus requested time to undertake discovery on that issue.  Pl.'s 56(d) Mot.  Over a year after the filing of DOJ's initial motion for summary judgment, including the submission of three briefs,

four declarations, and 386 pages of exhibits by DOJ and four briefs, one declaration, and 379

pages of exhibits by plaintiff, the pending motions became ripe for resolution at the end of 2019.

## II.    LEGAL STANDARDS

### A.    Rule 56(a)

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." FED. R. CIV. P. 56(a).  "In FOIA cases, summary judgment may

be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather

than merely conclusory statements, and if they are not called into question by contradictory

evidence in the record or by evidence of agency bad faith." *Aguiar v. DEA*, 865 F.3d 730, 734–

35 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Judicial Watch, Inc. v. United*

*States Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)); *see also Students Against Genocide v.*

*Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) ("[A]n agency is entitled to summary

judgment if no material facts are in dispute and if it demonstrates 'that each document that falls

within the class requested either has been produced . . . or is wholly exempt from the Act's

inspection requirements.'" (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978))).  Most

FOIA cases will be resolved on summary judgment. *Brayton v. Office of the U.S. Trade*

*Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

FOIA was enacted "to promote the 'broad disclosure of Government records' by

generally requiring federal agencies to make their records available to the public on request."

*DiBacco v. United States Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *United States Dep't*

*of Justice v. Julian*, 486 U.S. 1, 8 (1988)).  To balance the public's interest in governmental

transparency and "legitimate governmental and private interests [that] could be harmed by

release of certain types of information," *Judicial Watch, Inc. v. United States Dep't of Defense*,

913 F.3d 1106, 1108 (D.C. Cir. 2019) (internal quotation marks omitted) (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982)), FOIA has nine exemptions, set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive' and must be 'narrowly construed,'" *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011) (citations omitted) (first quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973); and then quoting *Abramson*, 456 U.S. at 630). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must "determine *de novo* whether non-disclosure was permissible." *Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015). "FOIA places the burden 'on the agency to sustain its action,' and the agency therefore bears the burden of proving that it has not 'improperly' withheld the requested records." *Citizens for Responsibility & Ethics in Wash. v. United States Dep't of Justice*, 922 F.3d 480, 487 (D.C. Cir. 2019) (citations omitted) (first quoting 5 U.S.C. § 552(a)(4)(B) and then quoting *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)); *see also United States Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Pub. Citizen*

*Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (alterations in original)

(quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

### B.      Rule 56(d)

Federal Rule of Civil Procedure 56(d) provides that a court "*may* deny a motion for

summary judgment or order a continuance to permit discovery if the party opposing the motion

adequately explains why, at that timepoint, it cannot present by affidavit facts needed to defeat

the motion."  *Strang v. United States Arms Control and Disarmament Agency*, 864 F.2d 859, 861

(D.C. Cir. 1989) (emphasis in original).  The party requesting relief bears the burden of

"show[ing] what facts he intend[s] to discover that would create a triable issue and why he could

not produce them in opposition to" the motion for summary judgment.  *Byrd v. EPA*, 174 F.3d

239, 248 n.8 (D.C. Cir. 1999).  That burden, however, cannot be satisfied by "conclusionary

assertion[s] without any supporting facts," *id*., and the party seeking discovery must identify

"with sufficient particularity why additional discovery is necessary," *United States ex rel.*

*Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014) (quoting *Convertino v.*

*United States Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012)).  "District Courts," however,

"are afforded discretion in ruling on requests for additional discovery pursuant to" Rule 56(d).

*Stella v. Mineta*, 284 F.3d 135, 147 (D.C. Cir. 2002).  Indeed, given that discovery management

entails the kind of supervision of "the to-and-fro of district court litigation" that "falls within the

expertise . . . of district courts," *Watts v. SEC*, 482 F.3d 501, 507 (D.C. Cir. 2007), that discretion

"is at its zenith," *Folliard*, 764 F.3d at 26 (citing *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 580 (D.C.

Cir. 2010)).

## III.   DISCUSSION

Before analyzing the parties' cross-motions for summary judgment, determining whether

that analysis would be premature is appropriate.  Plaintiff's motion under Rule 56(d) is thus

discussed first.  As plaintiff fails to show that the requested discovery is necessary, consideration

of the parties' cross-motions for summary judgment follows.

### A.  PLAINTIFF FAILS TO DEMONSTRATE A NEED FOR DISCOVERY

Plaintiff claims that he cannot yet properly oppose DOJ's motion for summary judgment

with respect to the adequacy of the FBI's search for responsive records.  Consequently, he

requests an opportunity, pursuant to Federal Rule of Civil Procedure 56(d), to undertake

discovery on that issue.  Rule 56(d) provides that, if a party opposing summary judgment "shows

by affidavit or declaration that, for specified reasons, [he] cannot present facts essential to justify

[his] opposition, the court may" do one of the following: "(1) defer considering the motion [for

summary judgment] or deny it; (2) allow time to obtain affidavits or declarations or to take

discovery; or (3) issue any other appropriate order."  FED. R. CIV. P. 56(d).  "*Convertino* [*v.*

*United States Department of Justice*, 684 F.3d 93 (D.C. Cir. 2012)], established the applicable

standard" for deciding whether consideration of a motion for summary judgment must be

delayed.  *Haynes v. Dist. of Columbia Water and Sewer Auth.*, 924 F.3d 519, 532 (D.C. Cir.

2019).  In order to secure the postponement he seeks, plaintiff must "(1) outline the particular

facts [he] intends to discover and describe why those facts are necessary to the litigation;

(2) explain why [he] could not produce the facts in opposition to the motion for summary

judgment; and (3) show the information is in fact discoverable."  *Id*. at 530 (quotation marks and

alterations omitted) (quoting *Convertino*, 684 F.3d at 99–100).  Whether the nonmovant has

"diligently pursued discovery of the evidence" he seeks is also relevant.  *Folliard*, 764 F.3d at 26

& n.5 (internal quotation marks omitted) (quoting *Convertino*, 684 F.3d at 99).  "This inquiry

must be resolved through 'application of the *Convertino* criteria to the specific facts and

circumstances presented in the request,' rather than on the basis of presumptions about a given

stage of litigation."  *Haynes*, 924 F.3d at 530 (quoting *Folliard*, 764 F.3d at 27).

11

That plaintiff's request for discovery is made in the FOIA context makes this an uphill challenge for him since the law is well settled that "discovery is generally 'disfavored' in mine-run FOIA cases." *Am. Ctr. for Law and Justice v. United States Dep't of State*, 289 F. Supp. 3d 81, 92 (D.D.C. 2018) (quoting *Justice v. IRS*, 798 F. Supp. 2d 43, 47 (D.D.C. 2011)).  Instead, so long as an agency "establish[es] the adequacy of its search by submitting reasonably detailed, nonconclusory affidavits describing its efforts . . . the district court ha[s] discretion to forgo discovery and award summary judgment on the basis of affidavits."  *Freedom Watch, Inc. v. Nat'l Sec. Agency*, 783 F.3d 1340, 1345 (D.C. Cir. 2015) (internal quotation marks and citation omitted) (quoting *Baker & Hostetler LLP v. United States Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006) and *Goland*, 607 F.2d at 352).  Those affidavits or declarations must, of course, be "submitted in good faith," *Goland*, 607 F.2d at 352, but agency affidavits are generally accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims."  *Bartko v. United States Dep't of Justice*, 898 F.3d 51, 74 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).  Discovery is therefore the exception in FOIA cases and, so long as the agency's affidavit passes muster and is "submitted in good faith," discovery requests should be denied. *Baker & Hostetler*, 473 F.3d at 318 (D.C. Cir. 2006) (quoting *Schrecker v. Dep't of Justice*, 217 F. Supp. 2d 29, 35 (D.D.C. 2002)).

This FOIA-specific aversion to discovery does not change the standard announced in *Convertino* for determining whether to pause summary judgment proceedings under Rule 56(d). It does, however, color the first *Convertino* factor.  Specifically, to show that the requested discovery is "necessary to the litigation," *Convertino*, 684 F.3d at 99, plaintiff must explain why the FBI's affidavits describing its search methods are not submitted in good faith such that

12

discovery is warranted.  *Baker & Hostetler*, 473 F.3d at 318.  A brief description of the relevant

affidavits submitted by the FBI is thus in order.

The FBI first described its search methods on August 1, 2012, during its successful

attempt to secure a multi-year-long stay of this case.  In a declaration by the agency's Section

Chief of the Record/Information Dissemination Section ("RIDS"), the FBI explained how its

records are organized.  To begin, the FBI maintains a "Central Records System ('CRS')," which

contains "all information that it has acquired in the course of fulfilling its mandated law

enforcement responsibilities."  2d Hardy Decl. ¶ 10.  These CRS records are organized by

"General Indices," which represent "various subject matters" and can be searched "manually or

through . . . automated indices."  *Id.* ¶ 11.  To complete such a search, the FBI uses a case

management system known as the Automated Case Support ("ACS") system.  *Id.* ¶ 13.  More

specifically, the "Universal Index ('UNI')," an application within ACS, allows FBI personnel to

search "a complete subject/case index to all investigative and administrative cases."  *Id.* ¶ 13(c).

Apart from CRS, the FBI maintains the "Electronic Surveillance ('ELSUR') Indices."  *Id.*

¶ 15.  ELSUR indices are "used to maintain information on subjects whose electronic and/or

voice communications have been intercepted" by the FBI since 1960.  *Id.*  In its 2012

declaration, the FBI did not explain how, precisely, the ELSUR indices are searched except to

say that agency personnel "access[]" ELSUR records "electronically."  *Id.*  The FBI has since

made clear that, when ACS was implemented in 1995, "prior ELSUR indices" interfaced with

that system, meaning that "ELSUR indexed data could be searched through ACS/UNI."  16th

Hardy Decl. ¶ 115.

As for the searches in response to plaintiff's FOIA requests referenced in plaintiff's First

Amended Complaint, the FBI explained that RIDS "quer[ied] CRS using the name of the

individual or organization identified by plaintiff in his request, and/or by using key words derived from plaintiff's requests where the request was not about a specific individual or organization." 2d Hardy Decl. ¶ 19. Using ACS, the FBI also searched CRS by breaking down the search terms phonetically. *Id.* When it had additional identifying information for the subject of a request, *e.g.*, "dates of birth, places of birth, and/or social security numbers," RIDS would use it to "ensure search results pertained to the correct individual at issue in plaintiff's requests." *Id.* The searches encompassed both "main files," which are records corresponding to the subject of a request itself, and "reference entries," records which contain "only a mere mention or reference" to the subject of a request. *Id.* ¶¶ 11, 20.

With respect to ELSUR records requested by the plaintiff, "RIDS . . . completed searches of those indices for the subjects plaintiff identified in his requests." *Id.* ¶ 21. The FBI's 2012 declaration does not go into much detail about how RIDS "completed" those searches of the ELSUR indices. Subsequent declarations, however, clarified how the FBI searched for ELSUR records in this case. Prior to 2015, when the searches for plaintiff's requested records would have been conducted, if RIDS received a request for ELSUR records, it would "contact[] the FBI personnel that manage the ELSUR database" to conduct a search of the ELSUR indices and report the results back to RIDS. 16th Hardy Decl. ¶ 115. ELSUR personnel, it turns out, searched the ELSUR indices using the exact same method RIDS used to look for records, *i.e.* a "search[] of ACS/UNI." *Id.*

In his attempt to meet the first *Convertino* factor, plaintiff questions whether the declarations submitted by the FBI relevant to the adequacy of its search for ELSUR records were submitted in good faith. Plaintiff, through his attorney's declaration, points to a hodgepodge of documents obtained in separate FOIA litigation brought by plaintiff and others that purportedly

"paint[] a picture of a complex series of FBI systems for the storage, retrieval, indexing, and searching" of and for ELSUR materials.  Decl. of Jeffrey Light ("Light Decl.") ¶ 11, ECF No. 102-2; *see also generally* Pl.'s 56(d) Mot., Exs. 1–8, ECF 102-1.  According to plaintiff, the documents also contain numerous "conflicting statements about FBI searches for ELSUR material in response to FOIA and Privacy Act requests."  Light Decl. ¶ 11.  Plaintiff argues that these alleged inconsistencies and inaccuracies create a specter of "bad faith," Pl.'s 56(d) Mot. at 3, and thus entitle him to far-reaching discovery into, *inter alia*, the manner in which ELSUR records are stored, the search capabilities of various FBI programs, and the policies and practices of RIDS with respect to searches for ELSUR materials.  Light Decl. ¶ 18.

Plaintiff's presentation of certain documents that he claims suggest the FBI submitted its declarations in bad faith is simply not persuasive.  Some of those documents long pre-date the searches in this case, some relate to searches in other cases, some do not relate to FOIA searches at all, and those that do relate to the FOIA requests at issue in this case are at least consistent with, and even helpful to, the FBI's description of the ELSUR searches it conducted.  To begin, plaintiff points to a declaration filed in a different case by the same FBI official who authored the relevant declarations in this case.  Pl.'s 56(d) Mot. at 2.  In it, the FBI declarant explains that prior to February 2015, he and his team understood that to search for ELSUR records, they needed to forward requests to ELSUR personnel, as they did in this case.  In 2015, however, RIDS discovered that, because the ELSUR indices had interfaced with the ACS/UNI case management system, those records were accessible through that application.  In fact, it became clear that when RIDS forwarded a request to ELSUR personnel, those agents were running the exact same search that RIDS was conducting itself.  Pl.'s 56(d) Mot. at 2; 16th Hardy Decl.

¶ 115.  This revelation, which post-dates the searches in this case, serves only to show that, to the extent RIDS forwarded plaintiff's requests to ELSUR personnel, it did so needlessly.[8]

Plaintiff attempts to muddy the waters by pointing to a 1998 internal FBI memorandum sent to FOIA personnel instructing agents to limit ELSUR searches "to only retrieving [ELSUR] information on those individuals considered as a target of the investigation and listed as a 'principal' for the electronic surveillance."  Pl.'s 56(d) Mot., Ex. 5 at 1.  The memorandum explains that "principal" means "the target" of the electronic surveillance, *id*. at 2, noting that an ELSUR search may turn up two other kinds of references: "overhear[s]," which are conversations of someone other than a principal that have been recorded, and "mention[s]," which indicate that a participant in a recorded conversation mentioned the name of a third party, *id*.  Plaintiff admits that, because this memorandum was circulated 13 years before this litigation commenced, he does not know whether the policies it describes "were still in effect at the time the FBI conducted searches in this case."  Light Decl. ¶ 6.  Absent more, plaintiff's assertion that the FBI improperly limited the scope of the search for ELSUR records is thus "purely speculative," and cannot overcome the presumption of good faith the FBI's declaration must be afforded.  *Bartko*, 898 F.3d at 74 (quoting *SafeCard Servs., Inc.*, 926 F.2d at 1200).[9]

The same conclusion applies to plaintiff's reliance on an FBI training PowerPoint obtained via an unrelated FOIA request.  That PowerPoint describes "[f]our separate [ELSUR] record categories," including "principal records," "proprietary interest records," "intercept

---

[8]    Plaintiff also points to the FBI's declarant's deposition testimony taken in another case regarding RIDS's search procedures that "[i]f it looks like there could be ELSUR documents, then we'll do an ELSUR search."  Light Decl. ¶ 9; Pl.'s 56(d) Mot., Ex. 8 at 45.  This deposition was taken on October 22, 2009, at least five years before the FBI's declarant says he realized a separate ELSUR search was unnecessary.  His testimony in that case is therefore consistent with his declarations in this case.

[9]    To the extent that plaintiff argues the documents he has produced call into question the adequacy of the FBI's search, that is a different question, discussed *supra* in Part III.B.1.  To require discovery, however, plaintiff must do more than suggest the agency's search was inadequate by producing some evidence that calls into question the agency's good faith.

records," and "reference records."  Pl.'s 56(d) Mot., Ex. 6 at 5 (capitalization altered).  As

plaintiff's declarant concedes, however, "the training material does not indicate which of these

separate record categories are to be searched."  Light Decl. ¶ 7.  The training material sheds no

light on whether the FBI's description of its ELSUR searches was made in good faith and

therefore does not bear on whether discovery is warranted in this action.

      Nor does plaintiff's discussion of three systems related to the management of ELSUR

records present any evidence of bad faith on the part of the FBI.  Plaintiff has submitted a

description of something called the ELSUR Data Management System ("EDMS").  Pl.'s 56(d)

Mot., Ex. 2.[10]  He also submits a 2013 FBI memorandum regarding certain whistleblower

allegations.  In determining that the allegations were unfounded, the memorandum described the

FBI's replacement, in 2012, of the ELSUR Records System ("ERS"), which was an

"alphanumeric and numeric index" of ELSUR records, with the ELSUR Data Application

("EDA"), a new ELSUR index with improved search functionality and ease of use.  Pl.'s 56(d)

Mot., Ex. 1 at 4 n.1, 7.  Finally, plaintiff submits two documents, obtained in response to his

FOIA request for documents related to how the FBI processed the FOIA requests at issue in this

case (what he calls a "FOIA about FOIA"), indicating that both the ERS and EDA were

searched.  Pl.'s 56(d) Reply, Exs. 1–2, ECF 123-1.  That the FBI maintains other applications

related to ELSUR records does nothing to call into question the FBI declarant's statement that, in

1995, "the ELSUR indices interfaced with ACS/UNI, and ELSUR indexed data could be

searched through ACS/UNI."  16th Hardy Decl. ¶ 115.  Plaintiff's own submission describes the

ERS as an "index," and it is safe to assume that its replacement, the EDA, is also an index of

ELSUR records.  Pl.'s 56(d) Mot., Ex. 1 at 4 n.1.  Plaintiff's submission is thus entirely

---

[10]     The description appears to be contained in a request for funds to improve EDMS in fiscal year 2008, though its origin is neither clear nor explained.

consistent with the FBI's declaration—the ERS and the later-implemented EDA are indices of

ELSUR records that "interfaced with ACS/UNI" and could be searched via that application.  At

best, the documents plaintiff obtained in his "FOIA about FOIA" request show that ELSUR

personnel may have searched the ERS and EDA directly, and do nothing to suggest that the

FBI's declarations were not "submitted in good faith."  *Goland*, 607 F.2d at 352.

Over the eight years this case has been pending, some change in records management and

search processes on the part of the FBI is hardly surprising.  Plaintiff's attempt to use that natural

development of agency procedures as evidence of agency bad faith is insufficient.  He has thus

failed to show why discovery, eschewed in FOIA litigation absent a showing of agency bad faith,

is "necessary" in this case.  *Convertino*, 684 F.3d at 99.

Accordingly, plaintiff's motion for discovery under Rule 56(d) is denied.

## B.      FBI AND ATF SEARCHES WERE ADEQUATE

Plaintiff contends that "[i]n the event that the Court denies [his 56(d)] motion," as it has,

"the FBI's Motion for Summary Judgment" should be denied "as to the adequacy of the search"

performed for the records he requested.  Pl.'s Opp'n at 1.  Plaintiff focuses his complaints

regarding search adequacy on the search performed by the FBI and does not point to any

deficiencies in the search performed by the ATF.  Nevertheless, both the FBI and ATF have

requested summary judgment as to the adequacy of each agency's search, and it is their "burden

. . . to sustain [their] action[s]."  5 U.S.C. § 552(a)(4)(B); *see also Citizens for Responsibility and

Ethics in Washington v. United States Dep't of Justice*, 922 F.3d 480, 487 (D.C. Cir. 2019).  The

legal standard for determining whether an agency has met that burden is discussed first, followed

by examination of the adequacy of the searches performed by the FBI and the ATF.

1.      *Legal Standard*

To obtain summary judgment with respect to the adequacy of its search, an agency must "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Inst. for Justice v. IRS*, 941 F.3d 567, 569–70 (D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Ancient Coin Collectors Guild v. United States Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011)).  The agency need not demonstrate that it has uncovered all records possibly responsive to a request, but rather that its "search for those documents was adequate." *Weisberg v. United States Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis omitted).  In crafting that adequate search, the agency "has a duty to construe a FOIA request liberally," *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), but "is not obliged to look beyond [its] four corners," *Aguiar v. DEA*, 865 F.3d 730, 740 n.1 (D.C. Cir. 2017) (quoting *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996)). In other words, the agency need not "divine a requester's intent," *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 64 (D.D.C. 2003), but it must show that it followed the request where it could reasonably lead.

An agency can meet its burden "by submitting a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020) (internal quotation marks and alterations omitted) (quoting *Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017)). Such affidavits "are accorded a presumption of good faith," *id.* (internal quotation marks omitted) (quoting *SafeCard Servs., Inc.*, 926 F.2d at 1200), which can be overcome only if the requester "raises substantial doubt, particularly in view of well defined requests and positive

indications of overlooked materials," *DiBacco v. United States Army*, 795 F.3d 178, 188 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Valencia-Lucena*, 180 F.3d 321, 326 (D.C. Cir. 1999)).  If after a review of the record, however, such doubt remains, an agency's request for summary judgment must be denied.  *Id*.

### 2.   *Adequacy of FBI Search*

Plaintiff raises four potential issues with the FBI's search in an attempt to manufacture the requisite doubt about the adequacy of the search: (1) he claims the FBI improperly limited the search performed to so-called "main files" and to animal rights subjects, Pl.'s Opp'n at 1; (2) documents known as "search slips" obtained by plaintiff in separate litigation purportedly indicate that records held at certain field offices were "unsearchable due to being boxed up for automation," *id*. at 2; (3) one search slip contains a note stating the search was "[l]imited to locality when going thru (sic) search," *id*. at 3; and (4) in e-mail correspondence the FBI indicated that "public source" documents contained within files responsive to plaintiff's requests had not been produced, *id*.  These challenges are addressed *seriatim*.

