IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CARL OGLESBY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civ. A. No. 02-CV-00603 (RWR) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE, | ) |
| et al, | ) |
| | ) |
| Defendants. | ) |

## THIRD DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), formerly at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C., and currently relocated to Winchester, Virginia. I have held this position since August 1, 2002.  Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 280 employees who staff a total of ten (10) FBIHQ units and two field operational service center units whose collective mission is to effectively plan, develop, direct and manage responses to requests for access to FBI records and information pursuant to the FOIA, as most recently

amended by the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13526;

Presidential, Attorney General and FBI policies and procedures; judicial decisions and

Presidential and Congressional directives. My responsibilities also include the review of FBI

information for classification purposes as mandated by Executive Order 13526[1], and the

preparation of declarations in support of Exemption 1 claims asserted under the FOIA[2]. I have

been designated by the Attorney General of the United States as an original classification

authority and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1.

The statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information pursuant to the provisions of the FOIA,

5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the

FBI's response to plaintiff's FOIA/Privacy Act requests directed to FBIHQ, Chicago, New York

City, and Washington Field Offices for records pertaining to himself.

(4)    The purpose of this declaration is to provide the Court and plaintiff with an

explanation of the procedures used by the FBI to review and process the 205-page sample chosen

by plaintiff. The 205 page sample included four permanent serial charge-out forms[3], indicating

---

[1] 75 Fed. Reg. 707 (2010).

[2] 5 U.S.C. § 552 (b)(1).

[3] Serial charge-out forms authorize the removal of a document from an FBI file, and placement of a document in another location, e.g., confidential file room or a supervisor's office. Document is to be replaced by the "serial charge-out." Normally, an agent wanting to see a document will call for an entire

that additional pages were located in the FBI's Special File Room[4] ("SFR").  Despite the fact that

all SFR documents were located and provided to plaintiff previously as part of the entire release,

the four SFR documents which have been selected in the sample have been placed behind each

corresponding serial charge-out form and are identified as Bates-stamp pages CPO-656-A, 658-

A, 659-A, and 660-A.  Therefore, these four corresponding pages have been added to plaintiff's

sample, despite their previous release to plaintiff.  Plaintiff also selected a Change-to Memo[5],

identified as CPO-1722, which indicates that file 100-123974 Serial 539 was changed to 62-

111917 Serial 4.  Serial 4 of 62-111917 was located and identified as three pages which

originated with a division of the U.S. Justice of Department ("DOJ"), which is now a part of the

DOJ National Security Division ("DOJ/NSD").  These pages have been referred to DOJ/NSD for

direct response to plaintiff and will not be included in this sample.  A Deleted Page Information

Sheet ("DPIS")[6] indicating this referral has been placed behind the Change-to Memo.  Two DPIS

forms were also chosen by plaintiff as a part of this sample.  The first is identified as CPO-1734.

The documents which correspond with this form are Air Force-originated documents identified

as Bates-Stamp pages CPO-1735 to CPO-1738.  All of these pages, with the exception of

---

"section" of a file and the section will later be returned.  "Serial charge-out" is thus a fairly unusual procedure.

[4] Special File Room is a location outside the Central Records complex for particularly sensitive FBI files.

[5] A Change-to Memo indicates that a document has been removed and placed in a more appropriate file.  The "Change-to memo" is placed where the document had been.  It is a more routine procedure than the "serial charge-out."

[6] The FBI replaced pages withheld in their entireties with a "Deleted Page Information Sheet" ("DPIS") which identifies the FOIA exemptions asserted to withhold the document in full as well as the Bates-page numbers for the withheld pages.  If the document originated with another Government agency, the DPIS will state that it was referred to that agency for review and direct response.

CPO-1735, were chosen by plaintiff as a part of this sample. CPO-1735 has now been included

as it corresponds with the DPIS. Therefore, one additional page --CPO-1735-- was added to this

sample, however, this page contains no exemptions and was released in its entirety. All of these

pages were previously processed and released by the FBI after consult with the Air Force and

will be addressed by the Air Force by separate declaration. The second DPIS is identified as

CPO-2114. The documents which correspond with this form are Army-originated documents

identified as Bates-stamped pages CPO-2113, 2115, and 2010-2126. These nine pages will not

be included in this sample as they were sent to the Army for direct response previously and the

Army responded directly to plaintiff's counsel by letter dated March 12, 2008 with respect to

these pages.

(5)    In summary, a total of five pages have been added to the plaintiff's 205-page

selection resulting in a **210-page selection**. The remainder of the material mentioned above will

be addressed in separate declarations to be submitted by the Army, Air Force and DOJ NSD,

respectively, in accordance with Vaughn v. Rosen, 484 F.2d 820, 827 (D.C. Cir. 1973).[7] This

declaration therefore provides a justification only for the FBI-originated information in this

210-page sample which the FBI has withheld from disclosure by the FBI pursuant to Privacy Act

Exemption (j)(2), 5 U.S.C. § 552a (j)(2), and FOIA Exemptions 1, 2, 6, 7(C), 7(D) and 7(E), 5

U.S.C. §§ 552(b)(1), (b)(2), (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E). Moreover, this

declaration supplements, and hereby incorporates, the Declaration of Scott A. Hodes, dated July

---

[7] The FBI also located certain documents which originated with CIA and NSA within this sample. The FBI sent referrals – either for consult or direct response – to these agencies on or about February 14, 2008 and February 3, 2009 and will address these in further detail infra, ¶¶ 145-154. This material will also be addressed separately by these agencies.

8, 2002 ("Hodes Declaration"), the Declaration of Nancy L. Steward, dated August 10, 2005

("Steward Declaration"), the Declaration of David M. Hardy dated March 7, 2006 ("Hardy

Declaration-March 7, 2006"), and the Declaration of David M. Hardy dated May 22, 2009

("Hardy Declaration-May 22, 2009") all of which have been submitted previously in this case.

## CORRESPONDENCE

(6)     The Hodes Declaration contains correspondence related to this case from

approximately April 1999 to approximately June 2002.  See Hodes Declaration, ¶¶ 4-15.

(7)     On or about May 23, 2002, the FBI notified plaintiff that his fee waiver was

denied, that he did not qualify for a waiver of search fees or duplication fees, and that upon

receipt of plaintiff's willingness to pay fees the remainder of the interim release will be mailed

and the remaining documents will continue to be processed. (See **Exhibit A**).

(8)     By letter dated June 21, 2002 Office of Information and Privacy[8] ("OIP")

responded to an appeal regarding a fee waiver and plaintiff's status as a representative of the

news media.  OIP advised plaintiff that he qualified as a journalist and is entitled to news media

status, and that his fee waiver was properly denied by the FBI. (See **Exhibit B**).

(9)     By letter dated October 7, 2002, the FBI requested payment a second time of

$85.10 from plaintiff for the release mailed on June 21, 2002 of 851 pages.  The FBI stated that if

it did not receive payment by October 21, 2002, a dispositive motion would be prepared based on

plaintiff's failure to exhaust administrative remedies. (See **Exhibit C**).

(10)     By letter dated October 21, 2002, plaintiff submitted a check in the amount of

---

[8] The Office of Information and Privacy changed its name to the Office of Information Policy on or about March 11, 2009.

$85.10. (See **Exhibit D**).

(11)     By letter dated May 7, 2003[9], the FBI made an interim release to plaintiff. Plaintiff was advised that 295 pages were reviewed and 287 pages were being released. (See **Exhibit E**).

(12)     By letter dated June 5, 2003, the FBI made the second interim release to plaintiff. Plaintiff was advised that 250 pages were reviewed and 240 pages were being released. (See **Exhibit F**).

(13)     By letter dated July 2, 2003, the FBI made the third interim release to plaintiff. Plaintiff was advised that 298 page were reviewed and 294 pages were being released. (See **Exhibit G**).

(14)     By letter dated August 6, 2003, the FBI made the fourth interim release to plaintiff.  Plaintiff was advised that 345 pages were reviewed and 344 pages were being released. (See **Exhibit H**).

(15)     By letter dated September 29, 2003, the FBI made the fifth interim release to plaintiff.  Plaintiff was advised that 907 pages were reviewed and 404 pages were being released. (See **Exhibit I**).

(16)     By letter dated October 31, 2003, the FBI made the sixth interim release to plaintiff.  Plaintiff was advised that 242 pages were reviewed and 222 pages were being released. (See **Exhibit J**).

(17)     By letter dated November 26, 2003, the FBI made the seventh interim release to

_____

[9] See Hodes Declaration, ¶¶ 4-15 regarding release letters dated June 10, 2002 (101 pages reviewed, 100 pages released) and June 21, 2002 (880 pages reviewed, 851 pages released).  This brings the total pages released in 2002-2003 to 4,510 pages reviewed and 3,770 pages released.

plaintiff. Plaintiff was advised that <u>399</u> pages were reviewed and <u>353</u> pages were being released. (<u>See</u> **Exhibit K**).

(18)    By letter dated December 23, 2003, the FBI made the eighth and final release to plaintiff. Plaintiff was advised that <u>793</u> pages were reviewed and <u>685</u> pages were being released. (<u>See</u> **Exhibit L**).

(19)    In response to plaintiff's "Cross-Motion for Summary Judgment" and "Opposition to Defendants' Motion for Summary Judgment" the following items were provided to plaintiff by letter dated March 6, 2006: search slips, worksheets, a prior request letter from plaintiff dated January 17, 1976, and one audiotape from the TV program "Impact." (<u>See</u> **Exhibit M**).

(20)    OIP acknowledged receipt of plaintiff's appeal by letter dated June 29, 2007. (<u>See</u> **Exhibit N**).

(21)    Pursuant to the joint status report dated April 30, 2007, the FBI made a series of interim releases beginning on or about July 2, 2007. By letter dated July 2, 2007, [10] the FBI provided the first interim release to plaintiff and advised him that <u>761</u> pages were reviewed and <u>747</u> pages were being released. (<u>See</u> **Exhibit O**).

(22)    Pursuant to the joint status report of April 30, 2007, the FBI also sent a letter to plaintiff dated July 2, 2007 detailing the FBI's search efforts for any and all COINTELPRO records and the results thereof. (<u>See</u> **Exhibit P**).

(23)    By letter dated August 31, 2007, the FBI made a second interim release to

---

[10] As a result of the re-processing of the entire collection of documents in this case, plaintiff received four interim releases of the re-processed documents from approximately July 2007-February 2008.

plaintiff. Plaintiff was advised that <u>1,105</u> pages were reviewed and <u>786</u>[11] were being released. (<u>See</u> **Exhibit Q**).

(24)     OIP responded to an appeal by letter dated September 25, 2007 and stated they were closing the appeal as the matter is before the Court. (<u>See</u> **Exhibit R**).

(25)     By letter dated November 30, 2007, the FBI made a third interim release to plaintiff. Plaintiff was advised that <u>1,214</u> pages were reviewed and <u>1,201</u> pages were being released. (<u>See</u> **Exhibit S**).

(26)     By letter dated February 14, 2008, the FBI made a fourth and final interim release to plaintiff. Plaintiff was advised that <u>815</u> pages were reviewed and <u>776</u> pages were being released. (<u>See</u> **Exhibit T**).

(27)     The FBI released a total of 34 pages that were inadvertently omitted from the fourth release by letter dated February 22, 2008. These pages were included in the original number of pages reviewed and released as stated in the February 14, 2008 letter. (<u>See</u> **Exhibit U**).

(28)     As a result of consultation with the Department of State, the FBI released five documents to plaintiff by letters dated April 30, 2008 and May 15, 2008. (<u>See</u> **Exhibit V**).

(29)     On or about June 30, 2008, plaintiff submitted to the FBI a selection of 221 pages to be <u>Vaughned</u> for the prior Hardy Declaration dated May 22, 2009. (<u>See</u> **Exhibit W**).[12]

(30)     As a result of consultation with the Internal Revenue Service (IRS), the FBI made

---

[11] Due to an inadvertent administrative error, the totals in this letter are incorrect and should instead reflect 1,038 pages reviewed and 799 pages released.

