UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RYAN NOAH SHAPIRO, | ) |
| | ) |
| PLAINTIFF | )   Civil Action No. 1:12-cv-313 (BAH) |
| vs. | ) |
| | ) |
| DEPARTMENT OF JUSTICE, | ) |
| | ) |
| | ) |
| DEFENDANT | ) |
| | ) |

## **PLAINTIFF'S MOTION FOR ATTORNEY FEES AND COSTS**

Plaintiff respectfully moves for an award of attorney fees in the amount of $679,898.50 and costs in the amount of $1,400. A Memorandum of Points and Authorities and a Proposed Order are attached. Defendant does not consent to the relief sought herein.

Respectfully Submitted,

___/s/ Jeffrey Light_____

Jeffrey L. Light
D.C. Bar #485360
1629 K St., NW
Suite 300
Washington, DC 20006
(202)277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RYAN NOAH SHAPIRO, | ) | |
| | ) | |
| PLAINTIFF | ) | Civil Action No. 1:12-cv-313 (BAH) |
| vs. | ) | |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| | ) | |
| DEFENDANT | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ATTORNEY FEES AND COSTS

# Table of Contents

I.  Eligibility ........................................................................................................... 1

II.  Entitlement ..................................................................................................... 5

  A.  Public Interest ........................................................................................... 5

  B.  Plaintiff's Interest in the Requests ......................................................... 10

  C.  Reasonableness of the Government's Conduct ...................................... 13

    i.  Pre-litigation Delay ......................................................................... 13

    ii.  Litigation Delay ............................................................................... 15

    iii.  Delaying tactics ................................................................................ 17

    iv.  Nature and duration of the *Open America* stay ........................... 17

    v.  Records released during preparation of the *Vaughn* index and summary judgment briefing ............................................................... 19

    vi.  Order on summary judgment .......................................................... 21

    vii.  Search for "mentions" ..................................................................... 22

  D.  Balancing the Factors .............................................................................. 23

III.  Amount of Attorney Fees .............................................................................. 29

  A.  Billing practices ....................................................................................... 29

  B.  Reasonable hourly rate ............................................................................ 30

  C.  Number of hours expended ..................................................................... 32

  D.  Calculation of the lodestar ...................................................................... 32

  E.  Adjustment .............................................................................................. 32

IV.  Fees on fees .................................................................................................... 34

V.  Costs .............................................................................................................. 35

VI.  Conclusion ..................................................................................................... 35

# Table of Authorities

**Cases**

*Abtew v. United States Dep't of Homeland Sec.*,
  808 F.3d 895 (D.C. Cir. 2015) ........................................................................ 22

*ACLU v. United States Dep't of Homeland Sec.*,
  810 F. Supp. 2d 267 (D.D.C. 2011) .............................................................. 15

*Alford v. VA*,
  277 F. Supp. 3d 91 (D.D.C. 2017) .................................................................. 3

*Am. Immigration Council v. United States Dep't of Homeland Sec.*,
  82 F. Supp. 3d 396 (D.D.C. 2015) ................................................................ 24

*Am. Oversight v. United States DOJ*,
  375 F. Supp. 3d 50 (D.D.C. 2019) ........................................................... 15, 24

*Barton v. United States Geological Survey*,
  Civil Action No. 17-1188 (ABJ),
  2019 U.S. Dist. LEXIS 167501, 2019 WL 4750195 (D.D.C. Sep. 29, 2019) ............. 35

*Bonner v. United States Dep't of State*,
  928 F.2d 1148 (D.C. Cir. 1991) .................................................................... 29

*Citizens for Responsibility & Ethics in v. United States DOJ*,
  Civil Action No. 11-1021 (JEB),
  2014 U.S. Dist. LEXIS 182097 (D.D.C. Oct. 24, 2014) ............................... 23

*Copeland v. Marshall*,
  641 F.2d 880 (D.C. Cir. 1980) .................................................................... 31

*Cornucopia Inst. v. Agric. Mktg. Serv.*,
  285 F. Supp. 3d 217 (D.D.C. 2018) .............................................................. 27

*Cotton v. Heyman*,
  63 F.3d 1115 (D.C. Cir. 1995) .................................................................... 25

*Davy v. CIA ("Davy I")*,
  456 F.3d 162 (D.C. Cir. 2006) ...................................................................... 1

*Davy v. CIA ("Davy II")*,
  550 F.3d 1155 (D.C. Cir. 2008) ................................................... 7, 11, 13, 20

*Dorsen v. United States SEC*,
  15 F. Supp. 3d 112 (D.D.C. 2014) ................................................................. 7

*Elec. Privacy Info. Ctr. v. FBI*,
  80 F. Supp. 3d 149 (D.D.C. 2015) ................................................................. 24

*Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*,
  811 F. Supp. 2d 216 (D.D.C. 2011) ............................................................... 15

*Hall v. CIA*,
  115 F. Supp. 3d 24 (D.D.C. 2015) ................................................................. 34

*Hardy v. BATFE*,
  293 F. Supp. 3d 17 (D.D.C. 2017) ................................................................. 26

*Harvey v. Mohammed*,
  951 F. Supp. 2d 47 (D.D.C. 2013) ................................................................. 30

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ....................................................................................... 32

*Hughes v. United States DOJ*,
  No. 19-cv-03278 (APM),
  2022 U.S. Dist. LEXIS 120014, 2022 WL 2528105 (D.D.C. July 7, 2022) ............... 35

*Judicial Watch, Inc. v. United States DOJ*,
  878 F. Supp. 2d 225 (D.D.C. 2012) ......................................................... 24, 26

*La Salle Extension Univ. v. Fed. Trade Com.*,
  627 F.2d 481 (D.C. Cir. 1980) ....................................................................... 28

*Labow v. United States DOJ*,
  831 F.3d 523 (D.C. Cir. 2016) ....................................................................... 22

*Mattachine Soc'y of Wash. v. United States DOJ*,
  406 F. Supp. 3d 64 (D.D.C. 2019) ................................................................. 26

*McKinley v. Fed. Hous. Fin. Agency*,
  739 F.3d 707 (D.C. Cir. 2014) ................................................................. 1, 10

*Miller v. Holzmann*,
  575 F. Supp. 2d 2 (D.D.C. 2008) ................................................................... 31

*Missouri v. Jenkins*,
  491 U.S. 274 (1989) ................................................................................. 30, 31

*Morley v. CIA*,
   810 F.3d 841 (D.C. Cir. 2016) ................................................................. 5, 8

*Morley v. CIA*,
   894 F.3d 389 (D.C. Cir. 2018) ...................................................... 25, 26, 27

*Murray v. Weinberger*,
   741 F.2d 1423 (D.C. Cir. 1984) ..................................................................... 31

*Nat'l Sec. Counselors v. CIA*,
   Civil Action No. 11-444 (BAH),
   2017 U.S. Dist. LEXIS 192545, 2017 WL 5633091 (D.D.C. Nov. 21, 2017) ............. 24

*Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*,
   771 F.2d 521 (D.C. Cir. 1985) ................................................................... 34

*Open Am. v. Watergate Special Prosecution Force*,
   547 F.2d 605 (D.C. Cir. 1976) ..................................................................... 2

*People for the Ethical Treatment of Animals v. NIH, HHS*,
   745 F.3d 535 (D.C. Cir. 2014) ..................................................................... 7

*Piper v. United States DOJ*,
   339 F. Supp. 2d 13 (D.D.C. 2004) ......................................................... 2, 26

*Poitras v. Dep't of Homeland Sec.*,
   Civil Action No. 15-1091 (BAH),
   2019 U.S. Dist. LEXIS 62215, 2019 WL 1569561 (D.D.C. Apr. 11, 2019) ................. 7

*Reyes v. United States Nat'l Archives & Records Admin.*,
   356 F. Supp. 3d 155 (D.D.C. 2018) ...................................................... 13, 14

*Schwartz v. United States DEA*,
   No. 13-CV-5004 (CBA) (ST),
   2019 U.S. Dist. LEXIS 34165, 2019 WL 1299192 (E.D.N.Y. Mar. 1, 2019) ............. 34

*See Protect the Public's Tr. v. IRS*,
   No. 23-cv-340-RCL,
   2024 U.S. Dist. LEXIS 27007, 2024 WL 663427 (D.D.C. Feb. 16, 2024) ................... 3

*Shapiro v. United States DOJ*,
   40 F.4th 609 (D.C. Cir. 2022) ................................................................. 3, 23