First, to bolster his contention that the search conducted was improperly constrained, plaintiff points to an internal RIDS newsletter, dated September 2011, containing a section titled with his name, "Shapiro."  Pl.'s Opp'n, Ex. 1 at 1, ECF No. 105-2.[11]  The newsletter instructs RIDS personnel who "have a request that was made on or after 7/11 for cross references related to animal rights" to consider "only cross references from file classifications 266, 100, and 336." *Id*.  The newsletter further instructs, for "requests from on or after 7/11 [that] request[] all references not limited to animal rights, no cross references will be searched."  *Id*.  Plaintiff

---

[11]      Plaintiff compiled each of the exhibits related to the adequacy of the FBI's search into a single document. For ease of reference the pagination assigned by the Court's Case Management/Electronic Case Files system (CM/ECF) will be used.

claims "[t]hese limitations on the scope of the FBI's search are unreasonable" and render the search "inadequate." Pl.'s Opp'n at 2. According to FBI's declarant, however, those instructions "only appl[ied] to [the] administrative" phase of plaintiff's requests and "[t]he FBI conducts *de novo* reviews in all [FOIA] cases subject to litigation." 16th Hardy Decl. ¶ 7. That declaration confirming *de novo* reviews, presumably made in good faith, renders any concern raised by the newsletter insignificant.[12]

The same can be said of plaintiff's other complaints about the FBI's search. The search slip he obtained containing the note, dated March 10, 2011, that a certain FBI field office was "[u]nsearchable due to being boxed up for automation," Pl.'s Opp'n, Ex. 4 at 10, pertains to FOIA search #1162667, which is not a subject of this litigation, 16th Hardy Decl. ¶ 9. Moreover, "the FBI completed all necessary manual indices searches, including those field offices which were unavailable at some point during the processing of Plaintiff's FOIA requests." *Id.*[13] Another search slip that worries plaintiff notes that a particular search was "limited to locality when going thru [sic] search," Pl.'s Opp'n, Ex. 5 at 16, but it too pertains to a request not at issue in this suit, *compare id.* (noting request at issue was "FOIPA #1173350-001") *with* 2d Hardy Decl., Ex. A (listing searches at issue and nowhere mentioning request number 1173350-001). Finally, while a third search slip, containing a RIDS employee's

---

[12]     In any event, to the extent the searches were limited during the administrative processing of plaintiff's requests, this was at his direction. On July 6, 2011, the plaintiff informed RIDS personnel of his decision to "limit cross-reference searches for all of [his] FOIPA requests submitted since 1 January 2011 to information pertaining in any way to animal protection/rights and environmental protection/rights issues/organizations/individuals/events/investigations/etc." Pl.'s Opp'n, Ex. 2 at 5. Five years later, after the searches for his records had been completed and the responsive documents were being processed, plaintiff rescinded that agreement. Pl.'s Opp'n, Ex. 3 at 7. Even if the FBI's subsequent declaration that it performed a "*de novo* review" of his requests once this case entered litigation did not settle the matter, the plaintiff cannot now complain about limitations on those administrative searches he himself sought.

[13]     Just to gild the lily, the very search slip on which plaintiff relies also contains a note, dated November 30, 2011, indicating that FBI personnel "completed manual indices search" of the field office in question. Pl.'s Opp'n, Ex. 4 at 14.

comment that the FBI doesn't "usually pull public source" documents, does refer to a search at issue in this case, the FBI's most recent declaration makes clear that the comment "does not depict the full history" of that request and that "the FBI processed all responsive records . . . including public source information."  16th Hardy Decl. ¶ 11.

In sum, plaintiff's cherry-picked phrases from documents obtained outside this litigation, many of which relate to searches for records responsive to requests not at issue in this case, do not call the adequacy of the FBI's search into question.  Even if they did, those doubts are more than allayed by the FBI's most recent declaration.  Perhaps in recognition of this fact, plaintiff makes no mention of search adequacy in his reply.  *See generally* Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Summ. J. Reply"), ECF No. 125.

While plaintiff has mounted an attack on the FBI's declarations by marshaling outside sources, a focus on the FBI's submissions in this case demonstrates that the agency has carried its burden.  The description of the agency's search appears in twelve paragraphs of a declaration submitted in support of the FBI's bid to secure the years-long stay of this case to process properly the records identified in searches.  2d Hardy Decl. ¶¶ 10–22; *see also* 15th Hardy Decl. ¶ 6 (explaining that the "[p]aragraphs 10-22 of the Second Hardy Declaration describe[d] . . . the FBI's search for records responsive to Plaintiff's requests").  Those paragraphs provide a general description of how the FBI stores and searches for records, 2d Hardy Decl. ¶¶ 10–18, as updated throughout this litigation and already described, *see supra*, Part III.A.  Detail about how the FBI searched for records related to the plaintiff's requests in this particular case are also provided.  *See* 2d Hardy Decl. ¶¶ 19–22.  Those paragraphs explain that, as of July 31, 2012, the FBI had "completed . . . searches for records potentially responsive to all" the plaintiff's requests at issue in this case.  *Id.* ¶ 19.  It did so by searching both main files and cross-references located in its

CRS, which, again, contains "all information that [the FBI] has acquired in the course of fulfilling its mandated law enforcement responsibilities." *Id*. ¶¶ 10, 20.  The FBI also "completed searches of [ELSUR] indices for the subjects plaintiff identified in his requests." *Id*. ¶ 21.

To complete those searches the FBI appropriately derived search terms from the requests at issue in this case.  Searches for requests about a specific individual or organization were conducted of the FBI's Central Records System "using the name of the individual or organization" and "a phonetic breakdown" of the same. *Id*. ¶ 19.  According to the FBI's declarant, that phonetic breakdown "facilitates location of records using the phonetic sounds of the terms, and for names, would return results for the initials of the first and middle names." *Id.* Additional information, if available, "including but not limited to dates of birth, places of birth, and/or social security numbers," would be used to ensure the search was accurate. *Id*.  Searches for requests that were "not about a specific individual or organization," *e.g.*, plaintiff's request for information regarding the Hyram Kitchen murder, *see* 2d Hardy Decl., Ex. A at 5, would "us[e] key words derived from plaintiff's requests" and phonetic breakdowns of the same, 2d Hardy Decl. ¶ 19.  The FBI has thus submitted "a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Evans*, 951 F.3d at 584 (internal quotation marks and alteration omitted).  It has met its burden and DOJ is entitled to summary judgment as to the adequacy of the FBI's search.

### 3.      *Adequacy of ATF Search*

ATF's involvement in this case was, for the most part, processing records forwarded to it by the FBI.  Plaintiff filed only a single request with ATF directly, *see* Chisholm Decl. ¶ 10;

FAC ¶ 280, and he raises no issue with the search performed in response to that request, Pl.'s

Summ. J. Mot. at 1–3, 51–53.  Indeed, ATF's declaration provides sufficient detail about its

search for plaintiff's requested records.  Plaintiff's request to ATF was for "any and all records

that were prepared, received, transmitted, collected and/or maintained by" ATF, "the Domestic

Terrorism Task Force (DTTF), the National Joint Terrorism Task Force, or any Joint Terrorism

Task Force referring or relating to . . . [t]he 11 November 1988 attempted bombing at that

Norwalk, Connecticut U.S. Surgical Corporation (USSC)."  Chisholm Decl., Ex. H at 1, ECF

No. 97-13; FAC ¶ 280.  ATF's declarant explains that "[b]etween September 13, 2011 and

September 20, 2011, ATF conducted a search" for the requested information "using the name

'United States Surgical Corp.'" as its search term.  Chisholm Decl. ¶ 12.  ATF searched the

"Treasury Enforcement Communications System (TECS)," which "was ATF's primary case

management system during the 1980's [sic] and most of the 1990's [sic]."  Chisholm Decl.

¶¶ 42, 46.  That database is "a comprehensive ATF law enforcement database that contains ATF

investigative records."  *Id*. ¶ 46.  ATF's declarant averred that "because the TECS database

contains the cases ATF has investigated, TECS was the place most likely to contain responsive

records," *id*. ¶ 47, and this initial search of the database failed to locate any responsive records,

*id*. ¶ 48.  ATF also sent plaintiff's request to its Boston Field Division to search for a case file

related to the USSC bombing, but that office was also unable to locate responsive records.  *Id.*

¶ 12.

        Plaintiff's complaint in this case included additional information that allowed ATF to

perform a more complete and accurate search.  In particular, plaintiff alleged that the records he

sought related to a specific ATF case file number.  *Id*. ¶ 22; FAC ¶ 282.  With this case number

in hand, ATF re-searched TECS and found "an ATF investigation from 1989 instead of 1988."

Chisholm Decl. ¶ 23.  The Boston Field Division searched the investigative file but found no responsive records, likely due to the fact that ATF's policy is to destroy investigative records after twenty years, meaning the records in question, had any existed, would have been destroyed in 2009.  *Id*. ¶ 24.  Plaintiff was provided with one responsive record: a printout of the "hit" in the TECS search.  *Id*. ¶ 52.  ATF's declarant avers that, given the foregoing, the agency "conducted a complete and adequate search of all records pertaining to the attempted bombing at the USSC in Norwalk, Connecticut, and limited responsive information was found and disclosed with the appropriate redactions."  *Id*.

In short, ATF has submitted "a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched."  *Evans v. Fed. Bureau of Prisons*, 951 F.3d at 584 (internal quotation marks and alteration omitted).  ATF has therefore established the adequacy of its search.

## C.   PROPRIETY OF THE FBI'S WITHHOLDINGS

Having dispatched with the threshold issue of the adequacy of the search performed, the processing of the records produced can now be discussed.  Since the FBI received the vast majority of the requests at issue and processed the vast majority of records, this agency's responses are addressed first.  Owing to the voluminous responsive records in this case, however, the parties have agreed to test the FBI's records processing using only a sample of the records produced.  *See* JSR (Oct. 20, 2017); Min. Order (Oct. 23, 2017) (approving use of sampling method).  The standards guiding analysis of a FOIA action using a sampling method and how that method affects the reach of this opinion are explained first before analyzing whether the records were properly withheld in full or in part.

### 1.      *Principles of Sampling in FOIA Litigation*

At the summary judgment stage of a FOIA action, a court would typically be required to examine "each and every" challenged redaction or withholding.  *Weisberg*, 745 F.2d at 1490. When, however, the number of documents is so large that it "would not realistically be possible to review each and every one," courts have permitted the parties to limit their dispute to a representative sample of processed records.  *Id*.  This sampling method is essential for FOIA actions implicating a large number of responsive records, but is relatively undertheorized.  A brief discussion of the principles underlying the sampling method and the possible ramifications for this case is thus helpful.

### a.      *Sampling Basics*

In broad strokes, after the agency has processed all of the records responsive to the requests at issue, released those records that are not exempt from disclosure, and identified the exemptions used to withhold any records, the sampling method should work as follows: (1) the parties select a representative sample of documents from the withheld records; (2) the agency creates a *Vaughn* index for that sample and/or submits the sample for *in camera* inspection; (3) the parties brief the propriety of the redactions or withholdings made within that sample; (4) the Court examines the justifications for those redactions and withholdings, determines whether any redactions or withholdings were made in error, and orders the agency to release any materials that were unjustifiably withheld within the sample, *Hunton & Williams LLP v. U.S. Env'tl Protection Agency* ("*Hunton*"), 346 F. Supp. 3d 61, 87–88 (D.D.C. 2018); and finally (5) the Court determines the "error rate" within the sample by counting up the "unjustified

withholdings" and dividing that number by the "total withholdings" made in the sample, *Bonner v. United States Dep't of State*, 928 F.2d 1148, 1154 n.3 (D.C. Cir. 1991).[14]

The fifth step is what differentiates the sampling method from run-of-the-mill FOIA litigation.  On the theory that, so long as "the sample is well-chosen, a court can, with some confidence, 'extrapolate its conclusions from the representative sample to the larger group of withheld materials,'" *Bonner*, 928 F.2d at 1151 (quoting *Fensterwald v. United States Central Intelligence Agency*, 443 F. Supp. 667, 669 (D.D.C. 1977)), the error rate is used as a rough measure of whether responsive records not included in the sample were properly withheld.  If that rate is "negligible," that ends the matter and summary judgment for the agency with respect to application of exemptions to the remaining withheld documents is appropriate.  *Hunton*, 346 F. Supp. 3d at 87.  If, however, the error rate is "unacceptably high," *Meeropol v. Meese*, 790 F.2d 942, 960 (D.C. Cir. 1986), the court may order the more drastic step of "requir[ing] agencies to reprocess *all* responsive records" that were withheld in full or in part.  *Hunton*, 346 F. Supp. 3d at 87 (emphasis added).  The sampling method's tolerance of negligible error rates recognizes that there is "a trade-off between the high degree of confidence that comes from examining every item for which exemption is claimed, and the limitations of time and resources that constrain agencies, courts, and FOIA requesters alike."  *Bonner*, 928 F.2d at 1151.  For FOIA actions involving a massive volume of responsive records, like this one, however, the gains in efficiency the method produces are essential.  *Weisberg*, 745 F.2d at 1489–90 ("Given

---

[14]     Parties and courts have, on occasion, selected samples from the entire universe of responsive records, including those released in full.  This method, however, risks producing a sample with an insufficient number of documents containing withholdings. *See Weisberg*, 745 F.2d at 1483 (explaining that, after a district court ordered a *Vaughn* index "of every two hundredth" responsive document, it needed to "order[] a supplemental *Vaughn* index when the first index produced a large number of pages containing no excisions").  Selecting a sample from only documents that have been withheld in full or in part thus better aligns with a court's task in FOIA actions, which is to determine whether documents have been "improperly withheld," not whether documents were properly released. 5 U.S.C. § 552(a)(4)(B).

[the] magnitude of disclosure, the District Court clearly could not have undertaken a review of each of the documents from which the Department, pursuant to FOIA's exemptions, excised material.")

### b.      *Possible Pitfalls*

While the basic structure of the sampling method is well-accepted, some nuances in implementation have yet to be conclusively ironed-out and are the subject of plaintiff's challenges to the sampling undertaken in this case, as discussed further below.

### (i)      *Maintaining Representativeness and the Proper Response to Tainted Samples*

In *Bonner v. United States Department of State*, the D.C. Circuit stressed that courts must strive "to preserve the representative character of the sample." 928 F.2d at 1152. After all, the sampling "technique will yield satisfactory results only if the sample employed is sufficiently representative, and if the documents in the sample are treated in a consistent manner." *Id*. at 1151. One way to taint a sample's representative character is to treat the sample differently than the entire universe of processed records. A simple example helps explain why. Imagine an agency locates 100,000 documents responsive to a particular request. During processing, the agency employs one of the FOIA exemptions to redact the name of "Individual A" throughout all 100,000 documents. The parties then select a sample of 500 documents that they intend to use to test the agency's exemptions. Before briefing begins, however, the agency re-reviews the *sample* records, determines that Individual A's name need no longer be redacted, and unredacts that name within the sample documents, but makes no adjustment to that redaction within the remaining 99,500 processed records. Clearly the sample would no longer be representative of the whole.

*Bonner* addressed just such post-selection tweaks to sample documents.  In that case, the parties disputed the propriety of the State Department's partial withholding of 1,033 documents. *Bonner*, 928 F.2d at 1149.  The parties agreed "to test State's FOIA exemption claims through a sampling procedure."  *Id*.  The plaintiff selected 63 of those documents and the agency agreed to prepare a *Vaughn* index describing information withheld in those 63 documents.  The index, however, "covered only 44 of the 63 sample documents."  *Id*.  Apparently, in the course of preparing the index the "State Department determined that 19 of the documents could be released in full."  *Id*.  The Circuit thus faced the question of whether "release of the 19 documents in full, with no accounting for the original withholding, undermined the confidence one can have that the Department correctly invoked FOIA to shield information contained" in the documents that were not a part of the sample.  *Id*. at 1151.  Answering that question in the affirmative, the Circuit explained that because the sample records "count not simply for themselves, but for presumably similar non-sample documents still withheld," the district court "should have ruled on the propriety of the initial deletions from the 19 documents."  *Id*. at 1152.

*Bonner* settles several issues.  First, an agency's burden in a sampling case is to "justify its initial withholdings" and the agency "is not relieved of that burden by a later turnover of sample documents."  *Id*. at 1154.  Indeed, when sampling is employed, the agency's *Vaughn* index should explain not only those withholdings the agency continues to defend, but also "explain why [any] once withheld portions [of the sample] were excised at the time of the agency's initial review."  *Id*. at 1153.

Moreover, *Bonner* holds that the calculation of the error rate must be made based on the agency's initial withholdings.  *Id*. at 1154 n.13.  This heightens the importance of requiring that the agency justify those initial withholdings, for while the choice to disclose information by an

29

agency may be an admission that the initial withholding was improper, this choice may also reflect the exercise of the agency's discretion to release information that may nonetheless be exempt.  5 U.S.C. § 552(d); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 293 (1979) ("Congress did not design the FOIA exemptions to be mandatory bars to disclosure.").  A post-selection release of sample records "does not, by itself, indicate any agency lapse," but does cast "doubt . . . on the agency's original exemption claim."  *Bonner*, 928 F.2d at 1152–53.

Finally, *Bonner* makes clear that, at least in sampling cases, "court review properly focuses on the time the determination to withhold is made" and thus courts should be chary of requests to consider the effect of events that post-date the agency's response to the requests at issue.  *Id*. at 1152.  In other words, "[r]epresentative sampling tests the propriety of the *agency's* FOIA processing," not whether the records would be released if they were processed today.  *Id*. at 1153.  Courts should not lightly "require an agency to adjust or modify its FOIA responses based on post-response occurrences" or else they risk creating "an endless cycle of judicially mandated reprocessing."  *Id*. at 1152; *see also Am. Civil Liberties Union v. United States Dep't of Justice*, 640 Fed. App'x 9, 13 (D.C. Cir. 2016) (same). After all, "the whole purpose of representative sampling is to reduce the administrative burden of large FOIA requests, and not to compound it." *Bonner*, 928 F.2d at 1153.

*Bonner*'s teaching is instructive for this case in several ways.  First, the FBI has done itself no favors by giving the selected samples exactly the kind of special treatment *Bonner* warns against.  As evident from the FBI's declaration, the Bureau re-reviewed the samples selected by the parties and altered its withholdings.  *See* 15th Hardy Decl. ¶ 149.[15]  That re-review resulted in, by the Court's count, release of previously withheld information on 94

---

[15]     The FBI's altered withholdings are described in footnotes 3, 22, 24, 26, 31, 33, 34, 35, 37, 38, 39, 40, 42, and 43 and in paragraphs 43 and 149 of the 15th Hardy Declaration.

individual pages of the sample and may have entailed removal of more than one redaction on

each of those pages.  The FBI's re-review also resulted in the application of new or different

FOIA exemptions to information on 95 sample pages.  The re-review thus casts doubt on the

utility of the sample in this case.  Moreover, in addition to those changes, the FBI decided, while

briefing in this action was ongoing, no longer to defend the application of certain exemptions and

released still more material previously withheld.  *See, e.g.,* 16th Hardy Decl. ¶ 28 (describing

how "[a]fter further review, the FBI" decided it would no longer assert Exemption 4 and would

release the withheld "pages to the Plaintiff in full").  DOJ wrongly asserts that disputes over

sample documents withheld at the time the sample was chosen but released to plaintiff as

briefing was ongoing, are now "moot."  Def.'s Reply Supp. Mot. Summ. J. & Opp'n Pl.'s Cross

Mot. Summ. J. ("Def.'s Reply") at 14, ECF No. 113.  As plaintiff correctly notes, this argument

disregards "the central holding in *Bonner*."  Pl.'s Reply at 15.  The question of whether now-

disclosed sample documents must be ordered released is indeed moot.  Yet, for all the reasons

described above, the agency must justify its initial withholdings and is not relieved of that burden

by subsequent release of documents.

　　　　Where possible, the Court has endeavored to rectify this problem.  For instance, when the

later-released records were made part of the summary judgment record and subject to review

directly, determination of whether the initial withholdings were in fact proper could occasionally

be made.  Nevertheless, with respect to certain exemptions challenged by plaintiff, the record is

insufficient to determine whether the agency's initial justifications were lawful, resulting in an

inability on this record to conclude whether the initial withholdings should be counted as an error

in calculating the error rate.

*Bonner's* teachings have implications for plaintiff as well.  He argues that certain

exemptions initially applied by the FBI have, with the passage of time, expired.  This argument,

however, runs counter to another central holding of *Bonner*, namely that "court review" of

agency withholdings "properly focuses on the time the determination to withhold is made."

*Bonner*, 928 F.2d at 1152.  As explained in more detail where relevant, DOJ will not be required

"to follow an endlessly moving target," *id*. at 1153 (internal quotation marks omitted) (quoting

*Meeropol*, 790 F.2d at 959), and this Court's review is constrained to determining the propriety

of the agency's withholdings at the time they were made.

### (ii)     *What Counts As An Error?*

Another nuance of the sampling method is defining what counts as an error.  Plaintiff

seems to suggest that any time an exemption is misapplied, that constitutes an error.  Circuit

caselaw, however, suggests that an error is an "unjustified withholding[]."  *Bonner*, 928 F.2d at

1154 n.13.  To be sure, the improper application of an exemption and an unjustified withholding

are often one and the same, but not always.  Commonly, a single redaction may be justified by

more than one FOIA exemption.  If, for example, a name has been redacted under both

Exemption 3 and Exemption 7(C), a determination that only Exemption 3 was applied in error

does not change the fact that the name is still properly withheld under another exemption.  Under

Circuit caselaw, this should not be counted as an error.  *Bonner*, 928 F.2d at 1154 n.13;

*Meeropol*, 790 F.2d at 960 (focusing on the number of documents "improperly withheld" rather

than the number of exemptions improperly applied in calculating the error rate).  This conclusion

aligns with the Court's authority in FOIA actions.  FOIA grants courts jurisdiction only to

"enjoin [an] agency from *withholding* records and to order the production of any agency records

*improperly withheld*." 5 U.S.C. § 552(a)(4)(B).  Only when all or part of a document has been "improperly withheld" will agency error be found.

**(iii)** *Identifying The Tipping Point*

Finally, the parties dispute the exact point at which an error rate moves from acceptable to "unacceptably high." *Meeropol*, 790 F.2d at 960.  In *Meeropol v. Meese*, the Circuit held that an "error rate of 25% . . . coupled with [a] finding by the district court that the [agency] had been 'intransigent'" warranted complete reprocessing of withheld records.  *Id*.  Similarly, in *Bonner*, the Circuit suggested that improper withholding of 19 documents out of a 63-document sample (or an error rate of just over 30%) may be unacceptably high with or without agency intransigence, but ultimately left that question to the district court.  *Bonner*, 928 F.2d at 1154.  While an error rate above 25% may thus more confidently be said to warrant full reprocessing of withheld records, *see Clemente v. F.B.I.*, 854 F. Supp. 2d 49, 59 (D.D.C. 2012) (holding that a 26.5% error rate required complete reprocessing), the Circuit has provided little guidance on where to set the threshold below that, *see, e.g., Schoenman v. FBI*, 763 F. Supp. 2d 173, 188 (D.D.C. 2011) (finding "no authority within this Circuit . . . providing that a 12.9% error rate" warrants complete reprocessing); *Hunton*, 346 F. Supp. 3d at 87 (refusing to order complete reprocessing after locating a "miniscule" error rate of just under two percent); *Citizens for Responsibility & Ethics in Washington v. United States Dep't of Justice*, 48 F. Supp. 3d 40, 52 (D.D.C. 2014) (refusing to order complete reprocessing after locating an "error rate of just over one percent").  That the Circuit in the past has not only considered the raw error rate, but also the good or bad faith of the agency at issue, means this may be another area of law that calls for "th'ol' 'totality of the circumstances' test." *United States v. Mead Corp*., 533 U.S. 218, 241 (2001) (Scalia, J. dissenting).  Although such tests may be "feared by litigants who want to know

33

what to expect," *id.*, given the innumerable variables that might come into play when courts condone a sampling approach—sample size, level of confidence the sample is representative of the whole, number of exemptions claimed per document, the conduct of the litigants and complexity of the requests, to name a few—a hard and fast rule seems particularly ill-suited to serve FOIA's aims.  The Circuit has chosen not to draw a precise line, and until it does so, that choice will be treated as deliberate.