[12] Seven pages were added to this sample, making it a 228 page sample. See ¶14 of Hardy Decl filed May 22, 2009.

a release of one document to plaintiff by letter dated July 8, 2008. (See **Exhibit X**).

(31)    As a result of consultation with the Central Intelligence Agency (CIA), Department of the Army (Army), and the Defense Intelligence Agency (DIA), the FBI made a release to plaintiff by letter dated April 10, 2009.  Plaintiff was advised that 41 pages were reviewed and 41 pages were being released.  (See **Exhibit Y**).

(32)    In the process of reviewing the documents in the prior 228 page sample for Hardy Declaration dated May 22, 2009, it was determined by the FBI that some additional information withheld pursuant to Exemption 7(D) and Exemption 1 should be released.  The FBI completed its review and released additional information within the prior 228 page sample.  As a result, the FBI re-processed an additional 148 pages from the larger collection of documents.  This information was released to plaintiff by letter dated May 21, 2009.  Plaintiff was advised that 148 pages were reviewed and 147 pages were being released.  (See **Exhibit Z**).

(33)    As a result of consultation with National Security Agency (NSA) and the Department of the Air Force (Air Force), the FBI made a release to plaintiff by letter dated July 30, 2009.  Plaintiff was advised that 17 pages were reviewed and 17 pages were being released. (See **Exhibit AA**).

(34)    By letter dated February 12, 2010, one CD was mailed to plaintiff at his request which contained the four interim releases ranging from July 2007-February 2008. (See **Exhibit BB**).

(35)    On November 12, 2010, a detailed listing of the location of all referred material, within the entire collection of documents, was e-mailed to plaintiff upon his request. (See **Exhibit CC**). At the same time, a detailed chart of all FOIA processing changes, made to the

entire collection of documents, was provided by e-mail to plaintiff pursuant to a re-review of the material (See **Exhibit DD**).

(36)    As a result of the re-review of all of the material in this case, the FBI made a release to plaintiff by letter dated April 14, 2010.  Plaintiff was advised that 3,828 pages were reviewed and 3,523 pages were being released. See ¶46. (See **Exhibit EE**).

(37)    The FBI identified pages included in the sample which had been inadvertently marked improperly with regard to classification.  Because of this, the FBI re-reviewed the entire collection of documents with regard to classification markings, and made a release to plaintiff of 115 corrected pages within the entire collection of documents by letter dated July 20, 2010.  (See **Exhibit FF**).

(38)    On or about May 8, 2010 plaintiff provided a 205 page sample selection by e-mail.  (See **Exhibit GG**).

## EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(39)    The CRS enables the FBI to maintain information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities.  The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes.  The CRS is organized into a numerical sequence of files called FBI "classifications," which are broken down according to subject matter.  The subject matter of a file may correspond to an individual, organization, company, publication, activity, or foreign intelligence matter (or program).  Certain records in the CRS are maintained at FBIHQ, whereas records that are pertinent to specific field offices of the FBI are maintained in those field offices. While the CRS is primarily designed to serve as an investigative tool, the FBI searches the CRS

for documents that are potentially responsive to FOIA and Privacy Act requests. The mechanism that the FBI uses to search the CRS is the Automated Case Support System ("ACS").

(40)    The ACS was implemented for all field offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that were previously automated. ACS can be described as an internal computerized subsystem of the CRS. Because the CRS cannot electronically query the case files for data, such as an individual's name or social security number, the required information is duplicated and moved to the ACS so that it can be searched. More than 105 million records from the CRS were converted from automated systems previously utilized by the FBI. Automation did not change the CRS; instead, automation has facilitated more economic and expeditious access to records maintained in the CRS.

(41)    The retrieval of data from the CRS is made possible through the ACS using the General Indices, which are arranged in alphabetical order.[13] The entries in the General Indices fall into two categories:

> (a) A "main" entry -- A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.
>
> (b) A "reference" entry --"Reference" entries, sometimes called "cross-references," are generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

(42)    Searches made in the General Indices to locate records concerning a particular subject, such as Carl Oglesby, are made by searching the subject requested in the index.

(43)    The ACS consists of three integrated, yet separately functional, automated

---

[13] The General Indices are not only automated but also include index cards which allow a manual search for records that pre-date the implementation of ACS on October 16, 1995.

applications that support case management functions for all FBI investigative and administrative cases:

      (a)  Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs"). When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is used by all FBIHQ, as well as all FBI field offices and Legats that are conducting or assisting in the investigation. Using a fictitious file number "111-HQ-12345" as an example, an explanation of the UCFN is as follows: "111" indicates the classification for the specific type of investigation, "HQ" is the abbreviated form used for the OO of the investigation, which in this case is FBIHQ; and "12345" denotes the individual case file number for the particular investigation.

      (b)  Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

      (c)  Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 109.2 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality,

Social Security number, address, and/or date of event.

(44)    The decision to index names other than subjects, suspects, and victims is a

discretionary decision made by the FBI Special Agent ("SA") - and on occasion, support

employees - assigned to work on the investigation, the Supervisory SA ("SSA") in the field

office conducting the investigation, and the SSA at FBIHQ.  The FBI does not index every name

in its files; rather, it indexes only that information considered to be pertinent, relevant, or

essential for future retrieval.  Without a "key" (index) to this enormous amount of data,

information essential to ongoing investigations could not be readily retrieved.  The FBI files

would thus be merely archival in nature and could not be effectively used to serve the mandated

mission of the FBI, which is to investigate violations of federal criminal and national security

statutes.  Therefore, the General Indices to the CRS files are the means by which the FBI can

determine what retrievable information, if any, the FBI may have in its CRS files on a particular

subject matter or individual, i.e., Carl Oglesby.

### RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(45)    An explanation of the records responsive to plaintiff's request is detailed in the

Hodes Declaration, ¶¶ 30-34.

(46)    From the files referenced in ¶¶ 31-35 of the Hodes Declaration dated July 8, 2002,

ten releases were made to plaintiff in 2002-2003 consisting of approximately **3,770** pages

released of **4,510** pages reviewed.[14]  This material was processed in paper, and redactions were

---

[14] The FBI located certain documents within the entire collection of documents, as well as in this 210 page sample and the prior 228 page sample, which originated with the IRS, U.S. Air Force, U.S. Army, U.S. Navy, Central Intelligence Agency, U.S. Department of Defense, U.S. Department of State, the National Security Agency, and the National Security Division.  The FBI sent referrals -- either for consult or direct response -- to these agencies on or about February 14, 2008, February 3, 2009, February

made by hand.  In 2007-2008, the material was entered into the electronic system, reprocessed, and four interim releases were sent to the plaintiff consisting of approximately **3,523** pages released of **3,828** pages reviewed.[15]  On April 14, 2010, defendant FBI provided a supplemental release to plaintiff consisting of approximately **3,523** pages released of **3,828** pages reviewed. The FBI agreed to a re-review of the material with regard to Exemption 1, however, the FBI also conducted a re-review with regard to all FOIA exemptions to determine if any additional segregable material could be released.  The material was Bates-stamped so it could be easily identified and a sample chosen by plaintiff.  Plaintiff has selected **205** pages[16] out of the entire collection of material from the 2010 Bates-stamped release.  One additional page is included in this sample for a total of **210** pages (See ¶¶ 4-5 above) which will be justified by the FBI herein.

---

4, 2009, April 17, 2009 and June 9, 2010 and will address these in further detail infra, ¶¶ 145-154.

[15] FBI employees attempted to locate the paper copy of some of the material that was processed and released in 2002-2003, but were unsuccessful in their efforts.  Therefore, this material could not be scanned into the system or reprocessed in 2007-2008.  This is the reason for the difference in page counts.

[16] Since the prior declaration filed in May 2009, the FBI conducted two separate reviews of the entire collection of documents.  In the first review, the FBI conducted a re-review of the material with regard to Exemption b1.  The FBI also conducted a re-review with regard to all FOIA exemptions to determine if any additional segregable material could be released.  In the second review, the FBI reviewed the entire collection of documents with regard to classification markings. During this review, it was determined that some pages had been inadvertently marked improperly with regard to classification. As a result of corrective action, additional information previously withheld pursuant to Exemptions 1 and 7(D) is being released.  All of these pages are now properly marked.  Because of this error noted in the sample, the FBI determined that it was necessary to review the classification markings of the entire set of approximately 3,523 responsive pages.  As a result of this review, the FBI identified and corrected the classification markings and released additional information pursuant to Exemptions 1 and 7(D), where appropriate, on approximately 115 pages (within the large collection) and made a release to plaintiff by letter dated July 20, 2010.

## ELECTRONIC SURVEILLANCE INDICES[17]

(47)    The Electronic Surveillance ("ELSUR") indices are used to maintain information

on subjects whose electronic and/or voice communications have been intercepted as the result of

a consensual electronic surveillance or a court-ordered (and/or sought) electronic surveillance

conducted by the FBI.  The ELSUR indices date back to January 1, 1960.  On or about October 9,

1991, the ELSUR indices were automated.  Since that time, FBIHQ and all FBI field offices have

electronically generated, maintained, modified and accessed all ELSUR records.

(48)    The ELSUR indices are a separate system of records from the CRS. Prior to

automation, the ELSUR indices consisted of index cards on individuals who had been the subject

of a microphone or telephone surveillance by the FBI from 1960.  As stated above, the previous

manual index card system was converted to an automated system on or about October 9, 1991.

These indices include individuals who were the (a) targets of direct surveillance, (b) participants

in monitored conversations, and (c) owners, leasers, or licensors of the premises where the FBI

conducted electronic surveillance.  In addition to the names of individuals in the above

categories, the cards in the ELSUR index contain the date the voice was monitored, a source

number to identify the individual on whom the surveillance was installed, and the location of the

FBI field office that conducted the monitoring.

(49)    ELSUR indices are published as a separate records system in the Federal Register

---

[17] The FBIHQ ELSUR indices were searched previously in this case, and revealed no records.
The ELSUR indices for the New York and Washington Field Offices were also searched, and revealed no
records.  The Chicago Field Office located ELSUR records.  An extensive search of the Chicago Field
Office failed to disclose a tape.  However, a transcript of the audio was processed and released to
plaintiff in the August 6, 2003 and November 30, 2007 releases and is located in File 100-CG-40903,
Sub A. This supplements and corrects Hodes Declaration ¶35.

because not all names contained in the ELSUR index can be retrieved through the General Index and CRS. <u>See</u> 52 Fed. Reg. 8482 (1992).

(50)    The FBI field offices that have conducted electronic surveillance at any time from 1960 to the present also maintain ELSUR indices. Since January 1, 1960, the field offices have been including in their ELSUR indices - and reporting to FBIHQ for inclusion in its index - the names of all persons whose voices have been monitored through a FBI microphone installation or a telephone surveillance. The names of monitored subjects are retrievable through the FBIHQ or local field office ELSUR indices.

## CONFIDENTIAL INDICES[18]

(51)    In 1999, plaintiff submitted requests to Washington Field Office, Chicago Field Office, and New York Field Office. The field offices conducted searches of the confidential indices at that time, and forwarded all responsive material to FBIHQ. The FBI does not search the confidential indices on third parties without privacy waivers. The confidential indices were only searched with regard to Carl Oglesby.

## JUSTIFICATION FOR NON-DISCLOSURE UNDER PRIVACY ACT EXEMPTION (j)(2)

(52)    Section (j)(2) of the Privacy Act exempts from mandatory disclosure systems of records "maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals . . . ."

(53)    Records concerning plaintiff were compiled by the FBI for various law

---

[18] Confidential indices, located only at the field offices, consist of the Confidential Human Source ("CHS") information.

enforcement investigations. Specifically, the responsive documents relate to an internal security investigation of the "Students for a Democratic Society" organization; Domestic Security which covers investigations by the FBI in the domestic security field (see 58 Fed. Reg. 51861 (1993); Anti-Riot Laws, 18 U.S.C. § 245 (b)(3); and various Foreign Counter Intelligence investigations. Accordingly, these documents are exempt from disclosure pursuant to 5 U.S.C. § 552a (j)(2) of the Privacy Act, in conjunction with 28 C.F.R. § 16.96. Although access to the records at issue was denied under the Privacy Act, the documents located responsive to plaintiff's requests were processed under the access provisions of the FOIA to achieve maximum disclosure.