*Tax Analysts v. United States Dep't of Justice*,
   965 F.2d 1092 (D.C. Cir. 1992) ................................................................. 25

iv

*Webster v. United States DOJ*,
   Civil Action No. 02-603 (RC),
   2021 U.S. Dist. LEXIS 176980, 2021 WL 4243414 (D.D.C. Sep. 17, 2021) .... 8, 14, 24

*Weisberg v. U.S. Dep't of Justice*,
   745 F.2d 1476 (D.C. Cir. 1984) .................................................................................. 5

*Zeyad Abdeljabbar v. BATF*,
   74 F. Supp. 3d 158 (D.D.C. 2014) .............................................................................. 4


**Statutes**
5 U.S.C. § 552(a)(4)(E)(ii) ............................................................................................... 1

5 U.S.C. § 552(a)(6)(B)(i) .............................................................................................. 14


**Other Authorities**
"Graphics for Economic News Releases," U.S. Bureau of Labor Statistics, available at
   https://www.bls.gov/charts/consumer-price-index/consumer-price-index-by-category-
   line-chart.htm (last visited April 26, 2025) .................................................... 31

"The Domestic Terrorist Threat: Background and Issues for Congress," CRS Report for
   Congress, Congressional Research Service (Updated February 19, 2014), *available at*
   https://www.congress.gov/crs_external_products/R/PDF/R42536/R42536.15.pdf (last
   visited Apr. 30, 2025) ...................................................................................... 8

"The Federal Bureau of Investigation's Efforts to Improve the Sharing of Intelligence and
   Other Information," U.S. Department of Justice Office of the Inspector General, Audit
   Report 04-10 (Dec. 2003), *available at*
   https://oig.justice.gov/reports/FBI/a0410/final.pdf (last visited April 25, 2025) .......... 9

Andrew Goudsward and Sarah N. Lynch, "FBI scales back staffing, tracking of domestic
   terrorism probes, sources say," Reuters (Mar. 21, 2025), *available at*
   https://www.reuters.com/world/us/fbi-scales-back-staffing-tracking-domestic-
   terrorism-probes-sources-say-2025-03-21/ (last visited Apr. 25, 2025)...................... 10

Jaclyn Diaz, "3 people face federal charges for Tesla attacks. Are such acts domestic
   terrorism?" NPR (Mar. 20, 2025), available at https://www.npr.org/2025/03/20/nx-s1-
   5333315/tesla-attacks-ag-bondi-domestic-terrorism-trump-musk (last visited Ap. 25,
   2025) ............................................................................................................ 10

Marlene Lenthang, "FBI launches task force to crack down on attacks against Tesla,"
   NBC News (Mar. 25, 2025), available at https://www.nbcnews.com/news/us-news/fbi-
   launches-task-force-crack-attacks-tesla-rcna197932 (last visited Apr. 25, 2025)........ 10

**Rules**

Fed R. Crim. Pro 6(e) ........................................................................................................ 20

"To obtain attorneys' fees under FOIA, a plaintiff must satisfy two requirements. First, he must be eligible for fees, which requires that he 'substantially prevail' as defined by 5 U.S.C. § 552(a)(4)(E)(ii). Second, an eligible plaintiff must demonstrate that he is entitled to fees." *McKinley v. Fed. Hous. Fin. Agency*, 739 F.3d 707, 710 (D.C. Cir. 2014). Plaintiff is both eligible for and entitled to fees in this case.

## I.    Eligibility

A plaintiff substantially prevails under FOIA if he has "obtained relief through either— (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii). Plaintiff has substantially prevailed under both theories in this case.[1]

Under provision (I), a plaintiff "substantially prevails" in an action when a court issues an order which (i) "change[s] the legal relationship between [the plaintiff] and the defendant," and (ii) "award[s] some relief on the merits[.]" *Davy v. CIA*, 456 F.3d 162, 165 (D.C. Cir. 2006) ("*Davy I*") (second alteration in original). Several such orders were issued in this case.

First, this Court's order of July 11, 2012 required that with respect to records about Plaintiff and the organization Compassion Over Killing, Defendant must "disclose to the

---

[1] Although there are a multitude of FOIA requests at issue in this case, eligibility must be determined as to the case a whole, rather than on a request-by-request basis. FOIA speaks of awarding fees in a "*case* under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). Further, the claims at issue here are part of an "interrelated" whole. (Order June 12, 2012) [ECF:dkt 11] at 3. It is for this reason that the Court consolidated Plaintiff's FOIA requests, which were initially separated into multiple lawsuits, into a single case. *Id.*

plaintiff all such documents by July 20, 2012." Defendant complied with the order, releasing 720 pages in whole or in part. (Second Hardy Decl. ¶ 23.) [ECF dkt: 17-1].

Second, the July 11, 2012 order required Defendant to submit a proposed schedule for production of the remaining records based on a priorities list provided by Plaintiff. Defendant proposed that, pursuant to *Open America*,[2] production should not occur until September 30, 2019. (Def. Mot. Open America Stay) [ECF dkt: 17]. This Court granted a stay, but only until September 30, 2017, at which time the stay would only be further extended for good cause. [ECF dkt: 61.] *See Piper v. United States DOJ*, 339 F. Supp. 2d 13, 19 (D.D.C. 2004) ("This Court's order reducing the FBI's stay request from four years to two years, therefore, constitutes 'at least some relief on the merits' of plaintiff's claim sufficient to find him the prevailing party consistent with the law of this Circuit.")

Third, this Court's Order of July 2, 2020 required Defendant to release a 4-page document improperly withheld in part by the FBI and several documents withheld by the ATF under Exemptions 3 and 4, or alternatively submit a renewed motion for summary judgment. [ECF dkt: 126]. The FBI and ATF chose to release the records. [ECF dkt: 129, 133].

Plaintiff also substantially prevailed under provision (II) because of a voluntary or unilateral change in position by the FBI and ATF.

First, to the extent that the FBI and ATF could hypothetically have filed renewed motions for summary judgments in response to the Court's Order of July 2, 2020, but chose instead to release the records, the disclosure represents a voluntary or unilateral change in agency position.

---

[2] *Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976).

Second, after the resolution of Plaintiff's appeal and the parties' filing of cross-motions for summary judgment on remand, the FBI changed its position and conducted a search of its field office records for electronic surveillance "mentions." [ECF dkt: 158]. The change in position followed the holding of the D.C. Circuit that "[t]he FBI's declarations do not explain how the ACS search conducted in this case would have revealed electronic surveillance 'mentions' if Bureau field offices omit those references from ELSUR indices." *Shapiro v. United States DOJ*, 40 F.4th 609, 614-15 (D.C. Cir. 2022). The FBI argued on remand that "[i]f 'mentioned' individuals were not indexed in the CRS, the FBI has no further method of searching for ELSUR material related to those individuals." (Bender Decl. ¶ 9) [ECF dkt: 148-3]. After Plaintiff pointed out in his Cross-Motion for Summary Judgment that there existed separate field office ELSUR Indices that include the names of mentioned individuals, (Pl. Mem. P&A in Support of CMSJ at 4) [ECF dkt:150], the FBI moved to stay further briefing and conducted a search of the relevant field office ELSUR indices for "mentions." [ECF dkt: 153, 160].

Although the search did not locate any responsive records, Plaintiff obtained the relief that was available for the FBI's failure to conduct a legally sufficient search for "mentions." *See Protect the Public's Tr. v. IRS*, No. 23-cv-340-RCL, 2024 U.S. Dist. LEXIS 27007 at *11, 2024 WL 663427 (D.D.C. Feb. 16, 2024); *Alford v. VA*, 277 F. Supp. 3d 91, 103 (D.D.C. 2017).

Third, to the extent that the FBI could have sought additional time to complete processing pursuant to the Court's order regarding the *Open America* stay, the FBI made a "unilateral commitment of additional resources" to comply with what it viewed as the

Court's "deadline" of September 30, 2017. (Def. Opp. Mot. Interlocutory Appeal, Ex. B ¶¶ 5,10) [ECF dkt: 65-1].

Fourth, after Plaintiff identified the records to be included in the *Vaughn* index, Defendant chose to disclose additional portions of the records rather than attempting to defend its redactions and withholdings. This change in position led to the release of additional information on 94 pages of records. (Fifteenth Hardy Decl. ¶ 149) [ECF dkt: 97-3]; (Mem. Op. at 30-31) (July 2, 2020) [ECF dkt: 127] (counting number of pages).

Fifth, after Plaintiff filed his cross-motion for summary judgment, Defendant chose to disclose still more records and portions of records. The FBI re-processed and released additional information from 33 pages of records which, it indicated, it did "in response to your Cross Motion for Summary Judgment and in Opposition to Defendants [sic] Motion of [sic] Summary Judgment." Def. Reply MSJ Ex. A [ECF: 118-1].