***

Having settled these disputes, the sampling used in this case is now discussed in detail. To prepare this case for the sampling analysis described above, the parties agreed to divide the sample into two parts.  JSR (Oct. 20, 2017).  Those parts are discussed in order.

### 2.   *Part I of Sample*

Part I of the sample is designed to test the agencies' application of FOIA exemption 7(A), which exempts from disclosure "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A). As plaintiff's requests began to flow into the FBI, the Domestic Terrorism Unit ("DTU") of the agency's Counterterrorism Unit took notice.  15th Hardy Decl. ¶ 40.  Owing to the number and interrelatedness of plaintiff's requests, the FBI took the prudent step of having DTU coordinate potential records releases.  *Id.*  Although this was not "standard protocol," this step allowed DTU to ensure that "operational techniques, confidential human sources, . . . and ongoing investigations were protected throughout all investigations implicated by Plaintiff's requests." *Id.*  As part of this special protocol, DTU was responsible for reviewing all responsive records to determine "whether FOIA exemption [7(A)] was applicable."  *Id.* ¶ 41.  As a result of this

review, the FBI withheld in full approximately 460,054 pages of responsive records under 7(A) "because they related to pending investigations." *Id*. ¶ 47. Since this exemption was invoked to justify the withholding of a large number of records, the parties agreed to create a special sample to test the validity of its application. For the sample, plaintiff selected five of his requests that turned up documents withheld in full under Exemption 7(A), and the parties decided to brief whether its applications "were proper at the time they were made *as opposed to at the time of briefing*." JSR (Oct. 20, 2017) ¶ 1 (emphasis in original). Specifically, plaintiff selected his requests for information pertaining to himself (FOIA Request No. 1167292-000), the organization known as Compassion Over Killing ("COK") (FOIA Request No. 1143759-000), the murder of Hyram Kitchen (FOIA Requests Nos. 1159897-000 and 1159897-001), William Edward Potter (FOIA Request No. 1179996-000), and Lindsay Parme (FOIA Request No. 1156661-000). 15th Hardy Decl. ¶ 7.

a.  ***Categorical Application of 7A Exemption***

FOIA exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Exemption 7(A) "reflects the Congress's recognition that law enforcement agencies have legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it comes time to present their case." *Citizens for Responsibility and Ethics in Washington v. United States Dep't of Justice* ("*CREW*"), 746 F.3d 1082, 1096 (D.C. Cir. 2014) (internal quotation marks and alterations omitted) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)). Plaintiff does not contest that the records at issue were "compiled for law enforcement

purposes." 5 U.S.C. § 552(b)(7).[16]  To justify its withholdings under Exemption 7(A), "DOJ

must therefore demonstrate that disclosure (1) could reasonably be expected to interfere with

(2) enforcement proceedings that are (3) pending or reasonably anticipated." *CREW*, 746 F.3d at

1096 (internal quotation marks omitted) (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533,

1540 (D.C. Cir 1993)).  Records compiled as part of "[a]n ongoing criminal investigation" thus

clearly "trigger[] Exemption 7(A)" so long as that "investigation continues to gather evidence for

a possible future criminal case, and that case would be jeopardized by the premature release of

that evidence." *Id*. at 1098 (quoting *Juarez v. Dep't of Justice*, 518 F.3d 54, 59 (D.C. Cir.

2008)).

　　　　An agency may "satisfy its burden of proof" under Exemption 7(A) "by grouping

documents in categories and offering generic reasons for withholding documents in each

category." *Id.* at 1098 (internal quotation marks omitted) (quoting *Maydak v. United States Dep't

of Justice*, 218 F.3d 760, 765 (D.C. Cir. 2000)).  An agency opting for such "[c]ategorical

withholding . . . has a three-fold task." *Id.* (quoting *Bevis v. Dep't of State*, 801 F.2d 1386,

1389–90 (D.C. Cir. 1986)).  The agency (1) "must define its categories functionally"; (2) "must

conduct a document-by-document review in order to assign documents to the proper category";

and (3) "must explain to the court how the release of each category would interfere with

enforcement proceedings." *Id*.  A category is functional if "it allows the court to trace a rational

---

[16]　　　　To show that the records at issue were compiled for law enforcement purposes, "the FBI need only
establish a rational nexus between the investigation and one of the agency's law enforcement duties and a
connection between an individual or incident and a possible security risk or violation of federal law."  *Blackwell v.
FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (internal quotation marks omitted).  The FBI asserts that "[t]he investigative
files at issue[] were compiled during the FBI's criminal investigation into Plaintiff and other third parties' crimes
involving potential terrorism activities related to animal rights and ecological extremism," 15th Hardy Decl. ¶ 51,
and that assertion is "entitled to deference," *Blackwell*, 646 F.3d at 40.  The records that make up Part I of the
sample thus clear the Exemption 7 threshold.

link between the nature of the document and the alleged likely interference." *Bevis*, 801 F.2d at 1389.

The FBI's declaration explains the categorical withholdings under Exemption 7(A) here in detail.  First, to satisfy its burden of showing that the withheld documents relate to "enforcement proceedings that are . . . pending or reasonably anticipated," *CREW*, 746 F.3d at 1096 (quoting *Mapother*, 3 F.3d at 1540), the declarant notes that all of the documents withheld in the Part I sample "were compiled during the FBI's criminal investigation into Plaintiff and other third parties' crimes involving potential terrorism activities related to animal rights and ecological extremism."  15th Hardy Decl. ¶ 51.  As explained above, "[d]ue to the large amount of responsive records involved and the interrelatedness of the material," the FBI coordinated its review of the responsive records across the agency.  16th Hardy Decl. ¶ 48.  Those "coordinated efforts [were] critical in this particular case" because the FBI feared that release of certain pieces of information "without considering the context and connection of those pieces of information to other ongoing efforts" could "allow Plaintiff to . . . gain access to a large portion of information regarding ongoing investigative efforts."  *Id*.  The potentially threatened investigative efforts included investigations "in the animal rights activist arena" that were pending at the time the FBI applied Exemption 7(A).  *Id*.  While the withheld documents may not have all come from active investigative files, "the FBI exempted information pursuant to Exemption 7(A) only when a particular Field Office or [DTU] advised release of the information could reasonably be expected to interfere with ongoing enforcement proceedings against some of the subjects at issue in [this] litigation, or other subjects, including individuals or organizations."  *Id*.

In other words, the FBI reviewed all documents with an eye toward the so-called "mosaic" effect.  *Id*.  The D.C. Circuit and the Supreme Court have recognized that an

"individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself."  *Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980); *see also CIA v. Sims*, 471 U.S. 159, 178 (1985); *Ctr. for Nat'l Sec. Studies v. United States Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003).  The potential for such a mosaic effect and the need to guard against such inadvertent leakage of otherwise exempt information is especially present in a case like this one, in which a great number of requests are made that all touch on or very near a single topic of investigative interest for the FBI.[17]

Plaintiff recognizes that the investigations potentially put at risk of improper disclosure by release of information in the Part I sample "were not necessarily on one of the five subjects challenged by Plaintiff."  Pl.'s Summ. J. Reply at 18 (quoting 16th Hardy Decl. ¶ 48).  He complains, however, that the FBI's description of those investigations is "vague."  *Id*.  Of course, "[t]he FBI need not submit declarations that reveal the exact nature and purpose of its investigations in order to satisfy FOIA—Exemption 7(A) exists precisely to shield that sort of revelation."  *Blackwell v. FBI*, 680 F. Supp. 2d 79, 94 (D.D.C. 2010) (citing *Swan v. SEC*, 96 F.3d 498, 500 (D.C. Cir. 1996)).  By describing the pending investigations that might be impacted by disclosure as "investigative efforts . . . in the animal rights activist arena," 16th Hardy Decl. ¶ 48, and noting that Part I records were related to "the FBI's investigation of potential terrorist acts related to animal rights and ecological extremism," 15th Hardy Decl. ¶ 46, the FBI has met its burden to show that the records relate to "enforcement proceedings that are . . . pending or reasonably anticipated," *CREW*, 746 F.3d at 1096.

---

[17]     Indeed, the need for the FBI to address this very concern led to the multi-year stay of this action.  Stay Order at 2.

Showing that the records relate to pending or anticipated enforcement actions, however, is not enough.  The agency must also show that release of the records "could reasonably be expected to interfere" with those investigations.  5 U.S.C. § 552(b)(7)(A).  As noted above, the FBI has attempted to do so by invoking the "categorical" method of withholding.  Step one in that method requires the FBI to define "functionally" the categories of records it withheld. *CREW*, 746 F.3d at 1098.  Broadly, the FBI divides the records withheld under Exemption 7(A) into two categories: (1) Evidentiary/Investigative Materials and (2) Administrative Materials, and then subdivided each of those categories into three subcategories.  15th Hardy Decl. ¶ 56. With respect to evidentiary/investigative materials, the FBI withheld: (1) exchanges of information between the FBI and other local, state, and federal law enforcement agencies that "would disclose evidence, investigative information, and criminal intelligence" developed by those agencies, *id*. ¶ 59; (2) information concerning physical or documentary evidence that was "gathered during the pendency" of various investigations, *id.* ¶ 60; (3) statements of confidential sources and witnesses, *id* ¶ 61.  As for administrative materials, the FBI withheld: (1) reporting communications that "permit an agency to monitor the progress of an investigation and to facilitate its conduct," *id.* ¶ 63; (2) miscellaneous administrative documents that "were used throughout" investigations, but contain information and are organized in such a way that would "reveal[] information of investigative value," *id.* ¶ 64; and (3) administrative instructions that "would disclose specific investigative procedures" like which FBI field offices have been assigned which investigative tasks, *id*. ¶ 65.

Step two requires the FBI to "conduct a document-by-document review in order to assign documents to the proper category."  *CREW*, 746 F.3d at 1098.  The FBI avers that "providing a document-by-document description or listing of the records responsive to Plaintiff's request[s]

. . . would . . . undermine[] the very interests that the FBI [seeks] to protect" by invoking

Exemption 7(A), and thus the declarant instead "described the types of responsive records" that

were being withheld because they were contained in "pending investigative files." 15th Hardy

Decl. ¶ 54. These records included FD-1057s, known as Electronic Communications ("ECs"),

which are used to "communicate within the FBI" and to "record and disseminate

intelligence/investigative information and for general investigation administration purposes." *Id*.

¶ 54(a). Other records withheld were FD-302s, which are "internal FBI forms in which evidence

is often documented, usually as a result of FBI interviews." *Id*. ¶ 54(b). The FBI also withheld a

variety of other types of records, including: "Letterhead/Memorand[a]," which provide

"investigative updates . . . and typically accompany[y] an EC, *id*. ¶ 54(c); FD-36s, which are

"utilized to report investigative details from" FBI field offices to FBI headquarters, *id.* ¶ 54(d);

"Fingerprint Cards," which are retained by the FBI "in connection with arrests, federal

employment, naturalization or military service," *id*. ¶ 54(e); "State and Local Law Enforcement

Documents," *id*. ¶ 54(f); "Other Investigative Documents Utilized for Investigative Purposes,"

which include "various types of documents reflecting information and evidence gathered during

an FBI investigation," *id.* ¶ 54(g); "Non-Public Court Documents," *id*. ¶ 54(h); FD-340

Envelopes, which "are used to organize and store documents" and "usually contain handwritten

notes of interviews, photographs, and other various evidentiary documents," *id*. ¶ 54(i);

"Handwritten Interview Notes," *id*. ¶ 54(j); photographs "used to identify subjects of

investigations," *id*. ¶ 54(k); "Intelligence Write-ups," which are used to "document/disseminate

relevant intelligence information," *id.* ¶ 54(l); FD-448s, which are "used to identify information

sent via facsimile to individuals within or outside the FBI," *id*. ¶ 54(m); "FD-515[s], 542[s],

[and] Accomplishment Report[s]," which are used to report investigative accomplishments such

40

as "arrest[s], conviction[s], sentencing[s], asset seizure[s]," etc., *id.* ¶ 54(n); "News Articles,"
which were "located and printed from public websites, *id.* ¶ 54(o); FD-525s, which are forms
used to "request[] development, scanning and/or printing of any film or digital media," *id.*
¶ 54(p); FD-7s, which are "utilized to submit complainant information collected during a phone
call received after normal business hours," *id.* ¶ 54(q); emails "discussing the direction or focus
of an investigation, *id.* ¶ 54(r); and "Documents Implementing Sensitive Investigative
Techniques," which cannot be described in detail because to do so "would reveal [sensitive]
technique[s] or sensitive data concerning [those] technique[s]," *id.* ¶ 54(s).  Each of these
categorically withheld documents falls into one or both of the "two categories" functionally
defined above.  *Id.* ¶ 56–57.

        The final step in the categorical method is for the agency to "explain to the court how the
release of each category would interfere with enforcement proceedings."  *CREW*, 746 F.3d at
1098.  The FBI does so.  As to exchanges between the FBI and other law enforcement agencies,
the agency believes that their release "would have identified the FBI's investigative interest[s,]
. . . revealed the scope and focus" of FBI investigations, "tipped off individuals who were of
interest to law enforcement" and finally given suspects or targets "the opportunity to destroy
evidence" or otherwise avoid detection.  15th Hardy Decl. ¶ 59.  Similar concerns animated the
FBI's withholding of information concerning physical or documentary evidence.  *Id.* ¶ 60.  As
the FBI notes, "[o]nce subjects become aware of the FBI's interest in their activities, they could
. . . take[] actions to conceal their activities, evade detection, and/or suppress or fabricate
evidence."  *Id.*  As to confidential witness and source statements, the FBI expresses concern that
release could result in "retaliation" against those cooperating sources.  *Id.* ¶ 61.  With respect to
the "administrative materials" withheld, the FBI justifies withholding reporting communications

by noting that their release "would have revealed the nature and scope of" ongoing investigations by revealing "the investigative steps taken to obtain witness and source interviews; techniques and investigative methods used to compile and/or solicit information from various sources; and any potential or perceived challenges in the investigations." *Id*. ¶ 63. The FBI similarly withheld miscellaneous administrative documents to avoid disclosing "information of investigative value" that "could have undermined . . . pending and prospective prosecutions." *Id*. ¶ 64. Finally, the FBI notes that releasing "administrative instructions" would have "permitted subjects or individuals of investigative interest to anticipate law enforcement actions and to alter, destroy, or fabricate evidence." *Id.* ¶ 65

Plaintiff, relying principally on *Citizens for Responsibility & Ethics in Washington v. United States Department of Justice* ("*CREW*"), 746 F.3d 1082 (D.C. Cir. 2014), takes issue with what he asserts is the FBI's failure to "provide any specific information linking" the subjects of his Part I requests with "other pending or prospective law enforcement proceedings." Pl.'s Opp'n at 22–23. Plaintiff's reliance is misplaced. In *CREW*, the FOIA request at issue sought information about an investigation of former Speaker of the House, Tom DeLay, that had been one part of a "wide-ranging public corruption investigation." 746 F.3d at 1087. The request came after DeLay had publicly announced information he received that he would not be charged. *Id*. Despite the fact the investigation into DeLay was closed, DOJ invoked Exemption 7(A) to withhold categorically all records, arguing their release would hamper "all related criminal investigations" underway as part of the public-corruption dragnet. *Id*. at 1097. The D.C. Circuit, however, found reason to doubt whether those investigations remained ongoing: "more than two-and-a-half years had passed since the FBI filed its initial declaration in the district court; the DOJ provided only 'vague' mention in the declaration that investigations were ongoing; DOJ

counsel failed to cite any ongoing proceedings when questioned about them at oral argument;" and DeLay's various associates known to have been under investigation had been convicted and sentenced since DOJ filed its declaration. *Manning v. United States Dep't of Justice*, 234 F. Supp. 3d 26, 35 (D.D.C. 2017) (citing *CREW*, 746 F.3d at 1096–99). In light of these doubts, the Circuit held that "without more information about the degree of overlap" between the DeLay investigation and the purported pending investigations into others, it could not say that the "circumstances characteristically support an inference that disclosure would interfere with any pending enforcement proceeding." *CREW*, 746 F.3d at 1099 (internal quotation marks omitted) (quoting *Nation Magazine*, 71 F.3d at 893 (D.C. Cir. 1995)).

No such doubts exist in this case. The FBI has consistently asserted that, at the time the records were processed—the time at which, by the parties' agreement, the propriety of the exemption must be tested, *see* JSR (Oct. 20, 2017)—investigations were ongoing into "potential terrorism activities related to animal rights and ecological extremism." 15th Hardy Decl. ¶ 51. The FBI has also detailed how the determination was made that the Part I records "overlap[ped]" with those ongoing efforts, *CREW*, 746 F.3d at 1099, explaining that "the FBI exempted information pursuant to Exemption 7(A) only when a particular Field Office or [DTU] advised release of the information could reasonably be expected to interfere with ongoing enforcement proceedings against some of the subjects at issue in [this] litigation, or other subjects, including individuals or organizations." 16th Hardy Decl. ¶ 48. Moreover, the overlap is self-evident given the singular focus of plaintiff's requests on animal rights organizations and activists that have been affiliated with events known to have been under investigation by the FBI. Pl.'s Opp'n at 24. Indeed, the FBI avers that one subject of a Part I request, the Hyram Kitchen murder, is still under active investigation by another agency. 16th Hardy Decl. ¶ 55 & n.10. The FBI's

detailed description of the categories of records it withheld and the logical link between the

subjects at issue and the ongoing investigations into "potential terrorism activities related to

animal rights and ecological extremism," 15th Hardy Decl. ¶ 51, combine to "characteristically

support an inference that disclosure would interfere with . . . pending enforcement

proceeding[s]." *CREW*, 746 F.3d at 1099 (internal quotation marks omitted) (quoting *Nation*

*Magazine*, 71 F.3d at 893).  DOJ is thus awarded summary judgment with respect to the

propriety of withholding Part I of the sample under FOIA Exemption 7(A).

### b.   *Expiration of Exemption 7(A)*

Although plaintiff concedes that "[t]he purpose of the sampling procedure is to evaluate

the accuracy of the agency's withholdings at the time they were made," he claims that "[i]f an

investigation is no longer prospective or pending at the time of the Court's decision,

withholdings under Exemption 7(A) cannot be accepted."  Pl.'s Opp'n at 28.  He thus requests

"that the Court . . . order the FBI to re-review the pending status of each investigation," the

pendency of which prevented disclosure of Part I documents.  *Id*. at 29.

His argument highlights a disconnect in legal principles governing application of

Exemption 7(A) versus those in the sampling context.  True, the Circuit has held that

"Exemption 7(A) is temporal in nature," and has explained that the relevant law enforcement

proceeding "must remain pending at the time of [the court's] decision, not only at the time of the

initial FOIA request."  *CREW*, 746 F.3d at 1097.  The Circuit has also stressed, however, that in

order serve the "purpose of representative sampling," *i.e.* "reduc[ing] the administrative burden

of large FOIA requests," an agency action "ordinarily should be upheld" if the Court "uncovers

no excisions or withholding improper when made."  *Bonner*, 928 F.2d at 1153.

This tension between two Circuit opinions, however, is less troubling on closer inspection.  In a typical FOIA action, the result is often court-ordered reprocessing of all responsive records upon a finding that an exemption has been misapplied.  Where, however, the number of responsive records is massive enough to warrant a sampling procedure, courts have shown special solicitude to the need to "reduce a voluminous FOIA exemption case to a manageable number of items."  *Bonner*, 928 F.2d at 1151.  That sensitivity is proper since the time necessary to process tens or hundreds of thousands of documents makes such actions particularly susceptible to being thrown into "an endless cycle of judicially mandated reprocessing" if courts order agencies to update their disclosures to account for post-response events.  *Id*. at 1152.  This case is a perfect example—DOJ sought and was awarded a three-year stay to give the relevant agencies the opportunity to process the mountain of records they had found.  To demand that DOJ undertake the Sisyphean task of checking that any exemptions properly applied during that three-year stay remain valid now would run counter to both Circuit caselaw and common sense.  Should plaintiff wish to determine whether any investigations pending at the time of the FBI's responses have since expired, clearing the way for further disclosures by the Bureau, he may of course file a new FOIA request, "but if he does, he will stand in line behind other FOIA requesters."  *Bonner*, 928 F.2d at 1153.  This Court will not indulge his request to be "place[d] . . . at the head of the current [FBI] FOIA queue."  *Id*.

### c.  *Error Rate for Part I*

Given the conclusion that Exemption 7(A) was properly applied to all documents responsive to the requests selected as part of the Part I sample, calculation of the error rate should be easy enough.  Nevertheless, the FBI's re-review of the Part I sample and subsequent release of "an additional 208 pages," in full or in part, somewhat complicates matters.  15th

Hardy Decl. ¶ 149.  In the end, however, this later release does nothing to undermine the propriety of the FBI's initial withholdings.  For one, the FBI asserts that "[a]t the time the FBI completed its review of these records, release of any of [them] would have risked disruption of ongoing enforcement proceedings."  *Id*.  Thus, the FBI has asserted that its justifications for withholding all other Part I records, which the Court has determined were valid, apply with equal force to the records the agency determined could later be released.  Given that the agency's burden in a sampling case is to "justify its initial withholdings," *Bonner*, 928 F.2d at 1154, the FBI has done so.[18]  DOJ is therefore awarded summary judgment as to the entire universe of records withheld categorically pursuant to Exemption 7(A).[19]

### 3.      *Part II of the Sample*

Part II of the sample was designed to test the remaining exemptions asserted by the FBI. Plaintiff selected 401 individual pages that had been released to him in part while the FBI selected a random sample of 100 pages that had been withheld in full under various FOIA exemptions.  JSR (Oct. 20, 2017) at 2.  The FBI asserted exemptions 1, 3, 4, 5, 6, 7(A), 7(C),

---

[18]      In any event, even counting all 208 pages as errors would likely be insufficient to create an "unacceptably high" error rate.  *Meeropol*, 790 F.2d at 960.  The denominator for calculation of the Part I error rate is quite large. For the two requests about plaintiff and Compassion Over Killing, the FBI has averred that 1,816 pages were categorically withheld under Exemption 7(A), 15th Hardy Decl. ¶¶ 12, 17, and that an additional 4,694 pages were withheld under Exemption 7(A) for the request about Lindsay Parme plus twelve others, 15th Hardy Decl., Ex. DD at 3, ECF No. 97-9, without specifying the number, if any, responsive to the Lindsay Parme request.  With respect to the Hyram Kitchen Murder and William Edward Potter requests, the FBI does not attempt to explain how many responsive pages were withheld under Exemption 7(A).  *Id.* ¶¶ 18–29.  The bare minimum number of pages withheld from the Part I requests is thus 1,816, though the total may be larger if the record were clearer as to the number of withheld records for the Lindsay Parme, Hyram Kitchen Murder and William Edward Potter requests. Yet, even in the worst-case scenario—accepting that the total number of Part I records was the bare minimum 1,816 and further accepting that every one of the 208 later-released pages were initially improperly withheld—the error rate would be just shy of 11.5%.  This would be insufficient to warrant complete reprocessing of withheld Part I records.  *See Schoenman*, 763 F. Supp. 2d at 187–88 (finding "no authority within this Circuit . . . providing that a 12.9% error rate" warrants complete reprocessing).