## JUSTIFICATION FOR REDACTED INFORMATION UNDER THE FOIA AND EXPLANATION OF CODED FORMAT USED

(54)    All information was processed to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide plaintiff with all material in the public domain and with all reasonably segregable portions of releasable material. No reasonably segregable, nonexempt portions were withheld from plaintiff. To further describe the information withheld could identify the material sought to be protected. Copies of the **210 sample pages** are attached hereto as **Exhibit HH**. Each page of Exhibit HH is numbered with the corresponding Bates number at the bottom of each page. Also included are pages labeled in a different manner as CPO-656-A, CPO-658-A, CPO-659-A, CPO-660-A. The FBI properly denied records responsive to plaintiff's requests in their entirety pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. § 552a (j)(2) in conjunction with C.F.R.§ 16.96(2003) and released pages with partial redactions pursuant to FOIA Exemptions 1, 2, 6, 7(C), 7(D) and 7(E), 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(3), (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E).

-17-

(55)   Copies of the documents contain coded categories of exemptions which detail the nature of the information withheld pursuant to the provisions of the FOIA.  To further describe the information withheld in more detail could identify the very material that the FBI is protecting. No reasonably segregable, nonexempt portions were withheld from plaintiff.  The coded categories are provided to aid the Court's review of the FBI's explanations of FOIA exemptions used to withhold the protected material.  Accordingly, a review of this information will reveal that all material withheld is exempt from disclosure pursuant to a properly asserted FOIA/Privacy Act Exemption or it is so intertwined with protected material that segregation is not possible without revealing the underlying protected material.

(56)   A coded format is used in this case to assist the Court and plaintiff in reviewing the information withheld within the context of the material itself.  Each instance of information withheld pursuant to the FOIA on the attached documents is accompanied by a coded designation that corresponds to the categories listed below.  For example, if "(b)(7)(C)-1" appears on a document, the "(b)(7)(C)" designation refers to Exemption (b)(7)(C) of the FOIA concerning "Unwarranted Invasion of Privacy."  The numerical designation, "1" following the "(b)(7)(C)" narrows the main category to the more specific subcategory, "Names and/or Identifying Information of FBI Special Agents and Support Personnel."  Listed below are the categories used to explain the FOIA exemptions asserted to withhold this material:

## SUMMARY OF JUSTIFICATION CATEGORIES

| CODED CATEGORIES | CODE | CATEGORY OF INFORMATION WITHHELD |
|---|---|---|
| **(b)(1)** | | **CLASSIFIED INFORMATION** |
| | | Information Properly Classified By an FBI Official Pursuant to E.O. 13526 |
| **(b)(2)** | | **INTERNAL AGENCY RULES AND PRACTICES** |
| | -1 | Investigative Techniques and Procedures |
| | -2 | Confidential Source Symbol Numbers [Cited at times in conjunction with (b)(7)(D)-1] |
| | -3 | Confidential Source File Numbers [Cited at times in conjunction with (b)(7)(D)-4] |
| | -4 | Confidential Identification Symbol Numbers of Electronic Microphone Surveillances |
| **(b)(6) & (b)(7)(C)** | | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| | -1 | Names and/or Identifying Information of FBI Special Agents and Support Personnel |
| | -2 | Names and/or Identifying Information of Third Parties who Provided Information to the FBI [Cited at times in conjunction with (b)(7)(D)-3 and (b)(7)(D)-5] |
| | -3 | Names and/or Identifying Information Concerning Foreign and Local Law Enforcement Personnel |
| | -4 | Names and or/ Identifying Information of Third Parties of Investigative Interest |
| | -5 | Names and/or Identifying Information of Third Parties Merely Mentioned |
| **(b)(7)(D)** | | **CONFIDENTIAL SOURCE MATERIAL** |
| | -1 | Confidential Source Symbol Numbers (Express Confidentiality) [Cited at times in conjunction with (b)(2)-2] |
| | -2 | Foreign Law Enforcement Agency Information (Express Confidentiality) |

| | -3 | Names and/or Identifying Information of Third Parties who Provided Information to the FBI under an "Express" Assurance of Confidentiality [Cited at times in conjunction with(b)(6)-2 and (b)(7)(C)-2, (b)(6)-4 and (b)(7)(C)-4 and (b)(6)-5 and (b)(7)(C)-5] |
| | -4 | Confidential Source File Numbers (Express Confidentiality) [Cited at times in conjunction with (b)(2)-3] |
| | -5 | Information Provided by and/or Identifying Data Concerning Source Symbol Numbered Informants under an Express Promise of Confidentiality [Cited at times in conjunction with (b)(6)-2 and (b)(7)(C)-2] |
| | -6 | Foreign Government Agency Information (Express Confidentiality) |
| | -7 | Names and/or Identifying Information of Third Parties who Provided Information to the FBI Under an "Implied" Assurance of Confidentiality [Cited at times in conjunction with (b)(6)-2 and (b)(7)(C)-2, (b)(6)-4 and (b)(7)(C)-4 and (b)(6)-5 and (b)(7)(C)-5] |
| **(b)(7)(E)** | | **INVESTIGATIVE TECHNIQUE OR PROCEDURE** |
| | | Investigative Techniques and Procedures |

## JUSTIFICATION FOR REDACTIONS

(57)    Paragraphs 57-143 _infra_, explain the FBI's rationale for withholding each

particular category of information under the specific exemption categories described above.

## APPLICATION OF FOIA EXEMPTION (b)(1) AND E.O. 13526

(58)    The FBI's analysis of the withholding of classified information contained in these

documents is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552 (b)(1).

Exemption (b)(1) protects from disclosure those records that are: "(A) specifically authorized

under criteria established by an Executive Order to be kept secret in the interest of national

defense or foreign policy; and (B) are in fact properly classified pursuant to such Executive

Order."

(59)    The FBI's analysis of whether Exemption (b)(1) permits the withholding of agency

-20-

records consists of two significant steps. First, the FBI must determine whether the information

contained in the records is information that satisfies the substantive and procedural criteria of the

applicable Executive Order governing the classification and protection of national security

information; and second, complies with the various substantive and procedural criteria of the

Executive Order.

(60)     Before I consider an Exemption (b)(1) claim for withholding agency records, I

determine whether the information in those records is information that satisfies the requirements

of E.O 13526[19], the Executive Order, which governs the classification and protection of

information that affects the national security[20] and whether the information complies with the

various substantive and procedural criteria of the Executive Order. E.O. 13526, which was

signed by President Barak Obama on December 29, 2009, is the Executive Order that currently

applies to the protection of national security information. I am bound by the requirements of

E.O. 13526 when making classification determinations.

(61)     For information to be properly classified, and thus properly withheld from

disclosure pursuant to Exemption (b)(1), the information must meet the requirements set forth in

E.O. 13526 § 1.1 (a):

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;

---

[19]  The FBI elected to review the b1 material pursuant to the new EO despite the fact that the old EO applied to the withholdings at issue.

[20] Section 6.1 (cc) of E.O. 13526, defines "National Security" as "the national defense or foreign relations of the United States."

(3) the information falls within one or more of the categories of information listed in § 1.4 of this order;[21] and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the

national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

(62)   All information which I determined to be classified, and which is under the control of the United States government, is marked at the "Secret" level, since the unauthorized disclosure of this information reasonably could be expected to cause serious damage to the national security.  See E.O. 13526 §1.2 (a)(2).  In addition to these substantive requirements, certain procedural and administrative requirements of E.O. 13526, must be followed before information can be considered to be properly classified, such as proper identification and marking of documents.  I made certain that all procedural requirements of E.O. 13526 were followed in order to ensure that the information was properly classified.  I made certain that:

(a) each document was marked as required and stamped with the proper classification designation;

(b) each document was marked to indicate clearly which portions are classified and which portions are exempt from declassification as set forth in E.O. 13526, § 1.5 (b);

(c) the prohibitions and limitations on classification specified in E.O. 13526 § 1.7, were adhered to;

(d) the declassification policies set forth in E.O. 13526, §§ 3.1 and 3.3 were followed; and

(e) any reasonably segregable portion of these classified documents that did not

---

[21] I made certain that all information was properly classified pursuant to 1.4 and 3.3.  In this case, all of the information is more than 25 years old and has been determined to have permanent historical value.  It has been evaluated under the standards articulated in § 3.3(a).

meet the standards for classification under E.O. 13526, were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

## FINDINGS OF DECLARANT REGARDING EXEMPTION (b)(1)

(63)     With the above requirements in mind, I personally and independently examined the information withheld from plaintiff pursuant to FOIA Exemption (b)(1).  I determined that portions of the classified information continue to warrant classification at the "Secret" level, respectively, and are exempt from disclosure pursuant to E.O. 13526, § 3.3 – specifically, release of the information would "(1) reveal the identity of a confidential human source, a human intelligence source, a relationship with an intelligence or security service of a foreign government or international organization, or a nonhuman intelligence source; or impair the effectiveness of an intelligence method currently in use, available for use, or under development;" and "(6) reveal information, including foreign government information, that would cause serious harm to relations between the United States and a foreign government, or to ongoing diplomatic activities of the United States."[22]

## FOREIGN RELATIONS OR FOREIGN ACTIVITIES

(64)     E.O. 13526, § 3.3 (b)(6), permits an agency to exempt from automatic declassification specific information, the release of which could be expected to "reveal information, including foreign government information, that would cause serious harm to relations between the United States and a foreign government, or to ongoing diplomatic activities

---

[22] Exemption (b)(1) has been asserted on the following Bates-stamped pages of Exhibit HH: CPO-125-126, 145, 295, 301, 316-317, 393, 395, 412, 416, 669, 672, 745, 1,051, 1,058, 1,077, 1085-1087, 1095, 1099, 1102, 1110, 1169, 1181, 1283, 1307-1308, 1338-1339, 1343, 1589, 1592-1593, 1599, 1603-1604, 1698-1699, 1768-1769, 2097, 2112, 2560-2562, 3004, 3401-3402 and 3510.

of the United States."

(65)     Information that identifies intelligence information gathered by the United States either about or from a foreign country is sensitive.  This condition exists due in part to the delicate nature of international diplomacy.  This information must be handled with care so as to not jeopardize the fragile relationships that exist among the United States and certain foreign governments.  The unauthorized disclosure of information concerning foreign relations or foreign activities of the United States can reasonably be expected to lead to diplomatic or economic retaliation against the United States; identify the target, scope or time frame of intelligence activities of the United States in or about a foreign country, which may result in the curtailment or cessation of these activities; enable hostile entities to assess United States intelligence gathering activities in or about a foreign country and devise countermeasures against these activities; or compromise cooperative foreign sources which may jeopardize their safety and curtail the flow of information from these sources.  Thus, the foreign relations or foreign activities withheld by the FBI are properly classified at the "Secret" level and withheld in accordance with E.O. 13526, § 3.3 (b)(6), and exempt from disclosure pursuant to FOIA Exemption (b)(1).[23]

## INTELLIGENCE ACTIVITIES OR  METHODS

(66)     E.O. 13526, § 3.3 (b)(1), exempts from disclosure "specific information, the release of which should clearly and demonstrably be expected to reveal the identity of a confidential human source, a human intelligence source, a relationship with an intelligence or

---

[23] Exemption (b)(1) representing "Foreign Relations" and "Foreign Activities" is cited on the following Bates-stamped pages of Exhibit HH: CPO-145, 393, 1308, 1589 and 3401-3402.

-24-

security service of a foreign government or international organization, or a nonhuman

intelligence source; or impair the effectiveness of an intelligence method currently in use,

available for use, or under development." The information withheld consists of intelligence

activities utilized by the FBI for gathering intelligence data. An intelligence activity or method

includes any intelligence action or technique utilized by the FBI against a targeted individual or

organization that has been determined to be of national security interest. An intelligence method

is used to indicate any procedure (human or non-human) utilized to obtain information

concerning such individual or organization. An intelligence activity or method has two

characteristics. First, the intelligence activity or method and information generated by it is

needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions. Second,

confidentiality must be maintained with respect to the activity or method if the viability,

productivity and usefulness of its information is to be preserved.