Sixth, in response to Plaintiff's motion to certify for interlocutory appeal, the FBI voluntarily changed its position and began providing Plaintiff with rolling releases of records based on his designated priorities, allowing Plaintiff to obtain records substantially faster than he would have without pressing the issue in litigation. (Def. Opp. Mot. Interlocutory Appeal, Ex. B ¶ 5) [ECF dkt: 65-1].

Seventh, the filing of this lawsuit caused the FBI to conduct more extensive searches in response to Plaintiff's FOIA requests than it otherwise would have done. The FBI's policy is to not conduct a cross-reference in response to FOIA requests at the administrative stage. *Zeyad Abdeljabbar v. BATF*, 74 F. Supp. 3d 158, 171 (D.D.C. 2014) ("'[I]t is the FBI's current policy to search for, identify and process only main files at the initial administrative state of' requests submitted pursuant to the FOIA and the Privacy

Act"); *see e.g.*, Def. MSJ Ex. C [ECF dkt: 97-5] (indicating that only a main file search

was conducted). Once the FOIA requests at issue in this case became the subject of

litigation, they were no longer subject to that policy and the FBI conducted cross-

references searches. *See e.g.*, Def. MSJ Ex. D [ECF dkt: 97-6] (indicating that both main

file and cross-reference records are being disclosed). Further, at the administrative stage

of this case, the FBI issued an internal memorandum placing restrictions on the searches

to be conducted of Plaintiff's requests. According to the FBI's declarant, these

restrictions were applicable only at the administrative stage and the filing of this lawsuit

caused the FBI to conduct new searches. (Sixteenth Hardy Decl. ¶ 7) [ECF dkt: 113-1].


## II.    Entitlement

Whether a plaintiff in a FOIA case is entitled to an award of attorney fees involves "a

balancing of four factors: (1) the benefit of the release to the public; (2) the commercial

benefit of the release to the plaintiff; (3) the nature of the plaintiff's interest; and (4) the

reasonableness of the agency's withholding." *Weisberg v. U.S. Dep't of Justice*, 745 F.2d

1476, 1498 (D.C. Cir. 1984). Since all four factors tilt in Plaintiff's favor, he is entitled to

an award of attorney fees.


### A.  Public Interest

"[T]he public-benefit factor requires an *ex ante* assessment of the potential public

value of the information requested, with little or no regard to whether any documents

supplied prove to advance the public interest." *Morley v. CIA*, 810 F.3d 841, 844 (D.C.

Cir. 2016) ("*Morley I*"). The FBI recognized, *ex ante*, the potential public interest value

of the records requested by Plaintiff when it granted a fee waiver for all of his animal

rights-related requests. (Fifteenth Hardy Decl. ¶ 37 and Ex. CC) [ECF dkt: 97-3].

Plaintiff will nevertheless address the public interest factor in order to establish that the

potential information in the requested records is not just in the public interest, it is

*strongly* in the public interest.

    Judged *ex ante*, one potential public value of the records requested is, as one expert

familiar with Plaintiff's requests put it: "answering significant questions about the role

that the government has played in portraying non-violent animal rights activists as

terrorists." (Potter Decl. ¶ 9.) [ECF dkt: 35-3]. For example, Plaintiff's "requests for

animal rights activists' FBI files will enable a comparison between the types of non-

violent conduct considered to be terrorism by the FBI and the types of violent conduct

not considered to be terrorism by the FBI, such as a tax protester who flew a plane into an

IRS building in Texas, militia members who incited brick attacks on lawmakers' offices,

and a white supremacist anti-Semite who murdered a guard at the National Holocaust

Museum." (Potter Decl. ¶ 11.) [ECF dkt: 35-3]. Plaintiff's request for FBI records about

animal use industries (e.g., fur and biomedical research) will provide an understanding as

to the influence of these industries in shaping the FBI's domestic terrorism priorities,

specifically the FBI's "2005 designation of the animal rights and environmental

movements as the leading domestic terrorism threats despite the fact that neither

movement has ever physically injured a single person in the movements' decades of

existence in the United States." (First Amended Compl. ¶ 3) [ECF dkt: 13].  Finally,

Plaintiff's request for records about the FBI's investigation into the murder of Hyram

Kitchen will shed light on a crime that "has repeatedly served a prominent place in law

enforcement and industry attacks on the animal rights movement for alleged violence" based on "'totally uncorroborated' and at times even untraceable information provided by proponents of animal experimentation." (Shapiro Decl. ¶¶ 42-43.) [ECF dkt: 24-1].

A majority of Plaintiff's FOIA requests at issue in this case involve individual animal rights activists. Even disclosure of records about enforcement actions by an agency against a single individual add to the fund of public knowledge. *Poitras v. Dep't of Homeland Sec.*, Civil Action No. 15-1091 (BAH), 2019 U.S. Dist. LEXIS 62215 at *19, 2019 WL 1569561 (D.D.C. Apr. 11, 2019) ("[S]ome value attaches to information illuminative of a U.S. agency's treatment of a U.S. citizen.") However the potential value of the information at issue here is of even greater public interest. Plaintiff's requests for investigative files of a large number of individuals will be especially illuminative because it can be aggregated and analyzed to disclose a larger picture of agency activity. *Dorsen v. United States SEC*, 15 F. Supp. 3d 112, 122 (D.D.C. 2014) ("[S]ome value attaches to the disclosure of the SEC's discrete decisions by shedding light on this enforcement activity and, in the aggregate, such information may provide *significant* public benefit") (emphasis added). The FBI investigate files, both individually and in the aggregate, are likely to shed light not only on patterns of FBI enforcement, but also of FBI investigative procedures used to target animal rights activists. *See People for the Ethical Treatment of Animals v. NIH, HHS*, 745 F.3d 535, 543 (D.C. Cir. 2014) (recognizing a "public interest in shedding light on agency investigatory procedures[.]")

The records sought by Plaintiff will also likely have a strong benefit to the public because of their "relation to a larger work addressing an historical issue of national importance," *Davy v. CIA*, 550 F.3d 1155, 1161 (D.C. Cir. 2008) ("*Davy II*"),

specifically, what scholars and analysts refer to as the "Green Scare" (First Am. Compl. ¶ 3.) The "Green Scare" is the "disproportionate, heavy-handed government crackdown on the animal rights and environmental movements, and the reckless use of the word 'terrorism' in the process." (First Am. Compl. ¶ 3.) Just as "[a] book covering government surveillance of dissidents leveraging 16,000 pages of original documents appears significant enough to 'have at least a modest probability of generating useful new information' in the public interest," *Webster v. United States DOJ*, Civil Action No. 02-603 (RC), 2021 U.S. Dist. LEXIS 176980 at *13-*14, 2021 WL 4243414 (D.D.C. Sep. 17, 2021), Plaintiff's dissertation covering government surveillance of animal rights activists leveraging tens of thousands of pages of original documents[3] is significant enough to meet the legal standard of "hav[ing] at least a modest probability of generating useful new information about a matter of public concern." *Morley I*, 810 F.3d at 844.

The records requested by Plaintiff are not just of historical value. They also relate to current issues of national importance and public debate. FBI investigative records pertaining to individual activists, nonprofit advocacy groups, a book (*Green is the New Red*), and a journalist (Will Potter) are relevant to discourse on the line between First Amendment advocacy and terrorism. *See* "The Domestic Terrorist Threat: Background and Issues for Congress," CRS Report for Congress, Congressional Research Service (Updated February 19, 2014), Summary at 1, *available at* https://www.congress.gov/crs_external_products/R/PDF/R42536/R42536.15.pdf (last visited Apr. 30, 2025) ("The boundary between constitutionally protected legitimate

---

[3] Over 38,000 pages of responsive records and 28 discs (CDs or DVDs) were released to Plaintiff as a result of this lawsuit. (Fifteenth Hardy Decl. ¶ 47) [ECF dkt: 97-3].

protest and domestic terrorist activity has received public attention. This boundary is especially highlighted by a number of criminal cases involving supporters of animal rights—one area in which specific legislation related to domestic terrorism has been crafted.") An example of the debate over the ongoing conflict between the First Amendment and criminal laws targeting the animal rights activists are "ag-gag" laws, which criminalize unauthorized photography and videorecording on farms (Potter Decl. ¶ 10) [ECF dkt: 35-3]; (First Am. Compl. ¶ 3) [ECF dkt: 13]; (Shapiro Decl. ¶ 41) [ECF dkt: 24-1]. *See Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193 (D. Utah 2017) (finding Utah's "ag-gag" law violates the First Amendment).