[19]      In an attempt to preserve any alternative exemption claims, the FBI looked through the documents withheld pursuant to its categorical application of Exemption 7(A) and asserted several other exemptions. 15th Hardy Decl. ¶ 68; *see Maydak*, 218 F.3d at 764 ("[A]s a general rule, [DOJ ] must assert all exemptions at the same time, in the original district court proceedings.").  The determination that exemption 7(A) was properly applied obviates any need to determine the propriety of those additional claimed exemptions.

7(D), and 7(E) to justify its withholdings in the sample.  Although FOIA "mandates that an agency disclose records on request, unless they fall within one of nine exemptions," *Milner*, 562 U.S. at 565, plaintiff believes the FBI may have nonetheless withheld responsive records in the absence of a justifying exemption by "blackballing" files or improperly excluding them.  These contentions are discussed first before turning to the FBI's withholdings under FOIA's exemptions.

a.    ***Blackballed Files***

Plaintiff first complains that the FBI may have "blackballed" certain files responsive to his requests.  Plaintiff cites an article allegedly quoting an FBI spokesman, who describes "blackballing" as a term generally used "to describe a file (not a request) that initially looked responsive but upon review" turned out not to be.  Pl.'s Opp'n at 3; *see also* Pl.'s Opp'n, Ex. 7, ECF No. 105-2.  He also submits a printout of a PowerPoint that apparently instructs FBI officials on what files should be blackballed.  Pl.'s Opp'n, Ex. 8, ECF No. 105-2.  He points to two additional documents, processing notes for two of his FOIA requests, that mention the term "blackballed" in attempt to show the method was used by the FBI in this case.  Pl.'s Opp'n, Exs. 9, 10, ECF No. 105-2.  Plaintiff states that he "has no way of knowing the full extent of the FBI's blackballing files in this case and therefore cannot make a discrete challenge for each file" that may have been unlawfully withheld.  Pl.'s Opp'n at 4.

This argument suffers from several flaws.  First, the documents to which plaintiff points to establish that the FBI "blackballed" files in this case relate to searches not at issue in this litigation.  16th Hardy Decl. ¶ 13.  Second, as the FBI explains, "[t]he term 'blackball' was used colloquially within RIDS years ago to reference files that were not being considered for processing" because they "were ultimately found to be not responsive due to a variety of

reasons." *Id*. The FBI is under no obligation to inform the plaintiff that it considered but did not release non-responsive records. *Wilson v. United States Dep't of Transp.*, 730 F. Supp. 2d 140, 156 (D.D.C. 2010). Third, the training material plaintiff submitted contains "obsolete information." 16th Hardy Decl. ¶ 13. Finally, and most importantly, the FBI avers that in this case it "*only* redacted information pursuant to [FOIA] exemptions." 16th Hardy Decl. ¶ 13. Plaintiff presents nothing that calls that assertion into question, and his request to order the FBI "to either deem each blackballed file as responsive or else provide sufficient justification as to why the decision to blackball the file was proper," is denied. Pl.'s Opp'n at 4.

> **b.** *Exclusions*

Section 552(c) of the FOIA permits agencies to "treat . . . records as not subject to the requirements" of the FOIA when, *inter alia*, a request involves access to "records or information compiled for law enforcement purposes" the disclosure of which "could reasonably be expected to interfere with enforcement proceedings" to the extent that (1) "the investigation or proceeding involves a possible violation of criminal law," (2) "there is reason to believe" that "the subject of the investigation or proceeding is not aware of its pendency," and (3) "disclosure of *the existence* of the records could reasonably be expected to interfere with enforcement proceedings." *See* 5 U.S.C. §§ 552(b)(7)(A), 552(c)(1) (emphasis added). Section 552(c) likewise permits agencies to "treat . . . records as not subject to the requirements" of FOIA whenever someone requests "informant records maintained by a criminal law enforcement agency." *Id*. § 552(c)(2). Finally, § 552(c) permits the FBI to issue a so-called "Glomar" response, in which it refuses "to confirm or deny the existence of any responsive records," *Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 425–26 (D.C.Cir.2013), to any request for records "pertaining to foreign intelligence or

counterintelligence, or international terrorism" as long as "the existence of the records remains classified information," 5 U.S.C. § 552(c)(3).

Plaintiff speculates that the FBI invoked one or more of these exclusions based on search slips he obtained via FOIA requests not at issue in this litigation. Those search slips note that certain documents had been "excluded." *See* Pl.'s Opp'n, Ex. 11, ECF No. 105-3. The FBI explains that it used the term "excluded" on those search slips not to refer to exclusion under Section 552(c), but "to account for the number of pages that were not processed because they are exact copies of documents already processed." 16th Hardy Decl. ¶ 15. Nevertheless, because plaintiff raised the specter of the application of one or more of the Section 552(c) exclusions, pursuant to the FBI's standard policies, the FBI has submitted *ex parte*, *in camera* a declaration "to respond to this portion of Plaintiff's challenges." *Id.* ¶ 14. The Court has conducted a full review of that declaration and, if such an exclusion in fact were employed, it was and continues to remain, amply justified.

### c. *Exemption 1*

FOIA exempts from disclosure "matters that are . . . (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The FBI invoked this exemption to withhold information contained on one page of the Part II sample, FBI *Vaughn* Index at 45, that was classified under Executive Order ("E.O.") No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009), which controlled classification of national security information at the time the records were produced, 15th Hardy Decl. ¶ 74. In order to show that the redacted information has been "properly classified" and is thus exempt from disclosure, 5 U.S.C. § 552(b)(1), DOJ must describe how it meets both the "substantive and

procedural criteria for classification" laid out by the E.O., *Judicial Watch, Inc. v. United States Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013); *see also* E.O. No. 13,526.

The FBI's declarant "made certain that all procedural requirements of E.O. 13526 were followed." 15th Hardy Decl. ¶ 76. He also described how he "personally and independently examined the FBI information withheld pursuant to Exemption 1" and determined that it met the substantive requirements "to warrant classification at the 'Secret' level" pursuant to the E.O. *Id.* ¶ 77. In particular, he determined that the classified information pertained to "intelligence activities (including covert action), intelligence sources or methods, or cryptology." *Id.*; *see also* E.O. 13,526 § 1.4(c). The FBI declarant explained that release of the information protected by Exemption 1 "would reveal intelligence activities and methods used by the FBI against targets" of investigations, or would "disclose the intelligence gathering capabilities of the activities or methods directed at targets." 15th Hardy Decl. ¶ 80. The declarant went into further detail in his subsequent declaration, explaining that "the FBI withheld information pursuant to Exemption 1 to protect intelligence methods utilized by the FBI for gathering intelligence data," disclosure of which "would reveal actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations; identify a target of a foreign counterintelligence investigation; and/or disclose the intelligence gathering capabilities of the activities or methods directed at specific targets." 16th Hardy Decl. ¶ 18.

Plaintiff contends that "[t]he FBI's declaration is inadequate as to Exemption 1 because it" is too conclusory, and requests that the record purportedly subject to Exemption 1 be examined by the Court *ex parte in camera*. Pl.'s Opp'n at 8. Plaintiff is wrong as to the adequacy of the FBI's declaration. For Exemption 1, "[i]f an agency's statements supporting [this] exemption contain reasonable specificity of detail as to demonstrate that the withheld

information logically falls within the claimed exemption and evidence in the record does not

suggest otherwise, . . . the court should not conduct a more detailed inquiry to test the agency's

judgment and expertise or to evaluate whether the court agrees with the agency's opinions."

*Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009).  "Indeed" courts in this Circuit

"have consistently deferred to executive affidavits predicting harm to national security, and have

found it unwise to undertake searching judicial review."  *DiBacco v. Dep't of the Army*, 926 F.3d

827, 835 (D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Ctr. for Nat'l Sec. Studies*,

331 F.3d at 927).  DOJ 's detailed affidavits, which clearly explain both how and why the

information was properly classified, have carried its "light" burden in this context.  *Am. Civil*

*Liberties Union*, 628 F.3d 612, 624 (D.C. Cir. 2011).

 Moreover, while *in camera* review is an option, FOIA "does not compel the exercise of

that option" and the decision whether to undertake such review is committed to the district

court's "broad discretion."  *Id*. at 626 (internal quotation marks omitted) (quoting *Ctr. for Auto*

*Safety v. EPA*, 731 F.2d 16, 20 (D.C. Cir. 1984)).  Courts must be particularly loath to invoke

that discretion "in national security situations like this case" and "should not resort to" *in camera*

inspection of Exemption 1 documents "routinely on the theory that 'it can't hurt.'"  *Id*. (quoting

*Larson*, 565 F.3d at 870 (D.C. Cir. 2009)).  Given the adequacy of the FBI's declarations, the

plaintiff's invitation to second-guess the FBI's prediction of harm to the national security is

rejected.  DOJ is entitled to summary judgment as to the FBI's application of Exemption 1.

   **d.**  *Exemption 3*

 FOIA Exemption 3 covers records "specifically exempted from disclosure by [a] statute"

other than FOIA, "if that statute" either "requires that the matters be withheld from the public in

such a manner as to leave no discretion on the issue[] or . . . establishes particular criteria for

withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).

Exemption 3 is not like FOIA's other exemptions "because 'its applicability depends less on the

detailed factual contents of specific documents.'" *DiBacco*, 926 F.3d at 835 (quoting *Morley v.*

*CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007)). The task for the Court in analyzing an agency's

Exemption 3 claims is relatively simple: determine whether the statute in question "is one of

exemption as contemplated by Exemption 3" and then determine whether "the withheld material

falls within the statute." *Larson*, 565 F.3d at 865. The FBI relies on four statutes as exempting

records, in part or in full, within Part II of the sample. These statutes are discussed in turn.

**(i)**     ***Title III***

First, the FBI relies on Title III of the Omnibus Crime Control and Safe Streets Act of

1968 ("Title III"), 18 U.S.C. §§ 2510 *et seq.*, to withhold information on 19 pages of the Part II

sample. Title III governs the procedure for law enforcement interception of "wire, oral, or

electronic communications." 18 U.S.C. § 2516. The law is well settled that "Title III falls

squarely within" Exemption 3's ambit. *Lam Lek Chong v. United States Drug Enforcement*

*Agency*, 929 F.2d 729, 733 (D.C. Cir. 1991). The question is thus whether the withheld material

"falls within the statute." *Larson*, 565 F.3d at 865. The FBI withheld information under the

statute "to protect the target" of Title III wiretaps and "analysis" of communications intercepted

under Title III. 15th Hardy Decl. ¶ 84. More specifically, "the withheld information includes

targets, types and dates of intercepts, numbers of intercepts on a particular target, types of

information and information obtained via lawfully authorized Title III" interceptions. 16th

Hardy Decl. ¶ 21.

This information falls within Title III. Except in limited circumstances in which the

Judge who authorized a Title III intercept may disclose the contents of the interception to the

52

"parties overheard, *see* 18 U.S.C. § 2518(8)(d), 10(a), use and disclosure" of those contents "is

governed by section 2517 of the statute." *Lam Lek Chong*, 929 F.2d at 732. Section 2517 in turn

strictly constrains the circumstances in which the contents of an interception may be disclosed.

18 U.S.C. § 2517(1)–(8). Moreover, Title III not only protects the contents of court-authorized

wiretaps, but also the applications for and orders granting such authorization. *Id.* § 2518(8)(b);

*see also Wright v. U.S. Dep't of Justice*, 121 F. Supp. 3d 171, 181 (D.D.C. 2015) ("The plain

language of the statute requires Courts to seal Title III applications and orders through the

mandatory verb 'shall,' and permits disclosure 'only upon a showing of good cause before a

judge of competent jurisdiction.'"). The FBI adequately explains that the redacted information

related to both the fact of, and information gleaned from, particular Title III intercepts. 16th

Hardy Decl. ¶ 21. Title III strictly limits the ways in which such information may be disclosed

and, therefore, exempts it from FOIA disclosure.

The FBI initially applied a small number of redactions, pursuant to Title III, on four

pages of the sample but, upon re-review, released the information. 15th Hardy Decl. at 38 n.22

(explaining that "Exemption (b)(3)-1 is no longer applicable" as to "page[] Shapiro-179308);

16th Hardy Decl. ¶ 21 ("[U]pon further review, the FBI re-processed Bates pages Shapiro-48862,

139196, [and] 179471 to release additional information" previously withheld under Title III).

The FBI does not attempt to justify its initial withholdings and analysis of three of the four

unredacted pages released to plaintiff available in the record shows those initial withholdings

were improper. *See* 16th Hardy Decl., Ex. A at 15, 24, 26.[20] Those pages reference intercepts,

but do not reveal their targets or their content. *Id.* Absent further explanation of the propriety of

the initial withholding, the Court concludes that information on those pages was improperly

---

[20] The fourth page on which information was initially redacted pursuant to Title III but later released has not
been submitted by either party.

withheld.  As the information has already been released, there is no need to order its disclosure.

Nevertheless, the four errors will be counted in determining the error rate within Part II of the

sample.

**(ii)**     ***Grand Jury***

Second, the FBI initially relied on Federal Rule of Criminal Procedure 6(e) to withhold in

part or in full 57 pages of the Part II sample.  *See* FBI *Vaughn* Index.  Now, "[a]fter further

review, the FBI is no longer asserting Exemption [3] pursuant to Rules of Criminal Procedure

Rule 6(e) on the sample pages."  16th Hardy Decl. ¶ 22.  Following this re-review, the FBI

released additional information on twelve of the sample pages but does not explain why

information from all 57 pages was not released.  16th Hardy Decl. at 10 n.3.  Plaintiff complains

that DOJ "has not provided any further justification as to why its prior withholding[s] were

justified."  Pl.'s Reply at 10.  As alluded to above, questions thus remain.  *See* Part III.C.1.b.i.,

*supra*.  Does DOJ believe its initial assertion of the exemption in this context was valid?  This

seems unlikely in this context given that Federal Rule of Criminal Procedure 6(e) *requires* that

"matter[s] occurring before the grand jury" remain confidential except in very limited

circumstances.  Fed. R. Crim. P. 6(e)(2)(B); *see also McKeever v. Barr*, 920 F.3d 842, 844 (D.C.

Cir. 2019) ("Federal Rule of Criminal Procedure 6(e) 'makes quite clear that disclosure of

matters occurring before the grand jury is the exception and not the rule' and 'sets forth in

precise terms to whom, under what circumstances and on what conditions grand jury information

may be disclosed.'" (quoting *Fund of Constitutional Gov't v. Nat'l Archives & Records Serv.*,

656 F.2d 856, 868 (D.C. Cir. 1981))).  This leads to the logical conclusion that the FBI erred in

its initial application of the Exemption 3 predicated on Rule 6(e) to the twelve pages from which

additional information has been released.  16th Hardy Decl. at 10 n.3.  The FBI, however, does

54

not explain why information has not been released from the other 45 pages which contained redactions pursuant to Exemption 3 and Rule 6(e).  Perhaps, as discussed above, *see* Part III.C.1.b.ii, *supra*, the information redacted on those pages was subject to other Exemptions as well, and although the information on those 45 pages is no longer withheld pursuant Exemption 3, it remains properly withheld under some other exemption.  Nonetheless, given the FBI's failure to explain why it failed to release information from those 45 pages, DOJ possibly committed an additional 45 errors by withholding information pursuant to Exemption 3 and Rule 6(e).

### (iii)  *National Security Act*

Third, the FBI relies on Section 102A(i)(1) of the National Security Act, 50 U.S.C. § 3024(i)(1), to withhold information on 5 pages of the Part II sample.  *See* FBI *Vaughn* Index; 16th Hardy Decl. ¶ 23.  That provision states that "[t]he Director of National Intelligence [("DNI")] shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  The statute empowers the DNI to "establish and implement guidelines for the intelligence community," *id*. § 3024(i)(2), of which the FBI is a part.

Plaintiff wisely does not quibble with the notion that the Act is an exemption statute as contemplated by Exemption 3.  *See DiBacco*, 926 F.3d at 834 (noting that the D.C. Circuit has held that the National Security Act "may be used to withhold information under Exemption 3").  Instead, he argues that "the FBI's declaration is inadequate . . . because the agency 'merely recite[s] the statutory standards'" for exemption under the National Security Act and fails to explain "how disclosure of the withheld material would reveal intelligence sources and methods."  Pl.'s Opp'n at 12 (quoting *Carter v. United States Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987)).

In response to this challenge, the FBI provided further detail.  In particular, the FBI explained that it has invoked the Act to "protect a file number assigned to a specific intelligence matter."  16th Hardy Decl. ¶ 23.  Such file numbers "contain a geographical prefix identifying the originating office," and a case number "which includes the file classification identifying type of investigation."  *Id*.  The FBI fears that release of this information "would lead to exposure of the particular intelligence activity and method at issue" by allowing "an adversary to attribute any information released from the document to the particular file."  *Id*.  Although linking the file number to the information in the documents at issue would not lead directly to the revelation of intelligence "sources [or] methods," 50 U.S.C. § 3024(i)(1), the FBI is concerned that, "as more information is identified with the particular file," the plaintiff or others could begin to construct a "mosaic" leading ultimately to "exposure of actual intelligence activities or methods," 16th Hardy Decl. ¶ 23.  Such disclosures "present[] the potential for individuals to develop and implement countermeasures, which would result in the loss of significant intelligence/information relied upon by national policymakers and the" Intelligence Community. 15th Hardy Decl. ¶ 87.

Notwithstanding this more fulsome explanation, plaintiff demands more specificity.  In particular, he seeks a better explanation of how disclosure of the file number would reveal intelligence sources or methods, and an explanation of "why these file numbers in particular are so sensitive as to warrant application of the National Security Act."  Pl.'s Reply at 10.  No further specificity is warranted.  The Supreme Court has held that, under the National Security Act, members of the Intelligence Community have the "power to withhold superficially innocuous information on the ground that it might enable an observer to discover the identity of an intelligence source."  *Sims*, 471 U.S. at 178.  For that reason, so long as the information

"could reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods," *Halperin*, 629 F.2d at 147, even if only by using it to construct a mosaic, withholding is proper.  Especially in light of the "substantial weight" that must be afforded agency affidavits "in the context of national security," the FBI's concerns about disclosing the file numbers in question clearly surpass that low bar.  *Larson*, 565 F.3d at 867.

### (iv)    *Pen Register Act*

Fourth, the FBI relies on the Pen Register Act, 18 U.S.C. § 3123, to withhold information on two pages of the sample: Bates Nos. Shapiro-10065 and Shapiro-224651.  FBI *Vaughn* Index at 7; 16th Hardy Decl. ¶ 24–26.[21]  That Act "is a qualifying statute under Exemption 3." *Labow v. United States Dep't of Justice*, 831 F.3d 523, 528 (D.C. Cir. 2016).  As the Pen Register Act requires "order[s] authorizing or approving the installation and use of a pen register," a device that allows law enforcement to record telephone conversations, "be sealed until otherwise ordered by the court," Exemption 3 applies to such orders and the information they contain.  18 U.S.C. § 3123(d)(1).  Whether Exemption 3, by way of the Pen Register Acts, applies to "information found in other . . . documents . . . [that] also contain[] the same information" is, as the Circuit recently noted "far less clear." *Labow*, 831 F.3d at 529.

The reach of Exemption 3 beyond the pen register orders themselves is directly in issue in this case as the FBI is not seeking to withhold a sealed pen register order.  16th Hardy Decl.

---

[21]    Initially the FBI also asserted that the Pen Register Act rendered exempt information on an additional page, Bates No. Shapiro-93317, but "[a]fter further review, the FBI is no longer asserting Exemption 3" on that page. 16th Hardy Decl. ¶ 24.  The FBI is not releasing that information, however, because it remains "exempt pursuant to other FOIA exemptions," including Exemptions 6, 7(C), and 7(E).  *Id.*; Pl.'s Opp'n, Ex. 14 at 2, ECF No. 105-3.  As the Court concludes those exemptions were properly applied, *see* Parts III.C.3.g and III.C.3.j. *infra*, this potentially improper application of Exemption 3 will not be counted as an error, *see* Part III.C.1.b.ii., *supra*.  The FBI has also noted that, as briefing was ongoing, the agency realized that information on another page, Bates No. Shapiro-224651, was "inadvertently" represented as withheld under Exemption 3 pursuant to Title III, when it should have been marked as exempt pursuant to the Pen Register Act.  16th Hardy Decl. ¶ 26.  This appears to have been nothing more than a clerical error and as redaction on that page was made for the "same reason[s]" as the redactions made on Bates No. Shapiro-10065, the analysis in this section applies to both pages.

¶ 25.  On the one hand, the Pen Register Act obviously does not give agencies *carte blanche* to withhold any piece of information that coincidentally also appears in a pen register order.  On the other, as the district court on remand from *Labow* put it, Exemption 3 does allow "an agency to withhold information" when "Congress has recognized a danger associated with its disclosure." *Labow v. United States Dep't of Justice*, 278 F. Supp. 3d 431, 441 (D.D.C. 2017) (citing *Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 628–29 (D.C. Cir. 1978)).  In other words, if disclosure of the information "would necessarily compromise the [pen register] order," its release would run afoul Congress's intent in calling for those orders to be sealed in the first place.  *Id.*; *see also, e.g., Sennett v. Dep't of Justice*, 962 F. Supp. 2d 270, 283 (D.D.C. 2013) (withholding "information that would reveal the identities and phone numbers of the individuals subject to pen registers" (internal quotation marks omitted)); *Brown v. FBI*, 873 F. Supp. 2d 388, 401 (D.D.C. 2012) (withholding "information regarding the target of pen registers, and reports generated as the result of the pen registers").  This Court agrees that if disclosure of the information would be tantamount to revealing the order itself, the information is properly withheld under Exemption 3.