(67)    The FBI protected the following categories of information specific to intelligence

activities and methods because disclosure reasonably could be expected to cause serious damage

to the national security. First, the withheld information on CPO-1058, 1110, 1338-1339, 1343,

1603 and 2560-2562 contains file numbers that are assigned to a specific intelligence activity.

Second, the withheld information on CPO-316, 1051, 1077, 1085-1086, 1088, 1095, 1099, 1102,

1169, 1339, 1343, 1592, 1603-1604, 1698-169, 1768-1769, 2560-2562 3004 and 3510 contains

detailed intelligence information gathered on specific individuals or organizations of national

security interest. Third, the withheld information on CPO-1085, 1095, 1102, 1169, 1283, 1308

and 2560 pertains to the character of the case, and specifically identifies the type of intelligence

activity directed at a specific target of national security interest. Disclosure of the

-25-

characterization could reasonably be expected to cause serious damage to the national security, as it would (a) disclose a particular intelligence or counterintelligence investigation; (b) disclose the nature, scope or thrust of the investigation and (c) reveal the manner of acquisition of the intelligence or counterintelligence information. Fourth, the withheld information on CPO-1169, 1283, 1307 and 1338 contains standard FBI terminology or phraseology which appears in the most recent FBI investigations. These pieces of information are effective means for the FBI to gather, store or disseminate intelligence information. The criteria utilized by the FBI in these instances to decide what actions by an individual or organization warranted the commencement of an investigation, or caused a certain activity to be given investigative attention over others, could be revealed through disclosure of this information. The criteria applied and priorities assigned are used in the FBI's present intelligence or counterintelligence investigations, and are in accordance with the Attorney General's guidelines on FBI intelligence or counterintelligence investigations. The information obtained from the intelligence activities or methods is very specific in nature, provided during a specific time period, and known to very few individuals.

(68)    It is my determination that the disclosure of the specific information which describes the intelligence activities or methods withheld in this case are still used by the FBI today to gather intelligence information. The release of this information could reasonably be expected to cause serious damage to the national security for the following reasons: (1) disclosure would allow hostile entities to discover the current intelligence gathering methods used; (2) disclosure would reveal current specific targets of the FBI's national security investigations; and (3) disclosure would reveal the determination of the criteria used and priorities assigned to current intelligence or counterintelligence investigations. With the aid of

this detailed information hostile entities could then develop countermeasures which could severely disrupt the FBI's intelligence-gathering capabilities. This would severely damage the FBI's efforts to detect and apprehend violators of the national security and criminal laws of the United States. The information withheld is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 3.3 (b)(1).[24]

### File Numbers

(69)     The classified information withheld on CPO-1058, 1110, 1338-1339, 1343, 1603, 2112 and 2560-2562 includes FBI file numbers assigned to specific intelligence activities. Their release would lead to exposure of the particular intelligence activities and methods at issue. Individual file numbers are assigned by FBIHQ and field offices and contain a geographical prefix or the originating office and case number, which includes the numerical characterization of the type of investigation followed by a chronological number assigned to a specific investigation/activity.

(70)     The disclosure of an intelligence file number in the aggregate will enable a hostile analyst to attribute any information released from the documents containing such a file number to that particular file. A hostile analyst can identify the specific intelligence activity by supplying further missing pieces. Hence, a partial mosaic of the activity begins to appear as more information is identified with the file leading to the exposure of actual current activities or methods. Disclosure of this file number will allow a hostile analyst, or anyone not privileged to this information, to patch bits and pieces of information together until the actual use of the

---

[24] Exemption (b)(1) representing "Intelligence Activities and Methods" is cited on the following Bates-stamped pages of Exhibit HH: CPO-316, 1051, 1058, 1077, 1085-1086, 1088 1095, 1102, 1110, 1169, 1283, 1308, 1338, 1343, 1592, 1603-1604, 1698-1699, 1768-1769, 2560-2562 and 3004.

application of the source or method can be determined. The identification of these intelligence sources or methods, which continues to furnish positive intelligence information to date, will severely limit its application. In addition, disclosure will inform hostile intelligence of the possible range of our intelligence capabilities, as well as the probable intelligence that the FBI has gathered, or can collect, concerning them. This knowledge provides potential or actual violators of the United States' national security laws a means of deflection or avoidance of lawful regulations. Disclosure will allow countermeasures to be implemented, making future operations more difficult, or compromise other ongoing planned intelligence operations. Accordingly, the release of the file numbers can lead to the exposure of the actual intelligence activity or method utilized in FBI investigations, and can reasonably be expected to cause serious damage (Secret) to national security. The file numbers are properly classified at the "Secret" level and withheld pursuant to E.O. 13526 § 3.3 (b)(1), and are exempt from disclosure pursuant to FOIA Exemption 1.

### Detailed Intelligence Activities

(71)     The classified information withheld on CPO-316, 1051, 1077, 1085-1086, 1088, 1095, 1099, 1102, 1169, 1339, 1343, 1592, 1603-1604, 1698-1699, 1768-1769, 2560-2562, 3004 and 3510 contains information regarding detailed intelligence activities gathered or compiled by the FBI on a specific individual or organization of national security interest. The disclosure of this information would cause the same harm as previously cited in ¶¶ 66-68, supra. This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526 § 3.3 (b)(1), and exempt from disclosure pursuant to FOIA Exemption 1.

## Character of Case

(72)     The classified information withheld on CPO-1085, 1095, 1099, 1102, 1169, 1283, 1308 and 2560 identifies the character of the case for a specific type of intelligence activity directed at a specific target of national security interest.  Disclosure of the characterization could reasonably be expected to cause serious damage (Secret) to the national security, as it would (a) disclose a particular intelligence or counterintelligence investigation; (b) disclose the nature, scope or thrust of the investigation and (c) reveal the manner of acquisition of the intelligence or counterintelligence information.  This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526 § 3.3 (b)(1), and exempt from disclosure pursuant to FOIA Exemption 1.

## Standard Terminology/Phraseology

(73)     The classified information withheld on CPO-1169, 1283, 1307 and 1338 consists of standard terminology or phraseology which is used in the most current FBI investigations. Disclosure of this information will reveal the scope and depth of the FBI's efforts in a particular intelligence matter.  Stated another way, disclosure will reveal the limitations of the FBI's efforts in a particular investigation or the amount of resources or efforts that the FBI is willing to expend on this particular matter.  This would allow a target to determine what information has been learned concerning him and what additional steps may be expected.  Even if the information described by this phraseology is shallow, but the subject is heavily involved in matters under investigation, release of the information alerts the subject to the fact that his activities may continue without fear of detection.  Conversely, if the information is substantial, release will prompt the subject to alter his course of conduct.  Although these results may not occur in the narrow context of this case, the results described are likely to occur if information of this nature is routinely released.  As a result, this information is properly classified at the "Secret" level and

withheld pursuant to E.O. 13526 § 3.3 (b)(1), and exempt from disclosure pursuant to FOIA Exemption 1.

### FOREIGN GOVERNMENT INFORMATION

(74)    E.O. 13526 § 6.1 (s) defines foreign government information as: "(1) information provided to the United States Government by a foreign government or governments, an international organization of governments, or any element thereof, with the expectation that the information, the source of the information, or both, are to be held in confidence; (2) information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of governments, or any element thereof, requiring that the information, the arrangement or both, are to be held in confidence; or (3) information received and treated as 'foreign government information' under the terms of a predecessor order."

(75)    Many governments, unlike that of the United States, neither officially acknowledge the existence of some of their intelligence and security services, nor the scope of their activities or the sensitive information generated by them.  The free exchange of information among United States intelligence and law enforcement services and their foreign counterparts is predicated upon the understanding that these liaisons, and information exchanged therefrom, are to be kept in confidence.  E.O. 13526, § 3.3 (b)(6), authorizes the classification of foreign government information.

(76)    The release of official United States Government documents that show the existence of a confidential relationship with a foreign government reasonably could be expected to strain relations between the United States and the foreign governments and lead to diplomatic, political, or economic retaliation.  A breach of this relationship can be expected to have at least a chilling effect on the free flow of vital information to the United States intelligence and law enforcement agencies, which may substantially reduce their effectiveness.  Although the confidential relationship of the United States with certain countries may be widely reported, they are not officially acknowledged.

-30-

(77)    Disclosure of such a relationship, predictably, will result in the careful analysis and possible compromise of the information by hostile intelligence services.  The hostile service may be able to uncover friendly foreign intelligence gathering operations directed against it or its allies.  This could lead to the neutralization of friendly allied intelligence activities or methods, the death of live sources, cause embarrassment to the supplier of the information, or result in economic or diplomatic retaliation against both the United States and the supplier of the information.

(78)    Even if the government from which certain information is received is not named in or identifiable from the material it supplies, the danger remains that if the information were to be made public, the originating government would likely recognize the information as material it supplied in confidence.  Thereafter, it would be reluctant to entrust the handling of its information to the discretion of the United States.

(79)    The following types of classified information provided by foreign government intelligence components are grouped according to: (a) information that identifies a named intelligence component of a specific foreign government and information provided by the component to the FBI;  (b) communications received from a named foreign government intelligence agency and classified "Secret" by that agency; (c) information that identifies by name, an intelligence component of a specific foreign government, an official of the foreign government, and information provided by that component official to the FBI.[25]

### Foreign Government Identity With Detailed Information

(80)    Exemption (b)(1) has been asserted to protect information that identifies named intelligence components of a specific foreign government and information provided by those components to the FBI.  The information reveals the relationship and cooperative endeavors between these components and the FBI with regard to the illegal activities of plaintiff and his co-

---

[25]  Exemption (b)(1) relating to foreign government information is cited on the following Bates-stamped pages of Exhibit HH: CPO-125-126, 669, 1589, 2097 and 3401-3402.

conspirators. The exchange of intelligence information between the foreign government components and the FBI is with the express understanding that their information will be kept classified and not released to the public. Disclosure of the withheld information would violate the FBI's promise of confidentiality. This breach could reasonably be expected to strain relations between the United States and the foreign governments. This could have a chilling effect on the free flow of vital information to the intelligence and law enforcement agencies and could cause serious damage to the national security and the war on transnational terrorism. Therefore, the withheld classified information on pages CPO-125-126, 1589, 2097 and 3401-3402 are properly classified at the "Secret" level and is exempt form disclosure pursuant to FOIA Exemption 1.

(81)    Classified information withheld identifies by name a specific foreign government intelligence component and detailed information provided by this foreign entity. This information is being withheld to protect the relationship and the cooperative endeavors between this component and the FBI. The exchange of information between this foreign government components and the FBI is with the express understanding that their information and relationship will be kept classified and not released to the public. This information is properly classified at the "Secret" level and continues to warrant classification pursuant to E.O. 13526, § 3.3 (b)(6), and is exempt from disclosure pursuant to FOIA Exemption 1.

**Identity of a Foreign Government Official and Information Provided**

(82)    Exemption (b)(1) has been utilized to protect information received from foreign intelligence agencies which, if released, would reveal the identities of the foreign government officials who provided the information. Information provided relayed information pertinent to an on-going FBI investigation. The exchange of information between these foreign government intelligence components and the FBI was with the express understanding that their information would remain classified and not be released to the public. Disclosure of the information would violate the FBI's promise of confidentiality to the foreign government intelligence components. A breach of this type could reasonably be expected to strain relations between the United States and these foreign governments, have a chilling effect on the free flow of vital information to the

-32-

intelligence and law enforcement agencies, and could cause damage to the national security of the United States and the war on transnational terrorism. Therefore, the classified information withheld on CPO-669 and 3510 which is under the control of the United States Government, is properly classified at the "Secret" level and continues to warrant classification pursuant to E.O. 13526, § 3.3 (b)(6), and is exempt from disclosure pursuant to FOIA Exemption 1.