The requested records would also shed light on the FBI's domestic terrorism investigation priorities, an issue of ongoing debate. Analysis of the requested records will allow the public to evaluate whether, as the Department of Justice's Office of Inspector General concluded, the FBI's focus on animal rights and environmental activists took resources away from investigating threats posed by domestic groups who have and will continue to engage in physical violence. "The Federal Bureau of Investigation's Efforts to Improve the Sharing of Intelligence and Other Information," U.S. Department of Justice Office of the Inspector General, Audit Report 04-10 (Dec. 2003) at 94, *available at* https://oig.justice.gov/reports/FBI/a0410/final.pdf (last visited April 25, 2025) ("We believe that the FBI's priority mission to prevent high-consequence terrorist acts would be enhanced if the Counterterrorism Division did not have to spend time and resources on lower-threat activities by social protestors or on crimes committed by environmental, animal rights, and other domestic radical groups or individuals (unless explosives or weapons of mass destruction are involved).")

A more recent example, from just last month, is the FBI's cut in staffing for its Domestic Terrorism Operations center, which "could undermine law enforcement's ability to counter white supremacists and anti-government extremists,"[4] while simultaneously launching a task force to crack down on attacks against Tesla, which the FBI Director referred to as "domestic terrorism."[5] An NPR article discussing Attorney General Bondi's statement that attacks on Telsa would be considered "nothing short of domestic terrorism" cited an author's discussion of the precedent set when "going back to the 1990s, the FBI, as the lead agency responsible for investigating terrorism in the United States, has investigated acts of vandalism and arson like those committed by eco-terrorism groups and treated them as domestic terrorism[.]"[6]

Accordingly, the first factor strongly weighs in favor of Plaintiff.

### B.  Plaintiff's Interest in the Requests

The second and third factors are "the commercial benefit to the plaintiff" and "the nature of the plaintiff's interest in the records," which are often considered together. *McKinley v. Fed. Hous. Fin. Agency*, 739 F.3d 707, 711 (D.C. Cir. 2014). These factors

---

[4] *See* Andrew Goudsward and Sarah N. Lynch, "FBI scales back staffing, tracking of domestic terrorism probes, sources say," Reuters (Mar. 21, 2025), *available at* https://www.reuters.com/world/us/fbi-scales-back-staffing-tracking-domestic-terrorism-probes-sources-say-2025-03-21/ (last visited Apr. 25, 2025).

[5] *See* Marlene Lenthang, "FBI launches task force to crack down on attacks against Tesla," NBC News (Mar. 25, 2025), available at https://www.nbcnews.com/news/us-news/fbi-launches-task-force-crack-attacks-tesla-rcna197932 (last visited Apr. 25, 2025).

[6] *See* Jaclyn Diaz, "3 people face federal charges for Tesla attacks. Are such acts domestic terrorism?" NPR (Mar. 20, 2025), available at https://www.npr.org/2025/03/20/nx-s1-5333315/tesla-attacks-ag-bondi-domestic-terrorism-trump-musk (last visited Ap. 25, 2025).

assess "whether a plaintiff has sufficient private incentive to seek disclosure of the documents without expecting to be compensated for it." *Id.*

Under the second and third factors, "a court would generally award fees if the complainant's interest in the information sought was scholarly or journalistic or public-interest oriented, [unless] . . . his interest was of a frivolous or purely commercial nature[.]" *Davy II*, 550 F.3d at 1162 (alterations except the final one in original).

Dr. Shapiro's interest in the information at issue in this case is scholarly, journalistic and public-interest oriented, not commercial. At the time this case was filed, Dr. Shapiro was a doctoral candidate at MIT in the Department of Science, Technology, & Society. (Shapiro Decl. ¶ 1) [ECF dkt: 24-1]. His "area of research and analytical expertise is the nexus of American national security and conflicts over animal use and protection." (Shapiro Decl. ¶ 5) [ECF dkt: 24-1]. More specifically, a key area of his research focus was (and continues to be) "the nature and evolution of FBI understanding and handling of the animal rights and animal protection movements from the Cold War to the present." (Shapiro Decl. ¶ 16) [ECF dkt: 24-1].

While conducting his research, Dr. Shapiro found that there was little to no scholarly or other information available on the intersection of the animal rights movement and FBI operations. (Shapiro Decl. ¶¶ 17-18) [ECF dkt: 24-1]. Dr. Shapiro therefore submitted FOIA requests to the FBI, including the ones at issue in this case, for records pertaining to individuals, organizations, periodicals, and events related to animal use and protection conflicts. (Shapiro Decl. ¶ 18) [ECF dkt: 24-1].

Dr. Shapiro explained in his FOIA requests that his purpose was to obtain information for "[s]cholarly research" and "[p]ublic dissemination of [his] analysis of" the requested

material. (*See e.g.*, Def MSJ Ex. I) [ECF dkt: 97-6 at 24]. Specifically, Plaintiff stated that he had "the ability and firm intent to disseminate" his analysis of the requested information "both within and outside of academia," including "through the production of [his] dissertation, books, scholarly and popular articles, scholarly and popular lectures, and scholarly and popular exhibits."[7] (*See e.g.*, Def MSJ Ex. I) [ECF dkt: 97-6 at 38]. He further explained that his dissertation would be available to the public when completed and that he had received offers from publishing houses interested in publishing his dissertation as a book.  (*See e.g.*, Def MSJ Ex. I) [ECF dkt: 97-6 at 38].

Dr. Shapiro has made good on his commitment to make the fruits of his FOIA requests at issue here available to the public. Dr. Shapiro's dissertation, which heavily relies on his analysis of the records he received as a result of this litigation, is available online, and Dr. Shapiro does not and has not received financial compensation when individuals access his dissertation. (Fourth Shapiro Decl. ¶ 5.) Further, Dr. Shapiro has provided records received as a result of this litigation and his analysis thereof for free to numerous journalists, including a Pulitzer-Prize winning journalist, who used them as the basis for an article in *The New York Times*. (Fourth Shapiro Decl. ¶¶ 6-8.) Dr. Shapiro has not received any compensation for providing this information to the journalists. (Fourth Shapiro Decl. ¶¶ 6-8.) Still further, Dr. Shapiro has utilized the records obtained through this case in multiple lectures for which he was not compensated. (Fourth Shapiro Decl. ¶¶ 9-10.) Finally, Dr. Shapiro has made many of the documents obtained through this case available for free on the website of Property of the People, Inc., a non-profit

---

[7] By the time he filed his lawsuit and FOIA requests, Dr. Shapiro already had an established track record in analyzing and disseminating materials on related topics. (Shapiro Decl. ¶¶ 6-8) [ECF dkt: 24-1].

charitable organization he founded. (Fourth Shapiro Decl. ¶ 11.) Dr. Shapiro does not and

has not received compensation for making these records available to the public for free

through Property of the People's website. (Fourth Shapiro Decl. ¶ 11.)

Thus, it can fairly be said that Dr. Shapiro's "purpose in filing the FOIA request and

pursuing litigation was to increase the public fund of knowledge about a matter of public

concern." *Davy II*, 550 F.3d at 1162. Dr. Shapiro, like the requester in *Davy II*,

"request[ed] information under FOIA about what the government was up to that he

intend[ed] to share with the public as part of his scholarship or 'news' gathering role

rather than merely to promote his private commercial interests." *Id.* Accordingly, the

second and third factors strongly weigh strongly in Plaintiff's favor.


### C. Reasonableness of the Government's Conduct

### i.       Pre-litigation Delay

An agency's failure to disclose responsive, non-exempt records prior to the start of

litigation due to an administrative backlog may weigh in favor of granting attorney's fees.

In *Reyes v. United States Nat'l Archives & Records Admin.*, 356 F. Supp. 3d 155, 166

(D.D.C. 2018), this Court held that in "circumstances where Defendant's failure to

release the requested documents prior to litigation was due to administrative backlog, the

Court concludes that the reasonableness of Defendant's conduct weighs in favor of

granting attorneys' fees." With one small exception,[8] the FBI failed to release any of the

---

[8] The FBI released 125 pages of records responsive to Plaintiff's request pertaining to
Lauren Beth Gazzola (FOIA Request #1146934) prior to the current lawsuit being filed.
(Second Hardy Decl. Ex. A, line 29) [ECF dkt: 17-1 at 29].

requested records prior to litigation in this case. The FBI attributed its failure to release the records to an administrative backlog. (Second Hardy Decl. ¶ 33) [ECF dkt: 17-1].