The information withheld here is just such information.  The FBI explained, at first, that information was withheld because disclosure "would reveal the existence or use of a pen register or trap and trace device, or reveal the existence of an investigation involving a pen register or trap and trace device."  15th Hardy Decl. ¶ 88.  In its subsequent declaration, the FBI says, in somewhat circular language, that the withheld information under the Pen Register Act "is the same information that would be contained in [a pen register] order" and that in the particular context "in which it was presented in the responsive document[s], making direct reference to the subject of a pen register, disclosure would reveal the specific information that the pen register statute requires be included in a pen register order, which in turn such information must be

sealed." 16th Hardy Decl. ¶ 25. Although this may not be the most pellucid language, the

Bureau makes clear that the information was withheld "to prevent the target of [a pen register]

order from knowing that he/she has been targeted." *Id*. Put differently, the agency has sought to

withhold information disclosure of which "would necessarily compromise the order." *Labow*,

278 F. Supp. 3d at 441. This information is properly withheld.[22]

###### e.    *Exemption 4*

FOIA Exemption 4 protects from disclosure "trade secrets and commercial or financial

information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The

FBI initially asserted this exemption with respect to two pages "from a book titled '*A Poor*

*Man's James Bond*' copyrighted in 1972 by Kurt Saxon." 15th Hardy Decl. ¶ 91. The FBI has

since decided to "release[] these pages to the Plaintiff in full." 16th Hardy Decl. ¶ 28. Again,

the FBI has not clarified whether this was a discretionary choice or an admission of error. The

Court will thus endeavor to determine whether the agency's initial justification, described in

some detail the FBI's fifteenth declaration, was valid.

The FBI did not contend that the book was a "trade secret[]," 5 U.S.C. § 552(b)(4),

instead asserting the book pages are "commercial information," 15th Hardy Decl. ¶ 91.

Moreover, the FBI suggests that the pages were "confidential." *Id*. In doing so, the FBI's

declarant echoed language from *National Parks and Conservation Association v. Morton*, 498

F.2d 765 (D.C. Cir. 1974), which held that commercial information is confidential "if disclosure

of the information is likely to have either of the following effects: (1) to impair the

---

[22]      The FBI also relied on Exemption 3 by way of the Juvenile Justice and Delinquency Act, 18 U.S.C.
§§ 5031 *et seq.*, and in particular 18 U.S.C. § 5038, in its attempts to preserve any exemption claims for documents
also categorically withheld under Exemption 7(A). *See* Note 19, *supra*. The determination that the FBI's
categorical application of Exemption 7(A) was proper obviates the need to address any additional exemptions
applied to such documents.

Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id*. at 770 (footnote omitted); *see also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc) (restricting the applicability of the *National Parks* test to circumstances in which an agency had received the commercial information by compulsion).  The FBI's theory is that, because the pages were copyrighted, their disclosure might cause substantial harm to the copyright holder's competitive position.  15th Hardy Decl. ¶ 93.

Finding the *National Parks* standard out of step with the "ordinary, contemporary, common meaning" of the word "confidential," the Supreme Court did away with this standard as briefing for this case was ongoing.  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019); *see also Ctr. for Investigative Reporting v. United States Customs and Border Protection*, 2019 WL 7372663, *10–14 (D.D.C. Dec. 31, 2019) ("grappl[ing] with the ramifications of *Food Marketing [Institute]*" for D.C. Circuit precedents).  In its place, the Supreme Court erected a new standard: "At least where commercial or financial information is [1] both customarily and actually treated as private by its owner and [2] provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4."  *Id*. at 2366.  That first requirement had long been the rule in this Circuit with respect to information provided to agencies voluntarily, *see Critical Mass Energy Project*, 975 F.2d at 879–80, but *Food Marketing Institute* stretched its application to all commercial information provided to agencies whether voluntarily or otherwise.  Although the Supreme Court did not "need to resolve" whether the second condition it announced was necessary in every case, whether the agency provided an "assurance of privacy" is undoubtedly relevant to

determining whether commercial information possessed by DOJ is "confidential." *Food Marketing Institute*, 139 S. Ct. at 2363; *see also Ctr. for Investigative Reporting*, 2019 WL 7372663 at *13–14.

As DOJ 's memorandum was submitted before *Food Marketing Institute* was decided, it does not address these factors.[23]  Nevertheless, applying the standard from *Food Marketing Institute* to the FBI's initial justification for withholding the pages in question, the Court holds that they were withheld in error.  First, the book is not "actually treated as private by its owner." *Food Marketing Institute*, 139 S. Ct. 2366.  Although the copyright for the book in question once belonged to Kurt Saxon, he seems to have transferred that copyright to another individual who subsequently "release[ed] it to the public domain." *Saxon v. Blann*, 968 F.2d 676, 678 (8th Cir. 1992).  Moreover, nothing indicates that the pages in question were "provided to the government under an assurance of privacy." *Food Marketing Institute*, 139 S. Ct. at 2366.  Although the pages are evidently already in plaintiff's possession, the two improperly withheld pages will be counted as errors.

### f.    *Exemption 5*

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption "incorporates the privileges that the Government may claim when litigating against a private party, including the governmental attorney-client and attorney work product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege." *Abtew v. United States Dep't*

---

[23]    DOJ's opposition to plaintiff's cross-motion *was* submitted after the relevant holding had been announced, but by then the FBI had withdrawn its application of Exemption 4 and was evidently operating under the mistaken belief that this relieved the agency of its burden to justify its initial withholdings, so *Food Marketing Institute*'s new standard again went unmentioned.

*of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).  Here, DOJ invokes the deliberative

process privilege, which permits an agency to withhold "documents reflecting advisory opinions,

recommendations and deliberations comprising part of a process by which governmental

decisions and policies are formulated," *Dep't of the Interior v. Klamath Water Users Protective

Ass'n*, 532 U.S. 1, 8 (2001) (internal quotation marks omitted) (quoting *NLRB v. Sears, Roebuck

& Co.*, 421 U.S. 132, 150 (1975)), in order that agencies may "craft better rules when their

employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with

the understanding that employees would be chilled from such rigorous deliberation if they feared

it might become public," *Judicial Watch, Inc. v. United States Dep't of Defense*, 847 F.3d 735,

739 (D.C. Cir. 2017).[24]

      "To qualify for the deliberative process privilege, an intra-agency memorandum must be

both pre-decisional and deliberative." *Abtew*, 808 F.3d at 898 (citing *Coastal States Gas Corp. v.

Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  "A document is 'predecisional' if it

precedes, in temporal sequence, the 'decision' to which it relates," *id.* (internal quotation marks

omitted) (quoting *Senate of the Commonwealth of Puerto Rico v. United States Dep't of Justice*

("*Senate of P.R.*"), 823 F.2d 574, 585 (D.C. Cir. 1987)), or was "'prepared in order to assist an

agency decisionmaker in arriving at his decision,' rather than to support a decision already

made," *Petroleum Info. Corp. v. United States Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C.

Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975)).

Deliberative, in this context, means the record is "a part of the agency give-and-take—of the

---

[24]      As briefing was ongoing, DOJ also decided to invoke the attorney-client privilege as to one document
already withheld under Exemption 5. 16th Hardy Decl. ¶ 36.  The Court holds that the document was properly
withheld under the deliberative process privilege and so need not address whether another privilege may apply.

deliberative process—by which the decision itself is made." *Abtew*, 808 F.3d at 899 (internal quotation marks omitted) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975)).

To gauge whether the deliberative-process privilege has been asserted appropriately, DOJ must explain, for each withheld record, at least, "(1) 'what deliberative process is involved,' (2) 'the role played by the documents in issue in the course of that process,' and (3) 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents.'" *Ctr. for Biological Diversity v. EPA*, 279 F. Supp. 3d 121, 147 (D.D.C. 2017) (citations omitted) (first quoting *Senate of P.R.*, 823 F.2d at 585–86; then quoting *id.*; and then quoting *Elec. Frontier Found. v. United States Dep't of Justice*, 826 F. Supp. 2d 157, 168 (D.D.C. 2011)).  DOJ, not the requester, must identify the deliberative process to which any record relates.  *100Reporters LLC v. United States Dep't of Justice*, 248 F. Supp. 3d 115, 152 (D.D.C. 2017) (citing *Coastal States*, 617 F.2d at 868).

Here the FBI has asserted the deliberative process privilege to protect three documents totaling eight pages.  The first document is described as "a memorandum documenting a meeting between two FBI Special Agents and an Assistant United States Attorney . . . discussing a prospective prosecution."  16th Hardy Decl. ¶ 30 (explaining the document was assigned Bates Nos. Shapiro-3014–15).  The document was intended to "memorialize[] the back and forth discussion between the two agents and the prosecutor assigned to the case about potential investigative avenues, investigative steps, purpose and advantage of certain investigative techniques, as well as legal procedures being explored."  *Id*.  This discussion "precede[d] and [led] to [a] final decision in preparation for the future prosecution."  *Id*.  The FBI has thus adequately stated what deliberative process is involved—"FBI and DOJ's deliberations," *id.*,

regarding the direction of a prospective investigation—the role the document played—memorializing a discussion of possible investigative avenues and techniques—and the nature of the decisionmaking authority of the author of the document—the FBI agents and DOJ prosecutor were assigned to the case and responsible for guiding the prospective investigation and prosecution.  This document was properly withheld.

Next the FBI asserts the privilege with respect to an electronic communication "documenting several FBI[] Special Agents' attendance to a conference on animal rights/terrorism."  *Id.* ¶ 31 (explaining the document was assigned Bates Nos. Shapiro-138769–70).  The portions of the document withheld pursuant to Exemption 5 detailed "a discussion . . . between an AUSA and the conference's attendees" that "contemplate[ed] investigative efforts to pursue a prospective prosecution."  *Id.*  Again, the FBI asserts this communication "precede[d] and [led] to [a] final decision in preparation for future prosecution."  *Id.*  Much the same analysis thus applies to this document.  The deliberative process involved is the discussion of possible investigative avenues to aid in a prospective prosecution, the document memorializes early discussions about those efforts, and the individuals involved are investigating Special Agents. *Id.*

Plaintiff focuses his complaints with respect to this document on his contention that the FBI waived the deliberative process privilege.  Pl.'s Reply at 13–14.  The document in question "memorializ[es] a meeting attended by the Executive Director of the Fur Commission."  *Id.* at 13.  According to plaintiff, the presence of this third party destroyed the privilege.  Plaintiff's argument misses the mark for two reasons.  First, the FBI clarifies that the Fur Commission was not "participating in the discussions about the prospective prosecution" reflected in the documents at issue.  16th Hardy Decl. ¶ 31.  Second, to the extent the Executive Director was, as

64

plaintiff suggests, "*present* during the discussions about the prospective prosecutions," this matters little as the privilege is asserted to exempt an Electronic Communication memorializing the discussion and nothing suggests that the document in question was ever shared with a third-party. *Cf. In re Sealed Case*, 121 F.3d 729, 741–42 (explaining that an agency waives the deliberative process privilege as to "specific documents" when it "reveal[s] [them] to third parties" outside the agency).

Finally, the FBI asserts the deliberative process privilege to an Electronic Communication "prepared to notify FBI Field Offices of recommendations regarding retention of evidence." 16th Hardy Decl. ¶ 32 (explaining the document was assigned Bates Nos. Shapiro-202953–56). Specifically, while the FBI "released the portion of the records reflecting the final determination and advice given to the Field Offices," it withheld "those portions of the document containing the analysis of potential scenarios, legal considerations, ideas and vulnerabilities." *Id*. This description fails to establish the applicability of the deliberative process privilege. For one, if a document is to qualify for the deliberative process privilege, it must "precede[], in temporal sequence, the 'decision' to which it relates." *Abtew*, 808 F.3d at 898. The FBI asserts that the information withheld was redacted from the same document which contained the final decision. Information is not predecisional if it appears simultaneously with the final decision. Moreover, the agency's explanation makes clear that the withheld information is more akin to analysis of the *ramifications* of a final decision not discussions as part of the "give-and-take . . . by which the decision itself is made." *Id*. at 899. The agency has failed to meet its burden with respect to this four-page document and it will thus be ordered to remove any redactions on the document made pursuant to Exemption 5 or provide further justification for those withholdings. In the

meantime, another four errors stemming from the four redactions made in this document will be added to the numerator of the error rate calculation.

### g.   *Exemptions 6 and 7(C)*

FOIA Exemption 6 shields from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Similarly, Exemption 7(C) protects "records or information compiled for law enforcement purposes, but only to the extent that the production" of those records "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).  Both exemptions "seek to protect the privacy of individuals identified in certain agency records."  *Am. Civil Liberties Union v. United States Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011).  Textual differences between the two exemptions, however, mean that "Exemption 7(C) is more protective of privacy than Exemption 6 and thus establishes a lower bar for withholding material."  *Id.* (internal quotation marks omitted) (quoting *United States Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 496 n.6 (1994)); *compare* 5 U.S.C. § 552(b)(6) (exempting only records "disclosure of which *would constitute* a *clearly* unwarranted" privacy invasion (emphasis added)) *with id.* § 552(b)(7)(C) (exempting records that "*could reasonably* be expected to constitute an unwarranted invasion" (emphasis added)).  Although the FBI has asserted the two in conjunction, 15th Hardy Decl. ¶¶ 102–04, because plaintiff does not take issue with the FBI's contention that the records in question were "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), only the FBI's application of Exemption 7(C)'s broader protection need be considered, *see Am. Civil Liberties Union*, 655 F.3d at 6 (analyzing only Exemption 7(C) when the "plaintiffs concede[d] that the requested records [were] . . . compiled for law enforcement purposes" (internal quotation marks omitted)).

Determining whether disclosure of the withheld information "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), requires courts "to balance the" asserted "privacy interest against the public interest in disclosure." *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 171 (2004) (citing *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 762 (1989)). "[T]he only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be informed about what their government is up to." *Davis v. United States Dep't of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (internal quotation marks omitted) (quoting *Reporters Comm.*, 489 U.S. at 773). As for the relevant privacy interests, the D.C. Circuit has consistently held that "third parties, witnesses, and informants mentioned in investigatory files maintain a privacy interest in keeping secret the fact that they were subjects of a law enforcement investigation." *Bartko*, 898 F.3d at 71 (internal quotation marks omitted) (quoting *Nation Magazine*, 71 F.3d at 894). The strength of that privacy interest is such that "the FBI is permitted 'to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is "necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity."'" *Id.* (quoting *Schrecker v. United States Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (itself quoting *SafeCard, Servs., Inc.*, 926 F.2d at 1206)). The burden is on the requester to "produce evidence that would warrant a belief by a reasonable person that . . . Government impropriety might have occurred." *Favish*, 541 U.S. at 174.

The FBI undertook the balancing act required by Exemption 7(C). To do so, the agency first split its invocation of Exemption 7(C) into eight categories, explaining that the exemption was used to withhold the following: (1) names and/or identifying information of FBI Special

Agents ("SAs") and support personnel, 15th Hardy Decl. ¶¶ 105–06; (2) names and/or

identifying data of third parties of investigative interest, *id*. ¶ 107; (3) names and/or identifying

information of non-FBI federal government employees, *id.* ¶¶ 108–10; (4) names and/or

identifying information of state and local law enforcement, *id*. ¶ 111; (5) names and/or

identifying information of third parties merely mentioned, *id*. ¶ 112; (6) names and/or identifying

data regarding third party victims, *id*. ¶ 113; (7) names and/or identifying information of third

parties who provided information to the FBI, *id*. ¶ 114; and (8) names and/or identifying data of

third parties with criminal records/rap sheets, *id*. ¶ 115.  For each category, the FBI then

identified the privacy interests at stake and balanced them against the public's interest in

disclosure.  *See, e.g., id.* ¶ 114 (explaining that disclosure of an informant's identifying

information could subject the informant to "reprisal, possible physical harm, or even death," and

determining that there was "no public interest in . . . disclosure" because it would not "shed light

on or significantly increase the public's understanding of the operations and activities of the

FBI").

Plaintiff neither challenges the categories defined by the FBI nor the privacy interests

asserted to support those categories.  Moreover, he fails to even mention the public's interest in

disclosure, let alone "produce evidence" that disclosure is necessary to uncover some

government malfeasance.  *Favish*, 541 U.S. at 174.  Instead, through a series of *ad hoc*

arguments, plaintiff takes aim at the existence *vel non* of a privacy interest in the first place.

First, plaintiff asserts that "at the time he submitted his FOIA requests, [he] included privacy

waivers or obituaries from scores of individuals."  Pl.'s Opp'n at 17.  Although plaintiff

identifies 24 pages on which he alleges the FBI improperly redacted the names or identifying

information of those individuals, he does not explain which redactions are improper because he

68

submitted a privacy waiver from a living individual and which are improper because he

submitted an obituary.[25]  His failure to adequately distinguish between the two makes it difficult

for the Court to measure properly the privacy interests at stake.  The Circuit has recognized that

"[t]he fact of death, . . . while not requiring the release of information, is a relevant factor to be

taken into account in the balancing decision whether to release information."  *Schrecker*, 349

F.3d at 661 (internal quotation marks omitted).  Nevertheless, "although death may diminish the

relevant privacy interests, it by no means extinguishes them because one's own and one's

relations' interests in privacy ordinarily extend beyond death."  *Am. Civil Liberties Union v.*

*United States Dep't of Justice*, 750 F.3d 927, 936 (D.C. Cir. 2014) (internal quotation marks

omitted).  The mere submission of an obituary, therefore, would not ineluctably lead to the

conclusion that withholding the deceased's identifying information is improper.  Moreover,

plaintiff's submissions do not make clear that his privacy waivers were sufficient to require

removal of the challenged redactions.  First, he does not explain how he knows that the

challenged redactions related to individuals for whom he submitted privacy waivers.  Pl.'s Opp'n

at 17–18.  Second, he has not attached the privacy waivers in question to his cross-motion for

summary judgment, so whether the waiver extended to the information redacted is unclear.

---

[25]     Plaintiff asserts that he submitted "a privacy waiver or obituary" for any individual whose name or
identifying information was redacted from numerous pages in the sample, as detailed in an "Addendum" to his
opposition.  Pl.'s Opp'n Ass., ECF No. 105-7.  The Addendum is a chart listing sample pages to which Exemption
7(C) was applied and notating the reasons why that application was improper.  *Id.*  Two such reasons identified in
that chart are "waiver submitted" and "deceased."  *Id.* (capitalization altered).  Although this presumably would
delineate between individuals for whom a privacy waiver was submitted and individuals for whom an obituary was
submitted, the FBI notes that plaintiff did *not* submit an obituary for any of the individuals listed in the "deceased"
column.  *Compare id.* (mentioning "Ferguson," "Mead," "Rancourt," and "LaRossa") *with* 16th Hardy Decl. ¶ 44
(noting that "with regards to William Ian Ferguson, Marcus Mead, James Rancourt, and James Larossa . . .
[p]laintiff . . . did not provide either a privacy waiver or death record for any of the four individuals he mentions in
his Opposition").  As plaintiff is adamant that his Addendum "lists numerous instances" when the FBI "redacted the
names of individuals for whom" he had "submitted a privacy waiver or obituary," Pl.'s Opp'n at 17–18, some
question thus remains as to whether the redactions identified in the "waiver submitted" column are only withholding
identifying information of individuals for whom plaintiff says he submitted a privacy waiver, or if he used that
column to identify potential redactions of identifying information of both individuals for whom he submitted a
privacy waiver and for whom he submitted an obituary.

Apparently at least some conditions are attached to those waivers as, according to plaintiff, the waivers he obtained extend only "to the release of information to [him], not the general public." Pl.'s Opp'n at 3 n.2.  Similar to the effect of an obituary then, the privacy waivers may do nothing more than "diminish" the individual's privacy interests, and without more, plaintiff's alleged submissions cannot overcome the individuals' strong and presumptive privacy interest. *See CREW*, 746 F.3d at 1096 ("[N]ames and identifying information of third parties contained in . . . investigative files are presumptively exempt.").

Plaintiff's failure to establish the complete absence of privacy interests on the part of individuals for whom he submitted privacy waivers and obituaries combined with his failure to produce evidence that disclosure is necessary to ferret out FBI misdeeds means he cannot show Exemption 7(C) was improperly invoked to hide their identifying information.  *Pub. Citizen Health Research Grp. v. United States Dep't of Labor*, 591 F.2d 808, 809 (D.C. Cir. 1978) ("[A]ny invasion of privacy can prevail, so long as the public interest balanced against it is sufficiently weaker.").

Second, plaintiff contends that "the FBI has improperly withheld information about individuals referenced only in their capacities as representatives of a business."  Pl.'s Opp'n at 18.  He gives three examples: (1) the redaction of the name Leon Hirsch from records identifying him as Chairman of the Board of the United States Surgical Corporation ("U.S.S.C."); (2) the redaction of an individual identified as CEO of Proctor & Gamble; and (3) the redaction of the name of the President of PETA and several celebrities from a single document.  In support of his contention that such redactions are categorically improper, plaintiff relies on another case in which he was a plaintiff, *Property of People v. United States Department of Justice*, 310 F. Supp. 3d 57 (D.D.C. 2018).  There, in analyzing the propriety of the FBI's response that it could

neither confirm nor deny whether it had "law-enforcement records" that "mention[] or refer[] to the living person Donald John Trump," another Court in this District discussed how, because Exemption 7(C) "does not extend to *corporations*," individuals mentioned in investigative files in their "official capacit[ies]" might not enjoy a privacy interest protected by that exemption. *Id.* at 62–63, 71 (emphasis in original) (internal quotation marks omitted) (quoting *FCC v. AT&T Inc.*, 562 U.S. 397, 410 (2011)). That opinion contained *dicta* regarding the "blurry" line between corporations and individuals, explaining that while "information[] about any crimes taken in [one's] personal capacity[] falls squarely within Exemption 7(C)," an individual "would have no privacy interest in his mere *affiliation* with" a particular organization, but ultimately did not "dwell" on the question because DOJ had "concede[d]" that the records at issue were not covered by Exemption 7(C). *Id.* at 71–72. This is a far cry from adopting the bright line rule plaintiff asserts here.

The case plaintiff cites is nonetheless instructive insofar as it explains that while mention of an individual's "mere affiliation" with an organization may be outside the protection of Exemption 7(C), *id.* at 71 (emphasis omitted), references that go beyond establishing "professional relationships" may very well be protected, *id.* at 72 (quoting *Sims v. CIA*, 642 F.2d 562, 574 (D.C. Cir. 1980)). The records to which plaintiff points do not merely affiliate individuals with organizations. With respect to Leon Hirsch, although the records in question append his corporate title to his name, they are investigative records regarding his attempted murder. Pl.'s Opp'n, Ex. 32, ECF No. 105-5.[26] As for the Proctor & Gamble CEO, the records describe an assault on his person by two protesters. Pl.'s Opp'n, Ex. 36, ECF No. 105-5. Finally, the names of the PETA president and certain celebrities were redacted from a document

---

[26]   As DOJ points out, after the re-review of the Part II sample, Mr. Hirsch's name was unredacted. The Court has already explained why it must nonetheless consider the FBI's initial justifications for its redactions.

describing incidents in which those individuals were the target of protest activities or listed as "people who [had] been associated" with those incidents.  Pl.'s Opp'n, Ex. 33, Ex. 105-5. Nothing in plaintiff's filings overcomes the "presumptive[] exempt[ion]" of "names and identifying information of third parties contained in investigative files."  *CREW*, 746 F.3d at 1096.