## INTELLIGENCE SOURCES

(83)   An intelligence source that requires continued classification is an individual who provided or is currently providing information that pertains to national security matters, the disclosure of which could reasonably be expected to result in serious damage to the FBI's intelligence and counterintelligence gathering capabilities.

(84)   My review disclosed that the information pertaining to a classified intelligence source is likely to identify this source. The withheld information and material provided by or that pertains to that source is specific and, if disclosed, reasonably could be expected to reveal the identity of the contributing source. I considered a number of factors in reaching this conclusion, including most importantly, the damage to the national security that would result by publicly identifying sources utilized in intelligence investigations, and the FBI's ability to protect and recruit intelligence sources in the future.

(85)   Disclosure of the identities of FBI intelligence sources, regardless of whether they are active or inactive, alive or deceased, can reasonably be expected to cause current and potential intelligence sources to fear that their identities will be publicly revealed at some point, despite the FBI's present express or implied assurance of confidentiality. This disclosure of sources' identities could jeopardize the physical well-being of the source or the source's family or associates or subject them to public ridicule and/or ostracism.

(86)   Thus, the release of information I determined to be source-identifying could reasonably be expected to cause serious damage to the national security by causing current intelligence sources to cease providing information, and discourage potential intelligence sources from cooperating with the FBI for fear their identities would be publicly revealed at some point.

Such a source reaction would eliminate one of the most crucial means of collecting intelligence information and, therefore, severely hamper the FBI's law enforcement efforts to detect and apprehend individuals who seek to damage the national security through violation of the United States criminal and national security laws. The classified information provided by intelligence sources on certain pages is properly classified at the "Secret" level and withheld pursuant to E.O. E.O. 13526, § 3.3 (b)(1), and exempt from disclosure pursuant to Exemption (b)(1).[26]

### Intelligence Source Symbol Number

(87)    The classified information withheld on CPO-301, 317, 393, 412, 672 and 1181 contains a numerical designator for a human intelligence source. A numerical designator serves as a singular identifier for an intelligence source utilized to provide information on a specific individual or organization determined to be of national security interest. A singular identifier is any word, term or phrase which could identify an intelligence source either released by itself or in the aggregate. This includes code names of sources, code names, numerical designators and file numbers. A singular identifier is used in lieu of the true identity of a source. The numerical designator is assigned to this specific source and is unique to and solely used for this source. The numerical designator is assigned sequentially and is usually prefixed with the geographic location of the FBI office from which the source is operated.

(88)    The  classified symbol numbers withheld on the above Bates-stamped pages consist of both active and discontinued human sources who provided or are providing information of value on individuals/or organizations of national security interest. In this case, where the symbol  number is isolated with no relevant information, the source was merely contacted or referenced on the page for any information of value he may possess concerning issues of national security.

(89)    The disclosure of this information could permit a hostile analyst to correlate the

---

[26] Exemption (b)(1) relating to intelligence sources is cited on the following Bates-stamped pages of Exhibit HH: CPO-295, 301, 317, 393, 395, 412, 416, 672, 745, 1181, 1593, 1599, 1768-1769, 2112 and 2560-2562.

documents and whatever information that can be gleaned from the documents. By matching source identifiers, such as file numbers and numerical designators, with bits and pieces of information, one can discern the true identity of the intelligence source. Public identification of a source will limit the effectiveness of such and have a chilling effect on the FBI's ability to recruit future sources. This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 3.3 (b)(1), and exempt from disclosure pursuant to FOIA Exemption 1.

### Intelligence Source Symbol Numbers with Detailed Information

(90)    The classified information withheld on CPO-395, 416, 745, 1593, 1599, 1768-1769 and 2560-2562 consists of detailed information provided by a human intelligence source targeted at a specific individual or organization of national security interest. The information is specific in nature and reflects a specific vantage point from which the source is reporting and if disclosed, would identify the intelligence source. This intelligence source continues to actively provide intelligence information to the FBI.

(91)    The classified symbol numbers with detailed information consist of discontinued human sources who provided information of value on individuals/or organizations of national security interest. This information is specific in nature and reflects a specific vantage point from which the source was reporting, and if disclosed, would identify the source.

(92)    The disclosure of the intelligence source identifier and detailed information would reveal the identity of a human intelligence source targeted at a specific individual or organization of national security interest. This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526 § 3.3 (b)(1), and exempt from disclosure pursuant to FOIA Exemption 1.

### Intelligence Source File Number

(93)    The classified information withheld on CPO-295 and 2112 contain file numbers assigned by FBI field offices to intelligence sources for the channelization/dissemination of intelligence information gathered by or attributed to the sources.

(94)    The release of these file numbers could reasonably be expected to cause damage

or serious damage to the national security, as it would result in the disclosure of the sources' identity and thereby, neutralize the sources, and compromise information previously provided by the sources. This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526, § 3.3 (b)(1), and exempt from disclosure pursuant to FOIA Exemption 1.

## DEFENDANT'S BURDEN OF ESTABLISHING
## EXEMPTION (b)(1) CLAIMS

(95)     The information withheld pursuant to Exemption (b)(1) was examined in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, each individual piece of information was evaluated with careful consideration given to the impact that disclosure of this information will have on other sensitive information contained elsewhere in the United States intelligence community's files. Equal consideration was given to the impact that other information -- either in the public domain or likely known or suspected by present or potential adversaries of the United States -- would have upon the information I examined, and upon attempts by a hostile entity to analyze such information.

(96)     In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause serious damage to the national security, and its withholding outweighed the benefit of disclosure, I exercised my prerogative as an original classification authority and designated that information as classified in the interest of national security, at the "Secret" level, and invoked Exemption (b)(1) to prevent disclosure. Likewise, the justifications for the withheld classified information were prepared with the intent that they be read with consideration given to the context in which the classified information is found. This context includes not only the surrounding unclassified information but also other information already in the public domain, as well as information likely known or suspected by other hostile intelligence entities. It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to foreign government information, intelligence sources, activities and methods, or information relating to foreign relations or foreign activities of the United States in

this public declaration, could reasonably be expected to seriously jeopardize the national security of the United States.

## EXEMPTION (b)(2)
## INTERNAL AGENCY RULES AND PRACTICES

(97)     5 U.S.C. § 552 (b)(2) exempts from disclosure information "related solely to the internal personnel rules and practices of an agency."

(98)     This exemption encompasses two distinct categories of records that are internal in nature: those involving trivial administrative matters of no genuine public interest ("Low" 2), and those more substantial in nature, the disclosure of which would risk circumvention of a statute or regulation ("High" 2).  The FBI invoked Exemption 2 (High) to protect information related to internal investigative techniques and procedures, source symbol numbers, informant file numbers and confidential identification symbol numbers of electronic microphone surveillances. Disclosure of this information could impede the effectiveness of the FBI's internal law enforcement procedures and may risk circumvention of the law.

### (b)(2)-1            Investigative Techniques and Procedures

(99)     Exemption (b)(2)-1 has been asserted to protect information consisting of specific internal investigatory techniques and procedures used by the FBI during the investigation of plaintiff and others.  To describe this information in further detail on the public record would identify that very information which the FBI seeks to protect pursuant to this exemption.  The revelation of these details could enable the targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use this important national security law enforcement technique.  Accordingly, the FBI has properly withheld this

information pursuant to Exemption (b)(2)-1.[27]

**(b)(2)-2**          **Confidential Source Symbol Numbers**[28]

(100)   Exemption (b)(2)-2 has been asserted, at times in conjunction with (b)(7)(D)-1 to protect the permanent source symbol numbers of FBI sources.  Permanent symbol numbers are assigned to confidential informants who report information to the FBI on a regular basis pursuant to an "express" grant of confidentiality.  The symbol number is used as an administrative reporting tool to protect the actual, sensitive identity of an informant in documents generated by the FBI.  A symbol number consists of a two-letter abbreviation which identifies the particular FBI field office where the symbol-numbered source is operating or has operated, followed by a sequentially assigned number.  For example, using a fictitious symbol number, "NY 1234" for informant "JOHN DOE," the two letter abbreviation "NY" reveals that this is a source of the New York Field Office and the source is the 1,234[th] symbol-numbered source of that office.  The symbol number would be used in all written reports in which JOHN DOE provided information to the FBI.  Therefore, every time NY 1234 was released, the reader of the document would know that the source behind the symbol number was the same individual reporting.  Thus, every time NY 1234 was used by the FBI in a record, the number would always refer to JOHN DOE and potentially reveal his identity.

(101)   Release of these source symbol numbers would indicate both the scope and location of FBI informant coverage within a particular geographic area.  If a particular symbol

---

[27] Exemption (b)(2)-1 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-1102 and 2638-2639.

[28]  Confidential source symbol numerous are always withheld by the FBI, even if the confidential source is deceased.

number such as NY 1234 is released to the public at repeated times and in various documents, the identity of the source could be determined. Each release of information in which the symbol number is disclosed reveals connections to dates, times, places, events and names from which the source's identity could be deduced. A person familiar with the facts being reported by JOHN DOE could easily identify NY 1234's identity as being JOHN DOE given enough instances in which NY 1234 provided information to the FBI. Releasing the symbol number, along with information provided by the source from the source's personal perspective concerning the matters being investigated by the FBI, would allow an individual with knowledge of such matters to extrapolate the source's true identity. This is especially true given the fact that regardless of the law enforcement investigative file in which the symbol number appears, NY 1234 would always be the symbol number used to protect the true identity of informant JOHN DOE. Thus, a confidential source symbol number is protected under FOIA Exemption (b)(2) since it is an internal administrative tool used by the FBI to protect informants' identities. The protection of these identifiers is essential to maintaining the integrity of the FBI's confidential source program where release could endanger the lives of informants or discourage cooperation by confidential sources. Accordingly, because these source symbol numbers are related solely to the FBI's internal practices, because disclosure would not serve any public interest, and because disclosure would impede the FBI's effectiveness, the FBI withheld this information pursuant to Exemption (b)(2)-2.[29]

---

[29] Exemption (b)(2)-2 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-175, 298, 301, 317, 393, 471, 658-A, 672, 928, 1035, 1085, 1095, 1099, 1102, 1127, 1169, 1181, 1198, 1262, 1264, 1696, 1766, 1854, 1861, 2638-2639 and 2781.

**(b)(2)-3**          **Confidential Source File Numbers**

(102)   Exemption (b)(2)-3 has been asserted, at times in conjunction with (b)(7)(D)-4, to protect informant file numbers of permanent confidential symbol number sources of the FBI. Similar in usage to the confidential source symbol numbers, these confidential source file numbers are also assigned in sequential order to confidential informants who report information to the FBI on a regular basis pursuant to an express assurance of confidentiality.  The confidential source file is unique to the particular confidential informant and is used only in documentation relating to that particular informant.  In this instance, confidential source file numbers were used to document information provided by various sources.

(103)   Disclosure of confidential source file numbers at various times and in various documents could ultimately identify these sources since it would reveal the connections of confidential informants to the information provided by them.  Repeated release of confidential source file numbers along with the information provided by these confidential informants would narrow the possibilities of their true identities.  This is especially true since each confidential source file number is assigned to only one confidential informant.

(104)   The disclosure of the identity of these confidential sources would have a chilling effect on the activities and cooperation of other FBI confidential informants.  It is only with the understanding of complete confidentiality that the aid of such informants can be enlisted, and only through this assurance of confidentiality that these informants can be persuaded to continue their assistance in providing information to the FBI in the future.  Accordingly, the disclosure of these confidential source file numbers could reasonably be expected to identify permanent confidential sources of the FBI.  Therefore, this information has been appropriately protected

-40-

from disclosure pursuant to Exemption (b)(2)-3.[30]

### (b)(2)-4    Confidential Identification Symbol Numbers of Electronic Microphone Surveillances

(105)   Exemption (b)(2)-4 has been asserted to exempt from disclosure the confidential identification symbol numbers of electronic microphone surveillances conducted by the FBI.  The FBI assigns these confidential identification symbol numbers to electronic microphone surveillances for internal record-keeping purposes and to further protect from disclosure the targets and locations of the ELSURs.  In this case, the targets of the electronic microphone surveillances were either individuals who were designated as members of the "Students for a Democratic Society" ("SDS") or individuals who were associated with the organization.  The confidential identification symbol numbers were utilized to document information provided by these electronic microphone surveillances concerning the activities of certain individuals designated as members of, or individuals associated with, the "SDS" by the FBI.