This case is similar to *Reyes* because for the vast majority of the requests at issue in this case, just as in *Reyes*, prior to litigation the agency acknowledged receipt of the requests, but did not notify the requester of whether or not the agency would comply with the request or take advantage of the extension provision of 5 U.S.C. § 552(a)(6)(B)(i). (Second Hardy Decl. Ex. A) [ECF dkt: 17-1] (listing dates of request, dates of acknowledgement, and date of FBI's response prior to litigation, if any).

In determining the reasonableness of the government's conduct in *Reyes*, the Court differentiated between a situation where the agency merely misses the 20-day statutory deadline and a situation, as was present there, where there was no substantive response from the agency for over 120 days and where the agency was only moved to respond after the plaintiff had filed suit. Here, the delays are even more extreme. *Id.* at 167. By the time Plaintiff filed the present suit on February 27, 2012, a large majority of the requests at issue in this case had been pending for over 6 months, and one request (Friends of Animals, #1160275) had been pending for over two years (Second Hardy Decl. Ex. A) [ECF dkt: 17-1]. And, as in *Reyes*, "there is little reason to expect that the processing of Plaintiff's FOIA request[s] would have been completed anytime soon absent the filing of [his] lawsuit." *Id.* Many other decisions of this Court are in accord with *Reyes*. *See e.g.*, *Webster v. United States DOJ*, Civil Action No. 02-603 (RC), 2021 U.S. Dist. LEXIS 176980 at *21, 2021 WL 4243414 (D.D.C. Sep. 17, 2021) ("Courts in this district have held that administrative delay and FOIA backlog do not form a reasonable basis in law"); *ACLU v. United States Dep't of Homeland Sec.*, 810 F. Supp.

14

2d 267, 277 (D.D.C. 2011); *Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 236 (D.D.C. 2011); *Am. Oversight v. United States DOJ*, 375 F. Supp. 3d 50, 68 (D.D.C. 2019). Whether or not the FBI's pre-litigation delay alone is sufficient to tilt this factor in Plaintiff's favor, the pre-litigation delay is part of a wholistic analysis and it has at least some "bearing on a court's decision whether to award fees[.]" *Am. Oversight*, 375 F. Supp. 3d at 68.

### ii.    Litigation Delay

The government acted with obduracy and recalcitrance during this litigation through repeated, lengthy, and unwarranted delays. The delays began immediately after litigation commenced. In case 11-cv-1835, which was consolidated into the present case, the government failed to timely respond to the Complaint, resulting in the Clerk's entry of default. The Court vacated the default, but instead of responding to the Complaint, Defendant filed another motion for an extension because the case was assigned to a government attorney who was just about to go on a two-week leave of absence. [11-cv-1835 dkt: 19, 21].

After the government filed its Answer, counsel for Defendant refused to meet and confer pursuant to the Court's standing order, [11-cv-1835 ECF dkt: 22] resulting in the Court ordering the production of the requested non-exempt records by February 20, 2012. The government requested and was granted an extension of nearly three months to produce the records, until May 15, 2012. [11-cv-1835 ECF dkt: 24]. Less than three hours before the midnight deadline for production of records, Defendant moved for an extension of time to produce the records or to file a stay. [11-cv-1835 ECF dkt: 24]. The motion for an extension did not provide a legal basis for continuing to withhold the

records and did not even claim that the FBI was unable to produce the records by the court-ordered deadline— a deadline that the FBI itself chose. Instead, the motion referred obliquely to the need for counsel to "confer with Federal Bureau of Investigation about the FOIA production and/or to obtain a declaration in support of a Motion to Stay." [11-cv-1835 ECF dkt: 25].

By July 9, 2012, when the Meet and Confer report in the consolidated cases was due, the FBI still had not produced the records and Defendant was not even prepared to file the Meet and Confer Report. [ECF dkt: 15.] Defendant requested an extension of time to file a Meet and Confer Report but made no mention of why it had failed to produce the records that were due to be produced nearly two months earlier. [ECF dkt: 14.] On July 11, 2012, the Court ordered the FBI to produce the records by July 20, 2012. The FBI complied and produced the requested records – five months to the day after the original due date for disclosure.

This kind of obdurate and recalcitrant behavior is precisely what FOIA's attorney fee provision is designed to disincentivize agencies from engaging in. Since 2010, the FBI knew that Plaintiff was submitting numerous requests relating to animal rights and began having its Domestic Terrorism Unit coordinate with the Records Management Division to allow "appropriate operational units across the FBI to review FOIA documents associated with Plaintiff's requests prior to release." (Fifteenth Hardy Decl. ¶ 40) [ECF dkt: 97-3]. When Plaintiff filed his first suit on October 18, 2011, the FBI was therefore well-aware of any unique challenges pertaining to Plaintiff's requests and its own resource constraints. Yet instead of seeking relief in the form of an *Open America* stay, the FBI failed to timely respond to the Complaint; failed to engage in the Meet and Confer

required by the Court's standing order; failed to disclose the records by the first court-ordered deadline; failed to disclose the records by the second court-ordered deadline, which the agency itself chose; sought an indefinite extension of time to produce the records just hours before the second deadline for disclosure expired; failed to comply with the Meet and Confer deadline in the consolidated cases; and only then did the agency begrudgingly release the records pertaining to Plaintiff and Compassion Over Killing. At no point did the FBI seek an *Open America* stay to obtain additional time to process the records on these two subjects.

### iii.    Delaying tactics

The government consistently delayed resolution of the merits of this case, including the ultimate disclosure of all non-exempt responsive records to Plaintiff, by repeatedly missing deadlines and asking for excessive extensions of time.

From the filing of the Complaint in this case through August 6, 2020, the date on which all non-exempt responsive records were produced, Defendant filed twenty-three motions for an extension of time [ECF dkt: 5, 7, 14, 28, 29, 45, 46, 63, 64, 85, 91, 92, 93, 94, 95, 96, 106, 107, 108, 109, 112, 129, 130] and two additional motions for an extension of time in 11-cv-1835, which was consolidated into this case. [11-cv-1835 dkt: 19, 25]. While it is not unreasonable for a case that is pending for over a decade to involve several extensions of deadlines, the government's request for an extension of time of nearly every court-ordered deadline for a substantive filing represents obdurate and recalcitrant behavior.

### iv.    Nature and duration of the *Open America* stay

17

In its Motion for an *Open America* Stay [ECF dkt: 19-1], the government presented no legal argument to justify the extreme length of its proposed stay—seven years. As Plaintiff pointed out in his brief, the FBI never explained how it arrived at seven years as the length of time that it needed. (Opp. Open America Stay at 42) [ECF dkt: 35]. Nor did it provide any legal justification to suggest that such a lengthy stay would be appropriate in this case. The Court ultimately allowed the FBI five years instead of seven to complete processing, with the option of extending the stay upon a showing of good cause. [ECF dkt: 61]. The FBI completed processing within five years, revealing that it only *needed* to take five years to process the records and simply *preferred* to take seven years. The FBI's request for seven years was both legally unreasonable and represented obdurate and recalcitrant conduct. It is important for the Court to award attorney fees here to disincentivize agencies from seeking unnecessarily lengthy stays on the theory that there will be no penalty for such foot-dragging.

The FBI also did not have a reasonable legal basis for its position that it should not have to make periodic releases of records during the pendency of its proposed 7-year stay. As Plaintiff pointed out in his brief, the government cited no cases in which a court has refused to order interim releases, whereas courts have ordered interim releases over the government's objection. (Opp. Open America Stay at 43) [ECF dkt: 35]. The government's position, that interim releases need not be made whenever multiple FOIA requests on the same subject are pending, is unworkable and unsupported by legal

authority, as *amici* pointed out in their robust briefing on the issue. (*Amici curiae* brief) [ECF dkt: 40-1].[9]

Moreover, the FBI's position that it should not have to make a *single* release before the conclusion of a 7-year stay represents obdurate and recalcitrant behavior, particularly in light of the parties having agreed that Plaintiff's requests would be processed in four tiers. Indeed, when faced with Plaintiff's Motion to Certify for Interlocutory Appeal, which pressed the issue, the FBI relented and agreed to make periodic releases after the completion of each tier. (Mem. P&A in Support of Pl. Mot. Certify for Interlocutory App. at 8-10) [ECF dkt:62]; (Def. Opp. Mot. Certify for Interlocutory App. at 10) [ECF dkt: 65]. Defendant chalked up its change in position to its "significant increase in speed of processing Plaintiff's request," (Def. Opp. Mot. Certify for Interlocutory App. at 10) [ECF dkt: 65], but that significant increase in speed was itself the result of the Court's order granting a stay for only five years instead of seven.