Third, plaintiff complains that the FBI redacted the name of a "high-ranking FBI official who presented testimony to Congress" from two pages within Part II of the sample.  Pl.'s Opp'n at 19.[27]  Plaintiff notes that the official's name, James Jarboe, appears alongside a copy of that testimony on the FBI's website.  *Id.*  Of course, "when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information."  *Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013).  To mount an "official acknowledgment" argument, the plaintiff bears the "initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld."  *Id.* at 427 (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)). Plaintiff has done so here, attaching a printout of an FBI webpage acknowledging Mr. Jarboe's testimony.  Pl.'s Opp'n, Ex. 38, ECF No. 105-5.  The FBI, perhaps in recognition of this, chose to release Mr. Jarboe's name on one of the two pages and explained that "[t]he name does not appear" on the other page identified by plaintiff.  16th Hardy Decl. ¶ 40.  This single mistake on a single page will be tallied in calculating the error rate within the sample.

Fourth, plaintiff complains of redactions from three documents of the names of individuals who are identified in the documents as "having pled guilty" to various crimes and as having been "identified as [parties] in a civil" lawsuit.  Pl.'s Opp'n at 19.  These redactions

---

[27]   Plaintiff asserts this name was improperly redacted on pages with Bates Nos. 202055 and 202061.

appear on four pages of the sample.[28]  Plaintiff is wrong that Exemption 7(C) "does not . . . apply

to single instances of public pleas and convictions."  Pl.'s Opp'n at 19.  Indeed in *American Civil

Liberties Union v. United States Department of Justice*, 655 F.3d 1 (D.C. Cir. 2011), the case on

which plaintiff relies, the D.C. Circuit notes that while "disclosure of convictions and public

pleas is at the lower end of the privacy spectrum," that does not mean "that a convicted

defendant has *no* privacy interest in the facts of his conviction."  *Id*. at 7 (emphasis in original).

Plaintiff's failure to even mention the possible public interest in disclosing the names of the

individuals identified as having pled guilty means that the withholding of their names was

proper.  The same goes for the individuals identified in relation to a civil lawsuit described in an

FBI investigative record.  Even if, as plaintiff asserts, mentioning the name of an individual in

that context "poses even less of a risk of stigma, embarrassment, or other harm" than being

identified as having been convicted of a crime, the lack of any countervailing public interest in

disclosure makes invocation of Exemption 7(C) proper.  Pl.'s Opp'n at 19.

Fifth, plaintiff asserts that the "FBI has also failed to ascertain the life status of certain

individuals who figure prominently in the withheld documents and who are, in fact, deceased."

Pl.'s Opp'n at 20.  According to plaintiff, the FBI improperly redacted the names of William Ian

Ferguson, Marcus Mead, James Rancourt, and James LaRossa.  He has provided evidence that

each of the individuals is deceased.  Pl.'s Opp'n, Exs. 42, 49, ECF No. 105-6.  "Without

confirmation that the Government took certain basic steps to ascertain whether an individual was

dead or alive," courts are typically "unable to say whether the Government reasonably balanced

the interests in personal privacy against the public interest in release of the information at issue."

---

[28]     The redactions appear on pages with Bates Nos. 822, 824, and 10799–10800.  The FBI eventually released
the name of an individual redacted on pages with Bates Nos. 10799–10800.  For reasons already noted, however, the
propriety of the initial withholding must still be determined.

*Schrecker v. United States Dep't of Justice*, 254 F.3d 162, 167 (D.C. Cir. 2001).  Plaintiff's

failure to identify a public interest in disclosure, however, is again fatal.  As noted above, even if

the FBI had determined that the individuals were deceased by conducting an adequate life-status

check, that fact would "by no means extinguish[]" the individual's privacy interests.  *Am. Civil*

*Liberties Union*, 750 F.3d at 936 (internal quotation marks omitted).[29]  Assuming the privacy

interests of the four individuals was minimal following their deaths, such minimal interests still

tip the scale in favor of withholding when weighed against nothing.  *Pub. Citizen Health*

*Research Grp.*, 591 F.2d at 809.[30]

Finally, plaintiff takes issue with the redaction of the names of Fran Trutt, Darryl

Benvenuto, and Mark Anagnos from pages within the sample.  He asserts that, because "their

names appear numerous times unredacted" both in publicly available documents and in certain

documents that have been disclosed to plaintiff as a result of the requests at issue in this case,

redaction of their names from other documents are improper.  Pl.'s Opp'n at 21.  Information

filed on a public docket or otherwise released by the FBI, of course, may differ substantially

from information contained in the FBI's investigative records, as plaintiff's exhibits clearly

show.  As an example of what plaintiff believes was an improper redaction, he submits an FBI

letter stating "All of the above documents relate to [the] investigation conducted by the DTTF

---

[29]     In fact, the FBI plausibly asserts that an adequate life-status check was conducted for each of the four individuals at the time it asserted Exemption 7(C).  16th Hardy Decl. ¶ 43–44 ("The FBI conducted a life status check of Mr. Ferguson, Mr. Mead, Mr. Rancourt and Mr. Larossa . . . .").

[30]     The FBI too quickly asserts that since "Mr. Ferguson is deceased[,] and Exemptions 6 and 7(C) no longer apply."  16th Hardy Decl. ¶ 44.  As explained, death merely diminishes an individual's privacy interest and does not destroy it.  Nevertheless, the FBI explains that even if those exemptions did not apply, because he was "a cooperating witness for the FBI" who was given "an express assurance of confidentiality," his identity and the information he provided remain properly hidden in documents related to his cooperation pursuant to Exemption 7(D).  *Id.*; *see also* 5 U.S.C. § 552(b)(7)(D) (exempting law enforcement records to the extent their disclosure "could reasonably be expected to disclose the identity of a confidential source . . . and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation . . . , information furnished by a confidential source").  As the Court holds the FBI properly applied Exemption 7(D) to protect such information, *see* Part III.C.3.i, *infra*, the redactions concerning Mr. Ferguson were not made in error.

with respect to federal prosecution of [REDACTED]."  Pl.'s Opp'n, Ex. 44, ECF No. 105-6. The letter also notes that the "documents [had] not . . . been made part of the public record" and should thus be given "appropriate safeguards."  *Id*.  The public mention of an individual's name in one context does not preclude the FBI from withholding it in another.  Plaintiff's own exhibits suggest that the FBI has shown just such sensitivity to context in application of the exemption, and the Court sees no reason to doubt that the same care has been shown in processing the pages plaintiff says contain improper redactions.  Moreover, at risk of belaboring the point, plaintiff's failure to identify a public interest that would be served by the disclosure of their names means plaintiff has failed to meet his burden.

"[A]s a general rule, when documents are within FOIA's disclosure provisions, citizens should not be required to explain why they seek the information."  *Favish*, 541 U.S. at 172. Information compiled by DOJ and subject to disclosure under FOIA "belongs to all."  *Id*.  In order to properly balance the privacy interests protected by Exemption 7(C) against the public's interest in disclosure, however, "the usual rule that the citizen need not offer a reason for requesting the information must be inapplicable."  *Id*.  Plaintiff's inability to show the complete absence of privacy interests with respect to the challenged redactions combined with his "failure to explain how disclosure would serve the public interest" has thus sunk the majority of his *ad hoc* arguments against the FBI's use of Exemption 7(C).  *Bartko*, 898 F.3d at 71.  The Court has located only one redaction made in error, and the FBI has already corrected it.  16th Hardy Decl. ¶ 40.  Despite the later correction, the error will count toward the error rate for the Part II sample.

### h.      *Exemption 7(A)*

Exemption 7(A) was discussed thoroughly with respect to documents in the Part I sample.  *See* Part III.C.2.  That same exemption was also used to shield parts of seven pages in

the Part II sample.  *See* FBI *Vaughn* Index.  The FBI withheld information on those pages using

the exact same standard used for those documents withheld under this exemption in Part I.  16th

Hardy Decl. ¶ 52.  These Part II withholdings are thus valid as well, and DOJ is entitled to

summary judgment as to the FBI's application of Exemption 7(A) to the Part II sample.

### i.    *Exemption 7(D)*

Exemption 7(D) protects

> records or information compiled for law enforcement purposes, but only to the extent that
> the production of such law enforcement records or information . . . could reasonably be
> expected to disclose the identity of a confidential source, including a State, local, or
> foreign agency or authority or any private institution which furnished information on a
> confidential basis, and, in the case of a record or information compiled by criminal law
> enforcement authority in the course of a criminal investigation or by an agency
> conducting a lawful national security intelligence investigation, information furnished by
> a confidential source

5 U.S.C. § 552(b)(7)(D).  DOJ, however, "is not entitled to a presumption that a source is

confidential within the meaning of Exemption 7(D) whenever [a] source provides information [to

a law-enforcement agency] in the course of a criminal investigation."  *Landano*, 508 U.S. at 181.

Instead, whether a source is truly confidential must be determined on a case-by-case basis.  *Id*. at

179–80.  A source may be found confidential within the meaning of Exemption 7(D) if that

source (1) "provided information under an express assurance of confidentiality" or (2) provided

information "in circumstances from which such an assurance could be reasonably inferred."  *Id*.

at 172 (internal quotation marks omitted).

In the case of express assurances of confidentiality, an agency "must present 'probative

evidence that the source did in fact receive an express grant of confidentiality.'"  *Campbell v.*

*United States Dep't of Justice*, 164 F.3d 20, 34 (D.C. Cir. 1998) (quoting *Davin v. United States*

*Dep't of Justice*, 60 F.3d 1043, 1061 (D.C. Cir. 1995)).  "It is not enough for the agency to claim

that all sources providing information in the course of a criminal investigation do so on a

confidential basis." *CREW*, 746 F.3d at 1101 (alteration and internal quotation marks omitted)

(quoting *Roth v. United States Dep't of Justice*, 642 F.3d 1161, 1184 (D.C. Cir. 2011)).

Evidence showing a source was provided an express assurance of confidentiality "can take a

wide variety of forms, including notations on the face of a withheld document, the personal

knowledge of an official familiar with the source, a statement by the source, or contemporaneous

documents discussing practices or policies for dealing with the source or similarly situated

sources." *Campbell*, 164 F.3d at 34.  For implied assurances of confidentiality, courts must

"consider four factors" drawn from *Roth v. United States Department of Justice*, 642 F.3d 1161

(D.C. Cir. 2011): "[1] the character of the crime at issue, [2] the source's relation to the crime,

[3] whether the source received payment, and [4] whether the source has an ongoing relationship

with the law enforcement agency and typically communicates with the agency only at locations

and under conditions which assure the contact will not be noticed." *Labow*, 831 F.3d at 531

(quoting *Roth*, 642 F.3d at 1184).

The FBI has invoked Exemption 7(D) to withhold five categories of information:

(1) names, identifying data and/or information provided by individuals under implied assurances

of confidentiality; (2) names, identifying information about, and/or information provided by

sources under express assurances of confidentiality; (3) confidential file numbers; (4) foreign

government agency information under express confidentiality; and (5) confidential source

symbol numbers.  15th Hardy Decl. ¶ 116–31.  Plaintiff does not contest the propriety of the

FBI's withholding of confidential file numbers and confidential source symbol numbers, and for

good reason.  As the FBI explains, "[c]onfidential source numbers" and confidential source

symbol numbers are "administrative tools that facilitate the retrieval of information supplied by a

source."  15th Hardy Decl. ¶ 124.  The source number or source symbol number is "unique to the

particular confidential informant and is used only in documentation relating to that particular

informant." *Id*. The FBI worries that "[r]epeated release" of this information "along with the

information provided by these confidential informants would narrow the possibilities of the

informants' true identities." *Id*. ¶¶ 125, 130. This Court has previously recognized that "it is the

FBI's practice to assign source symbols to informants only if those individuals report information

to the FBI on a regular basis pursuant to an express grant of confidentiality." *Clemente v. FBI*,

741 F.Supp.2d 64, 87 (D.D.C. 2010) (internal quotation marks omitted); *see also Poitras v.*

*Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 158 (D.D.C. 2018) (noting that confidential

source's "file number" is exempt for the same reason). Exemption 7(D) was thus properly

invoked and DOJ is entitled to summary judgment in this respect.

 Plaintiff's challenges focus on the remaining three categories. With respect to the

identifying information of, and information provided by, the individuals who the FBI says were

given express assurances of confidentiality, plaintiff maintains that the agency has failed to

provide the kind of "probative evidence" demanded by D.C. Circuit caselaw. *Campbell*, 164

F.3d at 34. The Court disagrees. The FBI explained that "[w]hen determining whether

individuals were granted express assurances of confidentiality, the FBI uses the context of the

records at issue and the information available in FBI indices to determine positively who

provided information to the FBI under express assurances of confidentiality." 16th Hardy Decl.

¶ 72. Indeed, if the FBI is uncertain about an individual's status as a confidential informant, its

"FOIA analysts will also reach out to FBI investigators for additional information." *Id*. With

respect to the documents in the Part II sample, the FBI notes that they contained markings

indicating the information was provided by a "Cooperating Witness" ("CW"). 16th Hardy Decl.

¶ 73. A document containing a CW designation means the informant "entered into an official,

confidential relationship[] with the FBI." *Id*. This "notation[] on the face of a withheld

document" constitutes probative evidence that an express assurance of confidentiality was given.

*Campbell*, 164 F.3d at 34. Additionally, documents given an "informant file[]" number similarly

reflect that the "individual was [an] official, established confidential source, and received an

express grant of confidentiality." 16th Hardy Decl. ¶ 73. The same goes for documents that

identified an individual using a "symbol source number." *Id*. On other documents, source's

identities had the notation "protect identity" beside them, or were described as "confidential

informant[s]." *Id*. ¶ 74. One document contains information described as "source reporting" and

notes that "disclosure of [the] information could compromise reliable . . . sources." *Id*. (second

alteration in original). A source is labeled "reliable" if the individual "has been established as an

official confidential source" and such individuals are "routinely granted express confidentiality."

*Id*. These are all probative indications that express assurances of confidentiality were given and

that the FBI's redactions were proper.

      The FBI also explains that some withheld information was inadvertently coded as

pursuant to an implied assurance of confidentiality when the information should have been

labeled as protected pursuant to an *express* assurance of confidentiality. *Id*. ¶ 71. This document

was a "complaint form from a corporation that provided information to the FBI concerning . . .

threats posed to the corporation by animal rights activist groups." *Id*. Although the form had an

option for the complainant or the FBI to check a box labeled "Protect Source," that box was left

blank, but the FBI explains, on the second page of the form, the complainant insisted that the

information was "for the exclusive and confidential use of the addressee(s)." *Id*. Plaintiff

contends that "[t]his statement . . . only indicates that the complaining company was *asking* for

confidentiality, not that it *received* an express assurance of confidentiality." Pl.'s Reply at 23.

*Campbell* does not require an agency locate dispositive evidence of an express assurance of confidentiality, only evidence that is "probative." *Campbell*, 164 F.3d at 34. A request from a complainant is certainly probative. This evidence along with the detailed accounting of how the FBI came to its conclusions that documents contained information about or from sources granted express assurances of confidentiality shows that Exemption 7(D) was properly invoked by the FBI in this respect.

Next, plaintiff turns to information about or from sources who were given *implied* assurances of confidentiality. While plaintiff may be right that the FBI's initial declaration was inadequate, Pl.'s Opp'n at 31, the agency's subsequent declaration painstakingly reviews each and every document over which Exemption 7(D) was applied to protect sources given implied confidentiality. 16th Hardy Decl. ¶¶ 57–70. The first *Roth* factor, "the character of the crime at issue" rests on the theory "that sources likely expect confidentiality when they report on serious or violent crimes, risking retaliation." *Labow*, 831 F.3d at 531. In this regard, the FBI asserts that the withheld information relates to sources in the investigation of "the arson of University of California at Davis's ('UCD') Animal Science Building on April 17, 1987" and the separate investigation into "the placing of an improvised explosive device ('IED') outside the United States Surgical Corporation in Norwalk, Connecticut, on November 11, 1988." 16th Hardy Decl. ¶¶ 58–59. These are precisely the kind of "serious or violent crimes" that would make informants fearful to come forward. The first factor thus weighs in favor of applying Exemption 7(D).

The second *Roth* factor asks courts to consider "the source's relation to the crime." *Labow*, 831 F.3d at 531. The relationships of the sources in question are explained by the FBI. With respect to the arson committed on UCD's campus, the sources include "third party

individuals closely connected with the group suspected of" the crime, 16th Hardy Decl. ¶¶ 60–
61, "an individual with close ties to the individuals suspected of committing [the] arson," *id*.
¶ 62, "individuals" with "close association[s] with the individuals suspected of involvement in
the UCD arson and/or information related to activities concerning the arson few individuals
would know," *id*. ¶ 63 and "a telecommunications company" that provided information in aid of
the investigation, *id*. ¶ 64. With respect to the attempted bombing of the U.S.S.C., the sources
were "personnel from the company targeted by the attempted IED attack" and "individuals"
relaying information on behalf of the "victim company," *id.* ¶ 66–67, an "individual closely tied
within individuals involved in the FBI's investigation into the attempted bombing," *id*. ¶ 68, and
"individual(s) closely connected with the crime" whose information was relayed by Leon Hirsch,
Chairman of the victim company, *id*. ¶ 69. In addition, these individuals all provided "singular"
information or information that "could result in their identification," *id*. ¶¶ 58, 65, which also
must be considered in analyzing the second *Roth* factor. *Labow*, 831 F.3d at 532. The proximity
of all these individuals and organizations to these violent or potentially violent crimes, combined
with the unique information the sources provided, means the second factor too weighs in favor of
a finding of confidentiality.[31]

DOJ does not allege that any of the relevant sources received payment, so the third factor
"weighs against a finding of confidentiality, but . . . is not itself dispositive." *Id*. The fourth
factor also weighs against a finding of confidentiality, if only slightly, as the FBI has not
provided any information about the source's "manner of communication." *Id*. Taken together,
however, the strength of the first two factors means that the FBI has carried its burden to show

---

[31]     Although a telecommunications company that aided the FBI may seem an odd inclusion in this list, the
context demonstrates that the inclusion is proper. Given that the investigations in question were into crimes
committed against companies or institutions that stood athwart the culprits' political aims, the fear of retaliation is
just as present for the company as it is for the individual sources. 16th Hardy Decl. ¶ 64.

that an implied assurance of confidentiality was given to the sources in question and DOJ is entitled to summary judgment in this respect as well.

The FBI is "no longer asserting Exemption 7(D) on the information within the fourth paragraph" on the page with Bates No. Shapiro-55994 on the theory that an implied assurance of confidentiality was given. 16th Hardy Decl. ¶ 70. This is appropriate as the information appears to come from the alleged perpetrator of the U.S.S.C. attempted bombing. The concerns about "retaliation" that undergird exemption 7(D) do not apply with equal force to statements by the alleged culprit. *Labow*, 831 F.3d at 531. As the FBI has pointed to no reason to believe the individual allegedly responsible for the crime would have been provided an assurance of confidentiality, this initial withholding was in error and will thus be counted as an error calculating the error rate.

Finally, the plaintiff asserts that the FBI "failed to present probative evidence that the foreign government sources" that provided information withheld on a single page "received an express grant of confidentiality." Pl.'s Opp'n at 33 (internal quotation marks omitted); *see* 16th Hardy Decl. ¶ 76. The FBI explains that the express assurance is "grounded on the ongoing, established agreement between the FBI and [a specific] foreign agency whereby the FBI will hold the information provided by the agency in confidence." 16th Hardy Decl. ¶ 76. This representation from the FBI is sufficient to uphold the invocation of Exemption 7(D) on this page. *See Poitras*, 303 F. Supp. 3d at 158 (holding that declaration that "the foreign agency . . . requested its relationship with the FBI be classified" was sufficient to exempt information pursuant to Exemption 7(D) (internal quotation marks omitted)).

The Court also finds plaintiff's argument speculating that the names of sources were excised throughout the record regardless of whether the informants were being discussed "*qua*

informants" unpersuasive.  Pl.'s Opp'n at 29.  Indeed, the FBI has provided a document-by-

document explanation of its redactions, and nothing suggests that once an individual was labeled

an informant all mentions of them were redacted.  Instead, the documents all appear to be

discussing the confidential information these confidential sources provided to the FBI.  Thus,

except for the one page noted above, DOJ is awarded summary judgment with respect to the

FBI's application of Exemption 7(D).

**j.      *Exemption 7(E)***

The final exemption asserted by the FBI is Exemption 7(E), which protects law

enforcement records to the extent those records "would disclose techniques and procedures for

law enforcement investigations or prosecutions, or would disclose guidelines for law

enforcement investigations or prosecutions if such disclosure could reasonably be expected to

risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The text of the exemption looks "not

just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain

risk of circumvention, but for an expected risk; not just for an undeniably or universally expected

risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk,

but for the chance of a reasonably expected risk."  *Mayer Brown LLP v. IRS*, 562 F.3d 1190,

1193 (D.C. Cir. 2009).  This exemption thus "sets a relatively low bar for the agency to justify

withholding." *Pub. Emps. for Envtl. Responsibility v. United States Section, Int'l Boundary and

Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 205 (D.C. Cir. 2014) (internal quotation marks

omitted) (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)).  In order to clear it, the

agency "must demonstrate only that release of a document might increase the risk 'that a law will

be violated or that past violators will escape legal consequences.'"  *Id*. (quoting *Mayer Brown*,

562 F.3d at 1193).  DOJ's burden is not the "highly specific" one "of showing how the law will

be circumvented," but instead it need only "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42 (internal quotation marks omitted) (quoting *Mayer Brown*, 562 F.3d at 1194).