(106)   Disclosure of these confidential identification symbol numbers at various times and in various documents could ultimately identify these targets and locations of these electronic microphone surveillances to persons who are familiar with the subject matters of these investigations.  Repeated release of these confidential identification symbol numbers along with the identities of the targets of the surveillances would narrow the possibilities of their locations.  This is especially true inasmuch as each confidential identification symbol number is assigned to

---

[30]  Exemption (b)(2)-3 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-295, 316, 672, 1051-1052, 1085, 1095, 1102, 1107, 1169, 1253, 1279, 1283, 1854 and 2638.

only a single electronic microphone surveillance.

(107)   Additionally, the disclosures of the targets and locations of FBI microphone surveillances could result in countermeasures being employed by current and future targets of electronic microphone surveillances, thus negating their usefulness to the FBI.  The disclosure of these confidential identification symbol numbers in conjunction with the information provided by these electronic microphone surveillances could reasonably be expected to lead to the identification of the targets and locations of these FBI microphone surveillances.  Accordingly, because these confidential identification symbol numbers are related solely to the FBI's internal practices, because the disclosure of these confidential identification symbol numbers would not serve any public interest, and because the disclosure of these confidential identification symbol numbers would impede the effectiveness of the FBI, the FBI properly withheld this information pursuant to FOIA Exemption (b)(2)-4. [31]

## EXEMPTION 7
## EXEMPTION 7 THRESHOLD

(108)   Exemption 7 of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subpart of the exemption.  See 5 U.S.C. § 552 (b)(7).  In this case, the harm that could reasonably be expected to result from disclosure concerns the invasion of personal privacy of certain individuals, the identity of confidential sources as well as information provided by these sources, and revealing sensitive law

---

[31] Exemption (b)(2)-4 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-393, 412, 656-A, 660-A, 874, 1227, 1768-1769, 2560, 2779 and 3880 (same as 660-A).

enforcement techniques.

(109)  Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.  There is no doubt that these records fall within the law enforcement scope of the FBI.  In this case, the documents relate to an internal security investigation of the "Students for a Democratic Society" ("SDS") organization; Domestic Security which covers investigations by the FBI in the domestic security field (see 58 Fed. Reg. 51861 (1993); Anti-Riot Laws, 18 U.S.C. § 245 (b)(3); and various Foreign Counter Intelligence investigations. The SDS, was suspected of engaging in subversive activity and encouraging violent demonstrations and criminally disruptive activities; it included a radical element known as the "Weathermen," which was dedicated to the use of violence as a means of achieving political ends.  The SDS was also believed to be a part of an international coalition of student organizations whose goal it was to bring about violent change to their governments. Accordingly, the information readily meets the threshold requirement of Exemption 7.  The remaining inquiry is whether disclosure of certain information contained in the responsive records "could reasonably be expected to constitute an unwarranted invasion of personal privacy," "disclose the identity of a confidential source," and "could reasonably be expected to risk circumvention of the law."

## FOIA EXEMPTIONS (b)(6) AND (b)(7)(C): CLEARLY UNWARRANTED AND UNWARRANTED INVASION OF PERSONAL PRIVACY

(110)    5 U.S.C. § 552 (b)(6) exempts from disclosure

personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.

(111)    5 U.S.C. § 552(b)(7)(C) exempts from disclosure

records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy.[32]

(112)    When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure.  In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of any individual whose name and/or identifying information appears in the documents at issue.[33]  When withholding the

---

[32] The practice of the FBI is to assert Exemption (b)(6) in conjunction with (b)(7)(C).  Although the balancing test for (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy," and the test for (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.  The privacy interests are balanced against the public's interests in disclosure under the analysis of both exemptions.

[33] The FBI has taken several steps to ascertain the current life/death status of the individuals whose names are withheld.  The FBI uses the birth date and/or the date of the investigation to determine whether an individual is living or deceased, to the extent either or both of these pieces of information are discernable from the file.  The date of birth is used to apply the judicially-recognized "100-year rule," *i.e.*, if the individual was born more than 100 years ago, the FBI presumes that he or she is dead and the name is released.  The FBI also uses institutional knowledge gained from prior FOIA requests or internal records.  By using institutional knowledge, the FBI can identify with sufficient certainty the life/death status of certain individuals.  If the FBI is unable to determine the life/death status of an individual through the use of these methods, the name of the individual is withheld pursuant to Exemptions 6 and 7C, as disclosure would constitute an unwarranted invasion of those individuals' privacy and no public interest would be served in releasing the names.  It is also the FBI's policy to release all names of high-

-44-

information, the individual's privacy interest was balanced against the public's interest in disclosure. In making this analysis, the public interest in the information was determined to be information which would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. In each instance where information was withheld pursuant to Exemption (b)(6) and (b)(7)(C), the FBI determined that the individuals' privacy interests were not outweighed by any public interest in disclosure. Every effort has been made to release all segregable information contained in these records without invading the privacy interests of these individuals.

### **(b)(6)-1 and (b)(7)(C)-1:**     **Names and/or Identifying Information of FBI Special Agents and Support Personnel**

(113)  Exemptions (b)(6)-1 and (b)(7)(C)-1 have been asserted to protect the names and identifying information of FBI SAs who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in these files. The SAs mentioned did not choose their assignments. Publicity, adverse or otherwise, regarding any particular investigation conducted by SAs may seriously impair the SAs' effectiveness in conducting future investigations. This privacy consideration also protects SAs from unnecessary, unofficial questioning as to the conduct of an investigation, whether or not they are currently employed by the FBI.

---

ranking FBI officials in policy-making positions, as well as individuals in public positions, as they do not have privacy rights while acting in their official capacity. This policy is applied to the individual's position at the time of the document, and not the present.

(114)    FBI SAs conduct official inquiries into violations of various criminal statutes and national security cases.  They come into contact with all strata of society, conducting searches and making arrests, all of which result in reasonable but nonetheless serious disturbances to individuals and their lives.  It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years, and to seek revenge on the agents and other federal employees involved in the investigation.  The publicity associated with the release of the identity of an FBI SA in connection with a particular investigation could trigger hostility towards the SA by the persons being investigated.  Accordingly, the FBI determined that the SAs whose names and information appear in these documents maintain a substantial privacy interest in not having their identities disclosed.

(115)    The FBI next examined the records at issue to determine whether there was any public interest that outweighed the substantial privacy interests of the FBI SAs referenced in the responsive records.  The FBI could not identify any discernible public interest.  Accordingly, the FBI determined that the disclosure of the names of FBI SAs would shed no light on the FBI's performance of its statutory duties in the investigation of the plaintiff.  Thus, the FBI determined that the SAs' privacy interests outweighed any public interest in disclosure, and that disclosure of the names and identifying information of the FBI SAs would constitute an unwarranted invasion of their personal privacy, and has therefore withheld this information pursuant to Exemptions (b)(6)-1 and (b)(7)(C)-1.

(116)    In addition, the FBI asserted Exemption (b)(6)-1 and (b)(7)(C)-1 to protect the names and identifying data of FBI support employees.  Support personnel are assigned to handle tasks relating to FBI investigations.  These individuals are in positions to access information

-46-

concerning official law enforcement investigations. They could therefore become targets of harassing inquiries for unauthorized access to FBI investigations if their identities were released. The FBI has determined that the FBI support employees maintain a substantial privacy interest in not having their identities and related information disclosed.

(117)   The FBI next balanced the privacy interests of the FBI support employees against the public interest in disclosure. The FBI determined that the disclosure of the names of FBI support personnel would not demonstrate how the FBI performs its statutory duties. Accordingly, after balancing the competing interests, the FBI has concluded that no public interest would be served by disclosing the identities of these FBI support employees to the general public. The disclosure of the names and related identifying information of the FBI support personnel would constitute a clearly unwarranted invasion of their personal privacy. Thus, the FBI has properly withheld their names and identifying information pursuant to Exemptions (b)(6)-1 and (b)(7)(C)-1.[34]

### (b)(6)-2 and (b)(7)(C)-2    Names and/or Identifying Information of Third Parties who Provided Information to the FBI

(118)   Exemptions (b)(6)-2 and (b)(7)(C)-2 have been asserted, at times in conjunction with (b)(7)(D)-3 and (b)(7)(D)-5, to protect the names and/or identifying information of individuals who assisted the FBI by providing information during the course of the FBI's investigation of plaintiff and others.

---

[34] Exemptions (b)(6)-1 and (b)(7)(C)-1 are cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-2, 12, 67, 76-77, 79, 82, 87, 92, 102, 106, 125, 149, 161, 291, 293, 322, 331, 388, 393, 434, 440, 462, 466, 468, 503, 581, 584, 640, 658-A, 829, 1037, 1085, 1095, 1102, 1169, 1245, 1262, 1264, 1279, 1283, 1308, 1589, 1592, 1599, 1603-1604, 1640, 1698-1699, 2097, 2112, 2198, 2560, 2779-2780 and 3004.

(119)   Information provided by individuals during an interview is one of the most

productive tools utilized by law enforcement agencies.  The largest roadblock in successfully

obtaining the desired information through an interview is the fear by the interviewee that his or

her identity could possibly be exposed and, consequently, they could be harassed, intimidated or

threatened with legal or economic reprisal, or possible physical harm.  In order to surmount these

obstacles, persons interviewed must be assured that their identities will be held in the strictest

confidence.  The FBI has attempted to release all segregable portions of the information provided

by these individuals without revealing their identities. In balancing the legitimate privacy interest

of these individuals against any public interest in disclosure, the FBI determined that there is a

complete lack of any bona fide public interest in disclosing this information because it will not

shed light on the operations and activities of the federal government.  Accordingly, the FBI

concluded that the disclosure of this information would constitute a clearly unwarranted and

unwarranted invasion of their personal privacy.  The FBI property withheld this information

pursuant to Exemptions (b)(6)-2 and (b)(7)(C)-2.[35]

### (b)(6)-3 and (b)(7)(C)-3     Names and/or Identifying Information Concerning Foreign and Local Law Enforcement Personnel

(120)   Exemptions (b)(6)-3 and (b)(7)(C)-3 have been asserted to withhold the names

and identifying information of foreign and local law enforcement personnel.  Identifying

information withheld includes the title/rank of these employees.  These employees were acting in

their official capacity and aided the FBI in the law enforcement investigative records responsive

---

[35] Exemptions (b)(6)-2 and (b)(7)(C)-2 are cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-79-82, 106, 137, 144, 149-150, 161, 175, 186, 187, 267, 291, 298-299, 301, 316, 322, 346, 348, 352, 462, 486, 503, 546, 640, 672, 759, 874, 1181, 1237, 1245, 1264, 1283, 1308, 1696, 2197-2198, 2639, 3017 and 3051.

to plaintiff's request. The rationale for protecting the identities of FBI SAs and support personnel found at paragraphs 112-116, supra, also pertains to withholding the names and identifying information of these foreign and local law enforcement personnel. To release the identities of these law enforcement personnel could subject them as individuals to unnecessary, unwarranted harassment which would constitute an unwarranted invasion of privacy. Furthermore, these individuals could become a prime target for compromise if their identities were known. There is no public interest to be served in releasing the identities of these individuals. Therefore, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. Accordingly, the FBI has properly withheld this information pursuant to Exemptions (b)(6)-3 and (b)(7)(C)-3.[36]

### (b)(6)-4 and (b)(7)(C)-4    Names and/or Identifying Information of Third Parties of Investigative Interest

(121)   Exemptions (b)(6)-4 and (b)(7)(C)-4 have been asserted to protect the names and identifying information of third party individuals who are of investigative interest to the FBI and/or other law enforcement agencies. Identifying information withheld concerning these third parties includes addresses, dates of birth, and other personal information. Being linked with any law enforcement investigation carries a strong negative connotation and a stigma. To release the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Accordingly, the FBI has determined that these individuals maintain a substantial privacy interest in not having their identities disclosed. In making a