### v.    Records released during preparation of the *Vaughn* index and summary judgment briefing

After Plaintiff designated a sample of records for inclusion in the FBI's *Vaughn* index, the FBI reconsidered a number of its withholdings and released additional information. After Plaintiff cross-moved for summary judgment, pointing out several areas in which the FBI has improperly withheld material, the FBI released further information.

This subsection of the brief summarizes these belated disclosures and states the reason why the withholdings were improper. It is important to keep in mind, however,

---

[9] This Court never addressed the interim release issue. (Order on Mot. for *Open America* Stay) [ECF dkt: 61].

that it is not Plaintiff's burden to show that the withholdings were unreasonable; the burden is on the agency to show that it had a colorable basis for its actions. *Davy II,* 550 F.3d at 1163. Since the FBI made no attempt to explain the basis for its initial withholdings, it has failed to meet its burden of showing that it had a colorable basis for withholding.

First, the FBI had no reasonable legal basis for withholding Shapiro-179308, Shapiro-48862, Shapiro-139196, and Shapiro-179471. It initially redacted information on these pages under Exemption 3 in conjunction with Title III, but these redactions were erroneous because those pages did not reveal the targets of the intercepts or their content. (Mem. Op. 53) [ECF dkt: 127].

The FBI applied Exemption 3 in conjunction with Fed R. Crim. Pro 6(e) to 57 pages. (Mem. Op. 54) [ECF dkt: 127]. Twelve pages were erroneously withheld and subsequently released to Plaintiff. (Mem. Op. 54) [ECF dkt: 127]. The FBI did not voluntarily release the remaining forty-five pages, but failed to explain how it differentiated those pages from the pages it released. (Mem. Op. 54) [ECF dkt: 127]. The FBI never set forth a reasonable legal basis for the withholdings on any of these 57 pages.

The FBI applied Exemption 4 to two pages from a book on the grounds that it was confidential commercial information. (Mem. Op. 59) [ECF dkt: 127]. It later released these pages to Plaintiff. (Mem. Op. 59) [ECF dkt: 127]. The FBI had no reasonable legal basis for withholding these pages because its withholding was premised on the book being copyrighted when in fact the book was in the public domain. (Mem. Op. 61) [ECF dkt: 127].

The FBI applied Exemptions 6 and 7(C) to the name of a high-ranking FBI official who presented testimony to Congress, but on the FBI's own website, it shows the name of that official. (Mem. Op. 72) [ECF dkt: 127]. The FBI therefore had no reasonable legal basis for withholding the name.

The FBI applied Exemption 7(D) on Shapiro-55994 on a theory of an implied assurance of confidentiality, but the information withheld was actually provided by the culprit and there is no reason to assume that a culprit would implicitly be assured confidentiality. (Mem. Op. 82) [ECF dkt: 127]. The FBI re-processed this page without the redaction and released it to Plaintiff. The FBI had no reasonable legal basis for thinking the individual was given an implied assurance of confidentiality such that Exemption 7(D) would apply.

The FBI improperly applied Exemption 7(E) to redact the phrase "hotel room" from the sentence "Request reimbursement for cost of a hotel room," but subsequently re-assessed its position and released this phrase. (Mem. Op. 89) [ECF dkt: 127]. The FBI had no reasonable legal basis for this redaction because, as this Court explained, "revealing the fact a hotel room was rented for individuals attending an animal rights conference cannot reasonably by thought to risk circumvention of the law." (Mem. Op. 89.)

### vi.    Order on summary judgment

This Court held that the FBI had improperly applied Exemption 5 to pages Shapiro-202953-56. (Mem. Op. 65) [ECF dkt: 127]. The FBI provided no reasonable legal basis for asserting the deliberative process privilege under Exemption 5 to these pages. The document did not precede the decision to which it related, as is required for withholding

under clear and binding case law, *Abtew v. United States Dep't of Homeland Sec.*, 808

F.3d 895, 898 (D.C. Cir. 2015), but instead was simultaneous with the decision.

This Court also held that the ATF had improperly applied Exemptions 3 and 4. (Mem.

Op. 99-101) [ECF dkt: 127]. The ATF provided no reasonable legal basis for asserting

Exemption 3 as to material submitted to a grand jury because its justification for

withholding was nearly identical to that rejected by the D.C. Circuit in *Labow v. United*

*States DOJ*, 831 F.3d 523, 530 (D.C. Cir. 2016). The ATF also had no reasonable legal

basis for asserting Exemption 4, which requires the information withheld to be

confidential. Indeed, ATF made "*no* attempt to explain why such information is

'confidential.'" (Mem. Op. 101) [ECF dkt: 127] (emphasis added).

### vii.    Search for "mentions"

According to an FBI internal memorandum, FOIA personnel searching the Electronic

Surveillance (ELSUR) indices should only retrieve information on those individuals

considered to be a "principal" and not those individuals who are referenced as a

"mention." (Pl. 56(d) Mot. Ex. 5 at 1) [ECF dkt: 102-1]. A "principal" is the

"individual/organization that is the target of the ELSUR" and a "mention" means "that a

participant of the recorded conversation mentioned the name of a third party." (Pl. 56(d)

Mot. Ex. 5 at 2) [ECF dkt: 102-1]. This Court held that Plaintiff's production of this

memorandum was not enough to entitle him to discovery, but also noted that whether it

calls into question the adequacy of the FBI's search was a different question. (Mem. Op.

16 & n.9) [ECF dkt: 127]. This latter question—whether the FBI conducted an adequate

search for "mentions"— was never directly answered by this Court.

The D.C. Circuit, however, answered this question on appeal. The FBI was not entitled to summary judgment on the issue because its "declarations do not explain how the ACS search conducted in this case would have revealed electronic surveillance 'mentions' if Bureau field offices omit those references from ELSUR indices." *Shapiro v. United States DOJ*, 40 F.4th 609, 614-15 (D.C. Cir. 2022). On remand, the FBI conceded that its ACS search would not have revealed ELSUR "mentions" for individuals who were not indexed in the CRS; it instead argued that it had no means to search ELSUR material for such "mentions." (Bender Decl. ¶¶ 9-10) [ECF dkt:148-3]. After Plaintiff pointed out that an earlier FBI declaration in this case indicated that some field offices maintained their own ELSUR indices which would contain mentions, the FBI confirmed that it could, after all, search for ELSUR material for "mentions" of individuals not indexed in the CRS, but referenced in field office ELSUR indices. (Pl. Mem. P&A in Support of CMSJ at 4) [ECF dkt:150]; [ECF dkt: 153, 160]. Thus, not only was the FBI's original refusal to search for "mentions" legally unsupported, the new argument it made on remand was factually unsupported.

### D.  Balancing the Factors

Where, as here, the first three factors favor the requester, courts need not labor over the degree of reasonableness of the agency's conduct. *Citizens for Responsibility & Ethics in v. United States DOJ*, Civil Action No. 11-1021 (JEB), 2014 U.S. Dist. LEXIS 182097 at *12 (D.D.C. Oct. 24, 2014) ("The Court need not parse the reasonableness of DOJ's nondisclosures, however, because even if Justice did prevail on this one factor, CREW's success on the first three would still tip the balance in favor of awarding

fees. . . . Although DOJ's withholdings may not have been unreasonable, the Court, weighing the factors, nonetheless finds that the other three outweigh this factor for briefing done in *CREW I*.") In such a situation, a plaintiff is entitled to fees regardless of whether the fourth factor weighs strongly in his favor, weakly in his favor, or is neutral. *See e.g.*, *Nat'l Sec. Counselors v. CIA*, Civil Action No. 11-444 (BAH), 2017 U.S. Dist. LEXIS 192545 at *36, 2017 WL 5633091 (D.D.C. Nov. 21, 2017) ("Since all four entitlement factors favor the plaintiff, the plaintiff is entitled to a fee award for those counts on which the plaintiff is eligible"); *Am. Immigration Council v. United States Dep't of Homeland Sec.*, 82 F. Supp. 3d 396, 408 (D.D.C. 2015) ("AIC's success on the first three factors, combined with some degree of success on the fourth, is more than sufficient to establish its entitlement to fees"); *Am. Oversight*, 375 F. Supp. 3d at 69 ("[T]he first three factors tip decidedly in favor of awarding fees in favor of American Oversight, and the fourth factor tips, if at all, slightly in the same direction . . . . Accordingly, American Oversight is both eligible and entitled to an award of fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E)"); *Elec. Privacy Info. Ctr. v. FBI*, 80 F. Supp. 3d 149, 156 (D.D.C. 2015) ("[T]he first three entitlement factors weigh in favor of EPIC and the final factor is neutral and finds that EPIC is entitled to attorney's fees and costs"); *Webster*, 2021 U.S. Dist. LEXIS 176980 at *22-*23, 2021 WL 4243414 ("In sum, the public interest, commercial benefit, and nature of interest factors favor awarding attorneys' fees while the reasonableness of withholding factor is neutral. The Court therefore finds that, altogether, the factors warrant granting Plaintiffs their attorneys' fees"); *Judicial Watch, Inc. v. United States DOJ*, 878 F. Supp. 2d 225, 238 (D.D.C. 2012) ("[T]his factor weighs neither for nor against awarding fees to Judicial Watch;

24

rather, it is neutral. In sum, the Court concludes that three of the four fee entitlement factors weigh in favor of awarding fees to Judicial Watch. Therefore, Judicial Watch is both eligible and entitled to fees and costs[.]")