As relevant to the Part II sample, the FBI has invoked Exemption 7(E) to withhold eleven categories of information: (1) sensitive file numbers or subfile names; (2) monetary payments for investigative techniques; (3) locations and identity of FBI and/or Joint Units, Squads, and/or Divisions; (4) dates and/or types of investigations; (5) collection/analysis of information; (6) database information and/or printouts; (7) undercover operations; (8) information regarding targets, dates, and scope of surveillance; (9) statistical information contained FBI FD-515 forms; (10) investigative focus of specific investigations; and (11) a specific law enforcement technique utilized to conduct national security investigations. 15th Hardy Decl. ¶¶ 132–45.[32]

At the outset, the FBI's handling of the records and information withheld pursuant to Exemption 7(E) has complicated analysis of the propriety of that Exemption's application. As noted above, special treatment of documents selected as part of a representative sample threatens to render that sample useless. *See* Part III.C.1.b.i, *supra*. For numerous sample documents initially withheld pursuant to Exemption 7(E), the FBI has withdrawn its defense of, or changed its justification for, the redactions by either releasing additional information from the sample documents or continuing to withhold information in reliance on other FOIA exemptions.[33] Where possible, the initial justification for withholding of these materials has been analyzed.

---

[32]    The FBI also asserted the exemption to shield parts of certain Part I documents that contained "targets of pen registers/trap & trace devices" and material compiled in the "Behavioral Analysis Unit's Violent Criminal Apprehension Program." 15th Hardy Decl. ¶¶ 146–47. As the Court has already determined that Part I documents were properly withheld pursuant to Exemption 7(A), there is no need to address the propriety of these exemptions.

[33]    This special treatment is evidenced in the following locations within the FBI's declarations: 15th Hardy Decl. at 67 n.37; *id*. at 68 n.38; *id.* at 70 n.39; *id*. at 73 n.40; 16th Hardy Decl. ¶ 80; *id*. ¶ 87; *id.* ¶ 97; *id*. ¶ 99; *id*. at 49 n.15; and *id*. ¶ 104.

Where, however, that has not been possible, the Court cannot determine whether the FBI has withdrawn its initial justification as a matter of discretion, or as an admission of error.

The FBI detailed its initial justifications one by one, explaining how release of information in each of these categories "logically . . . might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42. According to the FBI, releasing the "file numbering convention" would risk identifying the "investigative interest or priority given to such matters," because by "[a]pplying a mosaic analysis, suspects could use [the] numbers . . . in conjunction with other information known about other individuals and/or techniques, to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities." 15th Hardy Decl. ¶ 135; *see also Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928 (noting that "courts have relied on . . . mosaic arguments in the context of national security"). Moreover, "[c]ontinued release of sensitive investigative file numbers would provide criminal[s] with an idea of how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative strategies." 15th Hardy Decl. ¶ 135. As for information regarding monetary payments, the FBI states that "[r]evealing the amount of money the FBI has paid or plans to pay in order to implement certain investigative techniques would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts." *Id*. ¶ 136. The FBI seeks to protect locations of FBI units, squads, and/or divisions because revealing such information could "allow hostile analysts to determine where geographically the FBI is focusing its investigative resources, and allow them to relocate their criminal activities elsewhere," while revealing those units' identities would allow individuals to determine "exactly what the FBI's interest is." *Id*. ¶ 137. Revealing the dates and/or types of investigations, "would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary

investigation" and "predict FBI investigative reactions" to help them "avoid detection." *Id*.

¶ 138.  Protecting the "methods the FBI uses to collect and analyze the information it obtains" is

important to prevent individuals from learning "how and from where the FBI collects

information" enabling "criminal[s] to educate themselves about the techniques employed for the

collection and analysis of information and the types of information of greatest value to FBI

investigations." *Id*. ¶ 139.

Next, the FBI explains that release of database information and/or printouts "could enable

criminals to employ countermeasures to avoid providing the FBI with key investigative data

and/or allow them to predict how the FBI utilizes certain data to further its investigations." *Id*.

¶ 140.  The FBI also withheld "specific details of particular [undercover] operations [that] are not

[publicly] known" including "how it conducts undercover operations and . . . the specific

techniques used" to avoid possibly "devastating operational consequences." *Id*. ¶ 141.

Disclosure of "non-public details about when, how, under what circumstances, and on whom the

FBI conducts surveillance would allow current and future subjects of FBI investigations and

other potential criminals to develop and utilize countermeasures to defeat or avoid different types

of surveillance operations," rendering those techniques "useless." *Id*. ¶ 142.  The FBI next

asserts that revealing the investigative focus of specific investigations would "reveal the scope of

the FBI's programs and the strategies it plans to pursue in preventing and disrupting criminal

activity." *Id*. ¶ 144.  Finally, the FBI refers to a "sensitive law enforcement technique" that it

"cannot name . . . even generically, without revealing information that is, itself, exempt." *Id*.

¶ 145.  Although "the technique may be known by the public in a general sense," the public is

not aware of "its use in the specific context of this case," and neither are "details about and

analysis of [the] . . . technique." *Id*.  To reveal the "technique and these details would effectively reveal the specifics of how and in what settings the technique is employed." *Id*.

The above summary of the detail the FBI provides regarding the information it has withheld pursuant to Exemption 7(E) is more than sufficient to "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42.  Plaintiff raises myriad objections, but none seriously undermines the FBI's initial declarations.[34]

First, plaintiff challenges the withholding of sensitive file numbers, asserting the FBI's "justification . . . is insufficient given the absence of information about how long the investigations at issue have been closed for."  Pl.'s Opp'n at 35.  In making this argument he relies on opinions from two of his other FOIA lawsuits, one against DOJ and another against the CIA.  *Id*. at 34 (citing *Shapiro v. United States Dep't of Justice*, 239 F. Supp. 3d 100 (D.D.C. 2017) and *Shapiro v. CIA*, 247 F. Supp. 3d 53 (D.D.C. 2017)).  In both cases, summary judgment was withheld with respect to certain file numbers because the records presented were insufficient to determine whether release of the withheld information at issue "pose[d] a present day threat of circumvention of the law."  *Shapiro*, 247 F. Supp. 3d at 73 (quoting *Shapiro*, 239 F. Supp. 3d at 120).  This Court, however, has determined that the FBI has adequately described that present-day threat.  The FBI denies applying "a blanket policy of protecting all file numbers" but instead performs a case-by-case "circumvention risk analysis" in which it considers the types of investigations, the age of the records, and "the interrelation of file numbers to other investigations in terms of . . . impact on enforcement efforts."  16th Hardy Decl. ¶ 79.  In other

---

[34]    Plaintiff does not appear to challenge the withholding of information from FBI Form FD-515, which rates the effectiveness of investigative techniques used in particular investigations.  15th Hardy Decl. ¶ 143.  Release of such information could allow individuals to "change their activities and modus operandi in order to circumvent and avoid detection and/or surveillance in the future," *id*., and was thus properly withheld under Exemption 7(E).

words, the FBI fears that, by studying how the agency has "respond[ed] to different investigative circumstances" in the past, individuals in the present "could obtain an exceptional understanding as to how they might structure their behavior to avoid detection and disruption by FBI investigators." 15th Hardy Decl. ¶ 135. The FBI has thus shown how file numbers, even those marking closed investigations, might help individuals evade current law enforcement activities.[35] This Court joins the chorus of judicial decisions concluding that file numbers may be redacted pursuant to Exemption 7(E). *Shapiro*, 239 F. Supp. 3d at 118 n.5 (collecting cases).[36]

Next, plaintiff complains about the FBI's withholding of information that would reveal "monetary amounts requested by FBI personnel and/or paid by the FBI in order to implement particular investigative techniques," Pl.'s Opp'n at 36 (quoting 15th Hardy Decl. ¶ 136), on the theory that "amounts requested" do not reveal how the FBI has actually allocated its resources. *Id*. As the FBI explains, however, FBI agents request particular amounts based on on-the-ground determinations as to what funds are "necessary to conduct [an] operation." 16th Hardy Decl. ¶ 86. This information would reveal how FBI training has instructed agents to respond to particular investigative circumstances.

Plaintiff also takes issue with the fact that, on one page of the sample, the FBI invoked Exemption 7(E) to hide not the amount spent, but the product on which the money was spent.

---

[35]     The plaintiff's two other arguments with respect to file numbers are also rejected. First, the FBI is under no obligation to differentiate why certain file numbers it withholds create a risk of circumvention of the law and why others may be released. Pl.'s Opp'n at 35. Exemption 7(E) requires only that the FBI logically demonstrate why the material actually withheld creates such a risk. As described above, the FBI has carried that burden. Second, plaintiff argues that even "[i]f the Court disagrees with [him] and finds that case file numbers fall within the ambit of Exemption 7(E), the FBI should still be ordered to release segregable portions of the case file numbers." Pl.'s Opp'n at 36. The FBI's explanation that "file numbers are not reasonably segregable" and "[d]isclosure of any part of the file numbers exempted within the context of the file undermines the very exemption interests articulated above as it would provide a frame work [sic] to determine the exact matter prompting the FBI to open an investigation," 16th Hardy Decl. ¶ 85, are sufficient to defeat plaintiff's segregability argument.

[36]     The FBI withdrew application of Exemption 7(E) to file numbers contained on ten pages within the sample. As noted above, whether that withdrawal was an act of agency discretion or instead an admission of error is unclear. These ten redactions will thus be counted as potentially erroneous withholdings.

The FBI subsequently agreed with plaintiff and released the redacted information, revealing it had redacted the phrase "hotel room" from the sentence "Request reimbursement for cost of a hotel room."  16th Hardy Decl., Ex. B, ECF No. 113-3.  Here the Court agrees with plaintiff that revealing the fact a hotel room was rented for individuals attending an animal rights conference cannot reasonably be thought to risk circumvention of the law.  This redaction will be treated as an error in calculating the error rate.

Again referring to a document that appears to be a request for reimbursement for the rental of the hotel room referenced above, plaintiff complains that while disclosing "the total amount the FBI has or would be willing to spend on [an] entire investigation" may reveal the FBI's level of focus on a particular matter, "revealing the cost of a hotel room rented" would not.  Pl.'s Opp'n at 37.  Again, plaintiff's atomistic challenges to certain redactions ignores the holistic approach the FBI must take toward the records in this case.  Though the cost of one hotel room may not reveal much, given the volume of plaintiff's requests in this area, the FBI must be cautious in revealing individual budget line-items lest it reveal the entire budget.  The redaction of individual costs is thus proper.

With respect to identities and locations of particular investigative units, plaintiff claims that the FBI's attempt to withhold such information is "radical."  Pl.'s Opp'n at 39; *but see Reporters Comm. for Freedom of the Press v. FBI*, Civil Case No. 15-1392 (RJL), 2020 WL 1324397, *10 (D.D.C. Mar. 20, 2020) (granting the FBI summary judgment as to its withholding under Exemption 7(E) of "the identity and/or location of FBI or joint units, squads, or divisions"); *Shapiro v. Dep't of Justice*, 393 F. Supp. 3d 111, 116–19 (D.D.C. 2019) (upholding the redaction of "the identity of an FBI unit," and explaining that, while the argument need not be addressed, "other members of this Court" had found that unit names and locations may

properly be withheld under a "'resource allocation' rationale"); *Poitras*, 303 F. Supp. 3d at 159;

*Labow v. United States Dep't of Justice*, 66 F. Supp. 3d 104, 127 (D.D.C. 2014), *aff'd in part

and rev'd in part on other grounds*, 831 F.3d 523 (D.C. Cir. 2016).  The FBI has adequately

described how "repeated release of" such information "would reveal the variety and breadth of

tools the FBI can bring to the table in its investigations" and, in particular, how and where the

FBI allocates the resources possessed by the units in question.  16th Hardy Decl. ¶ 91.  Plaintiff

also complains that the FBI has been inconsistent in its application of Exemption 7(E) to the

identities and locations of particular investigative units.  Pl.'s Opp'n at 41.  As the FBI

explained, however, that some exempt information slips through the cracks does not call into

question the "justification for withholding" that information from other documents,16th Hardy

Decl. ¶ 92, especially when the FBI's concern is not hiding the existence of units, but rather how

those unit's resources are allocated.  In any event, as noted already, nothing in FOIA *requires* an

agency to withhold exempt information, 5 U.S.C. § 552(d), and plaintiff's attempts to point to

minor inconsistencies in the FBI's processing of hundreds of thousands of records in response to

his requests as evidence of either agency bad faith or admissions of agency error will not be

indulged.

Next, plaintiff complains that the FBI must reveal dates and types of investigations by

pointing out that such information is often found in public court opinions.  Pl.'s Opp'n at 42.

Again, the Court's task here is to determine whether information has been properly *withheld*, not

whether similar information was properly *released* in other scenarios.  Focusing on the FBI's

justification for its redactions, the FBI's concern that "provid[ing] a window into the FBI's

assessment methodology and timing on deciding" when to initiate a preliminary investigation or

convert a preliminary investigation to a full one is compelling.  16th Hardy Decl. ¶ 95.

90

Especially given the "low bar" for withholding information pursuant to Exemption 7(E), the FBI has carried its burden.

Plaintiff also challenges the FBI's use of Exemption 7(E) to withhold information regarding the collection and analysis of information by the agency.  Plaintiff worries that, because he cannot "imagine anything that an FBI employee might do that . . . does *not* involve either collecting or analyzing information in some form or another," allowing such redactions would threaten to "sweep within [the Exemption's] scope" nearly all of the FBI's activities.  Pl.'s Opp'n at 43.  The FBI counters that information withheld under Exemption 7(E), in this category protected "the finer points" of how such information collection and analysis techniques are used and only insofar as revelation of such information could reasonably be thought to risk circumvention of the law.  16th Hardy Decl. ¶ 97.  The FBI's careful analysis and release of large portions of thousands of documents reveals that plaintiff's bogeyman is little more than a strawman.  Contrary to the plaintiff's hyperbole, the Court is not "sanction[ing] an interpretation of the law under which the FBI" could "withhold every document."  Pl.'s Reply at 29.  Only when the FBI has conducted a careful examination of whether the release of specific materials could risk the circumvention of law and logically demonstrated how that risk might come to fruition, will the Court uphold its withholdings.  The FBI has done so here.[37]

Plaintiff next challenges the withholding of information about or drawn from "non-public databases used for official law enforcement purposes."  15th Hardy Decl. ¶ 140.  Plaintiff asserts that the information withheld in one document relates to a database the FBI has already been

---

[37]     The FBI withdrew initial application of Exemption 7(E) to protect information concerning collection and analysis of information from one page within the sample.  16th Hardy Decl. ¶ 97 ("Upon further review and consideration of foreseeable harm, the FBI no longer asserts Exemption 7(E) under code category collection and analysis of Bates Page Shapiro-93317").  Since the record is unclear whether that information remains exempt under another exemption, whether the FBI stands behind its initial withholding of the information, or whether the FBI has admitted error, this is counted as a potentially erroneous withholding.

revealed publicly, Pl.'s Opp'n at 44, an assertion the FBI says "is not true," and, further, that the referenced database is "used by FBI Special Agents" and other personnel "to comprehensively categorize and store terrorism-related investigative and intelligence data," 16th Hardy Decl. ¶ 100.  Plaintiff also complains that the information redacted pursuant to this justification within another document is not information pulled from a sensitive database but is rather a description of that database.  Pl.'s Opp'n at 45.  The FBI explains that the description is of a "highly-sensitive, digital tool used for collection and analysis of information," the existence of which is not widely known.  16th Hardy Decl. ¶ 101–04.  The FBI has convincingly addressed plaintiff's concerns, and therefore Exemption 7(E) has been properly applied in this respect.[38]

Plaintiff again misses the mark with his challenge of the FBI's withholding of "operational details" of the Bureau's undercover operations.  16th Hardy Decl. ¶ 105.  The FBI has explained that it has sought to protect only "non-public details about how it conducts undercover operations," 15th Hardy Decl. ¶ 141, that include "the specific types of undercover techniques deployed in specific investigations; how FBI investigators use undercover operatives/operations to investigate specific targets; the extent operatives can infiltrate organizations; covert communication techniques; covert funding techniques," and more, 16th Hardy Decl. ¶ 105.  This detail is more than sufficient to meet Exemption 7(E)'s low bar.[39]

---

[38]      The FBI is no longer withholding information on twenty pages pursuant to Exemption 7(E) because it concerns non-public databases, but instead is withholding the same information under the same Exemption because it would reveal the techniques and procedures the FBI uses to collect and analyze information. 16th Hardy Decl. ¶ 99 & n.15.  As the Court has already determined that the FBI may properly withhold information to protect its collection and analysis techniques and procedures, these withholdings were not made in error and will not count toward the error rate.

[39]      Plaintiff speculates that information redacted from one page contains only an "analysis of the forfeiture potential of action against the Animal Liberation Front," Pl.'s Opp'n at 46, but points to nothing suggesting that the analysis does not contain precisely the information concerning undercover operations the FBI seeks to protect. Plaintiff's guess as to what is behind the redaction cannot overcome the detailed explanation the FBI has provided. *See* 16th Hardy Decl. ¶ 105.

Plaintiff continues his list of challenges to the FBI's use of Exemption 7(E) by objecting to the FBI's use of the exemption to shield "the precise identity of the targets [of FBI surveillance] and the common nexus between that target and additional targets to be surveilled." 16th Hardy Decl. ¶ 106. To the extent that the FBI has used exemption 7(E) to protect "information about the installation" of surveillance devices, the "exact duration" of a particular surveillance operation, and "specific surveillance device[s] utilized," those redactions are unchallenged. *Id*. With respect to the FBI's redacting the identities of surveillance targets on three pages of the sample, Exemption 7(E) is properly applied. The FBI admits that many surveillance techniques are already known to the public, but by revealing the identity of the target of particular surveillance methods, the FBI risks revealing why and how particular surveillance techniques are implemented. Release of the identities of these targets could thus reveal the FBI's procedure or technique for selecting specific surveillance methods and begin to unveil, in mosaic-like fashion, the FBI's surveillance playbook. The FBI has thus logically demonstrated how the identities it has shielded pursuant to Exemption 7(E) risk circumvention of the law.

Plaintiff challenges the FBI's application of Exemption 7(E) to protect the "investigative focus of specific investigation[s]" on two pages within the sample, 16th Hardy Decl. ¶ 108 (capitalization altered), on grounds that the FBI has not adequately explained how the specific redacted information risks the circumvention of law. The FBI's declarations, however, clarify that on one page the information would reveal "the specific connection between one or more individuals or groups" at issue in this case and "another matter under investigation." *Id*. On the other page, the redacted information would reveal how the FBI "validate[s] the reliability" of cooperating witnesses. *Id*. The Court has no trouble concluding that such information, if

revealed, would risk circumvention of the law.  Plaintiff nonetheless objects that at least one of those documents "gives no indication of how" the redacted information "could risk current circumvention of the law."  Pl's Reply at 32.  That, of course, is the point of the Exemption.  It has been properly invoked to protect the investigative focus of particular investigations in this case.

Finally, plaintiff objects to the FBI's use of Exemption 7(E) to protect information concerning a "sensitive technique . . . used by the FBI to obtain valuable intelligence information."  15th Hardy Decl. ¶ 145.  This technique is "classified at the Secret level" and "providing further details on the public record" would, according to the FBI, "divulge the very information the FBI must protect under" FOIA exemptions 1 and 3.  16th Hardy Decl. ¶ 109.  The FBI further explains that the technique is used as a "building block in many of the FBI's domestic terrorism, international terrorism, counterterrorism and counterintelligence investigations."  *Id*.  Revealing details about the technique "would compromise [this] crucial means of collecting intelligence information and severely hamper the FBI's law enforcement efforts."  15th Hardy Decl. ¶ 145.  The FBI has thus adequately described why the information in question must be withheld pursuant to Exemption 7(E).

Except where specifically noted, the FBI has properly invoked Exemption 7(E) and has more than met its burden to demonstrate logically how the information it withheld could, if released, risk circumvention of the law.  Given, however, the FBI's shifting justification for many documents and its subsequent release of material on a number of pages, the Court is unable to determine precisely how many withholdings were made in error.  In addition to the FBI's single certain error it committed by withholding the words "hotel room" from a single document, there are eleven instances of potential error in the agency's application of Exemption 7(E).

### k.     *Segregability*

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure.  5 U.S.C. § 552(b).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman v. United States Marshals Serv.*, 494 F.3d 1107, 1117 (D.C. Cir. 2007).  Except in limited circumstances detailed above, plaintiff has not challenged the FBI's efforts to segregate exempt material from nonexempt materials.  That choice is reasonable given that the FBI has been "able to segregate for release approximately 38,788 pages and 28 CDs/DVDs" responsive to plaintiff's requests.  15th Hardy Decl. ¶ 149.  Plaintiff's choice not to challenge the FBI's segregability analysis also means he has done nothing to overcome the presumption of compliance the FBI is afforded.  Given the FBI's diligent release of tens of thousands of documents to plaintiff, DOJ is entitled to summary judgment with respect to the FBI's segregability analysis.

### l.     *Error Rate Calculation*

As noted on numerous occasions above, the calculation of the error rate in this case has been complicated by the FBI's numerous re-reviews of the sample and subsequent release of additional information that had initially been withheld.  Normally, such conscientious and repeated review of withholdings should be commended, but in sampling cases such second-looks with different withholding outcomes require explanation.  Plaintiff has assumed that each instance of subsequent release he has pointed out must count as an error in calculating the error rate.  Pl.'s Reply at 6.  As explained throughout this opinion, however, the Court has reviewed the redactions plaintiff has challenged by analyzing the FBI's initial justifications where possible and has also worked to determine whether the FBI's later removal of an *exemption* meant it was

removing a *redaction*.  As a result of this analysis, 25 errors can be identified as certain.  Another

56 instances have been identified in which subsequent withdrawals of particular Exemptions may

indicate the FBI erred, but the record is insufficient to make a concrete determination.  In the

worst-case scenario, then, the FBI has committed 81 errors throughout the 501-page Part II

sample.  The error rate, at its highest, is thus just over 16%.[40]  As noted above, whether this error

rate is sufficient to warrant complete reprocessing of the FBI's withheld records, is a question

that must take into account the totality of the circumstances.  In contrast to *Meeropol*, in which it

took the combination of a 25% error rate and a "finding by the district court that the FBI had

been 'intransigent'" to warrant full reprocessing, no hint of agency bad faith is present in this

action.  *Meeropol*, 790 F.2d at 960.  To the contrary, the vast majority of the potential errors

were only revealed because the FBI diligently attempted to release all nonexempt segregable

material.  The FBI's re-reviews of the Part II sample raised complications, but were performed in

an effort to comply fully with its FOIA obligations.  Plaintiff has pointed to no authority for the

proposition that full reprocessing would be warranted for error rates less than 25% or even 20%.

Given the FBI's diligent processing of hundreds of thousands of pages in this case and its

substantial efforts to release as many of those pages as possible, a potential error rate of 16%,

and a true error rate that is likely much lower, is insufficient to justify complete reprocessing.