---

[36] Exemptions (b)(6)-3 and (b)(7)(C)-3 are cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-292, 466 and 549.

determination whether to release the names and personal information concerning these third parties, the public's interest in disclosure was balanced against the individual's right to privacy. It was determined that this information would not enlighten the public on how the FBI conducts its internal operations and investigations. Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted and unwarranted invasion of their personal privacy. Thus, the FBI has properly asserted Exemptions (b)(6)-4 and (b)(7)(C)-4 to withhold this information.[37]

### (b)(6)-5 and (b)(7)(C)-5     Names and/or Identifying Information of Third Parties Merely Mentioned

(122)   Exemptions (b)(6)-5 and (b)(7)(C)-5 have been asserted to protect the names, addresses, telephone numbers, and other identifying information concerning third parties merely mentioned in these FBI investigative records. Other identifying information includes the third parties' relationship to plaintiff. During the course of the FBI's investigation of plaintiff, information was obtained from third parties who came in contact with plaintiff during his activities. These individuals were not of investigative interest to the FBI. These third parties maintain legitimate privacy interests in not having this information disclosed. To release the names and other personal information about these individuals could cause unsolicited and unnecessary attention to be focused on them. The presence of their names in FBI files may cast

---

[37] Exemptions (b)(6)-4 and (b)(7)(C)-4 are cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-2, 67-69, 161, 182-184, 186, 295, 298, 301, 317, 331, 348, 351, 388-389, 395, 416, 440, 462, 466-468, 492, 503-504, 546, 549, 584, 615, 658-A, 928, 1035, 1050-1052, 1058, 1077, 1085-1086, 1088, 1095, 1099, 1102, 1110, 1111, 1169, 1227-1228, 1245, 1307-1308, 1338, 1343, 1450-1451, 1589, 1593, 1599, 1601, 1603-1604, 1640, 1696, 1698-1699, 1709, 1768-1769, 1855-1857, 1859-1861, 1950, 1996, 2001, 2072, 2097, 2110, 2112, 2166, 2197-2198, 2560-2562, 2573, 2610, 2633, 2635, 2638, 2779-2781, 3018, 3036, 3060, 3283, 3286, 3401, 3465, 3510, 3519 and 3798.

them in an unfavorable or negative light to the public. These individuals maintain strong privacy

interests in not having their personal information disclosed. Disclosure of their names and other

personal information would reveal that these third parties were connected with the FBI's

investigation of the plaintiff in some way. Disclosure of the identities of these individuals could

subject them to harassment, embarrassment and undue public attention. Accordingly, the FBI

has determined that these individuals maintain a substantial privacy interest in not having their

identities disclosed.

(123) After identifying the substantial privacy interests of these third parties, the FBI

balanced their privacy interests against the public interest in disclosure. The FBI determined that

the disclosure of the names of these third parties would not shed any light on the operations and

activities of the FBI. Accordingly, disclosure of this information would constitute a clearly

unwarranted and an unwarranted invasion of their personal privacy. Thus, the FBI has properly

withheld this information pursuant to Exemptions (b)(6)-5 and (b)(7)(C)-5.[38]

## EXEMPTION (b)(7)(D)
## CONFIDENTIAL SOURCE MATERIAL

(124) 5 U.S.C. § 552 (b)(7)(D) provides protection for:

records or information compiled for law enforcement purposes, but only to the
extent that the production of such law enforcement records or information . . . .
(D) could reasonably be expected to disclose the identity of a confidential source,
including a State, local or foreign agency or authority or any private institution
which furnished information on a confidential basis, and, in the case of a record or
information compiled by a criminal law enforcement authority in the course of a
criminal investigation or by an agency conducting lawful national security

---

[38] Exemptions (b)(6)-5 and (b)(7)(C)-5 are cited as a basis for withholding information on the
following Bates-stamped pages of Exhibit HH: CPO-1, 68, 77, 79-82, 87, 127, 137, 144, 149-150, 158,
298-299, 301, 322, 467, 471, 486, 581, 640, 745, 829, 874, 928, 959, 1099, 1102, 1198, 1227, 1245,
1592-1595, 1854, 2671, 2097, 2779-2781 and 3017.

intelligence investigation, information furnished by a confidential source.

(125)   Numerous informants report to the FBI on a regular basis and are informants in the common meaning of the term.  Some of the sources provide information under an express assurance of confidentiality.  Further, during the course of an investigation, other individuals are interviewed under circumstances from which an assurance of confidentiality can reasonably be inferred.  These individuals are considered to be confidential informants or sources since they furnish information only with the understanding that their identities and the information provided will not be divulged outside the FBI.  Information provided by these individuals is singular in nature, and if released, could reveal their identity.

(126)   During the course of the FBI's investigation, FBI SAs sought the assistance of numerous individuals in obtaining information to aid its investigation.  Information was provided by certain third parties under an implied grant of confidentiality and by other third parties who provided information under an express assurance of confidentiality.

(127)   If the FBI disclosed their cooperation, these individuals could be subjected to acts of reprisal, harassment, or an unnecessary amount of public attention.  The FBI has learned through experience that individuals who provide information about subjects under investigation must be free to do so without fear of reprisal should their identities or information they provided be disclosed outside their confidential relationship with the FBI.  Individuals who provide investigative information must be free to furnish that information with complete candor and without the understandable tendency to hedge or withhold information out of fear that their names or their cooperation with the FBI will later be made public.  Those who provide information in these investigations must be secure in the knowledge that their assistance and their

identities will be held in confidence.

(128)   The release of a source's identity would forever eliminate that source as a future means of obtaining information.  In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources.  It is only with the understanding of complete confidentiality (whether express or implied) that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future.  There is no legitimate public interest to be served in revealing the identities of the individuals who cooperated with the FBI by providing information in these criminal investigations of plaintiff and other individuals.  Therefore, the identities of these confidential sources, as well as any specific information provided by them which would identify them, have been withheld from disclosure pursuant to FOIA Exemption (b)(7)(D).

### (b)(7)(D)-1   Confidential Source Symbol Numbers (Express Confidentiality)

(129)   Exemption (b)(7)(D)-1 has been asserted, at times in conjunction with (b)(2)-2 to protect the permanent source symbol numbers of FBI sources mentioned in the responsive documents.  Permanent symbol numbers are assigned to confidential informants who report information to the FBI on a regular basis pursuant to an "express" grant of confidentiality.  The symbol number is used as an administrative reporting tool to protect the actual, sensitive identity of an informant in documents generated by the FBI.  A symbol number consists of a two-letter abbreviation which identifies the particular FBI field office where the symbol-numbered source is operating or has operated, followed by a sequentially assigned number.  For example, using a fictitious symbol number, "NY 1234" for informant "JOHN DOE," the two-letter abbreviation

"NY" reveals that this is a source of the New York Field Office and the source is the 1,234th

symbol-numbered source of that office. The symbol number would be used in all written reports

in which JOHN DOE provided information to the FBI. Therefore, if "NY 1234" was released

every time, the reader of the document would know that the source behind the symbol number

was the same reporting individual, thereby potentially identifying JOHN DOE.

(130)   Release of these source symbol numbers would indicate both the scope and

location of FBI informant coverage within a particular geographic area. If a particular symbol

number such as "NY 1234" is released to the public at repeated times and in various documents,

the identity of the source could be determined. Each release of information in which the symbol

number is disclosed, reveals connections to dates, times, places, events and names from which

the source's identity could be deduced. A person familiar with the facts being reported by JOHN

DOE could easily identify the identity of "NY 1234" as being JOHN DOE given enough

instances in which "NY 1234" provided information to the FBI. Releasing the symbol number,

along with information provided by the source from the source's personal perspective concerning

the matters being investigated by the FBI, would allow an individual with knowledge of such

matters to extrapolate the source's true identity. This is especially true given the fact that

regardless of the law enforcement investigative file in which the symbol number appears, "NY

1234" would always be the symbol number used to protect the true identity of informant JOHN

DOE. The protection of these identifiers is essential to maintaining the integrity of the FBI's

confidential source program where release could endanger the lives of informants or discourage

cooperation by information sources. Accordingly, because disclosure would not serve any public

interest, and because disclosure would impede the FBI's effectiveness, the FBI has withheld this

information pursuant to Exemption (b)(7)(D)-1.[39]

### (b)(7)(D)-2    Foreign Law Enforcement Agency Information (Express Confidentiality)

(131)    Exemption (b)(7)(D)-2 is asserted to withhold the identity of and the information provided by three foreign law enforcement authorities to the FBI under an "express" assurance of confidentiality.  The FBI has many agreements with foreign governments under which security and/or criminal law enforcement information is exchanged.  The agreements specify the extent of confidentiality requested by the respective foreign authorities.  While one agency might request confidentiality for its identity and not necessarily the information provided, another agency might request confidentiality for both its identity and the information provided, and yet another agency may request that its information be protected while it does not object its relationship with the FBI being disclosed.  Accordingly, the FBI has withheld the identity of three law enforcement authorities who requested their identity be protected.[40]

### (b)(7)(D)-3    Names and/or Identifying Information of Third Parties who Provided Information to the FBI under "Express" Assurance of Confidentiality

(132)    Exemption (b)(7)(D)-3 has been asserted, at times in conjunction with (b)(6)-2 and (b)(7)(C)-2, (b)(6)-4 and (b)(7)(C)-4 and (b)(6)-5 and (b)(7)(C)-5, to protect the names and/or identifying information of third parties who assisted in the investigation of plaintiff and others under an "express" assurance of confidentiality.  As part of the criminal investigation of

---

[39] Exemption (b)(7)(D)-1 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-175, 298, 301, 317, 393, 471, 672, 874, 928, 1035, 1181, 1198, 1262, 1264, 1696, 1766, 1854, 1861, 2560 and 2638-2639.

[40] Exemption (b)(7)(D)-2 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-90, 125 and 669.

plaintiff, the FBI interviewed several individuals who provided valuable information regarding

the activities of plaintiff and others.

(133)  Information provided by these individuals during an interview is one of the most

productive investigative tools utilized by law enforcement agencies.  The largest roadblock in

successfully obtaining the desired information through an interview is fear by the interviewee of

his or her identity possibly being exposed and, consequently, being harassed, intimidated, or

threatened with legal or economic reprisal, or possible physical harm.  In order to surmount these

obstacles, persons interviewed must be assured that information received from them will be held

in the strictest confidence.  The FBI has attempted to release all segregable portions of this

individual's statement without actually revealing his or her identity.  The continued access to

persons willing to honestly relate pertinent facts bearing upon a particular investigation

outweighs any benefits derived from releasing the identity of this individual.  Therefore, this

information has been appropriately protected from disclosure pursuant to Exemption

(b)(7)(D)-3.[41]

### (b)(7)(D)-4     Confidential Source File Numbers (Express Confidentiality)

(134)  Exemption (b)(7)(D)-4 has been asserted, at times in conjunction with (b)(2)-3, to

protect the informant file number of permanent confidential symbol number sources of the FBI.

Similar in usage to the confidential source symbol number, these confidential source file

numbers are also assigned in sequential order to confidential informants who report information

to the FBI on a regular basis pursuant to an "express" assurance of confidentiality.  The

---

[41] Exemption (b)(7)(D)-3 is cited as a basis for withholding information on the following  Bates-stamped pages of Exhibit HH: CPO-79-82, 121, 137, 175, 186-187, 291, 298, 301, 316, 322, 640, 655, 672, 759, 874, 1283, 1696, and 2197-2198.

confidential source file is unique to the particular confidential informant and is used only in documentation relating to that particular informant.

(135)   Disclosure of confidential source file numbers at various times and in various documents could ultimately identify these sources since it would reveal the connections of confidential informants to the information provided by them.  Repeated release of confidential source file numbers along with the information provided by these confidential informants would narrow the possibilities of their true identities.  This is especially true since each confidential source file number is assigned to only one confidential informant.