Here, the Court need not analyze every failing of Defendant in order to conclude that the fourth factor favors Plaintiff, or is at the very least neutral. Cases in which the fourth factor favors defendant are typically those in which case law is unclear on a legal issue or calls for a highly fact-specific inquiry. *See e.g.*, *Cotton v. Heyman*, 63 F.3d 1115, 1121-22 (D.C. Cir. 1995) (fourth factor weighed in agency's favor because "Smithsonian could reasonably interpret our precedent to support its position" and the relevant "fact intensive test lacks a strong predictive element"); *Tax Analysts v. United States Dep't of Justice*, 965 F.2d 1092, 1096 (D.C. Cir. 1992) (quoting district court finding that the fourth factor weighed in favor of the agency because there was "no clear precedent on the issue"); *Morley v. CIA*, 894 F.3d 389, 395 (D.C. Cir. 2018) ("*Morley II*") (in novel case involving interaction between FOIA and JFK Act, "given the statute and given the language of *Tax Analysts*, the CIA had a strong legal argument that referring Morley to the Archives was legally permissible and appropriate.") In contrast, the agencies' erroneous withholdings and redactions in this case involved straightforward application of well-established precedent[10] or were completely undefended on the merits.[11]

---

[10] For example, the FBI applied Exemption 5 to pages Shapiro-202953-56 even though well-established precedent allows withholding under the deliberative process privilege only of records that preceded the decision to which they relate. *Abtew v. United States Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015). (Mem. Op. 65) [ECF dkt: 127].

[11] (Mem. Op. 31) [ECF dkt: 127] ("[T]he FBI decided, while briefing in this action was ongoing, no longer to defend the application of certain exemptions and released still more material previously withheld.")

Further, when some of the agency's conduct is reasonable and some is not, the agency's mixed performance may still favor the plaintiff on the fourth factor. *See e.g.*, *Mattachine Soc'y of Wash. v. United States DOJ*, 406 F. Supp. 3d 64, 69 (D.D.C. 2019) ("[A]lthough the FBI prevailed on some issues raised during summary judgment, many of its actions during the initial search were unreasonable. Therefore, even though the fourth factor is a slightly closer call than the first, second, and third factors, the Court finds that the fourth factor weighs in favor of Mattachine's entitlement to costs and fees); *Hardy v. BATFE*, 293 F. Supp. 3d 17, 29 (D.D.C. 2017) (fourth factor weighed in favor of plaintiff even though the "vast majority of contested withholdings" were upheld, where three documents were ordered to be released, and as to two other records, summary judgment was denied due to insufficient information provided by the agency); *Piper*, 339 F. Supp. 2d at 23 ("The main factual focus of this inquiry is the reasonableness of the [withholding of the] documents that were ordered released. It is true that the Government properly withheld much of the disputed documents in this case. However, turning its attention to documents that were ordered released, the Court finds that the Government acted unreasonably.") Even in the absence of recalcitrance or obduracy and where the agency provides some legal justification for its withholdings, an agency's mixed performance is neutral at best. *Judicial Watch*, 878 F. Supp. 2d at 238.

Even if the Court concludes that the fourth factor favors defendant, however, it may still find Plaintiff is entitled to fees. *Morley II*, 894 F.3d at 397 ("[W]hen the first three factors favor the plaintiff, but the fourth does not, a district court retains very broad discretion under the four-factor test about how to balance the factors and whether to award attorney's fees.") One approach is simply to count how many factors point in each

direction. *Id.* at n.6 (Henderson, J., dissenting) ("If each factor can be met with by a 'yes' or 'no' answer, three in favor should outweigh one against"); *Cornucopia Inst. v. Agric. Mktg. Serv.*, 285 F. Supp. 3d 217, 226 (D.D.C. 2018) ("In sum, because three out of the four factors favor plaintiff, the Court finds that plaintiff is entitled to recover attorneys' fees.") This approach is both easy to apply and avoids the potential to give a single factor dispositive weight. *Davy II*, 550 F.3d at 1159 ("No one factor is dispositive[.]") Particularly in a case like this, where consideration of the fourth factor involves evaluating the reasonableness of the government's position on a wide range of issues and the obduracy of its conduct through lengthy litigation, a simple "yes" or "no" answer on each factor alleviates the burden on the Court of having to determine precisely how strongly the fourth factor supports which party and *then* having to determine precisely how much weight to give that factor compared to the other factors. Applying a straightforward "yes"/"no" approach, Plaintiff is entitled to fees as long as he prevails on the first three factors, even if the Court finds that the fourth factor weighs in favor of the government to a greater or lesser degree.

Should this Court disagree with this approach, however, the D.C. Circuit has also endorsed an approach in which factors which tilt strongly in favor of one party can outweigh the factors which tilt weakly against the party. *Morley II*, 894 F.3d at 396 ("[W]ith factor four heavily favoring the agency and the other three factors only slightly favoring Morley, we cannot say that the District Court abused its discretion in concluding that the fourth factor tilted the balance in favor of denying attorney's fees.") Plaintiff would prevail under this approach as well, even if the Court finds that the fourth factor weighs against him, given how strongly the first three factors weigh in his favor.

Whatever approach it chooses, this Court should remain mindful of the purposes of the attorney fee provision: "Congress clearly intended the award of fees to serve two separate and distinct FOIA objectives. One goal, as the district court recognized, is to encourage Freedom of Information Act suits that benefit the public interest. . . . . Congress also provided attorneys' fees . . . as compensation for enduring an agency's unreasonable obduracy in refusing to comply with the Freedom of Information Act's requirements." *La Salle Extension Univ. v. Fed. Trade Com.*, 627 F.2d 481, 484 (D.C. Cir. 1980). Viewing the four factors through the lens of both incentivizing FOIA suits in the public interest and compensating Plaintiff for having to endure some degree of agency obduracy, Plaintiff is entitled to attorney fees.

An award of attorney fees in this case would encourage FOIA suits that benefit the public interest. Historians and others scholars, particularly graduate students like Plaintiff was at the time of filing this suit, will generally lack the incentive or financial ability to pay market rates of hundreds of dollars per hour to obtain documents for their research. Yet their ability to analyze and inform the public about the functioning of government is dependent on access to information about the inner workings of government that, particularly in the area of national security, the government is reluctant to disclose without a requester filing a lawsuit.

As to the second goal of FOIA's fee provision, even if the Court finds that Defendant's withholdings and search failure were reasonable, Defendant's pre-litigation and litigation conduct reflect a general attitude of unreasonable obduracy in refusing to come into full compliance with FOIA: the FBI's lengthy pre-litigation silence after acknowledging the requests at issue in this case; Defendant's repeated requests for

extensions of time in this case; Defendant's refusal to meet and confer after the Answer was filed; the FBI's request for an unnecessarily lengthy *Open America* stay; the FBI's refusal to make interim releases until after Plaintiff sought interlocutory appeal on the issue; the FBI's refusal to comply with *Bonner v. United States Dep't of State*, 928 F.2d 1148 (D.C. Cir. 1991), which requires the agency to justify its initial withholdings in a sample *Vaughn* index even after disclosure; the FBI and ATF's failure to provide the Court with necessary information to fully evaluate several of its withholdings; and the FBI's failure to conduct an additional search for electronic surveillance "mentions," despite knowing that the search it conducted would not have located such records. An award of attorney fees would compensate Plaintiff for enduring these actions over the last 13 years.

### III.    Amount of Attorney Fees

### A.  Billing practices

Undersigned counsel's billing practices are detailed in his attached declaration. (Second Light Decl.) To summarize briefly, counsel enters time entries contemporaneously using the billing software ClickTime. Time is entered after counsel has finished work on the case for the day. Time entries are in increments of one-tenth of an hour.