Except with respect to the few redactions the FBI must remove noted above, *see* Part III.C.3.f,

---

[40]        The error rate may in fact be much lower, and not just because many of the errors used in this calculation
are merely potential errors.  *Bonner* instructs that "[t]o determine the error rate," the Court must "consider the
unjustified *withholdings* compared to the total *withholdings* from" the sample documents.  *Bonner*, 928 F.2d at 1154
n.13 (emphasis added).  Where entire pages are withheld, a page is of course synonymous with a withholding.
When, however, records are released in part, a single page may contain multiple withholdings.  If the denominator
for determining the error rate in the Part II sample is thus total withholdings, as *Bonner* suggests it should be, it is
likely much larger than 501.  Nevertheless, because even using the smaller denominator of total pages produces an
error rate insufficient to require total reprocessing, the Court need not dwell on this point.

*supra*, DOJ is thus entitled to summary judgment with respect to the entire universe of records processed by the FBI.[41]

Plaintiff's alternative bid to secure "more limited relief," Pl.'s Opp'n at 53, is denied.  In particular he requests that "if a particular . . . exemption category has an unacceptably high error rate, the FBI should be ordered to reprocess all records in which that exemption category is invoked."  *Id*.  As an example, he says "if a review of the sample reveals that the FBI consistently redacted the names of third parties of investigative interest for whom [plaintiff] provided privacy waivers," then the FBI should be ordered "to reprocess all records in which it invoked Exemptions 6 and 7(C) as to third parties of investigative interest."  *Id*.  Simply put, the Part II sample is not designed for that kind of analysis.  *See* JSR (Oct. 20, 2017) (noting the Part II sample would be designed to test "assertion of other exemptions where Exemption 7(A) has not been invoked categorically").  For instance, many of the exemptions at issue appear on only one or two pages.  Under plaintiff's theory, a single mistake with respect to one of those exemptions would result in full reprocessing of records in which that exemption was asserted.  This would transform a tool intended to lessen the bureaucratic burden into one almost certain to lead to more work for the FBI.  Had the parties wished for the more targeted approach proposed by plaintiff, they could have designed samples to test each of the various asserted exemptions.  They did not.  The resulting sample, while well picked to test the accuracy of the FBI's

---

[41]     Plaintiff rightly complains about the many changes the FBI made to its withholdings in response to his opposition.  Pl.'s Reply 3–5 (alleging that "the original [*Vaughn*] 'index is wholly inadequate and riddled with countless examples of mistakes and other incongruities'" (quoting *Schoenman v. FBI*, 604 F. Supp. 2d 174, 202 (D.D.C. 2009))).  Those changes have, as already noted, frustrated the Court's ability to easily determine the propriety of the agency's initial withholdings.  Nevertheless, those changes have been accounted for or, where that was impossible, a potential error has been noted.  Some understanding must also be extended to the FBI, which has been deluged with plaintiff's requests and has been working diligently over the last eight years to process and release tens of thousands of records out of the hundreds of thousands reviewed.  Clarity in the FBI's initial *Vaughn* index would have been preferable, but all of the FBI's explanations have provided an adequate basis for proper analysis of the FBI's withholdings, such that, even when that analysis is viewed in the light most favorable to the plaintiff, the FBI has met its FOIA obligations.

withholdings overall, is not a good tool for the more precise relief plaintiff now, belatedly, requests.

### D.   ATF Withholdings

The parties pay much less attention to the ATF's withholdings from a comparative handful of documents processed by that agency.  When the FBI located ATF documents in performing its searches pursuant to plaintiff's requests or found information in responsive records that concerned the ATF, those documents were forwarded to ATF for processing.  *See generally*, Chisholm Decl.  As a result, the ATF processed 509 pages of records pursuant to the FBI's referrals or requests for consultation.  *See generally*, ATF *Vaughn* Index; Chisholm Decl. As described above, ATF also received a single FOIA request directly from plaintiff.  Part III.B.3, *supra*.  That search resulted in the release to plaintiff of a single, four-page document. ATF *Vaughn* Index at 23.  Owing to the limited number of documents, ATF chose not to submit a sample *Vaughn* index and instead has provided justifications for withholdings from each and every document it processed.  The ATF asserted Exemptions 3, 4, 5, 6, 7(C), 7(D), and 7(E) to support its withholdings.  Plaintiff challenges all but the ATF's assertion of Exemptions 6 and 7(C).  The challenged redactions are discussed in turn.

### 1.   *Exemption 3*

The ATF invoked Exemption 3 pursuant to Federal Rule of Criminal Procedure 6(e) which prohibits disclosure of "matter[s] occurring before the grand jury."  Fed. R. Crim. P. 6(e). Plaintiff does not challenge the notion that Rule 6(e) is an exemption statute as contemplated by Exemption 3.  Pl.'s Opp'n at 51; *see also Labow*, 831 F.3d at 529 ("This court has already held that Federal Rule of Criminal Procedure 6(e) is a qualifying statute under Exemption 3.").  The only question is whether the records or information withheld by the ATF "fall within Rule 6(e)." *Labow*, 831 F.3d at 529.

98

The ATF has asserted Exemption 3 to withhold "documents and information submitted to the Grand Jury."  Chisholm Decl. ¶ 58.  "If disclosed," the ATF says, the withheld "material would reveal protected inner workings of Grand Jury proceedings, including, most significantly, the substance of the Grand Jury's investigation and the evidence is considered."  *Id*.  The Circuit recently explained that "[t]he mere fact that information has been presented to the grand jury does not itself permit withholding."  *Labow*, 831 F.3d at 529 (citing *Senate of P.R.*, 823 F.2d at 584).  Instead, when an agency invokes Exemption 3 via Rule 6(e), "the 'touchstone' is whether the information sought would reveal something about the grand jury's identity, investigation, or deliberation."  *Id*.

The ATF has provided little detail about what exactly is withheld beyond that already recounted.  Its *Vaughn* index shows that Exemption 3 has been applied to documents variously described as "ATF report[s] of investigation," "grand jury information," "material submitted to grand jury," and "information submitted to grand jury."  ATF *Vaughn* Index (capitalization altered).  The ATF's conclusory statement that disclosure of the withheld material "would reveal [the] protected inner workings of Grand Jury proceedings, including . . . the substance of the Grand Jury's investigation and the evidence it considered," Chisholm Decl. ¶ 58, is nearly identical to the justification found insufficient when offered by the FBI in *Labow*.  *Labow*, 831 F.3d at 530 (rejecting the FBI's "conclusory statement that '[a]ny disclosure of [the withheld] information would clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of a federal grand jury'" (first alteration in original)).  The Court is mindful of the bind this may put the ATF in should the agency be required to release information that, on its face may contain no indication of association with a grand jury, but now that the ATF has asserted Rule 6(e)'s protection, for which the proverbial cat may be out of the bag.  The Circuit

has already opined, however, that this problem "should not bar disclosure."  *Id*.  The relevant

question remains "whether the documents would have revealed the inner workings of the grand

jury had they been released in response to the initial FOIA request."  *Id*. (citing *Wash. Post Co.*

*v. United States Dep't of Justice*, 863 F.2d 96, 100 (D.C. Cir. 1988)).  On the current record, that

question cannot be satisfactorily answered.  ATF, which has submitted only a single declaration

in this case, will be given the opportunity to submit a more detailed explanation for why the

records in question could not have been disclosed at the time of the agency's initial response to

plaintiff's FOIA requests.

### 2.    *Exemption 4*

Under Exemption 4, ATF withheld "financial information from department stores

concerning pricing, quantities, unit prices, and merchandise value, along with security measures

in various locations."  Chisholm Decl. ¶ 62.  ATF provides descriptions of the documents on

which Exemption 4 was applied as including "ATF report[s] of investigation[s]," "security

information report[s]" from Macy's California, other documents from Macy's concerning

vandalism at some of its stores, a "description of merchandise" obtained from the San Francisco

Police Department ("SFPD"), and an incident report obtained from the SFPD.  ATF *Vaughn*

Index.

As noted above, while briefing was ongoing and after ATF had already submitted its

*Vaughn* index, the Supreme Court changed the applicable standard for analyzing whether

financial or commercial information in an agency's possession were confidential records under

Exemption 4.  Under that new standard, "[a]t least where commercial or financial information is

[1] both customarily and actually treated as private by its owner and [2] provided to the

government under an assurance of privacy, the information is 'confidential' within the meaning

100

of Exemption 4." *Food Marketing Institute*, 139 S. Ct. at 2366.  ATF's *Vaughn* Index and

declaration do not contain sufficient information to measure against this standard.  For that

matter, they do not contain sufficient detail to measure the application of Exemption 4 against

any standard.  The declaration merely lists the kinds of information withheld but makes no

attempt to explain why such information is "confidential."  While "security measures" in place at

various department stores might "customarily be treated as private" by those stores, this surmise

would be pure conjecture on the current record.  *Id*.  Given the new Exemption 4 standard and

the utter lack of any detail as to why the information withheld by the ATF should be considered

confidential, ATF will also be provided an opportunity to either release the information withheld

under Exemption 4 or submit a more detailed explanation of how its withholdings fall under this

exemption's aegis.

   **3.**  ***Exemption 5***

   ATF asserted Exemption 5's deliberative process privilege to protect "report[s] of

investigation[s]," a "telecommunication message," and various "draft document[s]," ATF

*Vaughn* Index, that detailed "a Special Agent's assessment of what ha[d] transpired in an

investigation," Chisholm Decl. ¶ 64.  These documents related the Special Agent's "frank

opinions or recommendations" related to criminal investigations.  *Id*. ¶ 69.  Plaintiff, in a two-

sentence objection to application of this Exemption, complains that "there is no indication as to

what role the documents play in the deliberative process" and that the "ATF has not indicated

whether any factual material being withheld can be segregated and released."  Pl.'s Opp'n at 53.

   ATF, however, has met its burden.  The agency explains the deliberative process

involved is the discussion of "alternative avenues of action available in the investigation" at

issue.  Chisholm Decl. ¶ 64.  The role the documents played in the deliberative process is

described as memorializing the Special Agent's communication of his opinions and recommendations to "a superior or other agent." *Id*. Finally, the declaration explains that this Special Agent was empowered to "make . . . decisions as part of a criminal investigation," *id*. ¶ 65, which adequately describes the "nature of the decisionmaking authority vested in the . . . person issuing the disputed opinion," *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 147. As to plaintiff's segregability complaint, ATF explains that "staff reviewed each page of the material identified as responsive to ensure that no additional information could be released" and that "[a]ll releasable information has been provided to Plaintiff." Chisholm Decl. ¶ 107. Plaintiff does nothing to rebut the "presumption that [ATF] complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117.

### 4. *Exemption 7(D)*

ATF has also met its burden with respect to its application of Exemption 7(D). As the agency explained, it withheld "portions of ATF Reports of Investigation that would reveal the identity of confidential sources or the information they provided" and "[d]ates that could be used for identification of the aforementioned individuals." Chisholm Decl. ¶ 93. ATF notes that sources it has sought to protect were "cooperat[ing] under the assumption of confidentiality." *Id*. ¶ 99. Plaintiff complains that the ATF has only addressed "one of the four factors that must be considered." Pl.'s Opp'n at 53.

As a refresher, the four *Roth* factors for determining whether it is reasonable to believe an implied assurance of confidentiality was given to a particular source are: "[1] the character of the crime at issue, [2] the source's relation to the crime, [3] whether the source received payment, and [4] whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at locations and under conditions which assure the

contact will not be noticed." *Labow*, 831 F.3d at 531 (quoting *Roth*, 642 F.3d at 1184).  The

ATF explains that the crime at issue "involve[d] domestic terrorism and the use of explosives."

Chisholm Decl. ¶ 97.  These are certainly "serious or violent crimes" that weigh in favor of a

finding of confidentiality.  *Labow*, 831 F.3d at 531.  Contrary to plaintiff's assertions, the FBI

has also addressed the second factor by noting that "[i]t is clear that if [the] information provided

by the source were to be released, then the source's identity would be known to those involved

with the animal rights movement."  Chisholm Decl. ¶ 97.  When a source provides "singular"

information, that is, "the kind of information that, if it were revealed to the public, could be

traced to a particular source," the relationship of the individual to the crime and alleged criminals

can properly be inferred.  *Labow*, 831 F.3d at 532.  Although the ATF fails to address the

remaining two factors, the strength of the first two suggest that the sources at issue expected

confidentiality.  The ATF has thus carried its burden and DOJ is entitled to summary judgment

with respect to the ATF's application of Exemption 7(D).

### 5.  *Exemption 7(E)*

With respect to Exemption 7(E), plaintiff challenges only ATF's application to "withhold

from Plaintiff information about techniques for funding law enforcement investigations."

Chisholm Decl. ¶ 102; Pl.'s Opp'n at 53.  He makes the same arguments he made with respect to

funding requests and the funding of individual techniques in challenging the FBI's use of

Exemption 7(E).  These arguments are no more persuasive here and DOJ will likewise be

granted summary judgment with respect to the ATF's application of Exemption 7(E).[42]

---

[42]     Plaintiff's complaint is mainly concerned with his allegations that the FBI and ATF violated FOIA, but it
also contains one allegation that the agencies violated the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896,
codified at 5 U.S.C. § 552a.  FAC ¶ 518.  This act "regulates the collection, maintenance, use, and dissemination of
information about individuals by federal agencies."  *Wilson v. Libby*, 535 F.3d 697, 707 (D.C. Cir. 2008) (internal
quotation marks and citations omitted) (quoting *Doe v. Chao*, 540 U.S. 614, 618 (2004)).  The Privacy Act grants
individuals "access to [their] record or to any information pertaining to [them] which is contained" in an agency's
records system.  5 U.S.C. § 552a(d)(1).  DOJ argues that the FBI's Central Records System and the ATF's records

**IV.     CONCLUSION**

For the foregoing reasons, plaintiff's motion for discovery under Rule 56(d) and his

cross-motion for summary judgment are DENIED.  DOJ's motion for summary judgment is

GRANTED IN PART and DENIED IN PART. Specifically, DOJ's motion is DENIED with

respect to (1) the FBI's application of Exemption 5 to pages with Bates Nos. Shapiro-202953–

56; and (2) ATF's application of Exemptions 3 and 4, but GRANTED in all other respects. DOJ

may, by August 3, 2020, either release the information withheld by the FBI pursuant to

Exemption 5 on pages with Bates Nos. Shapiro-202953–56 and by ATF pursuant to FOIA

Exemptions 3 and 4, or submit a renewed motion for summary judgement supported by

supplemental declarations justifying the information's continued withholding.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: July 2, 2020

_____
BERYL A. HOWELL
Chief Judge

---

systems are exempt from the Privacy Act's Requirements.  Def.'s Mem. at 9–10; *see also* 5 U.S.C. § 552a(j)(2)
("The head of any agency may promulgate rules . . . to exempt any system of records within the agency . . . if the
system of records is . . . maintained by an agency or component thereof which performs as its principal function any
activity pertaining to the enforcement of criminal laws . . . and which consists of . . . reports identifiable to an
individual compiled at any stage of the process of enforcement of the criminal laws from arrest or indictment
through release from supervision."); 28 C.F.R. § 16.96 (exempting the FBI's Central Records System); *id.* § 16.106
(exempting ATF's records systems).  Plaintiff does not respond to this argument and has thus waived his argument
that summary judgment is improper for his Privacy Act claim.  DOJ is thus entitled to summary judgment as to that
claim.

## APPENDIX

## CHRONOLOGICAL LISTING OF PLAINTIFF'S REQUESTS

| | Agency | Request Number | Subject Matter | Date of Request |
|---|---|---|---|---|
| 1 | FBI | 1020553 | National Anti-Vivisection Society | May 2, 2005 |
| 2 | FBI | 1121258 | Ryan Noah Shapiro | October 6, 2008 |
| 3 | FBI | 1134526 | A Declaration of War: Killing People to Save Animals and the Environment | July 8, 2009 |
| 4 | FBI | 1143549 | Animal Liberation Front | January 29, 2010 |
| 5 | FBI | 1143759 | Compassion Over Killing | January 31, 2010 |
| 6 | FBI | 1143926 | Friends of Animals | January 31, 2010 |
| 7 | FBI | 1144151 | American Anti-Vivisection Society | January 31, 2010 |
| 8 | FBI | 1143766 | New England Anti-Vivisection Society | January 31, 2010 |
| 9 | FBI | 1146934 | Lauren Beth Gazzola | April 10, 2010 |
| 10 | FBI | 1156519 | Last Chance for Animals | October 22, 2010 |
| 11 | FBI | 1156549 | Miyun Park | October 22, 2010 |
| 12 | FBI | 1156661 | Lindsay Parme | October 24, 2010 |
| 13 | FBI | 1157033 | Animal Defense League | November 4, 2010 |
| 14 | FBI | 1156759 | No Compromise | November 4, 2010 |
| 15 | FBI | 1160275 | Friends of Animals | December 24, 2010 |
| 16 | FBI | 1159897 | Hyram Kitchen Murder | December 29, 2010 |
| 17 | FBI | 1160815 | Compassion Over Killing | January 18, 2011 |
| 18 | FBI | 1161231 | Compassion Over Killing | January 18, 2011 |
| 19 | FBI | 1143759-001 | Compassion Over Killing | March 9, 2011 |
| 20 | FBI | 1166938 | National Crime Information Center records about possibility of violence against unknown veterinary school deans by unknown animal rights activists | May 19, 2011 |
| 21 | FBI | 1167292 | Ryan Noah Shapiro | May 26, 2011 |
| 22 | FBI | 1167308 | Nathan Donald Runkle | May 27, 2011 |
| 23 | FBI | 1167305 | Sarah Jane Blum | May 27, 2011 |
| 24 | FBI | 1167538 | Freeman Wicklund | May 31, 2011 |
| 25 | FBI | 1168139 | Dallas Rachael Rising | June 7, 2011 |
| 26 | FBI | 1167816 | Chris DeRose | June 7, 2011 |
| 27 | FBI | 1167824 | Jack D. Carone | June 7, 2011 |
| 28 | FBI | 1167840 | Linda T. Tannenbaum | June 7, 2011 |
| 29 | FBI | 1168703 | Crescent Vellucci | June 7, 2011 |
| 30 | FBI | 1167949 | Jonathan Christopher Mark Paul | June 7, 2011 |
| 31 | FBI | 1168146 | Leslie Stewart | June 7, 2011 |
| 32 | FBI | 1167894 | Sheila Laracy | June 7, 2011 |
| 33 | FBI | 1167292-001 | Ryan Noah Shapiro | June 8, 2011 |
| 34 | FBI | 1168089 | Henry Hutto | June 9, 2011 |
| 35 | FBI | 1168026 | Animal Liberation Front Supporters Group | June 9, 2011 |

| 36 | FBI | 1169365 | Kimberly Ann Berardi | June 21, 2011 |
| 37 | FBI | 1179685 | Peter Daniel Young | June 28, 2011 |
| 38 | FBI | 1169688 | Kevin Rich Olliff | June 28, 2011 |
| 39 | FBI | 1169964 | Joseph W. Bateman | June 28, 2011 |
| 40 | FBI | 1169999 | David Patrick Hayden | June 28, 2011 |
| 41 | FBI | 1169590 | Iver R. Johnson III | June 29, 2011 |
| 42 | FBI | 1169540 | Aaron Glenn Leider | June 29, 2011 |
| 43 | FBI | 1169433 | Patrick Kwan | June 29, 2011 |
| 44 | FBI | 1170870 | Gina Lynn | July 7, 2011 |
| 45 | FBI | 1170449 | Joseph Buddenberg | July 12, 2011 |
| 46 | FBI | 1170437 | Michael A. Budkie | July 12, 2011 |
| 47 | FBI | 1170784 | Rick A. Bogle | July 12, 2011 |
| 48 | FBI | 1170104 | Stephen Omar Hindi | July 12, 2011 |
| 49 | FBI | 1171428 | Julie Elizabeth Lewin | July 20, 2011 |
| 50 | FBI | 1171502 | Camille Marino | July 22, 2011 |
| 51 | FBI | 1171759 | Foundation for Biomedical Research | July 26, 2011 |
| 52 | FBI | 1171768 | National Association for Biomedical Research | July 26, 2011 |
| 53 | FBI | 1172386 | Americans for Medical Progress | July 26, 2011 |
| 54 | FBI | 1172382 | Center for Consumer Freedom | July 26, 2011 |
| 55 | FBI | 1173044 | National Animal Interest Alliance | July 26, 2011 |
| 56 | FBI | 1173385 | Fur Information Council of America | July 26, 2011 |
| 57 | FBI | 1171597 | Perceptions International | July 26, 2011 |
| 58 | FBI | 1171892 | Sean Diener | July 26, 2011 |
| 59 | FBI | 1179601 | Kelly Ann Higgins | July 26, 2011 |
| 60 | FBI | 1156519-001 | Last Chance for Animals | July 26, 2011 |
| 61 | FBI | 1171492 | American Medical Association | August 5, 2011 |
| 62 | FBI | 1171456 | Allison Helene Lance Watson | August 5, 2011 |
| 63 | FBI | 1143926-001 | Friends of Animals | August 10, 2011 |
| 64 | FBI | 1173573 | Mercy for Animals | August 10, 2011 |
| 65 | FBI | 1167308-001 | Nathan Donald Runkle | August 10, 2011 |
| 66 | FBI | 1144639-001 | Fund for Animals | August 10, 2011 |
| 67 | FBI | 1144151-001 | American Anti-Vivisection Society | August 10, 2011 |
| 68 | FBI | 1143766-001 | New England Anti-Vivisection Society | August 10, 2011 |
| 69 | FBI | 1020553-001 | National Anti-Vivisection Society | August 10, 2011 |
| 70 | FBI | 1168026-001 | Animal Liberation Front Supporters Group | August 10, 2011 |
| 71 | FBI | 1167305-001 | Sarah Jane Blum | August 10, 2011 |
| 72 | FBI | 1173497 | Animal Liberation Front Conference | August 15, 2011 |
| 73 | FBI | 1173506 | Steven Paul Best | August 19, 2011 |
| 74 | FBI | 1159897-001 | Hyram Kitchen Murder | September 2, 2011 |
| 75 | ATF | 11-1208 | United States Surgical Corporation Attempted Bombing | September 2, 2011 |
| 76 | FBI | 1173555 | Utah Animal Rights Coalition/United Animal Rights Coalition | September 8, 2011 |
| 77 | FBI | 1177804 | Lauren Beth Gazzola | November 15, 2011 |

| 78 | FBI | 1178088 | Screaming Wolf | November 22, 2011 |
|---|---|---|---|---|
| 79 | FBI | 1179180 | A Declaration of War: Killing People to Save Animals and the Environment | November 22, 2011 |
| 80 | FBI | 1179204 | Rodney Adam Coronado | December 5, 2011 |
| 81 | FBI | 1179996 | Will Potter | December 20, 2011 |
| 82 | FBI | 1182729 | United States Surgical Corporation | February 10, 2012 |
| 83 | FBI | 1182395 | Green is the New Red | February 10, 2012 |