(136)   The disclosure of the identity of these confidential sources would have a chilling effect on the activities and cooperation of both current and future FBI confidential informants.  It is only with the understanding of complete confidentiality that the aid of such informants can be enlisted, and only through this assurance of confidentiality that these informants can be persuaded to continue their assistance in providing information to the FBI in the future.  Accordingly, the disclosure of this confidential source file number could reasonably be expected to identify a permanent confidential source of the FBI.  Therefore, this information has been appropriately protected from disclosure pursuant to Exemption (b)(7)(D)-4.[42]

**(b)(7)(D)-5**     **Information Provided by and/or Identifying Data Concerning Source Symbol Numbered Informants under an Express Promise of Confidentiality**

(137)   Exemption (b)(7)(D)-5 is asserted, at times in conjunction with (b)(6)-2 and (b)(7)(C)-2, to withhold the information provided and/or identifying information concerning

---

[42] Exemption (b)(7)(D)-4 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-295, 316, 672, 1279 and 2638.

source symbol numbered informants. The disclosure of this information may likely reveal a confidential source's identity. The disclosure of a source's identity would forever neutralize that source as a future means of obtaining information. In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources. It is only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this confidence that these sources can be persuaded to continue providing valuable assistance in the future. Thus, the FBI has properly withheld this information pursuant to FOIA Exemption (b)(7)(D)-5.[43]

### (b)(7)(D)-6    Foreign Government Agency Information (Express Confidentiality)

(138)   Confidential source material also protected by the assertion, of exemption (b)(7)(D)-6 is information from a foreign government agency or authority which furnished information to and/or requested information from the FBI on a confidential basis. The FBI, in connection with a wide variety of criminal and national security investigations, solicits and receives information regularly from foreign government agencies and authorities. Inherent in this cooperative effort is the mutual understanding that the identity of such a source and the information provided by it will be held in confidence by the FBI, and not released pursuant to FOIA and Privacy Act requests. This mutual understanding has been, and will continue to be, the foundation upon which the exchange of information between the FBI and foreign government agencies and authorities is based. If disclosure of these cooperative efforts were made public pursuant to FOIA and Privacy act requests, cooperation between the FBI and these agencies and

---

[43] Exemption (b)(7)(D)-5 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-137, 175, 197, 395, 416, 471, 546, 672, 745, 874, 928, 1593, 1854-1855-1861, 2560-2562, 2638-2639, 2670-2671 and 3017.

authorities would be greatly diminished, causing great detriment to effective law enforcement. The need for this protection was expressed in the enactment of the Freedom of Information Reform Act of 1986, which amended the FOIA exemption (b)(7)(D)-6 to explicitly state the protectability of this type of confidential source. Exemption (b)(7)(D)-6 was asserted to protect such information, the official/employee furnishing same and the name of the agency as well as any identifying information. Thus, the FBI has properly withheld this information pursuant to FOIA Exemption (b)(7)(D)-6.[44]

### (b)(7)(D)-7    Names and/or Identifying Information of Third Parties who Provided Information to the FBI Under an "Implied" Assurance of Confidentiality

(139)   Exemption (b)(7)(D)-7 was cited, at times in conjunction with (b)(6)-2 and (b)(7)(C)-2, (b)(6)-4 and (b)(7)(C)-4 and (b)(6)-5 and (b)(7)(C)-5, to protect the names, identifying information, and information provided by third parties to the FBI or other law enforcement agencies in the investigative files concerning Carl Oglesby under an implied assurance of confidentiality. These third parties provided information concerning the subject's involvement with the SDS "Students for a Democratic Society" organization and various foreign counter intelligence activities which were of interest to the FBI or other law enforcement agencies. These third party sources provided specific detailed information that is singular in nature concerning the subject of this investigation. The disclosure of the identities of these individuals could have disastrous consequences.

(140)   The SDS was a radical organization that advocated civil disobedience and

---

[44] Exemption (b)(7)(D)-6 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-125, 145, 292, 1589 and 3401-3402.

demonstrated a proclivity towards violence. It formed alliances with other radical, violent

organizations, such as the Black Panther Party. If the identities of the third parties who provided

information concerning Oglesby's involvement with the SDS, these individuals would have cause

to fear for grievous bodily injury if not their lives. The SDS was in open revolt against the

government. This fear of violent retaliation is not merely speculative; the "Weather

Underground" a group that claimed responsibility for several bombings some of which resulted

in fatalities, was an off-shoot of the SDS. The information provided was directly related to these

activities and Oglesby. Given the times and the individuals involved in the SDS, it is reasonable

to infer that no information would have been provided to the FBI unless there was an implied

confidentiality. To do otherwise, would have been foolhardy.

(141)   These third parties provided information of value to the FBI concerning this

investigation, and in doing so, have placed themselves in harm's way should the public become

aware of their cooperation with the FBI. It is for this reason these third parties would expect that

their identities and the information they provided not be released to the general public.

Accordingly, it is reasonable to infer that each of the third parties that provided information to

the FBI did so under circumstances from which an assurance of confidentiality may be implied.

The information the third parties provided under an assurance of confidentiality warrants the

protection of the third party names, as well as the information they provided that would identify

them. Thus, the FBI has properly withheld this information pursuant to FOIA Exemption

(b)(7)(D)-7. [45]

---

[45] Exemption (b)(7)(D)-7 is cited as a basis for withholding information on the following Bates-stamped pages of Exhibit HH: CPO-126-127, 175, 182-183, 959, 1181, 1245, 1592, 1603, 1698-1699, 2001, 2097-2098, 2112 and 3051.

## EXEMPTION (b)(7)(E)
## INVESTIGATIVE TECHNIQUES AND PROCEDURES

(142)   5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

records or information compiled for law enforcement purposes, but only to the
extent that  the production of such law enforcement records or information . . .
(E) would disclose techniques and procedures for law enforcement investigations
or prosecutions, or would disclose guidelines for law enforcement investigations
or prosecutions if such disclosure could reasonably be expected to risk
circumvention of the law.

In order for this exemption to apply, the specifics and use of the technique or procedure at issue

must not be well-known to the public.

### (b)(7)(E)        Investigative Techniques and Procedures

(143)   The FBI has asserted Exemption (b)(7)(E), to withhold information which affords

"categorical" protection for techniques and procedures used in law enforcement investigations or

prosecutions.  To describe this information in further detail on the public record would identify

that very information which the FBI seeks to protect pursuant to this exemption.  While the

protection of Exemption 7(E) is generally limited to techniques and procedures that are not well

known to the public, even commonly known procedures may be protected from disclosure if the

disclosure could reduce or nullify their effectiveness.

(144)   The revelation of these details could enable the targets of these techniques to

avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use

this important law enforcement technique, therefore allowing circumvention of the law.

Accordingly, the FBI properly withheld this information pursuant to Exemption (b)(7)(E).[46]

---

[46] Exemption (b)(7)(E) is cited as a basis for withholding information on the following  Bates-
stamped pages of Exhibit HH: CPO-2638-2639.

-61-

## REFERRED DOCUMENTS

(145)   In the course of reviewing the documents responsive to plaintiff's request, the FBI identified certain documents which originated with other government agencies or contained information originating from other agencies.  In accordance with the DOJ regulations, 28 C.F.R. § 16.4, the FBI referred these documents either for consultation or for direct response to plaintiff. An updated detailed accounting of the ultimate results of the FBI's efforts with respect to these referrals is provided below.

### Internal Revenue Service

(146)   See Second Hardy Declaration, ¶ 113, previously filed in this case, for a detailed accounting of this referral.  The referral was complete at that time, and no further action is necessary.  No pages contained in this sample contain information originating with this agency.

### U.S. Air Force

(147)   See Second Hardy Declaration, ¶ 114, previously filed in this case, for a detailed accounting of this referral.  At that time, the Air Force had not yet responded to the FBI.  The Air Force returned the documents to the FBI by letter dated June 8, 2009 with partial redactions, on three out of eight pages, pursuant to FOIA Exemptions (b)(1), (b)(6) and (b)(7)(C).  The FBI processed the pages accordingly and forwarded the material to plaintiff by letter dated July 30, 2009.  The FBI also asserted FOIA Exemptions (b)(1), (b)(2), (b)(6), (b)(7)(C) and (b)(7)(D). Three of these pages are located in this sample and are identified as CPO-1736-1738.  These pages will be addressed by the Air Force in a separate declaration.

## U.S. Army

(148)   See Second Hardy Declaration, ¶¶ 115-116, previously filed in this case, for a detailed accounting of this referral.  The referral was complete at that time, and no further action is necessary.  Nine pages originating with the U.S. Army are located in this sample and are identified as CPO-2113, 2115 and 2120-2126.  The Army will address these pages in a separate declaration.

## U.S. Department of Defense/Defense Intelligence Agency

(149)   See Second Hardy Declaration, ¶ 117, previously filed in this case, for a detailed accounting of this referral.  The referral was complete at that time, and no further action is necessary.  No pages contained in this sample contain information originating with this agency.

## U.S. Department of State

(150)   See Second Hardy Declaration, ¶ 118, previously filed in this case, for a detailed accounting of this referral.  The referral was complete at that time, and no further action is necessary.  No pages contained in this sample contain information originating with this agency.

## U.S. Navy

(151)   See Second Hardy Declaration, ¶ 119, previously filed in this case, for a detailed accounting of this referral.  The referral was complete at that time, and no further action is necessary.  No pages contained in this sample contain information originating with this agency.

## National Security Agency

(152)   See Second Hardy Declaration, ¶ 120, previously filed in this case, for a detailed accounting of this referral.  At that time, the FBI had not yet processed the referral response.  The FBI has now processed the pages accordingly and forwarded the material to the plaintiff by letter

dated July 30, 2009. The FBI also asserted FOIA Exemptions (b)(1), (b)(2), (b)(6), (b)(7)(C) and (b)(7)(D). Seven pages originating with NSA are located in this sample and are identified as CPO 3873-3879. NSA will address these pages in a separate declaration.

### Central Intelligence Agency

(153)   See Second Hardy Declaration, ¶ ¶ 121-125, previously filed in this case, for a detailed accounting of this referral. The referral was complete at that time, and no further action is necessary. Ten pages originating with CIA are located in this sample and are identified as CPO-102, 346, 577, 881, 1037, 1039, 1107, 1110-1111 and 1279. CIA will addresses these pages in a separate declaration. Two of these pages, CPO 102 and 881 have been addressed previously by the CIA.

### Department of Justice National Security Division

(154)   The FBI forwarded a referral package to the DOJ/NSD dated June 9, 2010 consisting of three pages that originated with the DOJ/NSD. DOJ/NSD responded directly to plaintiff's counsel by letter dated June 21, 2010, regarding the three pages, which correspond with the Change-to Memo identified as CPO-1722. DOJ/NSD withheld some information pursuant to FOIA Exemptions (b)(6) and (b)(7)(C). These pages will not be included in this release, as they were referred directly to DOJ/NSD for response to plaintiff. DOJ/NSD will addresses this pages in a separate declaration.

### CONCLUSION

(155)   The FBI has released all segregable information from documents responsive to plaintiff's request. The FBI has carefully examined the records which the plaintiff provided as a sample for the FBI to Vaughn. The FBI properly denied records responsive to plaintiff request in

its entirety pursuant to Privacy Act Exemption (j)(2), 5 U.S.C. §552a (j)(2) in conjunction with C.F.R. § 16.96(2003). It has processed and released all segregable information from the responsive documents attached as **Exhibit HH** under the provisions of the FOIA. The FBI released 200 pages with partial redactions pursuant to FOIA Exemptions 1, 2, 6, 7(C), 7(D), and 7(E) 5 U.S.C. §§ 552 (b)(1), (b)(2), (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E) and 10 pages were released in their entireties. Furthermore, the FBI carefully examined the pages withheld in part, and determined that the information withheld from plaintiff in this case, if disclosed, could reasonably be expected to damage national security, impede the effectiveness of the FBI's internal law enforcement procedures, cause clearly unwarranted and unwarranted invasions of the privacy interests of numerous individuals, disclose the confidential sources and the information they provided to the FBI, and reveal investigative techniques and procedures. Accordingly, the FBI has released all reasonably segregable, non-exempt information in this case. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through HH attached hereto are true and correct copies.

Executed this ⟶ day of November, 2010.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, VA