Each entry contains both a "task" and "comments" field which together indicate the nature of the task (e.g., email) and the specifics of the task (e.g., the recipient and subject matter of the email). Although entries such as "Legal Research: Opposition" would be sufficiently detailed for a fee petition, *Harvey v. Mohammed*, 951 F. Supp. 2d 47, 66

(D.D.C. 2013), undersigned counsel endeavored to provide detail about the specific argument or section of the brief involved. This detail is intended to enable Defendant and the Court to evaluate time entries in light of Plaintiff's partial success on the merits. The column "Ad. Hrs." indicates the number of hours claims, adjusted to take account for partial success on the merits.

### B.  Reasonable hourly rate

The current Fitzpatrick matrix rate for an attorney with 21 years of experience is $859/hour.[12] The use of current hourly rates for an attorney with the undersigned's current level of experience is justified under the circumstances of this case.

The Supreme Court explained that "compensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings." *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989). The Court held that, therefore, under a federal fee-shifting statute, "an appropriate adjustment for delay in payment" is warranted. *Id.* at 284. The D.C. Circuit has likewise explained, "The hourly rates used in the 'lodestar' represent the prevailing rate for clients who typically pay their bills promptly. Court-awarded fees normally are received long after the legal services are rendered. That delay can present cash-flow problems for the attorneys. In any event, payment today for services rendered long in the past deprives the eventual recipient of the

---

[12] Plaintiff has calculated his hourly fees based on the 2025 version of the USAO's Fitzpatrick matrix. https://www.justice.gov/usao-dc/media/1395096/dl?inline While this matrix arguably underestimates the rates of lawyers for complex federal litigation in the District of Columbia area, Plaintiff has chosen to use this matrix to reduce the number of issues that need to be litigated in this fee petition.

value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable." *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980). The past few years can certainly be described as "an inflationary era" with inflation hitting a staggering 9.1% in June 2022. *See* "Graphics for Economic News Releases," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/charts/consumer-price-index/consumer-price-index-by-category-line-chart.htm (last visited April 26, 2025).

In *Jenkins*, the Supreme Court approved calculating an adjustment through "the application of current rather than historic hourly rates[.]" 491 U.S. at 284. In this jurisdiction, "[c]urrent market rates have been used in numerous cases to calculate the lodestar figure when the legal services were provided over a multiple-year period and when use of the current rates does not result in a windfall for the attorneys." *Murray v. Weinberger*, 741 F.2d 1423, 1433 (D.C. Cir. 1984). Nothing about the facts of this case suggest that use of current rates would result in a windfall.

A related question to whether to apply current market rates is the question of whether to apply those rates based on undersigned counsel's current level of experience or the level of experience he had at the time the work was performed. This Court addressed the issue in *Miller v. Holzmann*, 575 F. Supp. 2d 2, 20 (D.D.C. 2008), finding that "[p]aying counsel at historical, or even current, rates based on their experience levels when they performed the work would not achieve this equivalence because it ignores the time value of money: one dollar received today is more valuable than it would be if received five years from now for two reasons – first, because it will buy more now than it will after five years of price inflation, and second, because of the interest that can be earned from it in the interim." This case, like *Miller*, is a "suit of epic duration," lasting a

similar time. *Id.* at 18 ("The time entries included in relator's fee petition span a thirteen-year period[.]") Finally, although it was not necessary to the holding in *Miller* and is not necessary to the holding here, much of the blame for delay "can be laid at the government's feet." *Id.* at 20.

### C.   Number of hours expended

The total number of hours expended by undersigned counsel on the merits portion of this case is 1,002.4. This figure includes time spent on the above-captioned case, the three other cases which were consolidated into the present case, the appeal to the D.C. Circuit, and the preparation of a petition for a writ of certiorari.

### D.   Calculation of the lodestar

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Multiplying the hourly rate by the number of hours yields a lodestar of $861,061.60.

### E.   Adjustment

An adjustment to the lodestar must be made to ensure "the expenditure of counsel's time was reasonable in relation to the success achieved." *Hensley*, 461 U.S. at 436. There are different ways to accomplish this: "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436-37.

In this case, because counsel's billing records identify the amount of time spent on briefing by the issue involved, these entries can be readily excised or reduced. To account for limited success, Plaintiff has reduced:

- By 100% all entries related to his petition for a writ of certiorari

- By 100% entries for the time spent preparing his opening and reply briefs on the following issues on appeal: Rule 56(d) Motion for Discovery, *Open America* stay, and *ex parte* filing of the Clancy declaration

- By 75% entries for time spent preparing an opposition to the government's Motion for Summary Affirmance on appeal

- By 100% entries for time spent on Plaintiff's Cross-Motion for Summary Judgment (Non-exemption withholdings), Rule 56(d) Motion for Discovery, Reply in Support of Cross-Motion for Summary Judgment (Exemption 1, 6, 7(A), 7(C), 7(D), non-exemption withholdings), and Reply in Support of Rule 56(d) Motion for Discovery

- By 100% all entries related to Plaintiff's Motion for Reconsideration of Order Granting Summary Judgment

Plaintiff has also reduced by 100% all entries related to the motion to unseal the Clancy declaration on remand, as the relief sought in that motion is pursuant to the common law right of access, not FOIA. Finally, as an exercise of billing discretion, Plaintiniff has excised entries between February 6, 2025 and March 31, 2025. During this period, litigation on the merits had ended, but undersigned counsel had not yet begun preparing his fee petition. The time expended during this period, which included

settlement negotiations, communication between undersigned counsel and Plaintiff, and work related to a Joint Status Report, is not included in the attached billing records.

The resulting total hours for work performed on the merits portion of the case is 727.2. Multiplying by the reasonable hourly rate of $859/hour, the result is $624,664.80. This amount is proportional to the results obtained by Plaintiff, including the disclosure of tens of thousands of pages of records relating to matters in the public interest, including a significant amount of information that the government initially withheld pursuant to an exemption. Plaintiff also obtained significant success in his appeal to the D.C. Circuit, which led to a new search for ELSUR "mentions" that the government had previously steadfastly opposed conducting. The requested fee award is also in line with that awarded in other lengthy and complex FOIA cases. *Hall v. CIA*, 115 F. Supp. 3d 24, 35 (D.D.C. 2015) (for case that lasted ten years, awarding $414,477.90 in 2015 dollars); *Schwartz v. United States DEA*, No. 13-CV-5004 (CBA) (ST), 2019 U.S. Dist. LEXIS 34165 at *34, 2019 WL 1299192 (E.D.N.Y. Mar. 1, 2019) (for case that lasted four years, recommending an award of $546,903.86 in 2019 dollars).

## IV.    Fees on fees

It "is settled in this circuit" that "[h]ours reasonably devoted to a request for fees are compensable." *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*, 771 F.2d 521, 528 (D.C. Cir. 1985). So far, undersigned counsel has expended 64.3 hours in connection with this fee petition. Multiplying by the hourly rate of $859/hour, the fees-on-fees requested so far totals $55,233.70, which is less than 9% of the fees request on the merits. *See Barton v. United States Geological Survey*, Civil Action No. 17-1188 (ABJ), 2019

34

U.S. Dist. LEXIS 167501 at *23, 2019 WL 4750195 (D.D.C. Sep. 29, 2019) (allowing

fees on fees of "more than 25% of the fee for litigating the underlying FOIA matter.")

Plaintiff will submit updated billing entries for the time expended on his reply brief in

support of the fee petition, but it is unlikely that this will increase the fees-on-fees

percentage to more than 15% of the underlying FOIA matter.


## V.    Costs

Plaintiff seeks costs in the amount of $1,400. This figure represents the total costs for

filing the Complaints in cases 11-cv-1835, 12-cv-313, 12-cv-315, and 12-cv-318, all of

which were consolidated into this case. Even if the Court reduces the award of attorney

fees to account for less than complete success, costs in the full amount should still be

granted. *Hughes v. United States DOJ*, No. 19-cv-03278 (APM), 2022 U.S. Dist. LEXIS

120014 at *23-*24, 2022 WL 2528105 (D.D.C. July 7, 2022) (costs for filing fee not

adjusted to account for lesser degree of success). Plaintiff is not requesting costs related

to his appeal or petition for a writ of certiorari.


## VI.    Conclusion

For the foregoing reasons, Plaintiff requests costs of $1,400 and fees of $679,898.50,

plus any fees that accrue in connection with the filing of Plaintiff's reply brief in support

of his fee petition.

Respectfully Submitted,

    /s/ Jeffrey Light

Jeffrey L. Light
D.C. Bar #485360
1629 K St., NW
Suite 300
Washington, DC 20006
(202)277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

*Counsel for Plaintiff*